**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**Northern Division**

**CHARLES SLAUGHTER**                                                                    **PLAINTIFF**

**vs.**                                                          **Civil Action No. 3:20-cv-789-CWR-FKB**

**DR. THOMAS E. DOBBS, in his Official**
**Capacity as the Mississippi State Health**
**Officer**                                                                                   **DEFENDANT**

## INTERVENORS' MOTION TO DISMISS

Mississippi Association for Home Care ("MAHC"), Sta-Home Health Agency of Jackson, LLC, Kare-in-Home Health Services, Inc. (Kare) and WAYS, LLC d/b/a Sunflower Home Health Agency ("WAYS") (collectively, "Intervenors") file this Motion to Dismiss this action pursuant to Federal Civil Rule 12(b)(6) as follows:

### INTRODUCTION AND SUMMARY

1.     Charles Slaughter's ("Slaughter") Complaint asks this Court to declare that both the Mississippi Health Care Certificate of Need Law of 1979, Miss. Code Ann. §§ 41-7-171 – 41-7-209 ("CON laws"), generally, and in particular the Mississippi statutory moratorium, Miss. Code Ann. § 41-7-191(9) ("legislative moratorium"), on the issuance of CONs for home health

**EXHIBIT 1**

agencies,[1] violate the equal protection and due process clauses of the United States Constitution and the Mississippi Constitution.[2]

2.     Slaughter's complaint should be dismissed for failure to state a claim. To state a claim for violation of equal protection and due process rights, he must, but fails to, negate the existence of a reasonably conceivable rational basis for the CON laws and the legislative moratorium. And while inconvenient or costly for Mr. Slaughter, it is reasonably conceivable that the CON laws and legislative moratorium serve rational, legitimate purposes, including ensuring that Medicaid/low-income and rural Mississippians have access to home health care. Equal protection and due process are not licenses for the courts to judge the wisdom, fairness or logic of legislative choices. The Mississippi legislature has chosen repeatedly to retain the CON laws and the legislative moratorium. Whether a reasonably conceivable rational basis exists is a question of law, hence this motion to dismiss.

## FACTUAL BACKGROUND

3.     A Certificate of Need, or CON, is a written order of the Mississippi State Department of Health ("MSDH") finding, *inter alia*, that a proposed health care service provider satisfies the plans, standards and criteria set forth in the CON Laws and MSDH rules and regulations. The CON is Mississippi's regulatory mechanism designed "to prevent unnecessary duplication of health resources; provide cost containment, improve the health of Mississippi

---

[1] The legislative moratorium was first enacted in 1983 for a one-year period. The Legislature extended the moratorium periodically for several years until the time limit was removed to make it a continuing, indefinite legislative moratorium. *See, e.g.,* Laws 1983, Ch. 484, § 1; Laws 1984, Ch. 472, § 2; Laws 1985, Ch. 534, § 1; Laws 1986, Ch. 437, § 34; Laws 1987, Ch. 515, § 1; Laws 1989, Ch. 530, § 1; Laws 1990, Ch. 510, § 1.

[2] Slaughter's Complaint also attacks an alleged administrative moratorium, but this claim is moot because the administrative moratorium ended in 1982.

2

residents; and increase the accessibility, acceptability, continuity and quality of health services."
15 Code Miss. R. Pt. 9, Subpt. 91, R. 1.1.

4.      The Mississippi State Board of Health ("MSBH") is charged with various duties,
including to formulate public policies regarding public health matters; to adopt MSDH regulations
embodying those public policies; and to annually review Mississippi statutes affecting public
health to make recommendations to the Legislature to enhance public health services. *See* Miss.
Code. Ann. §§ 41-3-5.1, 41-3-6 & 41-3-15.

5.      MSDH regulations ("CON Manual") expressly state as a matter of "public policy"
that the CON is the means chosen by the Mississippi Legislature and the MSBH to avoid unneeded
duplication of health care resources, contain costs, improve the health of Mississippi residents, and
to make quality health care more accessible, acceptable, and continuous for Mississippians. 15
Code Miss. R. Pt. 9, Subpt. 91, R. 1.1. This regulation further provides in part:

> The Department will disapprove a CON application if the applicant fails to
> provide or confirm that the applicant shall provide a reasonable amount of
> indigent care or has admission policies which deny access to care by
> indigent patients.
>
> The Department will disapprove a CON application if approval of the
> request would have significant adverse effect on the ability of an existing
> facility or service to provide Medicaid/indigent care.
>
> The State Health Officer shall determine whether the amount of indigent
> care provided or to be offered is "reasonable." The Department has
> determined that a reasonable amount of indigent care is an amount which is
> comparable to the amount of such care offered by other providers of the
> requested service within the same, or proximate, geographic area.

*Id.* Thus, it is readily apparent that the MSBH and MSDH intend, in part, that the CON laws serve
as a means to increase access to quality health care for Medicaid/low-income/indigent individuals.
Moreover, this MSDH regulation recognizes the potential that unfettered competition could

3

impede the ability of existing health care providers to service Medicaid/low-income/indigent individuals.

6.      The MSDH regularly reviews and updates the official State Health Plan to identify state health needs and establishes standards and criteria for health-related activities which require Certificate of Need. *See* Miss. Code Ann. §§ 41-7-185(g) & 41-7-173(t); 15 Code Miss. R. Pt. 9, Subpt. 91, R. 1.14 ee.

7.      Because the legislative moratorium, Miss. Code Ann. § 41-7-191(9), is still in effect, the CON Manual currently recites that the MSDH is "[p]resently" prohibited from issuing a CON for a new home health agency. 15 Code Miss. R. Pt. 9, Subpt. 91, R. 2.2. A similar reference to the legislative moratorium is found in the current, 2020 State Health Plan,[3] which also plainly states that the MSDH would in fact consider new CON applications for home health agencies if the moratorium were to be lifted:

> **If the present moratorium were removed** or partially lifted, MSDH would review applications for a CON for the establishment of a home health agency and/or the offering of home health services . . . . (emphasis added).[4]

*See* Exhibit 1 at p. 186. The 2020 State Health Plan goes on to list, and explain the reasoning for, the many criteria (referenced in Slaughter's Complaint ¶¶ 85-92) the MSDH will consider in

---

[3] The current State Health Plan became effective July 1, 2020, well after the impact of the current pandemic was known.

[4] Slaughter's Complaint misinterprets the Plan by calling this an "administrative moratorium." There was in fact a short-lived, nine-month administrative moratorium in the 1982-1987 State Health Plan. *See* Exhibit 2 at p. 282. That Plan explained that at that time "[t]he data available indicate that all counties had more home health agencies authorized to serve the county than were actually doing business in the county." *Id.* "Therefore, a policy was adopted that placed a moratorium on the issuance of Certificates of Need for additional home health agencies from April 15, 1982 until December 31, 1982." *Id.* The legislative moratorium was enacted in 1983 as Miss. Code Ann. § 41-7-191(9). Thus, the 1986 State Health Plan plainly states that the moratorium thereafter is due solely to the "Legislative Moratorium." *See* Exhibit 3 at p. XIII-4.

4

determining whether to issue a CON.  *Id.*  Notwithstanding Slaughter's claims that these criteria
are onerous for him personally, these criteria were not created in a vacuum.  The State Health Plan
is the product of analysis and input of the 11-member MSBH, the State Health Officer, numerous
staff within not just the MSDH but also from a number of other state boards and agencies, "and
numerous other organizations" as well.  *See* Ex. 1 at pp. 1-4.

8.     While the legislative moratorium remains in effect, that does not mean it has been
ignored.  The Legislature has repeatedly updated the CON laws over the past 30 years.[5]  In
addition, the MSBH is charged by law with the annual duty "to review the statutes . . . affecting
public health" and to recommend needed legislation to the Legislature.  Miss. Code Ann. § 41-3-
6.  The MSBH meeting minutes dating back to 2003 are published on its website and do not include
any recommendation to lift the moratorium.  Nevertheless, as recently as the year 2020 and again
in 2021, the Mississippi Legislature considered, but refused to act on, bills to lift the statutory
moratorium on the issuance of CONs for new home health agencies.  *See* 2020 H.B. 606; 2020
H.B. 605; 2021 SB 2747; 2021 H.B. 602.  Thus, it is clear that the Legislature has intentionally
decided that the legislative moratorium should remain in effect.

## ARGUMENT

## I.     LEGAL STANDARD

9.     To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint must
allege sufficient factual matter, accepted as true, to state a claim that is plausible on its face.  Yet

---

[5] The CON laws were amended in 1989, 1990, 1992, 1993, 1994, 1995, 1996, 1998, 1999,
2001, 2002, 2003, 2004, 2006, 2007, 2010, 2011, 2012, 2014, 2015, 2016, 2019 and 2020.  Miss.
Code §§ 41-7-173, 41-7-191 & 41-7-201.

because a 12(b)(6) motion tests the legal sufficiency of the allegations in the complaint, this Court is not required to accept as true legal conclusions or unwarranted factual inferences.

10.     Moreover, in deciding a motion to dismiss, the court may consider matters of public record as well as documents attached to the motion that are referred to in the plaintiff's complaint and are central to his claim. Thus, it is appropriate for this Court to consider Mississippi State Health Plan excerpts attached as exhibits to this motion.

## II.     SLAUGHTER'S CONSTITUTIONAL CHALLENGES MUST FAIL BECAUSE HE CANNOT NEGATE EVERY CONCEIVABLE RATIONAL BASIS FOR MISSISSIPPI'S CON PROGRAM, INCLUDING THE STATUTORY MORATORIUM

11.     Regarding equal protection, Slaughter argues that the moratorium "irrationally treats new home health agencies differently from materially indistinguishable existing home health agencies" and that the entire CON program "irrationally discriminates between different kinds of healthcare providers." Compl. [Document 1] ¶ 156. Similarly, as for the substantive due process argument, he argues that the United States and Mississippi Constitutions "protect[] the right to earn an honest living in the occupation of one's choice free from unreasonable government interference" and that the moratorium and certificate-of-need program violate his rights because they do not "advance any conceivable legitimate state interest." *Id.* ¶¶ 170-176. He continues that "[t]he true purpose of Mississippi's certificate of need program is to provide established health care facilities protection from competition" and that "[e]conomic protectionism is not a legitimate state interest." *Id.* ¶¶ 165 and 166.

12.     Slaughter admits that "Mississippi's home health licensure requirements and minimum standards of operation are intended to advance the state's interest in 'promoting the health, safety and welfare of the public." *Id.* ¶ 163 (citing Miss. Code Ann. § 41-71-13 and 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 46.1). Slaughter cannot show that the CON program (along with the statutory moratorium) are not rationally related to this same goal.

6

## A.     Slaughter's Equal Protection Claim Must Fail

13.     Equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. Where there are plausible reasons for legislative action, the court's constitutionality inquiry must be at an end. This standard of review is a paradigm of judicial restraint.

14.     On rational-basis review, a classification in a statute bears a strong presumption of validity. Slaughter has the burden to negate every conceivable basis for the rationality of the legislative classifications and requirements for CONs. The Mississippi Legislature's choices for CON requirements are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

15.     Whether a governmental action passes rational basis muster is a question of law. Hence, this motion to dismiss is an appropriate vehicle for this Court to dispose of this action.

16.     Mississippi has a duty and vital role to protect the health and welfare of its citizens. Thus, social and economic legislation such as Mississippi's CON laws and statutory moratorium are to be accorded a strong presumption of validity. Accordingly, Slaughter's claims under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment are subject to the rational basis standard of review, which requires this Court to uphold these statutes if it is reasonably conceivable that the statutes are rationally related to any legitimate governmental interest.

7

17.    Under the rational basis test a law will not be invalidated merely because Slaughter may provide evidence that the law does not in fact achieve some of the intended results.

18.    Mississippi's certificate-of-need program and statutory moratorium satisfy rational basis review. Even if Slaughter's alleged empirical factual allegations were taken as true, they cannot negate the legal conclusion that it was at least conceivably rational for the Mississippi Legislature, the MSBH and the MSDH to believe that the CON laws and moratorium might "prevent unnecessary duplication of health resources; provide cost containment, improve the health of Mississippi residents; and increase the accessibility, acceptability, continuity and quality of health services," the public policy as set forth in the CON Manual.

19.    It is at least conceivable that the CON laws and moratorium limits on competition may increase access to quality health care by Medicaid/low-income/indigent individuals and individuals in rural areas of the state.

20.    It is at least conceivable that the CON laws serve to enhance a legitimate legislative goal to promote the general welfare of Mississippians as a whole by coupling the privilege of holding a CON to a requirement that the CON holders provide a reasonable amount of charity services to Medicaid/low-income/indigent Mississippians.

21.    It is at least conceivable that the CON laws and moratorium serve to avoid the potential for competitors to cherry pick more lucrative medical services at the expense of Medicaid/low-income/indigent Mississippians. Without the CON requirements, home health agencies could increase services in urban and suburban areas that are more densely populated and where a higher number of patients are covered by private insurance or Medicare, which often pays a higher percentage of costs than Medicaid. This could leave rural and poor areas, like the Mississippi Delta and parts of Hinds County, underserved.

8

22.     It is at least conceivable that the CON laws and moratorium serve to increase Medicaid/low-income/indigent individuals' access to health care by enhancing the ability of CON holders to offset services (provided to Medicaid/low-income/indigent individuals) they are required to perform at a loss by more profitable services (provided to patients with private insurance or Medicare).

23.     Similarly, it is at least conceivable that the CON laws and moratorium serve to enhance the ability of home health agencies to provide a broader range of services to Medicaid/low-income/indigent Mississippians.

24.     It is at least conceivable that the absence of the CON laws and moratorium would impede the ability of an existing CON holder to provide a reasonable amount of home health care services to Medicaid/low-income/indigent individuals and persons in rural areas.

25.     It is at least conceivable that the absence of the CON laws and moratorium would result in additional competition for patients with private insurance or with Medicare (both of which pay higher reimbursement rates than Medicaid) which in turn would threaten an existing CON holder's ability to continue providing Medicaid/low income/indigent care, especially in rural areas, while staying economically viable.

26.     It is at least conceivable that a legislative body has a legitimate interest in enacting laws to assist in preventing the establishment of unneeded health care facilities.

27.     It is at least conceivable that protection that the CON laws and moratorium afford to CON holders serves to encourage the development of health care facilities where needed. Thus, the CON program might work to promote appropriate geographic distribution of home health agencies, helping to enhance access to services for Medicaid/low-income/indigent individuals and individuals in rural areas.

9

28.     It is at least conceivable that the Mississippi CON laws and moratorium serve to provide continuity to home health care services by enhancing the economic viability of CON holders.  More specifically, by preventing duplication of home health agencies, the CON program might ensure that Mississippi home health agencies have sufficient patient volume to be financially feasible.  And by helping to ensure the patient volume needed for home health agencies to be financially viable, the CON program might limit disruptions in patient care that could result if an agency were to close from financial distress.

29.     Slaughter's Complaint  also argues that Mississippi's CON laws, and in particular the legislative moratorium precluding the issuance of new CONs for home health agencies, are outdated statutes that no longer have a rational basis.  This argument ignores the fact that the Mississippi Legislature has reviewed and revised the CON laws 23 times over the past 30 years, including amendments in 1989, 1990, 1992, 1993, 1994, 1995, 1996, 1998, 1999, 2001, 2002, 2003, 2004, 2006, 2007, 2010, 2011, 2012, 2014, 2015, 2016, 2019 and 2020.  This continued focus on updating and improving the CON program and its requirements further refutes Slaughter's argument that Mississippi's CON requirements are outdated, arbitrary and irrational.

30.     As recently as the year 2020, the Mississippi Legislature considered, but refused to act on, a bill to lift the statutory moratorium on the issuance of CONs for new home health agencies.  *See* 2020 H.B. 606; 2020 H.B. 605.  Again, in 2021 bills in both the House and the Senate were introduced in the Mississippi Legislature which would have lifted the moratorium.  *See* 2021 Mississippi SB 2747; H.B. 602.  However, these bills failed again.  This Court should not second guess the wisdom of the Mississippi Legislature's decision yet again to keep the moratorium in place.

10

31.    Slaughter's Complaint also argues that the fact that twelve states have repealed CON requirements means that Mississippi's CON program, including the moratorium, is irrational. *See* Compl. [Document 1] ¶ 180.  But what other states are doing about CONs is irrelevant.  The freedom for each state legislature to determine how best to address the needs of its specific state has long been recognized by the courts.

32.    And as Slaughter admits, Mississippi is far from alone in having a CON program. Slaughter's Complaint states that as of 2020 some 35 states require some form of a CON.  *See* Compl. [Document 1] ¶ 69.  Further, just in the last two years, Indiana adopted such a CON program despite having repealed its CON laws in prior years. *See* Ind. Code §§ 16-29-7-1 to - 19 (2018).  If the status of CON laws in other states were relevant to whether Mississippi's CON requirements satisfied a rational basis analysis, the fact that a strong majority of states still use CONs makes Slaughter's burden to negative every conceivable rational basis supporting Mississippi's requirements that much more impossible to meet.

33.    Because Slaughter cannot negate every conceivable basis for the certificate-of-need program, including the moratorium, the CON program survives rational basis scrutiny and the Court should dismiss Slaughter's equal protection claims.

### B.  Slaughter's Substantive Due Process Claim Fails.

34.    Substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action.  However, the list of fundamental rights protected by the Fourteenth Amendment's Due Process Clause is short and does not include the right claimed by Slaughter here, *i.e.,* the "right to earn an honest living." Compl. [Document 1] ¶¶170-172 & 175.

35.    As with Equal Protection, when an individual challenges an economic regulation under the Due Process Clause, a State has the minimal burden of showing that the law has a rational

11

basis. Thus, the same analysis set forth above about Slaughter's equal protection claims likewise reveals that his due process claims must be dismissed.

## III.    SLAUGHTER'S COMPLAINT FAILS TO STATE A CLAIM UNDER 42 U.S.C. §§1983 & 1988

36.    Paragraph 24 of Slaughter's Complaint avers that he brings this suit in part pursuant to 42 U.S.C. § 1983.  This statute provides in pertinent part:

> Every person who, under color of any statute . . . of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Paragraph D of Slaughter's "Request for Relief" seeks attorney fees under 42 U.S.C. § 1988.  Other than the conclusory reference to 42 U.S.C. § 1983 in paragraph 24 of the Complaint, there is no other reference to the statute anywhere in the Complaint.  Indeed, nowhere in the Complaint is there any reference to any facts that would support the existence of any of the elements of proof necessary to establish a claim under the statute.  For instance, the only named defendant is Dr. Dobbs.  However, the Complaint does not allege any act on the part of Dr. Dobbs to "subject" or "cause" Slaughter to suffer a deprivation of any rights under the U.S. Constitution or statutes. Instead, Slaughter's claims are founded solely on the mere existence of the Mississippi CON laws and the statutory moratorium, not on anything Dr. Dobbs has done.

37.    42 U.S.C. § 1983 facially does not create a claim or provide relief in an action simply to declare a prohibitory statute unconstitutional.  Accordingly, this Court should dismiss Slaughter's conclusory claim under 42 U.S.C. § 1983.  Given the absence of a claim under 42 U.S.C. § 1983, this Court should also dismiss Slaughter's request for attorney fees under 42 U.S.C. § 1988.

12

## CONCLUSION

WHEREORE, PREMISES CONSIDERED, Intervenors pray that this Court will find that it is reasonably conceivable that Mississippi's CON laws, including the current legislative moratorium on home health agency CONs, are rationally related to legitimate legislative goals to promote the health and welfare of Mississippians as a whole, and Medicaid/low-income/indigent individuals in particular. For these reasons and all reasons noted above, Intervenors further pray that this Court will dismiss Slaughter's Complaint.

RESPECTFULLY SUBMITTED, this the ___ day of _____, 2021.

> MISSISSIPPI ASSOCIATION FOR HOME
> CARE, STA-HOME HEALTH AGENCY OF
> JACKSON, LLC, KARE-IN-HOME HEALTH
> SERVICES, INC. and WAYS, LLC d/b/a
> SUNFLOWER HOME HEALTH AGENCY
>
> B y :  s/_____
> PAUL N. DAVIS (MB #8638)
> THOMAS L. KIRKLAND, JR. (MB #4181)
> CAROLINE B. SMITH (MB #105501)
>
> THEIR ATTORNEYS

OF COUNSEL:
BUTLER SNOW LLP
1020 Highland Colony Parkway
Post Office Box 6010
Ridgeland, Mississippi 39158-6010
(P)(601) 948-5711
(F)(601) 985-4500
(E) paul.davis@butlersnow.com
(E) tom.kirkland@butlersnow.com
(E) caroline.smith@butlersnow.com

13

## CERTIFICATE OF SERVICE

I, Paul N. Davis, do hereby certify that on this ___ day of _____, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all registered attorneys.

This the ___ day of _____, 2021.

s/_____
Paul N. Davis

# FY 2020
# MISSISSIPPI
# STATE HEALTH PLAN

Mississippi State Department of Health

**EXHIBIT 1**



### State of Mississippi
#### TATE REEVES
Governor

July 27, 2020

Thomas Dobbs, M.D., M.P.H.
State Health Officer
Mississippi State Department of Health
P.O. Box 1700
Jackson, MS 39215

Dear Dr. Dobbs:

In accordance with the Mississippi Code Ann., Section 41-7-185(g), I hereby approve the FY 2020 Mississippi State Health Plan. The FY 2020 Mississippi State Health Plan shall replace the current Plan, effective July 30, 2020.

I appreciate your, the members of the State Board of Health, and all employees at the Department's commitment and desire to improve health care for all Mississippians.

Sincerely,

Tate Reeves
Governor

Post Office Box 139, Jackson, MS 39205 • Phone (601)359-3150 • Fax (601) 359-3741

**Governor**
**State of Mississippi**

**The Honorable Tate Reeves**

## Mississippi State Board of Health

Ed. D. Barham, MD, FACR Chairman

Thad Waites, MD, MACC, Vice- Chairman

J. Edward Hill, MD, FAAFP

Elayne H. Anthony, PhD

Edward J. Langton

Robert J. Moody

Sammie Ruth Rea, RN

Wheeler Timothy Timbs, III

Lucius M. Lampton, MD, FAAFP

Dwalia Sherree South, MD

James L. Perry III

## State Health Officer

Thomas Dobbs, MD, MPH

## Acknowledgments

The Mississippi Department of Health, Division of Health Planning and Resource Development, prepared the *FY 2020 Mississippi State Health Plan (also State Health Plan or Plan)* in accordance with Sections 41-7-173(s) and 41-7-185(g) Mississippi Code 1972 Annotated, as amended.

The *FY 2020 State Health Plan* results from the comments and information supplied by various divisions of the Department of Health, other agencies of state government, health care provider associations, and interested members of the public. The *Plan* also reflects the direction and guidance of the Mississippi State Board of Health.

The Division of Health Planning and Resource Development expresses appreciation to the many individuals who provided invaluable help in publishing a timely and accurate *State Health Plan* and recognizes the following agencies for particular contributions:

Mississippi Department of Health
  Communications
  Health Information Management
Mississippi Department of Rehabilitation
  Services

Office of Health Protection
  Preparedness and Response
  Licensure
  Communicable Disease
  Environmental Health

Office of Health Services
  Child\Adolescent Health
  Women's Health

Office of the Governor
Mississippi Department of Human Services
Mississippi Department of Mental Health

Mississippi Department of Education
University of Mississippi Medical Center
  School of Medicine
  School of Dentistry
  School of Health Related Professions
Board of Trustees of State Institutions
  of Higher Learning
Mississippi State Board of Medical
  Licensure
Mississippi State Board of Nursing
Mississippi Dental Association
Mississippi Nurses' Association

Numerous other organizations provided essential information. The Health Planning staff appreciates the cooperation and assistance of all who contributed to the *2020 Plan* and wishes that space permitted individual acknowledgment of each one.

**TABLE OF CONTENTS**

**Chapter 01-Introduction**

100 Legal Authority and Purpose ............................................................................... 1
101 Outline of State Health Plan ............................................................................. 2
102 General Certificate of Need Policies ................................................................ 2
103 Population for Planning ..................................................................................... 3
104 Health Personnel ............................................................................................... 5
    104.01    Physicians .......................................................................................... 5
    104.02    Dentists ............................................................................................... 7
    104.03    Nurses ................................................................................................ 9
    104.04    Physical Therapy Practitioners ........................................................ 10
    104.05    Occupational Therapists .................................................................. 10
    104.06    Emergency Medical Personnel ......................................................... 10

**Chapter 02-Long-Term Care**

200 Options for Long-Term Care ............................................................................ 11
201 Housing for the Elderly ................................................................................... 11
202 Nursing Facilities............................................................................................. 14
203 Long Term Care Beds for Individuals with Intellectual Disabilities and Other
    Developmental Disabilities ............................................................................. 14
204 Certificate of Need Criteria and Standards for Nursing Home Beds ........................ 15
    204.01    Policy Statement Regarding Certificate of Need Applications for the
               Offering of Nursing Home Care Services ............................................. 15
    204.02    Certificate of Need Criteria and Standards for Nursing Home Care Beds......... 16
    204.03    Certificate of Need Criteria and Standards for the Relocation/Transfer of
               Nursing Home Care Beds.................................................................... 17
    204.04    Certificate of Need Criteria and Standards for Nursing Home Beds As Part of a
               Continuing Care Retirement Community (CCRC) .................................. 17
205 Policy Statement Regarding Certificate of Need Applications for a Pediatric
    Skilled Nursing Facility ................................................................................... 24
206 Certificate of Need Criteria and Standards for Nursing Home Care Services for
    Intellectually Disabled and other Developmentally Disabled Individuals ..................... 24
    206.01    Policy Statement Regarding Certificate of Need Applications for the Offering
               of Nursing Home Care Services for Intellectually Disabled and Other
               Developmentally Disabled Individuals.................................................... 24
    206.02    Certificate of Need Criteria and Standards for Nursing Home Beds for
               Intellectually Disabled and Other Developmentally Disabled
               Individuals........................................................................................ 25

**Chapter 03-Mental Health**

300 Mississippi Department of Mental Health ......................................................... 32
301 Mental Health Needs in Mississippi ................................................................. 32
    301.01    Mental Health Needs of Children/Adolescents ...................................... 33
    301.02    National Survey on Drug Use and Health for Mississippi .......................... 33

301.03     Developmental Disabilities .............................................................    33
302 Adult Psychiatric Services (State Operated and Private) ........................................    33
303 Child/Adolescent Psychiatric Services ................................................................    36
304 Psychiatric Residential Treatment Facilities .......................................................    38
305 Alcohol and Substance Abuse Disorder Services...….............................................    40
   305.01     Alcohol and Substance Abuse Disorders ................................................    40
306 Certificate of Need Criteria and Standards for Acute Psychiatric, Chemical
     Dependency, and Psychiatric Residential Treatment Facility Beds/Services...................    44
   306.01     Policy Statement Regarding Certificate of Need Applications for Acute
            Psychiatric, Chemical Dependency, and Psychiatric Residential Treatment
            Facility Beds/Services ...................................................................    44
   306.02     General Certificate of Need Criteria and Standards for Acute Psychiatric,
            Chemical Dependency, and/or Psychiatric Residential Treatment Facility
            Beds/Services .............................................................................    46
   306.03     Service Specific Certificate of Need Criteria and Standards for Acute
            Psychiatric, Chemical Dependency and/or Psychiatric Residential Treatment
            Facility Beds/Services ...................................................................    48
     306.03.01 Acute Psychiatric Beds for Adults ..............................................    48
     306.03.02 Acute Psychiatric Beds for Children and Adolescents .........................    49
     306.03.03 Chemical Dependency Beds for Adults….........................................    49
     306.03.04 Chemical Dependency Beds for Children and Adolescents....................    50
     306.04.05 Psychiatric Residential Treatment Facility Beds/Services ....................    51
307 Private Distinct-Part Geriatric Psychiatric Services ............................................    54

**Chapter 04-Perinatal Care**

400 Natality Statistics .........................................................................................    56
401 Infant Mortality ...........................................................................................    56
402 Physical Facilities for Perinatal Care ................................................................    59
403 Certificate of Need Criteria and Standards for Obstetrical Services .........................    63
   403.01     Policy Statement Regarding Certificate of Need Applications for the Offering
            of Obstetrical Services ..................................................................    63
   403.02     Certificate of Need Criteria and Standards for Obstetrical Services ...............    64
404 Certificate of Need Criteria and Standards for Neonatal Special Care Services..............    66
   404.01     Policy Statement Regarding Certificate of Need Applications for the Offering
            of Neonatal Special Care Services .....................................................    66
   404.02     Certificate of Need Criteria and Standards for Neonatal Special Care Services
            ..............................................................................................    67
   404.03     Neonatal Special Care Services Bed Need Methodology............................    68
405 Guidelines for the Operation of Perinatal Units (Obstetrics and Newborn
   Nursery) ......................................................................................................    70
   405.01     Organization ...............................................................................    70
   405.02     Staffing ....................................................................................    71
   405.03     Perinatal Levels of Care .................................................................    71
   405.04     Perinatal Care Services....................................................................    75
   405.05     Hospital Evaluation and Level of Care Designation.................................    77

**Chapter 05-Acute Care**

500 General Medical/Surgical Hospitals ...................................................................    80
501 Hospital Outpatient Services ...........................................................................    85
502 Certificate of Need Criteria and Standards for General Acute Care Facilities .............    86

                                                     

502.01    Policy Statement Regarding Certificate of Need Applications for General
          Acute Care Hospitals and General Acute Care Beds ............................... 86
502.02    Certificate of Need Criteria and Standards for the Establishment of a General
          Acute Care Hospital ...................................................................... 86
502.03    Certificate of Need Criteria and Standards for Construction, Renovation,
          Expansion, Capital Improvements, Replacement of Health Care Facilities, and
          Addition of Hospital Beds ................................................................ 88
503 Long-Term Acute Care Hospitals ................................................................. 92
504 Certificate of Need Criteria and Standards for Long-Term Acute Care
    Hospitals/Beds ....................................................................................... 93
504.01    Policy Statement Regarding Certificate of Need Applications for Long-Term
          Acute Care Hospitals and Long-Term Acute Care Hospital Beds ................ 93
504.02    Certificate of Need Criteria and Standards for the Establishment of a Long-
          Term Acute Care Hospital and Addition of Long-Term Acute Care Hospital
          Beds .......................................................................................... 95
505 Swing-Bed Programs and Extended Care Services ........................................... 97
505.01    Swing Bed Utilization...................................................................... 97
505.02    Certificate of Need Criteria and Standards for Swing- Bed Services ............ 100
506 Therapeutic Radiation Services................................................................... 102
507 Stereotactic Radiosurgery ......................................................................... 102
508 Diagnostic Imaging Services....................................................................... 103
509 Certificate of Need Criteria and Standards for Therapeutic Radiation Services........... 105
509.01    Policy Statement Regarding Certificate of Need Applications for the
          Acquisition or Otherwise Control of Therapeutic Radiation Equipment, and/or
          the Offering of Therapeutic Radiation Services (other than Stereotactic
          Radiosurgery) ............................................................................... 105
509.02    Certificate of Need Criteria and Standards for the Acquisition or Otherwise
          Control of Therapeutic Radiation Equipment and/or the Offering of
          Therapeutic Radiation Services (other than Stereotactic Radiosurgery)......... 106
       509.02.01 Therapeutic Radiation Equipment/Service Need Methodology .............. 108
       509.02.02 Therapeutic Radiation Equipment Need Determination Formula.............. 109
509.03    Policy Statement Regarding Certificate of Need Applications for the
          Acquisition or Otherwise Control of Stereotactic Radiosurgery Equipment
          and/or the Offering of Stereotactic Radiosurgery ................................... 109

509.04    Certificate of Need Criteria and Standards for the Acquisition or Otherwise
          Control of Stereotactic Radiosurgery Equipment and/or the Offering of
          Stereotactic Radiosurgery ................................................................ 110
510 Computed Tomographic (CT) Scanning ......................................................... 112
510.01    Magnetic Resonance Imaging (MRI)
          .......................................................................... 112
511 Invasive Digital Angiography (DA) ............................................................. 116
512 Positron Emission Tomography (PET) .......................................................... 117
512.01 Certificate of Need Criteria and Standards for Magnetic Resonance
       Imaging Services (MRI) ....................................................................... 119
       512.01.01 Policy Statement Regarding Certificate of Need Applications for the
                Acquisition or Otherwise Control of Magnetic Resonance Imaging
                (MRI) Equipment and/or the Offering of MRI Services ....................... 120
       512.01.02 Certificate of Need Criteria and Standards for the Acquisition or
                Otherwise Control of Magnetic Resonance Imaging (MRI) Equipment
                and/or the Offering of MRI Services ............................................ 120

iii

512.01.03 Certificate of Need Criteria and Standards for Acquisition or
    Otherwise Control of MRI Equipment ........................................    120
512.01.04 Certificate of Need Criteria and Standards for the Offering of Fixed
    or Mobile MRI Services ...........................................................    122
512.01.05 Population-Based Formula for Projection of MRI Service Volume...........    124
513 Certificate of Need Criteria and Standards for Diagnostic and Therapeutic Imaging
Services ..........................................................................................................    124
513.01    Digital Angiography Equipment and
          Services...............................................................................    125
513.01.01 Policy Statement Regarding Certificate of Need Application for the
          Acquisition or Control of Digital Angiography Equipment and/or the Offering
          of Invasive Digital Angiography Services........................................    125
513.01.02 Certificate of Need Criteria and Standards for Invasive Digital Angiography
          in a Hospital.........................................................................    125
513.02    Positron Emission Tomography (PET) Equipment and Services.................    127
513.02.01 Policy Statement Regarding Certificate of Need Applications for
          the Acquisition or Otherwise Control of a Position Emission
          Tomography (PET) Scanner and Related Equipment............................    127
513.02.02 Certificate of Need Criteria and Standards for the Acquisition or
          Otherwise Control of a Positron Emission Tomography (PET)
          Scanner and Related Equipment including Cardiac only Pet Scanner.........    129
513.02.03 Certificate of Need Criteria and Standards for Offering of Fixed
          or Mobile Positron Emission Tomography (PET) Services including
          Cardiac only PET Scanner........................................................    130
514 Cardiac Catheterization ..........................................................................    134
515 Certificate of Need Criteria and Standards for Cardiac Catheterization Services
and Open-Heart Surgery Services .................................................................    136
515.01    Joint Policy Statement Regarding Certificate of Need Applications for the
          Acquisition or Otherwise Control of Cardiac Catheterization Equipment
          and/or the Offering of Cardiac Catheterization Services and the Acquisition of
          Open-Heart Surgery Equipment and/or the Offering of Open-Heart Surgery
          Services
          ...........................................................................................    136
515.02    Policy Statement Regarding Certificate of Need Applications for the
          Acquisition or Otherwise Control of Cardiac Catheterization Equipment
          and/or the Offering of Cardiac Catheterization Services
          ............................................    137
515.03    Certificate of Need Criteria and Standards for the Acquisition or Otherwise
          Control of Diagnostic Cardiac Catheterization Equipment and/or the Offering
          of Diagnostic Cardiac Catheterization Services .......................................    138
515.04    Certificate of Need Criteria and Standards for the Acquisition or Otherwise
          Control of Therapeutic Cardiac Catheterization Equipment for the
          Performance of PCI Services in a Hospital Without On-Site Cardiac Surgery
          and/or the Offering of PCI Services in a Hospital Without On-Site Cardiac
          Surgery ................................................................................    140
515.05    Certificate of Need Criteria and Standards for the Acquisition or Otherwise
          Control of Therapeutic Cardiac Catheterization Equipment and/or the
          Offering of Therapeutic Cardiac Catheterization Services ........................    142
515.06    Policy Statement Regarding the Certificate of Need Applications for the    143

|  | Establishment of Cardiac Ambulatory Surgical Facilities ........................ |  |
| 515.07 | Certificate of Need Criteria and Standards for the Establishment of Cardiac Ambulatory Surgical Facilities ........................................................ | 145 |
| 516 Open-Heart Surgery ........................................................................... | | 148 |
| 516.01 | Policy Statement Regarding Certificate of Need Applications for the Acquisition of Open-Heart Surgery Equipment and/or the Offering of Open-Heart Surgery Services................................................... | 150 |
| 516.02 | Certificate of Need Criteria and Standards for the Acquisition or Otherwise Control of Open-Heart Surgery Equipment and/or the Offering of Open-Heart Surgery Services................................................................. | 151 |
| 517 Systems of Care  ................................................................................. | | 154 |
| 518 Emergency Medical Services ................................................................. | | 154 |
| 518.01 | Organization........................................................................... | 154 |
| 518.02 | Protocols................................................................................ | 154 |
| 518.03 | Advisory Group........................................................................ | 155 |
| 518.04 | Performance Improvement........................................................... | 155 |
| 518.05 | Data System............................................................................ | 155 |
| 519 Mississippi Trauma Care System............................................................. | | 155 |
| 519.01 | Organization........................................................................... | 155 |
| 519.02 | Protocols................................................................................ | 156 |
| 519.03 | Advisory Committee.................................................................. | 156 |
| 519.04 | Performance Improvement........................................................... | 157 |
| 519.05 | Data System............................................................................ | 157 |
| 520 STEMI System of Care.......................................................................... | | 158 |
| 520.01 | Organization........................................................................... | 158 |
| 520.02 | Protocols................................................................................ | 158 |
| 520.03 | Advisory Group........................................................................ | 158 |
| 520.04 | Performance Improvement........................................................... | 159 |
| 520.05 | Data System............................................................................ | 160 |
| 521 Acute Ischemic Stroke System of Care....................................................... | | 160 |
| 521.01 | Organization........................................................................... | 161 |
| 521.02 | Protocols................................................................................ | 161 |
| 521.03 | Advisory Group........................................................................ | 161 |
| 521.04 | Performance Improvement........................................................... | 162 |
| 521.05 | Data System............................................................................ | 162 |

**Chapter 06-Comprehensive Medical Rehabilitation Services**

| 600 Comprehensive Medical Rehabilitation Services ............................................. | 165 |
| 601 The Need for Comprehensive Medical Rehabilitation Services ............................ | 166 |
| 602 The Need for Children's Comprehensive Medical Rehabilitation Services .............. | 166 |
| 603 Certificate of Need Criteria and Standards for Comprehensive Medical Rehabilitation Beds/Services ................................................................. | 167 |
| 603.01 | Policy Statement Regarding Certificate of Need Applications for Comprehensive Medical Rehabilitation Beds/Services ............................ | 167 |
| 603.02 | Certificate of Need Criteria and Standards for Comprehensive Medical Rehabilitation Beds/Services ............................................................ | 168 |
| 603.03 | Certificate of Need Criteria and Standards for Children's Comprehensive Medical Rehabilitation Beds/Services ................................................. | 172 |
| 603.04 | Comprehensive Medical Rehabilitation Bed Need Methodology ................. | 172 |

604 Certificate of Need Criteria and Standards for Comprehensive Medical Residential
Medical Rehabilitation Beds/Services for Patients with Traumatic Brain Injury (CRMR-
TBI) ............................................................................................   174
    604.01   Policy Statement Regarding Certificate of Need Applications for
Comprehensive Residential Medical Rehabilitation Beds/Services for Patients
with Traumatic Brain Injury ...........................................................   174
    604.02   Certificate of Need Criteria and Standards for Comprehensive Residential
Medical Rehabilitation Beds/Services for Patients with Traumatic Brain Injury
(CRMR-TBI) ..........................................................................   175

## Chapter 07-Other Health Services

700 Ambulatory Surgery Services ..................................................................   177
701 Certificate of Need Criteria and Standards for Ambulatory Surgery Services ...........   180
    701.01   Policy Statement Regarding Certificate of Need Applications for
Ambulatory Surgery Services .........................................................   181
    701.02   Certificate of Need Criteria and Standards for Ambulatory Surgery
Services..................................................................................   181
702 Home Health Care ..............................................................................   183
    702.01   Home Health Status.....................................................................   183
703 Certificate of Need Criteria and Standards for Home Health Agencies/Services ..........   186
    703.01   Policy Statement Regarding Certificate of Need Applications for the
Establishment of a Home Health Agency and/or the Offering of Home Health
Services..................................................................................   186
    703.02   Certificate of Need Criteria and Standards for the Establishment of a Home
Health Agency and/or the Offering of Home Health Services .....................   186
        703.03   Statistical Need Methodology for Home Health Services ................   187
704 Certificate of Need Criteria and Standards for End Stage Renal Disease Facilities ......   189
704 Certificate of Need Criteria and Standards for End Stage Renal Disease
Facilities ...........................................................................................   195
        704.01   Policy Statement Regarding Certificate of Need Applications for the
Establishment of End Stage Renal Disease (ESRD) Facilities ...........   195
        704.02   Certificate of Need Criteria and Standards for End Stage Renal Disease
(ESRD) Facilities .............................................................   197
        704.02.01 Establishment of an End Stage Renal Disease (ESRD) Facility ......   198
        704.02.02 Establishment of a Renal Transplant Center ...........................   201

## GLOSSARY

Glossary ...........................................................................................   202

## APPENDIX

Appendix ...........................................................................................   207

# Title 15 - Mississippi Department of Health

# Part VIII – Office of Health Policy and Planning

# Subpart 90 – Planning and Resource Development

## Chapter 1 Introduction

**100    Legal Authority and Purpose**

Section 41-7-171 et seq., Mississippi Code 1972 Annotated, as amended, established the Mississippi State Department of Health (MSDH) as the sole and official agency to administer and supervise all health planning responsibilities for the state, including development and publication of the *Mississippi State Health Plan.*  The effective dates of the *Fiscal Year 2018 Mississippi State Health Plan, Second Edition* extend from November 10, 2018, through June 30, 2019, or until superseded by a later *Plan.*

The 2018 State Health Plan, Second Edition establishes criteria and standards for health-related activities which require Certificate of Need review in an effort to meet the priority health needs identified by the department. The priority health needs are as follows:

- Disease prevention, health protection, and health promotion;

- Health care for specific populations, such as mothers, babies, the elderly, the indigent, the uninsured, and minorities;

- Implementation of a statewide trauma system;

- Health needs of persons with mental illness, alcohol/drug abuse problems, mental retardation/developmental disabilities, and/or handicap;

- Availability of adequate health manpower throughout the state; and

- Enhance capacity for detention of a response to public health emergencies, including acts of bioterrorism.

Section 41-7-191, Mississippi Code of 1972 Annotated, as amended, requires Certificate of Need (CON) approval for the establishment, relocation, or expansion of health care facilities. The statute also requires CON approval for the acquisition or control of major medical equipment and for the change of ownership of defined health care facilities unless the facilities meet specific requirements.

This *Plan* provides the service-specific CON criteria and standards developed and adopted by the MSDH for CON review of health-related activities requiring such review. The *Mississippi Certificate of Need Review Manual* provides additional general CON criteria by which the Department reviews all applications.

1

**702    Home Health Care**

Mississippi licensure regulations define a home health agency as: a public or privately owned agency or organization, or a subdivision of such an agency or organization, properly authorized to conduct business in Mississippi, which is primarily engaged in providing to individuals at the written direction of a licensed physician, in the individual's place of residence, skilled nursing services provided by or under the supervision of a registered nurse licensed to practice in Mississippi, and one or more of the following additional services or items:

1. Physical, occupational, or speech therapy

2. Medical social services

3. Home health aide services

4. Other services as approved by the licensing agency

5. Medical supplies, other than drugs and biologicals, and the use of medical appliances; or

6. Medical services provided by a resident in training at a hospital under a teaching program of such hospital."

All skilled nursing services and the services listed in items 1 through 4 must be provided directly by the licensed home health agency. For the purposes of this *Plan*, "directly" means either through an agency employee or by an arrangement with another individual not defined as a health care facility in Section 41-7-173 (h), Mississippi Code 1972, as amended. The requirements of this paragraph do not apply to health care facilities which had contracts for the above services with a home health agency on January 1, 1990.

**702.01 Home Health Status**

The 2016 *Report on Home Health Agencies* (the latest available) indicated that 56,051 Mississippians received home health services during the year. The reported noted there were 2,024,397 home health care visits made in 2016 in Mississippi. Each patient (all payor sources) received an average of thirty-four (34) visits.

Table 7-3
**Medicare Home Health Statistics
in the Ten-State Region
January 1, 2016 – December 31, 2016**

| | 2016 Total Home Health Visits | Total Home Health Claims | Total Home Health Payments | Total Home Health Patients | Average Home Health Payment per Patient | Average Visits per Patient |
|---|---|---|---|---|---|---|
| **Region Total** | **31,749,241** | **1,837,640** | **$4,867,820,107** | **945,751** | **$5,147** | **34** |
| Alabama | 2,593,834 | 152,665 | 361,674,479 | 74,299 | $4,868 | 35 |
| Arkansas | 1,225,853 | 71,340 | 168,094,540 | 36,963 | $4,548 | 33 |
| Florida | 12,150,926 | 611,951 | 1,855,186,730 | 328,895 | $5,641 | 37 |
| Georgia | 2,383,617 | 147,280 | 392,174,285 | 84,532 | $4,639 | 28 |
| Kentucky | 1,798,752 | 112,715 | 278,384,370 | 57,858 | $4,812 | 31 |
| Louisiana | 2,925,397 | 185,354 | 406,847,630 | 67,485 | $6,029 | 43 |
| **Mississippi** | **2,024,397** | **133,948** | **300,330,665** | **56,051** | **$5,358** | **36** |
| North Carolina | 2,654,532 | 174,679 | 457,761,772 | 106,679 | $4,291 | 25 |
| South Carolina | 1,418,020 | 93,116 | 243,526,027 | 58,798 | $4,142 | 24 |
| Tennessee | 2,573,913 | 154,592 | 403,839,609 | 74,191 | $5,443 | 35 |

Source: Palmetto GBA – Medicare Statistical Analysis Department, HCIS (Health Care Information System), December 2017



**Figure 7-1**
**Medicare - Average Home Health Payments**



Source: Palmetto GBA – Medicare Statistical Analysis Department, HCIS (Health Care Information System), December 2017

**703     Certificate of Need Criteria and Standards for Home Health Agencies/Services**

Should MSDH receive a CON application regarding the acquisition and/or otherwise control of major medical equipment or the provision of a service for which specific CON criteria and standards have not been adopted, the application shall be deferred until MSDH has developed and adopted CON criteria and standards. If MSDH has not developed CON criteria and standards within 180 days of receiving a CON application, the application will be reviewed using the general CON review criteria and standards presented in the *Mississippi Certificate of Need Review Manual* and all adopted rules, procedures, and plans of MSDH.

**703.01  Policy Statement Regarding Certificate of Need Applications for the Establishment of a Home Health Agency and/or the Offering of Home Health Services**

1. <u>Service Areas</u>:  The need for home health agencies/services shall be determined on a county-by county basis.

2. <u>Determination of Need</u>: A possible need for home health services may exist in a county if for the most recent calendar year available that county had fewer home health care visits per 1,000 elderly (65+) population than the average number of visits received per 1,000 elderly (65+) in the "ten-state region" consisting of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee. That number is currently 31,794,241 as shown in Table 7-3 (2016 is the most recent data available).

3. <u>Unmet Need</u>:  If it is determined that an unmet need exists in a given county, the unmet need must be equivalent to fifty (50) patients in each county proposed to be served. Based on 2016 data 31,749,241 visits approximates a Region Total of thirty four (34) visits per patient.

4. All CON applications for the establishment of a home health agency and/or the offering of home health services shall be considered substantive and will be reviewed accordingly.

**703.02  Certificate of Need Criteria and Standards for the Establishment of a Home Health Agency and/or the Offering of Home Health Services**

If the present moratorium were removed or partially lifted, MSDH would review applications for a CON for the establishment of a home health agency and/or the offering of home health services under the applicable statutory requirements of Sections 41-7-173, 41-7-191, and 41-7-193, Mississippi Code of 1972, as amended. MSDH will also review applications submitted for CON according to the general criteria as listed in the *Mississippi Certificate of Need Review Manual*; all adopted rules, procedures, and plans of MSDH; and the specific criteria and standards listed below.

The development or otherwise establishment of a home health agency requires CON. The offering of home health services is reviewable if the proposed provider has not provided those services on a regular basis within the period of twelve (12) months prior to the time such services would be offered.

### Need Criteria 1: Establishment of Need
The applicant shall document that a possible need for home health services exists in each county proposed to be served using the methodology contained in this section of the *Plan*.

### Need Criteria 2: Home Health Service Area Boundaries
The applicant shall state the boundaries of the proposed home health service area in the application.

### Need Criteria 3: Unmet Need
The applicant shall document that each county proposed to be served has an unmet need equal to fifty (50) patients, using a ratio of 31,749,241 patient total home health visits equals approximately 34 average visits per patient.

### Need Criteria 4: Home Office of New Home Health Agency
The applicant shall document that the home office of a new home health agency shall be located in a county included in the approved service area of the new agency. An existing agency receiving CON approval for the expansion of services may establish a sub-unit or branch office if such meets all licensing requirements of the Division of Licensure.

### Need Criteria 5: Application Requirements
The application shall document the following for each county to be served:

    a. Letters of intent from physicians who will utilize the proposed services.

    b. Information indicating the types of cases physicians would refer to the proposed agency and the projected number of cases by category expected to be served each month for the initial year of operation.

    c. Information from physicians who will utilize the proposed service indicating the number and type of referrals to existing agencies over the previous twelve (12) months.

    d. Evidence that patients or providers in the area proposed to be served have attempted to find services and have not been able to secure such services.

    e. Projected operating statements for the first three years, including:

        i. Total cost per licensed unit;

        ii. Average cost per visit by category of visit; and

        iii. Average cost per patient based on the average number of visits per patient.

### Need Criteria 6: Difference in Existing Services Already Provided
Information concerning whether proposed agencies would provide services different from those available from existing agencies.

### 703.03 Statistical Need Methodology for Home Health Services

The methodology used to calculate the average number of visits per 1,000 elderly (65+) in the ten state region consist of the following:

1. The ten-state region consists of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.

2. The 2023 projected population aged 65 and older estimates from each state.

3. Table 7-3 showing the average number of Medicare paid home health visits for the ten-state region, according to 2016 data from Palmetto GBA - Medicare Statistical Analysis Department of the Centers for Medicare and Medicaid Services. Figure 7-1 shows the total number of Medicare paid home health payments in the ten-state region.

4. In 2016, the region average of home health visits was 31,749,241. An average patient in the region received thirty-four (34) home health visits. Therefore 31,749,241, visits equal 34 patients. Note: The Mississippi average for 2016 was 2,024,397 visits (Medicare reimbursed) and an averaged patient received thirty-six (36) visits.

Mississippi Statewide
Health Coordination
Council.
State Health Plan, 1982.


MLC 1221 ELLIS AVE JACKSON,MS.39209
3 3194 00182 0499


IN LIBRARY
USE ONLY

# State Health Plan
# Mississippi, 1982-87




N.
D
122
JACKSON, MS   39209



COMMISSI

MISSISSIPPI LIBRARY COMMISSION
DOCUMENTS
1221 ELLIS AVENUE
JACKSON, MS   39209

ELLIS AVENUE
SON, MS   3920

## Statewide Health
## Coordinating Council

## Mississippi Health Care
## Commission

**EXHIBIT 2**

588 INSURANCE CENTER DRIVE/JACKSON, MISSISSIPPI 39216/601-981-6880

TABLE OF CONTENTS

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Chapter
    I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

        Legal Authority and Purpose of Plan . . . . . . . . . . 1
        Demographic and Socioeconomic Profile of Mississippi . . 3
        Sources Considered . . . . . . . . . . . . . . . . . . 7

   II.  MISSISSIPPI HEALTH PROGRAMS AND POLICY ANALYSIS . . . . . 8

        Federal Health Programs . . . . . . . . . . . . . . . . 8
        State Government Health Care Activities . . . . . . . . 11
        Local Government Health Care Activities . . . . . . . . 18
        State Health Expenditures . . . . . . . . . . . . . . . 19
        Emerging Health Care Policies in Mississippi . . . . . . 19
        Sources Considered . . . . . . . . . . . . . . . . . . 28

  III.  HEALTH STATUS . . . . . . . . . . . . . . . . . . . . . 29

        Mortality . . . . . . . . . . . . . . . . . . . . . . . 29
        Infant Mortality and Maternal Mortality . . . . . . . . 38
        Life Expectancy and Length of Life . . . . . . . . . . 44
        Fertility and Maternal and Infant Risk Measures . . . . 47
        Morbidity . . . . . . . . . . . . . . . . . . . . . . . 48
        Statewide Standards - Health Status . . . . . . . . . . 53
        Systems Changes Necessary to Achieve Health Status
            Standard . . . . . . . . . . . . . . . . . . . . . 54
        Sources Considered . . . . . . . . . . . . . . . . . . 55

   IV.  HEALTH PERSONNEL . . . . . . . . . . . . . . . . . . . . 56

        Physicians . . . . . . . . . . . . . . . . . . . . . . 56
        Dentists . . . . . . . . . . . . . . . . . . . . . . . 62
        Nurses . . . . . . . . . . . . . . . . . . . . . . . . 62
        Health Related Professions . . . . . . . . . . . . . . 65
        Health Manpower Standards . . . . . . . . . . . . . . . 68
        Health Systems Changes Required to Meet Standards . . . 69
        Health Personnel Goals and Objectives . . . . . . . . . 70
        Sources Considered . . . . . . . . . . . . . . . . . . 73

    V.  HEALTH PROMOTION AND DISEASE PREVENTION . . . . . . . . 74

        Introduction . . . . . . . . . . . . . . . . . . . . . 74
        Levels and Types of Prevention Activities . . . . . . . 74

       Issue Areas - Data and Analysis . . . . . . . . . . .   76
       Health Promotion and Disease Prevention Standards  . .  103
       Recommended Health Systems Changes Required to Achieve
         Standards  . . . . . . . . . . . . . . . . . . . .  104
       Goals and Objectives . . . . . . . . . . . . . . . .  105

VI.   AMBULATORY CARE  . . . . . . . . . . . . . . . . . .  125

       Community Health Centers . . . . . . . . . . . . . .  125
       Rural Health Clinics . . . . . . . . . . . . . . . .  127
       Hospital Outpatient Departments  . . . . . . . . . .  127
       End-Stage Renal Disease  . . . . . . . . . . . . . .  131
       Correctional Facility Health Care  . . . . . . . . .  139
       Health Maintenance Organizations . . . . . . . . . .  140
       Standards for Ambulatory Care  . . . . . . . . . . .  142
       Ambulatory Care Goals and Objectives . . . . . . . .  145

VII.  EMERGENCY MEDICAL SERVICES . . . . . . . . . . . . .  147

       Status of EMS in Mississippi . . . . . . . . . . . .  148
       Emergency Medical Services Standards . . . . . . . .  148
       Disaster Management  . . . . . . . . . . . . . . . .  151
       Recommended Health Systems Changes in EMS  . . . . .  152
       Emergency Medical Services Goals and Objectives  . . .  152

VIII. MENTAL HEALTH  . . . . . . . . . . . . . . . . . . .  155

       Introduction . . . . . . . . . . . . . . . . . . . .  155
       Mental Illness . . . . . . . . . . . . . . . . . . .  159
       Alcohol and Drug Abuse . . . . . . . . . . . . . . .  171
       Developmental Disabilities (DD)  . . . . . . . . . .  176
       Statewide Standards for Mental Health  . . . . . . .  182
       Systems Changes Required to Meet Standards . . . . .  183
       Mental Health Goals and Objectives . . . . . . . . .  183
       Sources Considered . . . . . . . . . . . . . . . . .  191

IX.   ACUTE INPATIENT CARE . . . . . . . . . . . . . . . .  192

       Population for Planning  . . . . . . . . . . . . . .  193
       General Hospital Beds  . . . . . . . . . . . . . . .  193
       Psychiatric and Chemical Dependency Beds . . . . . .  197
       Provisions for the Assurance of Hospital Care for
         the Needy  . . . . . . . . . . . . . . . . . . . .  216
       Specialized Services . . . . . . . . . . . . . . . .  219

X.    LONG TERM CARE . . . . . . . . . . . . . . . . . . .  247

       Elderly and Impaired . . . . . . . . . . . . . . . .  247
       Nursing Homes  . . . . . . . . . . . . . . . . . . .  249
       Community Services in Mississippi  . . . . . . . . .  251

Statewide Standards . . . . . . . . . . . . . . . 260
Long Term Care Goals and Objectives . . . . . . . . 261
Sources Considered . . . . . . . . . . . . . . . . 264

XI.   HABILITATION AND REHABILITATION SERVIES . . . . . . . 265

Habilitation Services . . . . . . . . . . . . . . 265
Rehabilitation Services . . . . . . . . . . . . . 265
Home Health Services . . . . . . . . . . . . . . . 281

XII.  PERINATAL CARE  . . . . . . . . . . . . . . . . . . . 285

Mortality and Morbidity Data . . . . . . . . . . . 285
Status of Perinatal Activities and Programs . . . . 290
Perinatal Resources and Needs . . . . . . . . . . . 294
Linkages and Gaps in Present Perinatal Care Systems . 303
Ad Hoc Advisory Committee on Perinatal Care:
  Accomplishments and Goals . . . . . . . . . . . . 305
Guidelines for Ambulatory Perinatal Care . . . . . . 307
Perinatal Standards . . . . . . . . . . . . . . . . 313
Health Systems Changes Required to Meet Perinatal
  Standards . . . . . . . . . . . . . . . . . . . . 313
Perinatal Care Goals and Objectives . . . . . . . . 315
Sources Considered . . . . . . . . . . . . . . . . 318

XIII. IMPLEMENTATION  . . . . . . . . . . . . . . . . . . . 320

Long Term Care . . . . . . . . . . . . . . . . . . 321
Perinatal Care . . . . . . . . . . . . . . . . . . 323
Disease Prevention and Promotion . . . . . . . . . . 325
Mental Health . . . . . . . . . . . . . . . . . . . 328
Health Personnel . . . . . . . . . . . . . . . . . 329

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . 332

## Home Health Services

Home health care can be defined as services rendered in the home to aged, disabled, sick or convalescent individuals who do not need institutional care. Home health also serves to minimize the effects of illness and disability by achieving maximal rehabilitation with the least possible disruption to daily living patterns. The availability of home health services as an alternative to nursing home care is often the determining factor as to whether or not an individual can remain at home.

There are several types of agencies which can provide home health services. They may be a single service agency, a multiple service agency, or a unit of an agency or institution organized to plan, coordinate and provide services appropriate for the individual and family. Health and human services which may be provided in the home include, but are not limited to, the following:

-medical care
-dental care
-nursing care
-physical therapy
-occupational therapy
-speech and audiological services
-respiratory therapy
-nutrition counseling and/or
  meal preparation
-social work
-optometric services
-pharmaceuticals
-podiatry
-preventive services

-mental health care
-homemaker-home health aide
-diagnostic and laboratory services
-medical services
-equipment and appliances
-recreation
-transportation
-pastoral services
-health education
-legal services
-cosmetology
-home maintenance and/or
  adaption

Of these services, nursing, homemaker-home health aide, physical therapy, occupational therapy, and speech and audiological therapy are the most commonly provided basic services. The other services listed may be considered desirable and could be provided directly by an agency. For a list of home health agencies and the services available, please refer to the Appendix.

## Existing Situation

From January 1, 1981 to December 31, 1981, approximately 23,462 Mississippians received home health services. This number represents a 71 percent increase over the number of individuals who received services from July 1, 1978 to June 30, 1979. Of this number, it is estimated that over 95 percent were Medicaid or Medicare eligible. This population generated 693,906 visits or 29.57 visits per eligible client. Nursing visits accounted for the greatest proportion of visits with 49 percent.

282

As of January 1, 1982, there were 81 health departments, 16 hospital based, and 35 non-profit home health agencies operating in Mississippi. Three private, non-profit agencies located in Memphis are also providing services. Map 4 shows the number of home health agencies by county. The number of home health agencies serving each county is shown in Map 5.

Medicaid expenditures for home health services increased over 50 percent from FY 80 to FY 81. In FY 81, home health expenditures were $747,486. This figure represents a 60.4% increase over expenditures in FY 80 of $466,092. There were 2,990 recipients of home health services in FY 81. The average spent per recipient was $250.00.

The data available indicate that all counties had more home health agencies authorized to serve the county than were actually doing business in the county. Therefore, a policy was adopted that placed a moratorium on the issuance of Certificates of Need for additional home health agencies from April 15, 1982 until December 31, 1982. For the licensure year beginning January 1, 1983, existing home health agencies shall be licensed for only those counties in which they served ten or more patients during the previous twelve month reporting period.

Prior to the date of January 1, 1983 the Commission shall determine the need for additional home health agencies, based upon the results stated above, it being the intent of the Commission that after January 1, 1983 existing home health agencies shall be licensed for only those counties which they are actually serving.

MAP 4

NUMBER OF HOME HEALTH AGENCY CENTRAL OFFICES BY COUNTY OF LOCATION, 1981



283

SOURCE: Directory of Mississippi
Health Facilities, July 1, 1981

MAP 5

NUMBER OF HOME HEALTH AGENCIES LICENSED TO SERVICE EACH COUNTY, 1982

284



SOURCE:  Mississippi Health Care Commission
         files

Mi.:1HP986 c.1
Mississippi. State Dept. of
Health
Mississippi state health
plan

# MISSISSIPPI

## State Health Plan
## 1986

IN LIBRARY
USE ONLY



MISSISSIPPI LIBRARY COMMISSION
DOCUMENTS
1221 ELLIS AVENUE
JACKSON, MS   39209



**Statewide Health
Coordinating Council**

**Mississippi State
Department of Health**

EXHIBIT 3

*2688 INSURANCE CENTER DRIVE/JACKSON, MISSISSIPPI 39216/601-981-6880*

## XIII.  HOME HEALTH CARE

Home Health Care is defined as part-time or intermittent care given in the home to persons with a skilled medical problem that are essentially home bound.  The group served includes the elderly, children with chronic diseases, and acutely and chronically ill adults.

Properly administered home health care services generally have the effect of reducing the length of hospital stays and also are often the determining factor as to whether or not an individual's entry into a nursing home is significantly delayed.  With the advent of the Diagnostic Related Grouping (DRG) reimbursement system, hospitals have been encouraged to discharge patients earlier.  This phenomenon has led to a resurgence of interest in home health care and an expansion of the traditional care delivered by home health agencies in the past. Besides such services as skilled nursing, home health aide, speech therapy, etc., home health agencies are now providing high tech services such as intravenous (IV) therapy, hyperalimentation and oncology chemotherapy.

There are several types of home health agencies.  Some agencies may offer only skilled nursing and home health aide services while others may offer many different types of services.  The services which may be provided by a home health care agency are:

> Skilled Nursing
> Physical Therapy
> Speech and Audiological Services
> Nutritional Services
> Ventilator and Respiratory Services
> Social Work
> Home Health Aide/Homemaker
> Occupational Therapy
> Durable Medical Equipment

### Existing Situation

From January 1, 1983 to December 31, 1983, approximately 31,771 Mississippians received home health services.  This represents an increase of 6,202 (24.26 percent) patients over the number served in calendar year 1982.

MAP XIII-1                           XIII-3

NUMBER OF HOME HEALTH AGENCY CENTRAL OFFICES BY COUNTY OF LOCATION, 1983



SOURCE:  Directory of Health Facilities
         July 1, 1983

XIII-2

There were 1,228,537 home health care visits made in 1983.   Each
patient received an average of 39 visits during 1983 as compared to 29
visits in 1982 for an increase of 10 (34 percent) visits per patients.


As of May 6, 1986, there were 81 health department, 19 non-profit
hospital based, 1 proprietary hospital based, 20 non-profit free-standing,
18 proprietary free-standing home health agencies operating in
Mississippi.  In addition, three agencies located in Memphis, Tennessee (2
non-profit and 1 proprietary) were also providing services.  Map XIII-1
shows the number of home health agency central offices by county of
location.

### Certificate of Need Criteria and Standards
### for Home Health Services


1.    The State Certificate of Need Review Manual.


2.    The adopted standards and criteria relative to home health services
      as outlined:


      a.  Service areas for proposed home health agencies will be based on
          county or multi-county boundaries.


      b.  It shall be determined that a possible need for health services
          exists in a county if for the most recent calendar year available
          a county had fewer home health care visits per one thousand
          elderly (65+) than the projected average number of visits per one
          thousand elderly (65+) in the ten-state region listed in d(1)
          below.  All individual counties in a proposed service area must
          meet this criterion.  Should a CON for a new agency be granted,
          only counties meeting this criterion will be in the authorized
          service area.


      c.  In addition, the theoretical unmet need must be at least fifty
          (50) patients in each county proposed to be served.  Based on
          1983 data, 1,950 visits approximates fifty (50) patients.


      d.  The home office of a proposed new home health agency granted a
          CON must be located in a county having a possible need as
          indicated by the above methodology.  An existing home health
          agency may establish a sub-unit or branch office provided such
          sub-unit or branch office meets all licensing requirements.

XIII-4

The methodology used to project the average number of visits per thousand elderly in the ten-state region was:

1. Data from the following states were used in calculating the projection: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee.

2. Using actual data from the Health Care Finance Administration, the average number of Medicare-paid home health visits per thousand elderly (65+) for the ten-state region during the years 1976-1980 was tabulated.

3. Using the linear regression the 1982 Medicare-paid home health visits per thousand elderly were projected.

4. The correlation coefficient (power of test) was computed as .99 which indicates the data are highly correlated.

   In 1982 the following counties met this criterion:  Calhoun Carroll, Clay, Franklin, Lafayette, Lowndes, Madison, Marshall, Neshoba, Panola, Quitman, Rankin, Tate, Tippah, Tishomingo, Webster, Winston, and Yalobusha.   See Map XIII-2.   While CON applications for the establishment of home health services in counties other than those listed above will be accepted for review, the need for such services is not recognized in this Plan.   (NOTE: No applications will be accepted due to the Legislative Moratorium).

e. In addition to meeting criteria "2a, 2b, 2c, and 2d" above, the applicants shall address in their CON application the following criteria of need for each county in which they desire to establish services:

   (1) Letters of intent from physicians who will utilize the proposed services.

   (2) Information indicating the types of cases physicians would refer to the proposed agency and the projected number of cases by category expected to be served each month for the initial year of operation.

   (3) Information from physicians who will utilize the proposed service indicating the number and type of referrals to existing agencies over the previous 12-month period.

   (4) Evidence that patients or providers in the area proposed to be served have attempted to find services and have not been able to secure such services.

(5) Projected operatin statements for the first three years including:

    (a) Total cost per licensed unit.

    (b) Average cost per visit by category of visit.

    (c) Average cost per patient based on the average number of visits per patient.

(6) Information concerning whether or not proposed agencies would provide services different from those available from existing agencies.

    All CON applications for new or expanded home health agencies are considered as substantive. Applicants who receive a Certificate of Need will not automatically be assigned all counties within a 50-mile radius. A CON will be valid only for the county(s) which meet all of the before mentioned criteria.

    In addition, the Statewide Health Coordinating Council supports the strengthening of the home health care licensure and monitoring program. Indications are that a major area of focus should be increased survey visits to patients receiving home health care services. Through this mechanism a better monitoring of the State's home health care system can be implemented.

XIII-6

MAP XIII-2
MISSISSIPPI COUNTIES HAVING FEWER (ACTUAL)
HOME HEALTH VISITS PER 1,000 PERSONS 65 AND OVER
THAN THE AVERAGE NUMBER OF MEDICARE (PROJECTED) PAID HOME HEALTH VISITS
PER 1,000 PERSONS 65 AND OVER FOR THE TEN STATE REGION, 1982



Ten State Region

Alabama
Arkansas
Florida
Georgia
Kentucky
Louisiana
Mississippi
North Carolina
South Carolina
Tennessee

SOURCE: Mississippi Health Care Commission,
1982