IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHARLES SLAUGHTER                                                PLAINTIFF

VS.                              CIVIL ACTION NO.: 3:20-CV-789-CWR-FKB

DR. THOMAS E. DOBBS, in his official
Capacity as the Mississippi State Health
Officer,                                                       DEFENDANT
_____

MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON PLEADINGS
_____

Dr. Thomas E. Dobbs, in his official capacity as the Mississippi State Health

Officer, ("Dr. Dobbs"), files this Memorandum in Support of his Motion for Judgment

on Pleadings pursuant to Fed. R. Civ. Pro. 12(c).

## INTRODUCTION

Plaintiff Charles Slaughter ("Plaintiff") alleges in his Complaint [Doc. 1] that

Mississippi's Certificate of Need statutes codified at Miss. Code Ann. §§ 41-7-171

through 41-7-209 (the "CON" laws), and particularly the statutory moratorium on the

issuance of a CON to a "new" Home Health Agency (Miss. Code Ann. § 41-7-191(9)

(the "statutory moratorium" or "moratorium"), violate equal protection and

substantive due process clauses of the Fourteenth  Amendment to the United States

Constitution. Plaintiff seeks injunctive relief and asks for additional relief pursuant

to 42 U.S.C. §§ 1983 and 1988. Dr. Dobbs moves this Court to dismiss the lawsuit

with prejudice for the failure of Plaintiff to negate every reasonable rational basis for

the statutes. F.R.C.P. 12(c).

## Factual Background

The Mississippi State Board of Health ("Board of Health") has been granted, *inter alia*, authority to appoint the State Health Officer (Dr. Dobbs) to serve as the agency head of the Mississippi State Department of Health ("MSDH")[1]. Miss. Code Ann. § 41-3-5. The Board of Health (and MSDH) also determines the various public policies pertaining to public health, including the consideration, publication and adoption of rules and regulations by MSDH. Miss. Code Ann. § 41-3-6. The Board and MSDH also study and review annually Mississippi's statutes related to health care and are authorized to make recommendations to the Mississippi Legislature of amendments or additions to existing statutes related to public health. Miss. Code Ann. § 41-3-15.

A Certificate of Need is a legislatively created mechanism that has a number of functions that directly relate to public health and public health policy in Mississippi.[2] The Board of Health and MSDH adopted regulations that govern the issuance of a "Certificate of Need" (or "CON") by the MSDH. *See* 5 Adm. Code. Miss. R. Pt.9 Subpart 91, R.1.1. also known as the "CON Manual". The CON Manual spells out that CONs are intended to "prevent unnecessary duplication of health resources; provide cost containment; improve the health of Mississippi residents; and increase

---

[1] Miss. Code Ann. § 41-3-15 (3): "The State Board of Health shall have general supervision of the health interests of the people of the state and to exercise the rights, powers and duties of those acts which it is authorized by law to enforce."

[2] The CON Manual provides: **Certificate of Need** means a written order by the State Health Officer setting forth the affirmative finding that a proposal in prescribed application form sufficiently satisfies the plans, standards, and criteria prescribed for such service or other project by Sections 41-7-171 et seq., Mississippi Code of 1972 Annotated, as amended, and by rules and regulations promulgated thereunder by the Department. [Doc. 7-2 at R. 1.14(h)]

the accessibility, acceptability, continuity and quality of health services." *Id.* A copy of the operative CON Manual is attached as Exhibit 2 to Dr. Dobbs' Answer [Doc. 7-2 at p.1, ¶2]. A number of activities and "health care facilities" are directly affected by CON Laws and regulations.[3]  Of the many types of facilities covered by CON Laws and regulations, a home health agency ("HHA") is but one. *Id.*

As the authorized agency that implements legislative statutory initiatives related to public health, the MSDH is also required to report its activities on a yearly basis in a report to the Governor and Legislature. Miss. Code Ann. § 41-3-15(1)(c)(vii). MSDH is further responsible for creating and publishing a regulatory document called the "State Health Plan" that details various public health policy goals and initiatives to accomplish said goals. The State Health Plan ("SHP") is generally updated and published on a regular basis (at least every three years) and expresses the state's projected "needs" standards for the issuance of CONs. [Doc 7-2 at p.1 ¶5]. MSDH receives and reviews applications for, as well as, issues CONs pursuant to the CON Laws, the CON Manual, and the operative SHP.  Miss. Code Ann. §§ 41-7-171 through -209. Excerpts from certain SHPs are attached to Dr. Dobbs' Answer at Exhibits 1 and 3. [Doc. Nos. 7-1 (1981-1987) and 7-3 (2020)].

---

[3] Miss. Code. Ann. § 41-7-173: "Health care facility" includes hospitals, psychiatric hospitals, chemical dependency hospitals, skilled nursing facilities, end-stage renal disease (ESRD) facilities, including freestanding hemodialysis units, intermediate care facilities, ambulatory surgical facilities, intermediate care facilities for the mentally retarded, home health agencies, psychiatric residential treatment facilities, pediatric skilled nursing facilities, long-term care hospitals, comprehensive medical rehabilitation facilities, including facilities owned or operated by the state or a political subdivision or instrumentality of the state….

## Historical Context of CON in Mississippi

In 1979 the Legislature adopted CON Laws and the predecessor of the MSDH, the Health Care Commission, was charged with implementation. Miss. Code Ann. §§ 41-7-171 *et seq.* In accordance with goals of the CON program the Health Care Commission and numerous other health care related agencies met, studied, and crafted public-health policies and regulations to implement CON Laws.

In 1981-82, the Health Care Commission determined, based on study of the home health industry, that then-existing home health agencies serving the Mississippi public were more than sufficient to meet the public need. State Health Plan 1982-87 at pg. 282 [Doc. 7-1 at pg. 282]. As a result, the Commission determined that, in accordance with the stated intent of the CON requirements, no new home health care agencies were needed. *Id.* In the 1982-87 State Health Plan, some details of the Commission's rationale and action taken are described:

> The data available indicate that all counties had more home health agencies authorized to serve the county than were actually doing business in the county. **Therefore, a policy was adopted that placed a moratorium on the issuance of Certificates of Need for additional home health agencies from April 15, 1982 until Dec. 31, 1982**. For the licensure year beginning January 1, 1983, existing home health agencies shall be licensed for only those counties in which they served ten or more patients during the previous twelve-month reporting period.
>
> Prior to the date of January 1, 1983 the Commission shall determine the need for additional home health agencies, based upon the results stated above, it being the intent of the Commission that after January 1, 1983 existing home health agencies shall be licensed for only those counties which they are actually serving.

State Health Plan 1982-87 at pg. 282 [Doc. 7-1 at pg. 282].

The above-mentioned "policy" is what Plaintiff refers to as the "Administrative Moratorium". [Doc 1 at ¶9]. This Administrative Moratorium was in place for less than nine (9) months. During the subsequent legislative session (1983), the Legislature passed a law which expressly codified the prohibition on the issuance of a new CON for a new home health agency, effective on April 9, 1983.  *See* Miss. Code Ann. §§ 41-7-191((8) now (9)) historical notes. It is unclear whether the Administrative Moratorium was extended from January 1, 1983 through April 8, 1983, but what is clear is that the Statutory Moratorium abrogated and rendered null and void the Administrative Moratorium. [Doc. 7-1 at pg. vii; XIIi and XII(1-6)(1986 SHP)]. After the 1983 enactment of Statutory Moratorium, there was no need for a separate administrative policy also prohibiting issuance of a CON for a new HHA. To date there has been nothing shown by Plaintiff or discovered in the archives of the MSDH and the Commission that indicates any attempt to enforce the Administrative Moratorium since 1982, because it was a temporary solution and clearly duplicative considering the statutory amendment. *See Id.*

The 1982 Administrative Moratorium was intended to provide the MSDH with additional time to study and determine the needs of the state, the accessibility of home health and to get an accurate count on the numbers of patients that were using home health. [Doc. 7-1 at p. 282]. After the initial nine-month administrative moratorium expired, the Commission reported to the Legislature and made recommendations that the Moratorium should be made permanent by virtue of a statutory amendment. [*See* Doc. 7-1 at p. XIIi and XII (1-6)]. This was based on the Commission's determination (after studies, notice, and public comments) that there

existed adequate home health agencies, such that there was not a need for new home health agencies.  This determination, in and of itself, is directly in accord with the CON law requirements that "need" be established to prevent unnecessary facilities, and it is a rational basis for the Statutory Moratorium.

On April 9, 1986 the "Mississippi Health Services Reorganization Act of 1986" became effective. The Act was based on several years of studies conducted by various disparate agencies that existed prior to reorganization, including special panel committees from the House and Senate Public Health Committees that were produced in 1984. The 1986 Act:

> expands significantly the moratorium on the issuance of Certificates of Need by the [newly created] Mississippi State Department of Health. The statute reads in part: "The Mississippi Health Care Commission, or its successor, shall not, for a period beginning upon the effective date of this section and ending July 1, 1987, grant approval for, or issue a certificate of need to any person for any person except as hereinafter provided.

[Doc. 7-1] State Health Plan of 1986 at pg. vii; XIIi and XII(1-6).

Through the years, numerous decisions have been made at the legislative level that CONs should not be issued unless the application met one of several limited exemptions which are detailed in the statutes and the 1986 Plan. *See id.* Currently, pursuant to Miss. Code Ann. § 41-7-191 (8 -9), there exist no fewer than six (6) statutory moratoria covering the following: 1.) skilled nursing facilities; 2.) intermediate care facilities; 3.) intermediate care facilities for the mentally retarded; 4.) home health agencies; 5.) the conversion of hospitals beds to intermediate nursing home care; and 6.) Medicaid-certified child/adolescent psychiatric or chemical

dependency beds.[4] Each of these legislative moratoria was recommended, adopted, and codified based on the CON general criteria and for the purposes as described in the 1986 State Health Plan and CON Manual.[5]

The most current version of the CON Manual confirms that the MSDH is presently prohibited from issuing a CON for a new home health agency. [Doc. 7-2 at Rule 2.2] (15 Code Miss. R. Pt. 9, Subpt. 91, R.2.2.). An acknowledgement of the current Statutory Moratorium is also found in the most recent 2020 State Health Plan effective July 1, 2020. The 2020 SHP and CON Manual further detail the standards and determinations MSDH would have to consider deciding whether to issue a new CON. These standards are generally common across CON determinations regardless of health facility type. *Id.* [Doc. 7-2 at Rule 8.1 "Criteria;" "General Considerations"].

The Board of Health is charged with reviewing the statutes and regulations affecting public health every year; and thereafter recommending changes or additions to statutes to the Mississippi Legislature. A determination of changes needed necessarily includes the ability to recommend to the Legislature that certain

---

[4] In the recently concluded 2021 Legislative session, the Mississippi Legislature passed HB160. See http://billstatus.ls.state.ms.us/documents/2021/pdf/HB/0100-0199/HB0160SG.pdf . One purpose of HB 160 was "to delete the moratorium on the authority of the State Department of Health to issue a health care certificate of need for the construction or conversion of child/adolescent psychiatric or chemical dependency beds participating in the Medicaid program…" *See id.* at pp. 72-73.  HB160 became effective on March 25, 2021, so there are now only five (5) statutory moratoria. The Legislature clearly can act when a need is demonstrated.

[5] The 1986 State Health Plan states: it is intended that such health planning and health regulatory activities will improve the health of residents, increase the accessibility, acceptability, continuity and quality of health services, prevent unnecessary duplication of health resources, and provide for some cost containment.  1986 SHP at I-1.  It further details the planning and fact-finding that was performed prior to the adoption of the 1986 Reorganization Act and states clearly the General CON Policies. *Id.* at I-(2-3).

moratoria be lifted if the Board or MSDH finds that it is in the interest of public health or furtherance of public health policy. Despite having access to the minutes from the Board's quarterly meetings, none of the minutes discloses any recommendation from the Board to lift the Moratorium in question regarding HHAs. *See* https://www.msdh.ms.gov/msdhsite/_static/19,0,124,208.html (last visited 4/26/2021).

## ARGUMENT

### I.     Legal Standard

"A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Higginbotham v. City of Louisville, Mississippi*, No. 1:19-CV-24-GHD-DAS, 2019 WL 4934949, at *2 (N.D. Miss. Oct. 7, 2019)(citing *Hebert Abstract Co. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th Cir. 1990) (per curiam); *Hall v. Hodgkins*, 305 Fed. App'x 224, 227-28 (5th Cir. 2008)).

"The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Johnson,* 385 F.3d at 529. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, at 678 (2009).

In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited to "the contents of the pleadings, including attachments thereto." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.,* 748 F.3d 631, 635

(5th Cir.2014) (considering a Rule 12(b)(6) motion); Fed.R.Civ.P. 12(d) (applying the same standard to consideration of matters outside the pleadings in both the Rule 12(c) and Rule 12(b)(6) contexts). However, this Court may also consider matters of public record (including publicly available documents from an administrative agency) as well as documents that are attached to Dr. Dobbs' Answer and/or Motion that are referred to in the Plaintiff's complaint and central to his claims. *Cinel v. Connick* 15 F.3d 1338, 1343 (5th Cir. 1994); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 439–40 (5th Cir. 2015)[6].

## II.    Plaintiff's claims regarding the nine-month "Administrative Moratorium" are moot

As demonstrated by the applicable agency regulations and publicly available documents, the Administrative Moratorium imposed for nine months in the year of 1982 expired by its terms and is null and void. Plaintiff has made no showing that the Administrative Moratorium is still effective, or that it has ever been enforced, or threatened to be enforced, against Plaintiff or anyone else. Generally, any set of circumstances that eliminates actual controversy renders an action moot. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006).

---

[6] (We have held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir.2004). Given the similarities in the analyses under Rule 12(c) and Rule 12(b)(6), we will apply the same rule to documents attached to the Defendants' motion for judgment on the pleadings. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir.2002)); *see also Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188 (D. Conn. 2007). Pursuant to judicial notice exception, courts that consider matters of public record on motion to dismiss for failure to state claim are limited to things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, **published reports**, **records of administrative agencies**, or pleadings in another action.

The termination, and subsequent abrogation of an administrative policy by statute, is certainly one such circumstance. *See e.g. State ex. rel. Pittman v. Ladner*, 512 So.2d 1271 (Miss. 1987)("we have as a matter of reason, precedent and choice determined that we should stay our hand from enforcement of that which has been repealed."). Therefore, any claims made by Plaintiff's Complaint regarding the temporary policy cannot be the basis for a valid cause of action, and any counts, claims or allegations based upon the inoperable Administrative Moratorium should be dismissed with prejudice.

### III.   Plaintiff cannot negate every conceivable rational basis for the statutes

Plaintiff's Complaint asserts only two causes of action, both of which are based on Fourteenth Amendment of the U.S. Constitution.  Alleging a violation of the Equal Protection Clause, Plaintiff states that the CON statutes, and the statutory moratorium specifically, "irrationally treats new home health agencies differently from materially indistinguishable existing home health agencies" and that the CON program "irrationally discriminates between different kinds of healthcare providers." [Doc.1 at ¶156].  However, there are currently six (6) statutory moratoria on CONs that cover a range of health care facilities. *See* supra, p. 6.  Quite clearly, the existence of these moratoria across the spectrum demonstrates that Plaintiff's argument that HHAs are being unfairly singled-out for discrimination is unfounded.

Plaintiff further claims the Due Process Clause of the Fourteenth Amendment (and the corresponding clause in the Mississippi Constitution), "protects the right to earn an honest living in the occupation of one's choice free from unreasonable government interference.  *Id.* at ¶ 170.  Plaintiff claims the Moratorium and the CON

program itself both violate his substantive due process rights because neither "advance any conceivable legitimate state interest." *Id.* at ¶¶172-175. To invoke substantive due process in this context, however, Plaintiff "must traverse 'unusually inhospitable legal terrain' because the Supreme Court has not invalidated an economic statute on substantive due process grounds since . . . 1935." *In re Blue Diamond Coal Co.*, 79 F.3d 516, 521 (6th Cir. 1996); *see also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955).

Plaintiff alleges that both the CON program, generally, and as applied to an HHA, and the Moratorium on a new CON for a HHA are nothing more than pure economic protectionism and that neither "achieve[s] any legitimate state purpose". [Doc. 1 at ¶¶186-87]. He states in a cursory manner that "no purported justification for CON in other contexts, such as control of capital expenditures or cross-subsidization, exists in the home health context. *Id.* at ¶187. This allegation is wrong. Home-health services, like most medical services, are highly cross-subsidized (i.e. indigent care is a condition of any CON as detailed in Mississippi's CON manual and discussed infra at p. 19-20).

Here, both Fourteenth Amendment claims are subject to the same **rational basis** standard of review (i.e. the paradigm of judicial restraint). *F.C.C. v. Beach Communications, Inc.* 508 U.S. 307, 313-15 (1993). Plaintiff admits, as he must, this is the proper standard. [Doc. 1 at ¶¶ 150-158]. Despite his lengthy Complaint and detailed recitation of one-sided support, Plaintiff has nevertheless failed to negate every reasonable, rational basis for the CON laws and the Moratorium itself. As such,

Plaintiff's claims for Equal Protection and Substantive Due Process violations are all subject to dismissal under controlling precedent.

For the purposes of Dr. Dobbs' Motion, whether the CON statutes and the Legislative Moratorium pass muster under the rational-basis test is a question of law. *Gaalla v. Citizens Med. Ctr.,* 407 F.App'x 810, 814 (5th Cir. 2011) (citing *Simi Inv. Co., v Harris Cnty., Tex.,* 236 F.3d 240, 249 (5th Cir. 2000)). This Court understands when a properly enacted statute is challenged on the basis of its constitutionality the legislative action is accorded "a strong presumption of validity." *Beach Comm'ns,* 508 U.S. at 314. Plaintiff here challenges an economic statute pursuant to the rational basis test and therefore faces a difficult undertaking: he must "negative every conceivable basis which might support" the legislation. *Id.*

The alleged violations of the Fourteenth Amendment must be analyzed in accordance with *Beach Comm'ns,* wherein the Supreme Court set out the standards for these types of challenges.  Importantly, the High Court states:

> **Equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.**  In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  **Where there are "plausible reasons" for legislative action, our inquiry is at an end.** This standard is the paradigm of judicial restraint.  The Constitution presumes that absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that **judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.**
>
> On rational-basis review, a classification in a statute [] comes to us bearing a strong presumption of validity, and **those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.** Moreover, because we

never require a legislature to articulate its reasons for enacting a statute, **it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature**. Thus, the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis. …

**In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.** Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.

508 U.S. at 313-15 (emphasis added).

To illustrate the deference to legislative prerogative and reasoning, the Fifth Circuit has restated *Beach* as follows: "the question is only whether a rational relationship exists between the government action and a conceivable legitimate objective. **If the question is at least debatable, there is no substantive due process violation.**" *Residents Against Flooding v. Reinvestment Zone No. Seventeen,* 734 F. App'x 916, 919 (5th Cir. 2018) (quoting *Simi Inv. Co.,* 236 F.3d at 251). To avoid dismissal, Plaintiff must completely eliminate (*i.e.* negate) **every conceivable reason** for enacting the legislation in question. Plaintiff's Complaint valiantly attempts—but ultimately fails—to eliminate all reasonable rationale for the CON laws, their application to home health agencies, and the Statutory Moratorium.

This Court is familiar with the above standards and properly applied them in the matter of *Clemons v United States,* 2013 WL 3943494 (S.D. Miss. June 13, 2013). The *Clemons* lawsuit challenged the non-economic damages cap that the Mississippi Legislature enacted in statutes as a part of "tort-reform." This Court correctly concluded that a "statutory discrimination will not be set aside if any facts reasonably may be conceived to justify it." *Id.* at *11 (citing *Nosser v. Natchez Jitney Jungle, Inc.,*

511 So. 2d 141, 143 (Miss. 1987) (citing *Dandridge v. Williams*, 397 U.S. 471, 481 (1970)).  This Court stated that "the standard of review requires doubts of a statute's constitutionality to be resolved in favor of upholding the law," and ultimately found **"it cannot be said that the plaintiff has proven beyond a reasonable doubt that there is no possible rational basis for the legislature's action."** *Id.* at *14. Based on the application of these stringent standards, the challenged statutes here should likewise be upheld.

Several circuits have applied these standards and found that CON laws do not violate the Fourteenth Amendment. *See Colon Health Centers of America, LLC v. Hazel,* 733 F.3d 535 (4th Cir. 2013); *Birchansky v. Clabaugh,* 955 F.3d 751 (8th Cir. 2020).  The Fourth and Eighth Circuits both held that cost containment goals of CON laws are legitimate governmental purposes.  *Id.* Both cases found the states' CON laws under scrutiny were constitutional. *Id.*

Finally, Plaintiff's Complaint quotes extensively and put much emphasis on an ongoing lawsuit in the Western District of Kentucky.  [*See* Doc. 1 throughout] (citing *Tiwari v. Friedlander,* No. 3:19-cv-884-JRW-CHL, 2020 WL 4745772 (Slip Copy) (W.D. KY Order signed Aug. 8, 2020)).  The *Tiwari* order that supports Plaintiff's position is an interim order, denying in-part a motion to dismiss filed by the state of Kentucky. The often-quoted order is not a final or dispositive ruling by that court and as such does not carry as much weight as Plaintiff here implies.

Moreover, in the other "half" of Kentucky—the federal court for the **Eastern** District—there is also ongoing litigation seeking to invalidate the same CON laws, wherein the court reached the opposite conclusion as did the court in *Tiwari. See*

*Truesdell v. Friedlander,* No. 3:19-CV-00066-GFVT, 2020 WL 5111206, at \*2–3 (E.D. Ky. Aug. 31, 2020).   In *Truesdell* the court considered—and dismissed—the exact same Fourteenth Amendment claims made by Plaintiff here. *Id.* at \*6-8.[7]

## IV.   Mississippi's CON laws and Moratorium are rationally related to the State's interests

The public's health and safety are unquestionably legitimate interests of Mississippi's government. *See* Miss. Code Ann. § 41-3-15 (3). Plaintiff admits this in his Complaint: stating that **licensing and regulation** of HHAs and overall health-planning is an important part of improving or protecting the health of the public at large. [Doc 1 at ¶ 163 citing Miss. Code Ann. §41-71-13 and MSDH Regulations at 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 46.1, *et seq.*].   Thus, the licensing and regulation of home health agencies does, by Slaughter's own admission, promote the health, safety, and welfare of the public (and satisfies rational basis). The CON program in Mississippi likewise promotes the health, safety, and welfare of the public. Plaintiff cannot prove otherwise to save his Complaint from dismissal.

---

[7] The strength of the dispute over the reasonableness of Kentucky's CON process is "not within the competency of the courts to arbitrate." *Vance v. Bradley*, 440 U.S. 93, 111–12 (quoting *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 48 357 (1916)). On the contrary, "it is the very admission that the facts are arguable that immunizes from constitutional attack the [legislative] judgment represented by this statute." *Id.*

Here, Plaintiffs have failed to plausibly rebut the State's asserted justifications for the CON program. Defendants, both in their briefs and implementing statutes, articulate a variety of legitimate purposes served by the program, including ensuring geographically convenient access to healthcare for Kentucky residents at a reasonable cost. Plaintiffs' "cursory, unsubstantiated assertion that the statute fails to advance this purpose or any other is insufficient to merit further factual inquiry." *Colon Health Ctrs. of Am.*, 733 F.3d at 548.

....

Once again, Plaintiffs do not show why the legislature's stated reasons are irrational, but only assert that the challenged statute discriminates "in favor of existing [] businesses." [R. 17 at ¶ 84.] Plaintiffs only offer cursory, unsubstantiated assertions such as "[t]he protest procedure and 'need' requirement bear no rational relationship to protecting public health or safety." *Id.* at ¶ 83. But, as previously explained, this type of bare assertion will not suffice to merit further factual inquiry. *Colon Health Ctrs. of Am., LLC*, 733 F.3d at 549.

Generally, CON laws became a mainstay of legislation throughout the U.S. in the 1970's to early 1980's as the amount of government spending on health care began to skyrocket and government sought controls to prevent waste, promote availability, secure access, ensure expertise, and avoid the creation of a huge amount of supply regardless of the public's needs. [Doc.1 at ¶¶ 49-50, 56-58]. Mississippi's CON laws were adopted via The Mississippi Certificate of Need Act of 1979. Miss. Code Ann. §§ 41-7-171 through -209.

To understand the rationale of CONs and of the Mississippi Legislature's intent by their enactment, this Court should first be aware that the healthcare "market" is **not a "free-market."** In fact, healthcare is nearly the exact opposite. In a free market, demand will drive supply. In healthcare markets, supply actually drives demand. This inverse relationship is described as "supplier-induced demand" or "Roemer's Law", the economic theorem posited by and named after its author, Milton Roemer.[8] Essentially, it demonstrates that in healthcare, the **creation** of supply will in turn spur patient demand for the service, even if the service is not strictly necessary. *Id.* Also, in many facets of healthcare, the State of Mississippi is ultimately left holding the bag when it comes to payments, and this is especially true of home health care where the majority of the payments are from Medicaid. The CON laws (i.e. the State's "control" of healthcare supply) were adopted as a counteractive agent to these non-typical market forces.

---

[8]  *See* Delamater, P. et al., "Do More Hospital Beds Lead to Higher Hospitalization Rates? A Spatial Examination of Roemer's Law," PLOS ONE (www.plosone.org), February 2013 8:2; There is a substantial body of peer-reviewed scientific literature that indicates an increase in supply results in a corresponding increase in the utilization of those services. *See e.g.*, Laurence Baker, *The Relationship Between Technology Availability and Health Care Spending*, Health Affairs (Nov. 5, 2003).

Mississippi's CON Manual expressly states that CONs are intended to "**prevent unnecessary duplication of health resources**; provide cost containment; improve the health of Mississippi residents; and increase the accessibility, acceptability, continuity and quality of health services." [Doc. 7-2]. The governmental interests in the minds of the Legislature upon adoption of CON laws and related moratoria can be summed up in one word: **balance**.

### A.    *CON improves costs containment*

By no means does CON law provide total cost containment. But, CON laws (including moratoria on new providers/holders) necessarily provide **some** cost containment by restricting (and closely monitoring) the holders and licensees that can seek payment/reimbursement directly from the state via Medicaid. This balance among providers to realistically curb costs was actually acknowledged and expressed as far as back as 1986 when the MSDH acknowledged that one intent of the CON regulations was to "provide for **some** cost containment" [Doc. 7-1 at 1986 SHP at I-1 ¶3 (emphasis added)].

As support, this Court may take notice of the public information and statistics that are collected and reported by the Centers for Medicare and Medicaid Services ("CMS"), a part of the federal Department of Health and Humans Services. *See generally* www.cms.gov. According to CMS, the top 5 highest-cost states **do not have CON requirements for HHAs.**[9] Mississippi's reimbursement costs are somewhere near the middle of the pack when compared to other states. But the point is that non-

---

[9]  The states with the highest reimbursement per patient are Louisiana, California, Nevada, Oklahoma, and Texas, none of which have CON requirements for HHAs.

CON states have higher overall reimbursement costs per patient covered by Medicaid and Medicare. Thus, it is at least arguable that the HHA CON laws of Mississippi continue to have **some** of their desired effect.

Plaintiff has asserted that the relatively low capital requirements to establish a HHA should negate the general CON rationale of "conserving limited capital resources." [Doc 1 at ¶159] This is a stagnant and myopic view however, considering that start-up costs are only one of a number of financial reasons why CON laws arguably work well. While a HHA may have lower start-up costs, it may have very high operational costs, especially if volume purchasing is not available due to a lack of clients/patients.

In home health, the only way to remain viable and thus continue to be able to provide home health services is if there are enough patients (and thus enough "practice") to justify the introduction of additional service-supply, and to then become proficient and thrive by being able to gain and maintain the necessary repetition in order to **develop expertise** in one's specialty. The CON restrictions thus not only benefit the provider by ensuring it does not expend limited capital in an area (or in a specialty) that does not have enough patient supply to thrive, but the laws also encourage longevity and foster expertise to **improve patient outcomes.**

### B.      *CON laws improve accessibility for all Mississippians*

Mississippi's HHA CON program benefits the patients across the state by ensuring **accessibility** and **continuity,** preventing "pop-up" providers who are only in business long enough to provide service to a few patients and then have to close their

business because of a lack of patients—thus leaving their existing patients without a provider during their time of need.  [Doc. 7-2].

Likewise, CON laws promote accessibility **statewide**. It is a simple concept that historically, businesses typically go where they are most likely to be successful. In the healthcare world, that means geographic areas with patients. As such, more populated areas would be more likely to attract providers, while less populous areas would not. Without state-imposed controls over new entrants to a market, it stands to reason that most would open and offer services in high-density areas. CON laws prevent this imbalance in a number of ways—including by requiring a need can be shown, and that a new provider will not injuriously impact the existing providers in that same area. CON laws expressly prevent "unnecessary duplication of healthcare services." [Doc. 7-2]. The state's interest is to ensure availability for all Mississippians, not just in population centers, and this is exactly what CONs have done regarding HHA considering there continues to be ample providers in all 82 counties. If a need ever arises, the CON moratorium can and would be lifted.

Another "accessibility" rationale of the state is ensuring services to indigent populations. Indigent care and the need for CON holders to provide services to all people across the economic spectrum is especially important to the state. CONs promote the understanding that all holders—not just some—provide indigent care, which is offset by private (or otherwise more profitable) patients.  The CON Manual states:

> The Department will disapprove a CON application if the applicant fails to provide or confirm that the applicant shall provide a reasonable amount of indigent care or has admission policies which deny access to

care by indigent patients. The Department will disapprove a CON application if approval of the request would have significant adverse effect on the ability of an existing facility or service to provide Medicaid/indigent care.

The State Health Officer shall determine whether the amount of indigent care provided or to be offered is "reasonable." The Department has determined that a reasonable amount of indigent care is an amount which is comparable to the amount of such care offered by other providers of the requested service within the same, or proximate, geographic area.

[Doc 7-2] CON Manual at pg. 1-2.

As this Court can see from the above, CON laws and regulations also balance the profitability of all CON holders so that each can and will continue to provide expert health care services to all Mississippians, not just those with insurance or wealth. Accessibility for all citizens is one of the expressed goals of CON. *Id.* Without the CON balance, the most profitable patients would be the most obvious targets for providers, leaving Medicaid and lower paying patients without a company to provide services to them. CON thus assures patient access statewide regardless of income.

If anyone could at any time enter into a healthcare market, such as Plaintiff wishes for home health, then those unrestrained and unnecessary new entrants will necessarily have an impact on the overall wellbeing of existing providers, assuming, as we must, a finite amount of patients in a given area. *See Id.* Again, some patients pay well, and some (like those covered by Medicaid) do not. If a provider only accepts high-paying clientele or only provides highly lucrative services, and therefore siphons those patients from existing providers, it leaves only low-paying services and customers to the existing providers. No provider can survive on Medicaid patients

alone. This lop-sided formula ultimately results in failure of the provider, which is also detrimental to patients.

Once more, there must be a balance—for the patients and the providers. The number of patients, as well as the profitability of those patients, must be balanced. This is what CON laws do. Even though Plaintiff may have support for his position, these basic "balance" propositions remain irrefutable. If Plaintiff's claims prevail, the geographic spacing, continuity of care, and statewide availability promoted by CONs will necessarily be undermined. Without CON laws, lack of availability will ultimately result for those areas with low patient populations or with high numbers of Medicaid recipients.

### C.    *CON improves patient outcomes*

In addition to the above, the current system is intended to and arguably does improve the public's health and health outcomes. For example, Mississippi's senior citizen community was unfortunately ranked dead-last as of 2019 in a survey of "health" rankings among all 50 states.[10] This would seemingly support a reasonable inference that the least healthy populations would require more healthcare than a healthier population. Further, it would be reasonable to surmise based on that ranking that our senior citizens would have much higher healthcare costs, and that statistically their healthcare outcomes would be worse.  Yet, a review of CMS data details that, instead of being more costly and suffering more unfavorable outcomes, Mississippi home-health agencies consistently outperform many non-CON states for

---

[10] *https://assets.americashealthrankings.org/app/uploads/ahr-senior-report_2019_final.pdf*

healthcare quality, cost-efficiency and accessibility. Evidence of this can be seen from data and surveys conducted by CMS for all Medicaid and Medicare participants. (https://data.cms.gov/provider-data/dataset/tee5-ixt5 at column 2.) Each state is assigned a "star" rating by CMS based directly on responses from the patients that are provided services by existing home health agencies. *Id.* Despite having the least healthy senior citizen population, Mississippi is one of only six states/territories that can boast a four (4) star rating. Thus, from a patient satisfaction standpoint, Mississippi's HHAs are very highly rated. *Id.*

The same data set also provides information about costs paid by Medicaid per patient, and again, Mississippi is well within the mean. *See id.* at last column. So, while not the least expensive, it is not the most expensive either. This is especially telling considering that our senior population is considered the least healthy, and thus should be the most expensive. As mentioned above, the most expensive states are all non-CON states for Medicaid reimbursement. *Id.* Further, the existing Mississippi HHAs provide more visits to their patients than the national average. *Id.* More visits and more personal attention result in happier and healthier patients. All of this is arguably due to the CON program's balance. This collected information provides numerous other examples of areas where, despite having an "unhealthy" population, Mississippi nevertheless has better outcomes than many other states, including those without CON restrictions on HHAs. [11]

---

[11] *See* https://www.cms.gov/Center/Provider-Type/Home-Health-Agency-HHA-Center (general info); https://data.cms.gov/provider-data/topics/home-health-services (all CMS data sets re: HHA).

### D.    The Moratorium remains because there is not a "need"

With regard to the moratorium as applied to new HHAs, the foremost rationale for the 1982 Administrative Moratorium and the subsequent Legislative Moratorium in 1983 through today is that the MSDH and the Board of Health consistently find that **there is not a need for additional HHAs.** This Court need only revisit the statutory authority granted to the MDSH and Board of Health wherein they are charged to study, analyze, and report on the levels of need throughout this State. Miss. Code Ann. §§ 41-3-6 and -19. With this collected information, they then make informed recommendations to the Legislature of **changes needed in statutes** to best meet the needs of the public and accomplish the goals of improving and protecting public health. Miss. Code Ann. § 41-3-6. Despite being armed with the best and most comprehensive set of information on healthcare in this state, neither the Board nor the MSDH has recommended that the Statutory Moratorium be removed. No evidence otherwise exists.

Further, despite having an opportunity to do so each session, the Mississippi Legislature has consistently rejected (for many years) proposed bills that would eliminate CON altogether or remove the HHA moratorium.[12]  This arguably demonstrates the same rationale that was the basis for the CON laws in 1979 and the moratoria in 1982 and 1983 remains viable still today. By preventing unnecessary or unneeded health care facilities, the state controls costs, it expands access, and it improves outcomes. **Moreover, the exact same arguable bases justifying the CON**

---

[12] *See e.g.* Bills proposed in Mississippi Legislature: 2020 HB 605, 2020 SB 2618 and 2619; Current session: 2021 HB 1305, 1306, and 309; 2021 SB 2747.

laws (supra) can equally support the existence of the HHA moratorium. These reasonable rational bases for the current statutory moratorium are enough to warrant dismissal of the claims because Plaintiff has not and cannot prove beyond a reasonable doubt that there is no reasonable basis for Mississippi's current CON moratorium regarding Home Health Agencies.

<u>CONCLUSION</u>

As demonstrated here, the Mississippi Legislature enacted laws relative to health care industries that were intended to provide balance in the industry and allow the state to meet its public health policy goals. CON laws do this in a number of ways, some arguably more effective than others. But the laws also authorize the Board of Health and MSDH to look at all complexities in this industry and adapt the state's policies to changing times and conditions. The CoVid-19 era is a glaring example of the state's interests, and its programs at-work. The Equal Protection and Substantive Due Process clauses of the Fourteenth Amendment are not intended to provide a mechanism by which individuals can render state statutes null and void without overcoming a very high bar. Further, the Fourteenth Amendment does not provide courts the opportunity to question or conduct fact-finding as to the wisdom of the state's legislative body. At least not without a demonstration that there is no conceivable or arguable rational reason for the existence/application of the challenged statute. Plaintiff Slaughter cannot do this. As shown, there are numerous arguable rational reasons why CON laws/moratoria were adopted, and evidence that they have continued for over forty years to achieve their intended goals. This Court should therefore dismiss the action with prejudice.

This the 11th day of May 2021.

Respectfully Submitted,

Dr. Thomas E. Dobbs, in his official capacity
as the Mississippi State Health Officer

BY:   LYNN FITCH, ATTORNEY GENERAL FOR
THE STATE OF MISSISSIPPI

BY    /s/ *Stephen Schelver*
DOUGLAS T. MIRACLE, MSB # 9648
Assistant Attorney General
STEPHEN F. SCHELVER, MSB # 101889
Special Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3522
Facsimile: (601) 359-2003
Doug.Miracle@ago.ms.gov
Stephen.Schelver@ago.ms.gov

## CERTIFICATE OF SERVICE

I, Stephen Schelver, Special Assistant Attorney General for the State of Mississippi, do hereby certify that on this date I electronically filed the foregoing with the Clerk of this Court using the ECF system thereby serving a copy to all counsel of record.

This the 11th day of May 2021.

/s/ Stephen Schelver
Stephen Schelver