**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**Northern Division**

| | |
|---|---|
| CHARLES SLAUGHTER, | |
| *Plaintiff*, | |
| vs. | Civil Action No. 3:20-cv-789-CWR-FKB |
| DR. THOMAS E. DOBBS, in his official capacity as the Mississippi State Health Officer, | ORAL ARGUMENT REQUESTED |
| *Defendant*. | |

---

**PLAINTIFF'S RESPONSE TO DEDENDANT'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

---

### INTRODUCTION

Plaintiff Charles Slaughter is a licensed physical therapist and an entrepreneur. In 1989, he started his own physical therapy clinic in south Jackson, Mississippi. He has dreamed of expanding his services to offer in-home physical therapy to homebound patients. Recognizing a need for this very service in the wake of the COVID-19 pandemic, Plaintiff decided to finally pursue his dream. But two things stand in his way – Mississippi's moratorium on new home health agencies and its certificate-of-need (CON) law. The moratorium has banned new home health agencies in the state for the past forty (40) years. Even if this moratorium did not exist, the CON law would require aspiring home health entrepreneurs to prove their services are "needed" before they can operate. These laws prevent Plaintiff from opening a safe, needed business and harms Mississippians by decreasing access to home health care. These laws' sole purpose is to protect existing providers from competition with new ones.

Because pure economic protectionism is never a legitimate government interest, Plaintiff sued on December 9, 2020, alleging the moratorium and CON law violate his federal and state equal protection and due process rights. Defendant moved for judgment on the pleadings, arguing Plaintiff's Complaint (Compl.) did not state a plausible claim, Doc. 19 (State Mem.).

In short, Defendant has failed to meet his burden. He wrongly relies on cases that proceeded past the pleading stage and outright ignores the facts alleged in the Complaint. But the rational-basis test, although deferential, is not a rubber stamp. Federal courts regularly declare laws unconstitutional under that test. More to the point, federal courts routinely deny motions to dismiss rational-basis claims, including claims involving another home health CON law.

If plaintiffs win rational-basis cases on the merits, they can survive motions to dismiss, where all factual allegations are construed in their favor. That is all Plaintiff is asking for now – a chance to prove his allegations that Mississippi's home health moratorium and CON law provide no public benefits and serve only to insulate established providers from honest competition.

## STATEMENT OF FACTS

I. **PLAINTIFF WANTS TO PROVIDE SERVICES THAT ARE DESPERATELY NEEDED DUE TO THE COVID-19 PANDEMIC AND THE STATE'S AGING POPULATION.**

Home health agencies offer personalized services to people in the comfort and privacy of their homes. Compl. ¶ 34. Many of these services are non-medical, including transporting people to appointments and helping with basic personal care or household chores. *Id.* Some basic medical care can also be provided by home health agencies, such as in-home physical therapy. *Id.* There is already an unmet need for home health services in Mississippi due to the state's aging population, and that need will only continue to grow. *Id.* at ¶ 37. Many older Mississippians prefer to receive care in their own home, rather than a nursing home. *Id.* at ¶ 40. Many other people prefer home health services because they are more affordable than other providers of care, such as

nursing homes and hospitals. *Id*. at ¶ 39. Moreover, the need for home health agencies has exploded in the wake of the COVID-19 pandemic, as more seniors seek to delay or prevent the need to be institutionalized in nursing homes that have been prone to outbreaks, and as people seek to avoid public health care facilities for fear of contracting COVID-19. *Id*. at ¶ 38.

Plaintiff is a licensed physical therapist and opened his own physical therapy clinic in south Jackson, Mississippi, in 1989. *Id*. at ¶ 22. During the course of his career, he did some consulting work for home health agencies and saw that the existing agencies were overbooked and did not provide enough time-intensive, quality care to their patients. Having seen this unmet need firsthand, Plaintiff dreamed of expanding his clinic's services to provide better quality care to homebound patients. *Id*. In the wake of the COVID-19 pandemic, Plaintiff decided it was time to start working to solve this problem in the community. *Id*.

## II.    MISSISSIPPI'S MORATORIUM STANDS IN PLAINTIFF'S WAY.

Enter the moratorium. This law makes is illegal for anyone to start a new home health agency in Mississippi. *Id*. ¶¶ 124–25. This law has been in place for forty (40) years, despite the fact that the number of home health patients in the state has increased by at least 194 percent during that time. *Id*. ¶¶ 9–11; 121. Plaintiff's dream was over before it began.

The purpose of Mississippi's moratorium was to protect agencies from competition with hospitals. *Id*. at ¶ 17. Medicare reimbursed home health agencies on a "cost basis," but changed hospitals' reimbursement to a less lucrative "diagnosis-related group." This encouraged hospitals to start home health agencies, which existing agencies lobbied against. *Id*. ¶¶ 18; 72; 119. While Defendant disputes this rational, the very document he cites (State Mem. 4) supports the allegation:

> With the advent of the *Diagnostic Related Grouping* reimbursement system, hospitals have been encouraged to discharge patients earlier. This phenomenon has led to a resurgence of interest in home health care and an expansion of the traditional care delivered by home health agencies in the past.

Doc. 7-1 (1982-87 State Health Plan), pg. 19. (emphasis supplied). In other words, because hospitals were now being reimbursed by Medicare with a flat fee, it was more economical to treat and discharge patients as quickly as possible. *Id*. ¶ 18. But once discharged, those patients would still need care, which could be provided by home health agencies, which were also still reimbursed by Medicare using the more lucrative "cost-basis". *Id*. This encouraged hospitals to enter the home health market so they could treat their own patients a second time at a more lucrative rate. *Id*. This led to the conflict between home health agencies and hospitals, where the agencies ultimately prevailed by securing the moratorium to keep more hospitals from entering the market. *Id*. ¶ 17. That conflict is no longer raging, since Medicare ultimately moved home health agencies onto their own flat-fee reimbursement. *Id*. ¶ 20. But the vestigial moratorium remains. *Id*. ¶ 11.

## III.    MISSISSIPPI'S CON PROGRAM WOULD ALSO STAND IN PLAINTIFF'S WAY.

Even if the moratorium were repealed, Plaintiff would have to contend with the CON law. He would have to apply for a certificate of need before starting a home health agency. *Id*. ¶ 7. His future competitors could formally oppose his application and engage in full-blown litigation. *Id*. at ¶¶ 8; 107–115. The Defendant would then use a rudimentary formula, along with the record of the public hearing, to determine whether there was a "need" for Plaintiff's business. *Id*. at ¶¶ 88; 114. That Plaintiff's dream would survive this crucible is doubtful. *Id*. at ¶¶ 94–99; 133.

## IV.    THE CHALLENGED LAWS SERVE ONLY TO SHIELD PROVIDERS FROM COMPETITION.

Under Mississippi's CON law, a new "health facility," which includes a home health agency, must obtain a CON to operate. Miss. Code § 41-7-191(1). Although "health facility" is broadly defined, the law exempts many facilities such as physician private practice offices, personal care residential-living and assisted-living facilities, abortion facilities, veterans homes, and health care facilities owned and/or operated by the state. *Id*. at §§ 41-7-173(h) and 41-7-191.

Theoretically, Defendant reviews CON applications against sixteen (16) criteria. 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 8.1. As the name "certificate of need" entails, however, the most important factor is need – or the state health plan's definition of "need." Compl. ¶¶ 87–90.

The state health plan, a document created by the state, contains determinations of "need" for various health care services, including home health care. Compl. ¶¶ 87–90. Included in the plan is a method of estimating how many people "need" home health services in each Mississippi county. *Id*. ¶ 88. This estimate is based on rudimentary arithmetic, but ignores the real circumstances on the ground. It assumes that the home health utilization rate averaged across a ten (10)-state region that includes Mississippi is an accurate predictor of future need. It then checks whether actual use in individual counties are consistent with this average utilization rate for the region. This formulation leads to a circular estimate that ignores whether adequate services are even available in the first place. If—and only if—predicted use in a county exceeded actual use by 50 people or more, new agencies would have a chance to open there. *Id.* ¶ 91. If the predicted need in a county was fewer than 50, new home health agencies would remain banned. *Id*. ¶ 90.

This rule works in an anticompetitive manner, allowing existing home health agencies to prevent the "need" for home health services from ever reaching 50. *Id*. ¶ 122. While aspiring home health agencies are banned from responding to any increased "need" below the 50 person threshold, existing home health agencies may increase their staffing to absorb any new "need" in their service areas below that same threshold. *Id*. This is clearly demonstrated by the fact that the number of home health patients in the state has increased by at least 194 percent while the state has continued to find that there is no "need" for any new home health agencies. *Id*. at ¶ 121.

Just the application process itself is difficult. The filing fee ranges from $500 to $25,000. 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 3.11. That is before the costs of consultants and

attorneys and the weeks required to complete an application.  Compl. ¶ 105.  Once the state deems

an application complete, the state notifies the public and any "affected persons."  15 Miss. Admin.

Code Pt. 9, Subpt. 91, Rs. 3.7 & 3.12.  Any "affected person" may then request a public hearing

to oppose the application.  *Id*. at R. 3.12.  In practice, the affected persons who oppose applications

are existing providers—typically an applicant's future competitors.  Compl. ¶ 109.  The application

often results in a public hearing that amounts to a full-blown trial before a hearing officer, featuring

counsel, exhibits, live testimony, and written motions.  *Id.* ¶¶ 108, 115.  Given the arbitrariness of

the application review factors, the state can always find a reason to deny a CON application.  *Id*.

¶¶ 97–99.  Even applications that comply with the need calculations can be denied. *Id.* ¶ 116.

In sum, rather than furthering any legitimate state interest in the health care system, the

process works as a simple competitor's veto. *Id*. ¶ 110.

## V.    MISSISSIPPI'S MORATORIUM AND CON LAW HARM THE PUBLIC.

The purported justification of this process is to "to prevent unnecessary duplication of

health resources; provide cost containment, improve the health of Mississippi residents; and

increase the accessibility, acceptability, continuity and quality of health services."  Miss. Admin.

Code Pt. 9, Subpt. 91, R. 1.1.  The challenged laws fail to serve these purposes for two reasons.

First, a separate set of laws and regulations, which require home health agencies to be

licensed, are already aimed at protecting public health and safety.  *See* Compl. ¶¶ 129–31.  Plaintiff

does not challenge those requirements.

Second, as basic economics predicts, artificially limiting the supply of home health

agencies harms the public.  It worsens service, decreases access, and increases costs.  *See* Compl.

¶¶ 67–70, 77–79, 100, 118, 160–61.  And those harms are not just the firsthand experiences of

Plaintiff.  Rather, they are the view of essentially every neutral party to study the issue.  *Id*. at ¶70.

For example, the federal government has concluded that CON programs do not work and has disavowed them for more than three decades. *Id.* ¶¶ 60–70. In 1988, a Federal Trade Commission (FTC) report concluded that CON programs harm consumers and raise health care costs by (1) barring new health care providers from entering the market and (2) encouraging existing providers to use less-efficient (but CON-exempt) methods. *Id.* ¶ 66. And again in 2004, the FTC and the Department of Justice reaffirmed the 1988 study and concluded that CON "programs are not successful in in containing health care costs, and that they pose serious anticompetitive risks that usually outweigh their purported economic benefits." *Id.* ¶ 67. The FTC and the Department of Justice affirmed this position again in 2016, and as recently as 2020, Commissioners on the FTC issued a statement about the harms of CON laws, especially during the COVID-19 pandemic. *Id.* ¶¶ 68–69. Additionally, there are four decades of academic research supporting the positions of the FTC and the United States Department of Justice. *Id.* ¶¶ 70.

Mississippi, however, has ignored this evidence. Lobbying by existing providers keeps the moratorium and CON program intact. *See* Compl. ¶¶ 72; 119. So Plaintiff, with no meaningful ability to petition the Legislature, is forced to proceed before this Court, the only forum that can vindicate his constitutional rights.

## STANDARD

Rule 8(a)(2) requires only that a plaintiff provide "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." That is not difficult to do. "The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. The plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *Taylor v. Univ. of Mississippi Med. Ctr.*, No. 3:19-CV-331-CWR-FKB, 2021 WL 951592, at *1 (S.D. Miss. Mar.

12, 2021) (quotation omitted). "This inquiry focuses on the allegations in the complaint, *not* whether plaintiffs have pleaded sufficient facts to succeed on the merits." *Porter v. Valdez*, 424 F. App'x 382, 385 (5th Cir. 2011) (citation omitted) (emphasis original).

## ARGUMENT

Plaintiff has properly pleaded that the home health moratorium and CON law arbitrarily favor some providers over others while failing to relate rationally to any legitimate government interest. The motion for judgment on the pleadings should thus be denied. In urging the Court to dismiss, Defendant misconstrues the governing law and inappropriately disputes the facts in the Complaint. But Plaintiff properly alleges facts that entitle him to relief. This Court should not go beyond the present motion to consider the merits without the benefit of a factual record.

Below, Plaintiff first describes rational-basis review and explains how Defendant mischaracterizes the legal standard. Next, Plaintiff demonstrates that he has properly pleaded equal protection and due process claims. Third, Plaintiff shows that Defendant's cases are inapt. Finally, Plaintiff shows that his claims against the administrative moratorium are not moot.

## I. THIS COURT SHOULD REJECT DEFENDANT'S CARICATURE OF RATIONAL-BASIS.

### A. The Rational Basis Test Is a Meaningful Standard of Review.

The gist of the Defendant's argument is this: Plaintiff's claims are subject to rational-basis review, but rational basis review is difficult to overcome, so the Court should dismiss. *See* State Mem. 10–15. In the Defendant's conception, rational-basis review as essentially a charade in which the outcome is foreordained. The Defendant devotes five pages to quoting familiar rational-basis boilerplate such as "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." (quoting *F.C.C. v. Beach Communications, Inc.* 508 U.S.

307, 313-15 (1993)).  The purpose of this recitation is to persuade this Court that "rational-basis review" is code for "the government always wins."

That is a misunderstanding.  Rational-basis review, while deferential, "is not a rubber stamp." *Tiwari v. Friedlander*, No. 3:19-CV-884-JRW-CHL, 2020 WL 4745772, at *6 (W.D. Ky. Aug. 14, 2020), *reconsideration denied sub nom. Tiwari v. Friendlander*, No. 319CV00884GNSCHL, 2021 WL 1407953 (W.D. Ky. Apr. 14, 2021)*; see also Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999) ("[T]he rational basis test 'is not a toothless one.'") (quoting *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013) ("The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation.").  In practice, laws routinely fail rational basis-review.  Including CON laws.

The Supreme Court has struck down at least twenty unconstitutional laws under the rational-basis standard since the 1970s.[1]  A large number of those have been economic laws. "Between 1970 to 2000, applying rational-basis review, the Supreme Court struck down at least a dozen economic laws as violating either the Equal Protection Clause or the Due Process Clause." *Tiwari*, 2020 WL 4745772, at *6 (collecting cases).  Courts in the Fifth Circuit routinely deny

---

[1] *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Morrison*, 529 U.S. 598, 614-15 (2000); *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); *United States v. Lopez*, 514 U.S. 549, 567 (1995); *Quinn v. Millsap*, 491 U.S. 95, 108 (1989); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 345 (1989); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985); *Williams v. Vermont*, 472 U.S. 14, 24-25 (1985); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985); *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Zobel v. Williams*, 457 U.S. 55, 64 (1982); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *James v. Strange*, 407 U.S. 128, 141-42 (1972); *Lindsey v. Normet*, 405 U.S. 56, 77-78 (1972); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971); *Reed v. Reed*, 404 U.S. 71, 76-77 (1971); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970).

motions to dismiss rational-basis claims at the pleading stage.[2]  Moreover, plaintiffs bringing rational-basis claims in this Circuit regularly prevail on the merits: the Fifth Circuit has invalidated at least half a dozen state actions under rational-basis review since the 1980s.[3]  District courts in the Fifth Circuit have also invalidated more than a dozen laws under the test.[4]  This happens when a law has an illegitimate purpose.  *E.g., St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013) (holding economic favoritism is not a legitimate purpose to regulate).  And even if a law has a legitimate purpose, it happens when the law lacks a logical connection to its purpose.  *E.g., Zobel v. Williams*, 457 U.S. 55, 64 (1982) (striking down program that gave oil money only to Alaskans who had been residents prior to 1980 because the state's proffered rationales could not be logically accomplished by the law).  Thus, plaintiffs can and do win rational basis challenges.  And if

---

[2] *See St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 746 (5th Cir. 2008); *Simi Inv. Co. v. Harris Cty.*, 236 F.3d 240, 251 (5th Cir. 2000); *Wheeler v. City of Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. 1981); *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1039–41 (5th Cir. 1980), *rev'd on other grounds*, 455 U.S. 283 (1982); *Doe v. Plyler*, 628 F.2d 448, 459 (5th Cir. 1980), *aff'd*, 457 U.S. 202 (1982); *Harper v. Lindsay*, 616 F.2d 849, 855 (5th Cir. 1980); *Thompson v. Gallagher*, 489 F.2d 443, 449 (5th Cir. 1973); *Davis v. Cantrell*, 2018 WL 6169255, at *4 (E.D. La. Nov. 26, 2018); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 110 F. Supp. 3d 719, 727 (W.D. Tex. 2015); *Brantley v. Kuntz*, 98 F. Supp. 3d 884 (W.D. Tex. 2015); *Newman Marchive P'ship v. Hightower*, 735 F. Supp. 2d 483 (W.D. La. Aug. 18, 2010); *Hous. Balloons & Promotions, LLC. v. City of Houston*, 2009 WL 1811224 (S.D. Tex. Jun. 24, 2009); *Creekmore v. Att'y Gen. of Tex.*, 341 F. Supp. 2d 648, 668 (E.D. Tex. 2004); *Esperanza Peace & Justice Ctr. v. City of San Antonio*, 316 F. Supp. 2d 433, 467–69 (W.D. Tex. 2001); *Casket Royale v. Mississippi*, 124 F. Supp. 2d 434, 440 (S.D. Miss. 2000); *Warner v. St. Bernard Parish Sch. Bd.*, 99 F. Supp. 2d 748, 752 (E.D. La. 2000); *Fred C. v. Tex. Health and Human Servs. Comm'n*, 988 F. Supp. 1032 (W.D. Tex. 1997); *La. Seafood Mgmt. Council v. Foster*, 917 F. Supp. 439, 446 (E.D. La. 1996); *White v. State Farm Mut. Auto. Ins. Co.*, 907 F. Supp. 1012, 1018–19 (E.D. Tex. 1995*); Hunt v. City of Longview*, 932 F. Supp. 828, 840 (E.D. Tex. 1995); *Santos v. City of Houston*, 852 F. Supp. 601, 607–09 (S.D. Tex. 1994); *McDonald v. Bd. of Miss. Levee Comm'rs*, 646 F. Supp. 449, 471–73 (N.D. Miss. 1986); *Margaret S. v. Treen*, 597 F. Supp. 636 (E.D. La. 1984*); Margaret S. v. Edwards*, 488 F. Supp. 181, 211 (E.D. La. 1980); *Walters v. Edwards*, 396 F. Supp. 808, 819–20 (E.D. La. 1975); *Linda R.S. v. Richard D.*, 335 F. Supp. 804, 812 (N.D. Tex. 1971).

[3] *See St. Joseph Abbey*, 712 F.3d at 227; *Simi Inv.*, 236 F.3d at 251; *Wheeler*, 664 F.2d at 100; *Aladdin's Castle*, 630 F.2d at 1039–41*; Plyler*, 628 F.2d at 459; *Harper*, 616 F.2d at 855.

[4] *See Brantley*, 98 F. Supp. 3d at 894; *Newman Marchive*, 735 F. Supp. 2d at 489–90; *Houston Balloons*, 2009 WL 1811224; *Creekmore*, 341 F. Supp. 2d at 668; *Esperanza Peace*, 316 F. Supp. 2d at 467–69; *Casket Royale*, 124 F. Supp. 2d at 440; *Fred C.*, 988 F. Supp. at 1036; *Santos*, 852 F. Supp. at 607–09; *McDonald*, 646 F. Supp. at 471–73; *Margaret S.*, 597 F. Supp. at 675; *Margaret S.*, 488 F. Supp. at 211; *Walters*, 396 F. Supp. at 819–20; *Linda R.S. v. Richard D.*, 335 F. Supp. 804, 812 (N.D. Tex. 1971).

plaintiffs can win rational-basis cases on the merits, they can survive a motion for judgment on the pleadings, where the question is only whether their allegations are plausible.

**B.  Rational Basis Challenges to CON Laws Can Survive Motions to Dismiss.**

Indeed, challenges *specifically to CON laws* survive motions to dismiss.  In *Tiwari*, a Kentucky district court denied dismissal of claims nearly identical to those brought in this case. 2020 WL 4745772.  The plaintiffs in *Tiwari* were prevented from starting their home health agency because their "competitors convinced Kentucky to block them from doing business, denying them a 'Certificate of Need.'"  *Id*. at *1.  The plaintiffs brought equal protection and substantive due process claims. *Id*. at *5.  The Defendants argued that Kentucky's CON program for home health agencies reduced costs, increased quality, and expanded access to medical services.  *Id*. at *7. Nevertheless, the district court found that the plaintiffs had plausibly alleged that Kentucky's CON program was not rationally related to those legitimate state interests.  *Id*. at *14.

Defendant criticizes Plaintiff's reliance on *Tiwari* because that opinion was on a motion to dismiss at the pleading stage rather than a dispositive ruling on the merits, and thus the *Tiwari* opinion "does not carry [] much weight," according to the Defendant.  State Mem. 14.  This is exactly backwards.  It is exactly *because* the *Tiwari* opinion dealt with a motion to dismiss that it "carries weight" at this stage in the proceedings.  To survive a motion to dismiss, the only question is whether the plaintiff's allegations are plausible – *not* whether they will ultimately prevail on the merits.  *Porter,* 424 F. App'x at 385.  The Defendant is, in essence, asking this Court to transform merits questions into threshold Rule 12 questions by jamming them into the plausibility inquiry.

In fact, the *Tiwari* plaintiff's ultimately did not prevail on their claims at the district court. *See Tiwari*, 2021 WL 1407953 at *1.  (The case is currently on appeal to the Sixth Circuit.  *See Tiwari*, Notice of Appeal, Dkt. No. 100.)  But the fact that the *Tiwari* plaintiffs' rational basis

11

claims were later dismissed at the summary judgment stage, after surviving a motion to dismiss, has no relevance to the Court's analysis at this stage in the proceedings. The fact that the *Tiwari* plaintiffs were unable to marshal the evidence in discovery to prove their allegations to the district court's satisfaction does not mean that the Plaintiff in this case will not be able to do so. This is especially true given two especially disturbing features of this case that were absent in *Tiwari*. First, unlike Kentucky, Mississippi has imposed a forty (40)-year (and counting) moratorium on new home health agencies. Compl. ¶¶ 9–11. Second, unlike the *Tiwari* plaintiffs, Plaintiff in this case has alleged that the need for home health agencies has been dramatically increased by the COVID-19 pandemic. *Id*. ¶¶ 2; 38; 136.

Other challenges to CON laws have similarly survived motions to dismiss. In *Birchansky v. Clabaugh*, 4:17-cv-209-RGE, 2018 WL 10097338, at *20 (S.D. Iowa Feb. 12, 2018), the district court declined to dismiss a constitutional challenge to Iowa's CON laws. There, the challenged law required the plaintiffs to obtain a CON to open outpatient surgical centers, yet an existing facility could open an identical center without obtaining a CON so long as the existing facility spent less than $1.5 million annually on the expansion. *Id.* at *2. The state offered many justifications for the CON law, arguing that the complaint should be dismissed because merely articulating those justifications was enough to survive rational-basis review. *Id*. at *16–17. But the court properly rejected the state's invitation to short circuit proper judicial review.

Instead, the court carefully reviewed the plaintiffs' allegations, especially the allegation that the sole accomplishment of the CON law was "naked economic protectionism[,]" and determined that the facts in the complaint "plausibly countered the reasonably conceivable bases for the CON requirement[.]" *Birchansky*, 2018 WL 10097338, at *20. Notably, surviving a motion to dismiss does not require plaintiffs to "negative every *possible* basis" for the CON law.

*Id*. at *18 (quotation omitted; emphasis in original). Surviving the motion to dismiss only required the plaintiffs to "plausibly allege Iowa's CON framework 'privilege[s] certain businessmen over others at the expense of consumers' and 'is not animated by a legitimate government purpose[.]'" *Id*. at *15 (quotation omitted).

Challenges to CON laws in other contexts have survived motions to dismiss as well. In *Bruner v. Zawacki*, No. CIV.A. 3:12-57-DCR, 2013 WL 684177, at *1 (E.D. Ky. Feb. 25, 2013), a district court denied a motion to dismiss a rational-basis challenge to a Kentucky CON program for moving companies. Moreover, the plaintiffs in *Bruner* ultimately prevailed on the merits, with the court invalidating the CON program because the evidence showed that it amounted to "an act of simple economic protectionism." *Bruner v. Zawacki*, 997 F. Supp. 2d 691, 701 (E.D. Ky. 2014). The court acknowledged that it could not second-guess the wisdom of the state's legislature, so long as a statutory classification was "reasonable." *Id*. at 698. But courts, of course, can strike down laws that are unreasonable and arbitrary—and that's exactly what happened in *Bruner*.

Additionally, at least one state court has struck down a CON requirement for new hospitals while relying in part on its state constitution's due process clause, which the court noted was "comparable" to the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. *In re Certificate of Need for Aston Park Hosp., Inc.*, 282 N.C. 542, 550 (1973) ("*Ashton Park*"). In that case, the Supreme Court of North Carolina found "no such reasonable relation between the denial of the right of a person, association or corporation to construct and operate upon his or its own property, with his or its own funds, an adequately staffed and equipped hospital and the promotion of the public health." *Id*. at 551. Thus, the court held that the state's constitution did not "permit the [state] [l]egislature to grant to the [state's health department] authority to exclude

13

[the plaintiff] from this field of service in order to protect existing hospitals from competition otherwise legitimate." *Id*. at 552.

C. **Courts Consider Evidence to Negate Hypothetical Rationales In Cases Where There Are Plausible Allegations That There Is No Logical Connection Between the Challenged Law and Any Legitimate Government Interest.**

As in *Tiwari*, *Birchansky*, *Bruner*, and *Ashton Park*, this Court should deny the motion for judgment on the pleadings and allow the parties to build a factual record. That's because facts matter, including in rational-basis cases. Regardless of the hypothetical justification the government may raise for a law, the Supreme Court has been clear that plaintiffs have the right to introduce evidence that a law lacks a rational basis in the real world. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational"); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) ("Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." (internal citations omitted)).

As this Court has acknowledged, the Fifth Circuit also decides rational-basis cases based on facts. "'[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality.'" *Clemons v. United States*, No. 4:10-CV-209-CWR-FKB, 2013 WL 3943494, at *9 (S.D. Miss. June 13, 2013) (quoting *St. Joseph Abbey*, 712 F.3d 215 at 223). *St. Joseph Abbey* was a recent and standard application of rational basis review by the Fifth Circuit. In that case, an abbey of Benedictine monks who sold handcrafted caskets challenged the state of

Louisiana's rules that allowed only state-licensed funeral homes to sell caskets to people in Louisiana. *Id*. at 217–18. Louisiana offered three seemingly plausible bases for the challenged rules: economic protection of the funeral industry, consumer protection for casket purchasers, and public health and safety for casket purchasers. As to the first rationale, the Fifth Circuit ruled that economic protection of a favored industry is not, on its face, a legitimate state interest. *Id.* at 222–23. As to the second and third rationales, both were seemingly plausible. If all rational basis review required was the offering or conjecture of a seemingly plausible basis, the court could have stopped there and dismissed the monks' claim.

Instead, the Fifth Circuit considered the evidence that the monks adduced during discovery and at trial, which negated both of the state's purported bases. For instance, regarding "health and safety," the monks established during discovery and trial that Louisiana did not require caskets for burial, did not impose requirements for their construction or design, did not require a casket to be sealed before burial, and did not require funeral directors to have any special expertise in caskets. *Id.* at 223–27. These facts fatally undermined the logic of Louisiana's "health and safety" basis for permitting only funeral homes to sell caskets to in-state customers.

The Fifth Circuit's opinion in *St. Joseph Abbey* is not an outlier. It is commonplace for courts conducting a rational-basis analysis to refer to record evidence in concluding that a purported justification for a law is too implausible to credit. For example, in *City of Cleburne v. Cleburne Living Center, Inc.*, the government posited that junior-high students from across the street might tease the mentally handicapped, but the Supreme Court rejected the plausibility of this based on the evidence that the junior high school had thirty mentally handicapped students. 473 U.S. 432, 449 (1985); *see also, e.g., Plyler v. Doe*, 457 U.S. 202, 230 (1982) (record evidence cited to refute the government's assertion that perhaps illegal alien children are less likely to remain in

state); *Craigmiles v. Giles*, 312 F.3d 220, 225 (6th Cir. 2002) (public-health justification for restricting who can sell a casket refuted by evidence at trial that retailers do not handle remains).

As a practical matter, the use of evidence and reasoning to refute asserted rationales is particularly prevalent in cases where there is a plausible reason to think that the real explanation for a law is an illegitimate government interest such as pure economic protectionism. This makes sense. The purpose of judicial deference in the rational-basis context is to ensure that courts do not improperly intrude on the legitimate prerogatives of legislatures. Rational-basis review was never intended to be a smokescreen for those seeking to commandeer the public power of government for purely private ends. *See Cleburne*, 473 U.S. at 446–7 (1985) ("Furthermore, some objectives — such as a bare desire to harm a politically unpopular group — are not legitimate state interests.") (cleaned up); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983) (distinguishing between legitimate state purposes and "providing a benefit to special interests"); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) ("Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected."); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949) ("the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition"); *St. Joseph Abbey*, 712 F.3d at 226–27 ("'naked economic preferences are impermissible to the extent that they harm consumers'") (quotation omitted); *Craigmiles*, 312 F.3d at 224 ("protecting a discrete interest group from economic competition is not a legitimate governmental purpose"); *Bruner*, 997 F. Supp. 2d at 698 (same); *Tiwari*, 2020 WL 4745772, at *11 ("Such wealth transfers were among the framing generation's chief concerns – transfers from weak factions to strong factions 'who are united and actuated by some common impulse of passion,

or of interest, adversed to the rights of other citizens, or to the permanent and aggregate interests of the community.'" (quotation omitted)).

These opinions do not mean that rational basis claims can never be dismissed at the Rule 12 stage or that survival of a claim at the Rule 12 stage is equivalent to a judgment as a matter of law in favor of the plaintiff. In cases where the state provides a rational basis for the challenged law and the plaintiffs have offered no plausible claims to the contrary, the case will be dismissed. But where the state provides only a theoretically plausible rationale and the plaintiff is successful in undermining the logic that makes that basis rational, then the claim can proceed to an evidentiary stage. In that stage, the state may be able to provide evidence or better argumentation that rehabilitates their bases for the challenged law or supports new bases. If the state does so, the rational basis claim later may be dismissed before trial, even though the claim survived a motion to dismiss, as in fact often happens in rational-basis cases.

In this case, like in *St. Joseph Abbey*, the Defendant has offered seemingly plausible bases for the CON law and moratorium. However, Plaintiff has offered context that belies the supposed rationality of those laws. Thus, the Court should allow the parties to build a factual record.

## II. THE COMPLAINT SUFFICIENTLY ALLEGES THAT THE MORATORIUM AND THE CON PROGRAM IRRATIONALLY TREAT PROVIDERS UNEQUALLY.

### A. The Complaint States a Federal and State Equal Protection Claim.

The crux of Plaintiff's federal and state[5] equal protection claim is that Mississippi's home health CON program and moratorium keeps newcomers (like Plaintiff) out of business, while

---

[5] Plaintiff's claims under the equal protection and due process guarantees of Article 3, Section 14 of the Mississippi Constitution (Compl. ¶¶ 149; 171) are currently construed as coextensive with the similar guarantees of the Fourteenth Amendment. *See Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2017 WL 3175915, at *5 (S.D. Miss. July 25, 2017); *Stallworth v. Bryant*, 936 F.3d 224, 227 n.5 (5th Cir. 2019). However, Mississippi's courts *always* have the prerogative of holding that those state-created rights afford greater protection of rights than are found in the Fourteenth Amendment. *See, e.g., Michigan v. Long*, 463 U.S. 1032 (1983). If that occurs during the pendency of this litigation, Plaintiff will inform the Court.

favoring existing providers.  Compl. ¶¶ 82–91; 120–24.  As a result, Plaintiff and home health patients suffer, while existing home health agencies profit.  In fact, some providers are exempt from the CON program altogether.  *Id*. at ¶ 84.  Plaintiff plausibly alleges that there is no rational basis for drawing these distinctions or otherwise treating some providers differently from others. *Id*. at ¶¶ 100, 150–66.  Instead, the only reason the challenged program and moratorium continue is because existing certificate holders lobby to keep them intact to avoid competition.  *Id*. ¶¶ 72; 119; s*ee also* Doc. 9 at pg. 5 (Mississippi Association for Home Care and members moving to intervene because the members "could lose such a substantial portion of their market[.]").  This alone is enough to survive a motion to dismiss.  Specifically, Plaintiff alleges:

- "Home health agencies may offer a range of non-medical and medical services to their clients." Compl. ¶ 34.

- "There is an unmet need for home health services throughout Mississippi."  *Id*. ¶ 37.

- The need for home health services has been increased by the outbreak of COVID-19. *Id*. ¶¶ 2; 38; 136.

- Plaintiff is personally aware of individuals in Mississippi who need or would prefer home health services and who cannot find adequate home health services.  *Id*. ¶ 135

- Applying the CON law to home health agencies does not further public health and safety because the licensure requirements accomplish that.  *Id*. at ¶¶ 163; 177;

- There is no rational reason to treat agencies "differently based on whether they already have a CON or based on who the home health agency's owner is."  *Id*. at ¶ 151;

- CON programs were first created to allocate federal funding for the creation of hospitals.  *Id*. at ¶ 49.

- But in comparison to opening a hospital, "[s]tarting a home health agency does not require a large capital investment."  *Id*. at ¶ 35.

- "No purported justification for certificates of need in other contexts, such as control of capital expenditures or cross-subsidization, exists in the home health context."  *Id*. at ¶ 159.

- "Even if Mississippi's certificate-of-need program achieved any of its purported purposes for some types of health care services, which it does not, the certificate-of-need program does not achieve any legitimate state purpose in the home health context." *Id.* at ¶ 158.

- "Mississippi's moratorium imposes an absolute ban on the establishment of new home health agencies." *Id.* at ¶ 132.

- The moratorium has been in effect for forty (40) years. *Id.* at ¶¶ 11; 127.

- "The original purpose of Mississippi's moratorium on the establishment or expansion of home health agencies was to protect existing home health agencies from competition with hospitals. . . ." *Id.* at ¶ 17.

- "Protecting home health agencies from competition with hospital-owned home health agencies is not a legitimate government purpose." *Id.* at ¶ 19.

- The strong incentives that caused hospitals to start their own home health agencies forty (40) years ago no longer exist. *Id.* at ¶ 20.

- Since the moratorium was imposed, the number of home health patients in Mississippi has increased by at least 194 percent. Despite this, the moratorium was never lifted. *Id.* at ¶ 121.

- "[A]s the need for home health services in Mississippi increases, existing home health agencies increase their staffing and capacity, thereby preventing the "need" for home health services (as calculated by the state health plan) from ever becoming acute enough to lead to the repeal of the moratorium." *Id.* at ¶ 122.

- "Even if the moratorium once served a legitimate government interest, which it did not, changed circumstances since the enactment of the moratorium have rendered it irrational." *Id.* at ¶ 155.

- "Artificially limiting the supply of home health services increases consumer costs, decreases access to care, decreases the quality of care, and discourages innovation." *Id.* at ¶ 161.

- The true purpose of Mississippi's home health CON program and moratorium on the issuance of new CONs for the establishment of home health agencies is to protect established health care facilities from competition. *Id.* at ¶¶ 164–65.

In response to these allegations, Defendant concedes, as he must, that new home health agencies are treated differently than existing home health agencies, since the moratorium allows existing home health agencies to continue operating while imposing a categorical ban on the

starting of new home health agencies.  *See* State Mem. 10.  Rather than arguing that Plaintiff is treated equally, the Defendant points out that aspiring healthcare entrepreneurs in five (5) other fields are also treated unequally by various moratoria imposed in those fields.  *Id*. at 10.  Thus, Defendant argues that Plaintiff's unequal treatment is rational because he has not been "singled-out" for unequal treatment.  *Id*.  Not so.  The fact that healthcare providers in other fields may be treated unequally does not mean it is rational to treat new home health agencies differently from existing home health agencies.  The rationality of the moratoria that exist in other health care fields is not before the Court.  The moratorium on new home health agencies is.

Defendant's argument also ignores that still other facilities can open without obtaining a CON at all.  Compl. ¶ 156; *see also* Miss. Code §§ 41-7-173(h) and 41-7-191 (exempting from the CON program various medical providers including physician private practice offices, personal care residential-living and assisted-living facilities, abortion facilities, veterans homes, and health care facilities owned and/or operated by the state of Mississippi or it's agencies).  It is beyond dispute that the moratorium and CON program treat some facilities more favorably than Plaintiff.

Therefore, the ultimate question is whether there is a rational reason for the state to favor some providers over others.  *See Gibson v. Tex. Dep't of Ins.—Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (laws violate equal-protection guarantees if they irrationally treat similarly situated individuals differently).  But this Court cannot determine the answer to that question at this stage because Plaintiff plausibly alleges that there is no rational reason for the CON program and moratorium to distinguish between providers as they do.  Compl. ¶¶ 150–58.  Plaintiff also plausibly alleges that instead of accomplishing a government purpose, the challenged CON program and moratorium actually raise health care costs and harm Mississippians.  *Id*. ¶¶ 160–61.  And finally, Plaintiff plausibly alleges that the rationales offered in defense of CON programs do

not apply in the home health context.  *Id.* ¶¶ 5; 158–59.  When accepted as true, these allegations state a plausible claim for relief and Plaintiff's equal-protection claim, therefore, should proceed.

### B.  The Complaint States a Federal and State Due Process Claim.

As with his equal-protection claim, Plaintiff also plausibly alleges that the home health CON program and moratorium violate his federal and state due process rights.  Laws that lack a rational relationship to a legitimate government purpose violate due process rights and are thus unconstitutional.  *See St. Joseph Abbey*, 712 F.3d at 227; *Tiwari,* 2020 WL 4745772 at *14. Specifically, Plaintiff alleges:

- "Congress found there was no evidence that certificate-of-need programs advanced their goal of lowering health care costs or even slowing the growth of health care costs. In fact, the evidence showed that certificate-of-need programs resulted in increased health care costs."  Compl. ¶ 63.

- "At least four times since 1986, the federal government has reaffirmed its conclusion that certificate-of-need programs raise costs and harm patients."  *Id.* ¶ 65.

- "The certificate-of-need application and review process, as created by MSDH and carried out by the Defendant and his predecessors and successors in office, prevents entrepreneurs like Plaintiff from offering cost-effective and specialized home health services, despite the fact that actual need for these services exists in the Jackson metropolitan area and throughout Mississippi."  *Id.* ¶ 118.

- Due to the moratorium, it is impossible to start a home health agency.  *Id.* ¶ 124.

- The actual purpose of Mississippi's certificate-of-need program and moratorium are to offer health care providers a government-backed shield from competition.  *Id.* ¶¶ 80; 101; 164–65; 183–84;

- "Upon information and belief, Defendant possesses no evidence that preventing home health agencies from opening increases access to safe, quality, affordable home health services in the Jackson metropolitan area or elsewhere in Mississippi, or achieves any other legitimate government interest."  *Id.* ¶ 100.

- "Ignoring the fact that the majority of states do not require certificates of need for home health agencies and have not experienced negative health or safety consequences is irrational."  *Id.* ¶ 181.

- It is irrational to ignore that only one other state in the United States imposes a moratorium (that has not been in place nearly as long as Mississippi's moratorium) on home health agencies, and that the forty-eight (48) states that do not impose a moratorium have not experienced negative health or safety consequences. *Id*. ¶ 182.

- "Even if Mississippi's certificate-of-need program achieved any of its purported purposes for some types of health care services . . . the certificate-of-need program does not achieve any legitimate state purpose in the home health context." *Id*. ¶ 186.

- Even if the moratorium once served a legitimate government interest, changed circumstances have rendered it irrational. *Id*. ¶ 174.

- The challenged laws harms entrepreneurs and further deprive consumers of home health services of additional options when choosing a home health provider. *Id*. ¶ 188.

Taking these allegations as true, Plaintiff has plausibly shown that the CON program and moratorium violate his federal and state due process rights because (1) they lack a rational relationship to any legitimate state interest and (2) they achieve nothing beyond economic protectionism, which is an illegitimate state interest. *St. Joseph Abbey*, 712 F.3d at 226–27; *Tiwari*, 2020 WL 4745772 at *12.

Defendant claims that the CON program and moratorium improve the quality of health care, increase access to care, and decrease costs. State Mem. 14. But merely stating a generic interest in the home health CON program and moratorium ignores Plaintiff's plausible allegations (which must be taken as true) that the program utterly fails to achieve any of its purported interests. Compl. ¶¶ 60–71, 102, 118. And even if CON programs are reasonable in some contexts, they are unreasonable in the home health context. *Id*. ¶ 186. In other words, Plaintiff has plausibly alleged that there is no rational relationship between the government's alleged goals and the home health CON program and moratorium it has adopted to pursue those goals.

Second, the Complaint alleges that the true purpose of the CON program and moratorium is the illegitimate purpose of offering "health care providers a government-backed shield from competition." Compl. ¶ 80. Instead of furthering public health or safety (which is accomplished

separately by licensure, *e.g. id.* ¶ 129–31), the program only protects existing home health agencies from competition. *Id.* ¶¶ 99, 101–03, 109–10, 119, 183–87. Economic protectionism of this sort is never legitimate. *St. Joseph Abbey*, 712 F.3d at 226–27; *Tiwari*, 2020 WL 4745772 at *14.

Other factual allegations support this view of the home health CON program and moratorium. For example, Plaintiff alleges that the original purpose of Mississippi's moratorium was to protect existing home health agencies from competition with hospitals brought on by a change in Medicare reimbursement methods. *Id.* ¶¶ 17–18. Plaintiff also alleges that, in practice, existing certificate holders oppose applications for certificates from newcomers, Compl. ¶ 109, illustrating that the true purpose of Mississippi's CON program and moratorium is to protect established health care facilities from competition. *Id.* at ¶¶ 164–65; s*ee also* Doc. 9 at pg. 5 (proposed intervenors "could lose such a substantial portion of their market[.]"). These allegations are enough to raise a plausible claim that the only reason the CON program and moratorium remain is for the improper purpose of protecting entrenched interests' bottom lines.

## III.   DEFENDANT FAILS TO CITE ANY RELEVANT AUTHORITY TO THE CONTRARY.

In the face of these plausible allegations, Defendant relies primarily on general rational-basis cases, many of which were decided on full records after trial or an evidentiary hearing or at the summary judgment stage, which is precisely what Plaintiff argues he is entitled to here. State Mem. 10–14. Defendant, then, relies primarily on two circuit court opinions involving CON laws. State Mem. 14. In *Colon Health Centers of America, LLC v. Hazel*, the Fourth Circuit affirmed the district court's dismissal of plaintiffs' challenges to Virginia's CON requirement for MRI machines. 733 F.3d 535, 548 (4th Cir. 2013). In *Birchansky v. Clabaugh*, the Eighth Circuit affirmed the district court's grant of summary judgment on plaintiffs' challenges to Iowa's CON

requirement for outpatient surgery centers. 955 F.3d 751, 759 (8th Cir. 2020). But those cases are distinguishable, for several reasons.

*Colon Health* did not involve a complete ban on new MRI machines. 733 F.3d at 541. *Birchansky* did not involve a complete ban on new outpatient surgery centers. 955 F.3d at 755. Here, Mississippi imposed a total ban on new home health agencies in 1981. Compl. ¶ 11. This moratorium has never been lifted, despite the fact that the number of home health patients in Mississippi has increased by at least 194 percent in that time. *Id*. at ¶ 121. Defendant offers no real rationale for this continued moratorium, aside from his own *ipse dixit*. *See* State Mem. 23. ("[T]he MSDH and the Board of Health consistently find that there is not a need for additional HHAs.") This purported reason is circular and irrational. By perpetually shielding the existing home health monopolies from competition and allowing them to continually expand their staffing and capacity within their service areas, Mississippi ensures that the formula it uses will *never* show a "need" for a new home health agency. Compl. ¶ 122. Thus, "the deck is stacked against start-ups" in a way that is impossible to overcome. *Tiwari*, 2020 WL 4745772 at *4.

The Court in *Tiwari* found plausible claims based on much less. There, the Court found Kentucky's formula "especially disturbing," because it was easier for incumbents to expand their services than for start-up competitors to enter the market. *Id*. at *12. "Incumbents [could] obtain a Certificate [to expand] when there were only . . . 125 patients in need, while start-ups [could] do so only when there are 250 patients in need." *Id*. at *12, n. 136. This "prevent[ed] the formula from showing a 'need' for the start-ups." *Id*. at *12. In Mississippi, it is *impossible* for startups to enter the market, and because nothing prevents incumbents from expanding their staffing and capacity, Mississippi's formula will likewise *never* show a "need."

Additionally, neither *Colon Health* nor *Birchansky* involved the home health context. The court in *Tiwari* examined those same two cases and found this difference mattered for two reasons:

> First . . . it doesn't cost much to start a home health agency. In fact, aside from regulatory expenses, you don't need much more than a qualified worker with a car and gas money. You don't need to buy a CT scanner or MRI machine, as in *Colon Health*. And you don't need to construct a whole center for outpatient surgery, as in *Birchansky*. Because it doesn't cost much to start a home health agency, the government doesn't need to guarantee a home health company a monopoly in order to incentivize someone to make the capital investment for it. . . .
>
> Second, unlike patients getting colonoscopies, MRIs, or outpatient surgery, home health patients can't travel to a provider outside their county. After all, the whole point of home health care is that it's *inside* your home. Patients in 114 of the Commonwealth's 120 counties can't access service from an innovative home health start-up. But in the states covered by *Colon Health* and *Birchansky*, patients can travel to another county, or even another state, for innovative care from entrepreneurs providing the medical procedures at issue.
>
> In short, even if the regulatory schemes in *Colon Health* and *Birchansky* rationally related to legitimate state interests, those decisions merely mean Kentucky's Certificate of Need laws might be constitutional for CT scanners, MRI machines, and outpatient surgery centers. They do not show how Kentucky's regime helps anyone in the home health context other than rent-seeking incumbents.

*Tiwari*, 2020 WL 4745772 at *13–14 (citations omitted); *see also* Compl. ¶¶ 5, 35, 40, 58–59, 124. The same reasoning applies to Mississippi's CON program and moratorium.

Defendant also relies on a district court opinion, *Truesdell v. Friedlander*, which dismissed plaintiffs' equal protection and due process claims against Kentucky's Certificate of Need requirement for ambulance companies. No. 3:19-CV-00066-GFVT, 2020 WL 5111206, *9 (E.D. Ky. Aug. 31, 2020). (A final judgment has not been rendered in the case and thus the dismissal of plaintiffs' equal protection and due process claims is not yet appealable. *Id.*) But just like *Colon Health* and *Birchansky*, the decision in *Truesdell* did not involve a complete ban on start-up ambulance companies and did not involve the home health context. Thus, *Truesdell* is distinguishable for the same reasons that *Colon Health* and *Birchansky* are.

In sum, Plaintiff plausibly alleges that Mississippi's home health CON law and moratorium are unconstitutional, and this Court should deny the motion, just as the court did in *Tiwari*.

## IV. PLAINTIFF HAS NEGATED DEFENDANT'S ASSERTED RATIONALES SUFFICIENTLY FOR THIS STAGE IN THE LITIGATION.

Defendant says the home health CON program and moratorium serve three purposes: they reduce costs, increase quality, and expand access to medical services. State Mem. 17–24. The question is whether the CON program and moratorium are rationally related to those asserted interests. Plaintiff has alleged facts in the Complaint that plausibly counter that they are not. While Defendant disputes the facts in the Complaint, at this stage, this Court must accept those facts as true and decide whether they state a plausible claim for relief. *Porter*, 424 F. App'x at 385.

The defendants in *Tiwari* asserted the same rationales that Defendant here does. Citing the same facts Plaintiff has alleged in his Complaint here, the court in *Tiwari* held that "for now, at the very least, Plaintiffs' allegations are plausible." *Tiwari*, 2020 WL 4745772 at *14.

### A. The Challenged Laws Are Not Rationally Related to Cost Reduction.

Plaintiff's Complaint includes "an extensive line of scholarly research that 'casts considerable doubt on the proposition that [Certificate of Need] programs lead to reduced healthcare expenditures or that their repeal leads to a surge in unnecessary services in the market.'" *Id.* (quotation omitted); *see also* Compl. ¶ 70, n.1. Specifically, Plaintiff's Complaint shows that:

- In 1998, a study in Duke's peer-reviewed *Journal of Health Politics, Policy, and Law* "found no evidence of a surge in acquisition of facilities or in costs following removal of [Certificate of Need] regulations. The same study found that mature [Certificate of Need] programs were not associated with a significant reduction in per capita costs;"[6]

---

[6] Emily Whalen Parento, *Certificate of Need in the Post-Affordable Care Act Era*, 105 Kentucky Law Journal 201, 227 (2017) (citing CHRISTOPHER J. CONOVER & FRANK A. SLOAN, *Does Removing Certificate-of-Need Regulations Lead to a Surge in Healthcare Spending?*, 23 JOURNAL OF HEALTH POLICY, POLITICS, & LAW 455, 469 (1998)).

- In 2003, a study in the peer-reviewed *Inquiry: The Journal of Health Care Organization, Provision and Financing* "showed that states that repealed their [Certificate of Need] laws did not experience significant growth in either nursing home or long-term care costs;"[7]

- In 2007, a study in the peer-reviewed *Health Education Journal* "showed that healthcare costs were, on average, higher in states with [Certificate of Need] programs;"[8]

- In 2010, a "more rigorous" study in the *Journal of Healthcare Finances*, "concluded that [Certificate of Need] programs not only failed to correlate to lower costs, they might actually lead to *higher* costs per admission."[9]

*See* Compl. ¶ 70, n.1.

Plaintiff's Complaint also illustrates that the federal government agrees with this line of scholarly research. Congress repealed its Certificate-of-Need mandate in 1986 because "the evidence showed that certificate-of-need programs resulted in increased health care costs." Compl. ¶¶ 60–63. In addition, the Department of Justice and the Federal Trade Commission have taken an active position against the continuance of CON programs. *Id*. ¶¶ 65–69. For example, in 2004, they cited "considerable evidence that [Certificate of Need] programs can actually increase prices by fostering anticompetitive barriers to entry." *Id*. ¶ 67. They originally took this position in 1988, and reaffirmed it in 2004, 2016, and 2020. *Id*. ¶ 66–69.

The court in *Tiwari* cited these exact same facts as sufficient to show that the plaintiffs' claims were plausible. 2020 WL 4745772 at *14.

---

[7] *Id*. at 227 (citing DAVID C. GRABOWSKI, *The Effects of CON Repeal on Medicaid Nursing Home and Long-Term Care Expenditures*, 40 INQUIRY 146, 154 (2003)).

[8] *Id*. (citing PATRICK A. RIVERS, *Does Certificate of Need Really Contain Hospital Costs in the United States?*, 66 Health Education Journal 229, 240-41 (2007)).

[9] *Id*. (citing PATRICK A. RIVERS, *The Effects of Certificate of Need Regulation on Hospital Costs*, Journal of Healthcare Finance, Summer 2010, 1, 10-11)).

**B.  The Challenged Laws Are Not Rationally Related to Increasing Access.**

Plaintiff's Complaint includes additional research that "support[s] the conclusion that [Certificate of Need] programs restrict access to care."  *Id.* at *9; *see also* Compl. ¶ 70, n.1. Specifically, Plaintiff's Complaint includes a 2014 study by George Mason University showing that "while the average state has 362 hospital beds per 100,000 population, this number falls to 263 hospital beds per 100,000 population in states with [Certificate of Need] programs."[10]  *See* Compl. ¶ 70, n.1.  Another study included in Plaintiff's Complaint "found no evidence" that those programs enhanced a state's ability to provide indigent care,[11] such as the Medicaid and indigent care that the Defendant here insists justify the CON program and moratorium.  *Id.*

Again, the court in *Tiwari* cited these exact same facts as sufficient to show that the plaintiffs' claims were plausible "[a]t least in the home health context . . . where 'starting a home health agency does not require a large capital investment.'"  2020 WL 4745772 at *9–10.

Defendant's non-statutory requirement that certificate holders provide Medicaid/indigent care fares no better.  State Mem. 19–20.  The CON statute Plaintiff challenges contains no requirement that certificate holders provide Medicaid/indigent care.  Miss. Code Ann §§ 41-7-171 *et seq*.  Of course, Defendant may choose to require medical facilities to provide Medicaid/indigent care, but that requirement has no logical connection to the CON law.  For the time being it may have made sense for Defendant to attach this requirement to certificate holders (since they are the *only* providers), but if the CON law is enjoined, he can attach this same requirement to all licensed providers, if desired.  The CON program is irrelevant to that policy choice.  "[A] hypothetical rationale, even *post hoc*, cannot be fantasy."  *St. Joseph Abbey*, 712 F.3d at 223.

---

[10] PARENTO at 228 (citing THOMAS STRATMANN & JAKE RUSS, *Do Certificate-of-Need Laws Increase Indigent Care*? 11-12 (Mercatus Center, George Mason Univ., Working Paper No. 14-20, 2014)).

[11] *Id*. (citing STRATMANN & RUSS at 18).

### C. The Challenged Laws Are Not Rationally Related to Increasing Quality.

Plaintiff's Complaint also includes research showing that "stringent [Certificate of Need] programs decrease the quality of care in many settings." *Id.* at *10; *see also* Compl. ¶ 70, n.1. Specifically, Plaintiff's Complaint includes:

- A 1988 study in the *New England Journal of Medicine* "showed higher mortality rates in hospitals in states with stringent [Certificate of Need] programs."[12]

- A 2009 study in *Health Services Research* "found that states that had dropped [Certificate of Need] regulations had lower mortality rates for [coronary artery bypass graft] surgery than states that kept their [Certificate of Need] programs."[13]

- An informal 2017 study in the *Kentucky Law Journal* concluded "hospitals in [Certificate of Need] states are approximately 50% more likely to be penalized [by Medicare] than those in non-[Certificate of Need] states."[14]

*See* Compl. ¶ 70, n.1.

Again, the court in *Tiwari* cited these exact same facts as sufficient to show that the plaintiffs' claims were plausible. 2020 WL 4745772 at *11.

In sum, Plaintiff has alleged facts in the Complaint that plausibly negate Defendant's asserted rationales for the challenged laws. Accepted as true, as they must be, these facts state a plausible claim for relief, as the court in *Tiwari* found. 2020 WL 4745772 at *14.

### V. PLAINTIFF'S CHALLENGE TO THE ADMINISTRATIVE MORATORIUM IS NOT MOOT.

Defendant argues that Plaintiff's challenge to the administrative moratorium is moot because it expired in 1982 (and was replaced by the statutory moratorium). State Mem. 9–10; *see also* Compl. ¶¶ 9–11. But the Mississippi Administrative Code still to this day says:

---

[12] PARENTO at 229 (citing STEPHEN M. SHORTELL & EDWARD F.X. HUGHES, *The Effects of Regulation, Competition, and Ownership on Mortality Rates Among Hospital Inpatients*, 318 NEW ENGLAND JOURNAL OF MEDICINE 1100, 1101, 1102 (1988)).

[13] *Id.* at 230 (citing VIVIAN HO, *Certificate of Need (CON) for Cardiac Care: Controversy Over the Contributions of CON*, 44 HEALTH SERVICES RESEARCH, 483, 493-96 (2009)) (cleaned up).

[14] *Id.* (cleaned up).

> The Department [of Health] likewise is prohibited from granting approval for or issuing a CON to any person proposing the establishment or expansion of the currently approved territory of, or the contracting to establish a home office, subunit, or branch office within the space operated as a health care facility as defined in Section 41-7-173 (h) (i) through (viii) by a health care facility as defined in subparagraph (ix) (home health agency) of Section 41-7-173 (h).

15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2. This may be intended as an acknowledgement of the statutory moratorium, but it does not say that. Even if the statutory moratorium were enjoined, the regulations would still contain this prohibition. The state health plan also states that "[i]f the present moratorium were removed or partially lifted, MSDH would review applications for a CON for the establishment of a home health agency. . . ." *See* Compl. ¶¶ 123. But this does not say whether it is referring to the prohibition in statute, or the one in the regulations, or both. If this Court enjoins enforcement of the statutory moratorium it should also enjoin enforcement of 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2 to deny home health CONs.

## CONCLUSION

Plaintiff respectfully requests this Court to deny the motion for judgment on the pleadings.

RESPECTFULLY SUBMITTED, this the 22nd day of June, 2021.

 /s/ *Aaron R. Rice*  
Aaron R. Rice  
MS Bar No. 103892  
MISSISSIPPI JUSTICE INSTITUTE  
520 George St.  
Jackson, MS 39202  
Tel: (601) 969-1300  
Email: aaron.rice@msjustice.org

A. Seth Robbins  
MS Bar No. 103096  
WATSON JONES PLLC  
2829 Lakeland Drive, Suite 1502  
Flowood, Mississippi 39232  
Tel: 601.939.8900  
Fax: 601.932.4400  
Email: srobbins@wjpllc.com         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been filed using the Court's ECF filing system.

This the 22nd day of June, 2021.

 /s/ *Aaron R. Rice*  
Aaron R. Rice