IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CHARLES SLAUGHTER

                                            PLAINTIFF


V.            CIVIL ACTION NO. 3:20-CV-789-CWR-FKB


DR. DANIEL P. EDNEY, IN
HIS OFFICIAL CAPACITY AS
THE MISSISSIPPI STATE
HEALTH OFFICER, ET AL.

                                            DEFENDANTS


30(b)(6) DEPOSITION OF MISSISSIPPI STATE
DEPARTMENT OF HEALTH
{DR. LUCIOUS LAMPTON}


Taken at the instance of the Plaintiff at
Mississippi Attorney General's Office, 550 High
Street, Jackson, Mississippi 39205, on Friday,
December 20, 2023,
beginning at 9:09 a.m.


**EXHIBIT**
**2**


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   to advise what we do.  We've attempted to address
 2   every issue that's been brought to us about
 3   problems that people are having and bring it
 4   before our committee.  And usually we set up a
 5   task force to deal with that.
 6                Such issues, as we've had issues with
 7   some counties not having dialysis units, and we've
 8   brought the -- we have a subcommittee that deals
 9   with renal CON, and we've discussed ways to try to
10   provide better access to care.
11                Probably in about 2009 the Board voted
12   to -- the primary role of CON, historically, had
13   been to control monitary spending by the
14   government in a big way, was one of the impetuses
15   for its creation.  At the Department we've seen it
16   has -- it can help us with health planning and
17   that we can use it as a vehicle to protect
18   essential institutions and also try to further
19   their access to care in the state.  So we made
20   access to care as one of the missions of CON in
21   Mississippi and officially included it in its
22   mission.
23                And I start every meeting by talking
24   about that we're here to protect the interests of
25   the citizens of the state.  And I think if we can
```

 1    were lifted there would be a significant need to
 2    look at that.  And when you were answering my
 3    question, you said that you weren't sure if the
 4    need would change.  And I think you meant the
 5    patients need for home health may not change based
 6    on what the moratorium does; is that right?
 7         A.   Right.  We may -- if the moratorium is
 8    lifted and then we sort of focus in perhaps a
 9    little bit more laser-like on need and are we
10    assessing it correctly.  Which we're doing any
11    way, but we may not have looked at, you know, in
12    the most recent period.
13              I mean, from my personal experience and
14    from talking with staff, I doubt there's going to
15    be a need for more home health services in the
16    state based on that.  It's just the health care
17    environment doesn't really seem to need that right
18    now because there is a retraction in demand for
19    home health services compared to a decade ago.
20         Q.   Yeah.  The reason I asked that is I just
21    wanted to make sure my question was clear.  What I
22    want to ask is regardless of whether the need
23    itself changes, the Board would look at the
24    criteria that applied to home health agencies,
25    that they had to meet in order to get a CON.  And

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   on Page 2?
 2         A.    I just don't want to go to Table 10.
 3         Q.    We're almost done with the tables.
 4               Do you see that it also totals the
 5   number of patients who were denied a referral to
 6   home health agency?
 7         A.    Total referrals -- yes.
 8         Q.    Okay.  And do you see above the totals
 9   in the descriptions of these we see that in the
10   2020 report on home health agencies it reports
11   that there were 811 patients who were denied a
12   referral because the needed service was
13   unavailable.  Do you see that?
14         A.    Needed service unavailable, total 811,
15   yes.
16         Q.    And then there's also a list for other
17   and it's 14,633.  Is that right?
18         A.    Correct.
19         Q.    Okay.
20         A.    That's a relatively large number of
21   other.  But there are a lot of others.
22         Q.    Is the Board of Health -- they're
23   conducting a review of the State Health Plan and
24   certificate of need process in Mississippi right
25   now?
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1        A.    Correct.

 2        Q.    Okay.

 3        A.    HMA is doing a very extensive study that

 4   may even go over years.

 5        Q.    Is it right that there's kind of two

 6   different pieces of that, as I understand it?  And

 7   I'll just say one being kind of correcting, or

 8   more about the State Health Plan itself and the

 9   data it uses and the methodologies and things like

10   that, and then maybe another --

11        A.    You are correct.  You know, we're trying

12   to see -- we're trying to make the State Health

13   Plan -- there is a desire to make it a more

14   strategic proactive document.  So we can better

15   inform the legislature and the leadership about

16   the needs of the state regarding health.

17              And then also it needs to be a more --

18   I'm not going to say -- we're looking at the regs

19   and what's in the State Health Plan to try to be

20   sure that we have policies that review need

21   criterion and that they're up-to-date with where

22   they need to be for 2023 and 2024 instead of 2000.

23        Q.    Okay.

24        A.    And, you know, and oftentimes you get a

25   need criteria and it remains unchanged for long
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   periods.  And we're very much feeling that if
 2   we're going to have CON, it needs to be a vital
 3   document in our State Health Plan.  Certainly
 4   needs to be a vital document and that we need to
 5   do updates with need criterion and we need to do
 6   updates with what needs CON and things that may
 7   not even need the CON any more.
 8        Q.   That review of the need criterion that
 9   is being conducted, does that include for home
10   health agencies?
11        A.   Yes.
12        Q.   Okay.  Do you know how -- first of all,
13   was this done using an appropriation from the
14   legislature to provide additional funds to conduct
15   these reviews and overhauls?
16        A.   Yes.
17        Q.   Do you know how that came about?  Who
18   was the first person who said to you that there
19   was going to be a review of the State Health Plan
20   and CON program?
21        A.   I do not remember.  I think we have been
22   talking -- the CON committee has been talking for
23   several years about the need to have outside
24   consultants come and give us direction and
25   expertise.
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1                On the Board of Health, Jim Perry has

 2     taken an outstanding role in encouraging us to do

 3     this.  But there are others, and there are

 4     legislative leadership that's very interested in

 5     this.  But I don't remember the first person that

 6     I've discussed.  But I think there's significant

 7     discussion, certainly probably going to occur at

 8     this legislative session about the CON process,

 9     its relevance in going forward, do we need to keep

10     it, do we need to get rid of it, do we need to get

11     parts of it.  As somebody who's worked with CON

12     for an extended period, my advice for the

13     legislative leadership and those in positions of

14     power is that if we decide we're going to get rid

15     of it, we probably need to get rid of it slowly

16     and with a considered plan about how we do it,

17     just not open the -- the barn doors open.  We have

18     a very fragile health system in the state, and it

19     doesn't respond to stress and change very well.

20     And even though market forces in the state play a

21     significant role with health care, health care is

22     different.  There are essential institutions that

23     have very low margins.  The government and

24     insurance payments often complicate those margins.

25     Hospitals often have to have call centers that are
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1    unrelated to their bread-and-butter services in

2    order to provide the bread-and-butter services.

3              I mean, I kind of view medicine as a

4    philanthropic enterprise that's working in a

5    market system.  And if you look at the history of

6    medicine in the state, the state has been

7    providing charity payments to hospitals for over a

8    hundred years.

9        Q.   I know from the -- I've watched the Zoom

10   meeting of y'all's December 12th meeting about all

11   of this.  And I know that you plan to get an

12   executive summary from the consultant soon,

13   hopefully before the legislative session.  Have

14   you seen an early draft of that executive summary?

15       A.   Outside of what was presented at the

16   Board meeting, I have not seen a draft.  Our hope

17   is we have a Board meeting on the 10th of January,

18   and they're supposed to provide us with that prior

19   to that and prior to the legislative session which

20   begins the 3rd, I believe.  So the intent of the

21   Board and the legislature in encouraging us to do

22   this has been to have our consultants advise not

23   only the Board, but the legislature about

24   appropriate health needs, especially with CON and

25   with the State Health Plan.

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
1        Q.   And in that meeting, Dr. Edney also said
2    that CON was definitely going to be a significant
3    issue this session.  Do you know what's prompted
4    it to be an issue such that the Board of Health
5    knows it will be an issue this session?
6        A.   I've been told by legislative leadership
7    that it's going to be an issue.  In the last, I
8    guess, two to three years a significant
9    legislative and executive leadership have been
10   expressing an interest in everything from
11   moderating CON to a gradualism of getting rid of
12   it to just an end to it.  So to say it's a --
13   there seems to be a little bit more discussion
14   about some definitive action with CON.  In the
15   past there would always be people that would want
16   to do something with CON.  But the stakeholders,
17   the hospitals, the nursing homes, the home health
18   agencies, most of the health infrastructure while
19   there are headaches with CON, most of them feel
20   like that it protects their ability to survive.
21   And fragility of the system has been such that
22   they've been able to keep things from happening.
23   But I think there's certainly -- I'm not sure
24   Libertarian would be the word, but I think there's
25   a thrust in the legislature that feels like that a
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1    market system without CON would be in the best
 2    interest of health care.  Although as people start
 3    to talk about how that would evolve, it gets
 4    complicated.  And as I stated, my thing
 5    is whatever -- it's a legislative decision.  We
 6    have CON because of legislature, and they felt it
 7    was necessary.  And it was a national thing for a
 8    period.  I think what we've tried to do during my
 9    tenure on the Board of Health from 2007 is
10    realizing the legislature was not going to get rid
11    of it.  We've tried to make it a functional system
12    that was responsive to the needs of the patients,
13    responsive to access to care and also responsive
14    to the stakeholders and not creating burdensome
15    hurdles.  And if there were needs and problems in
16    it, that we would try to address them and solve
17    them in a way that was in the best interest of the
18    citizens.  And I think in most situations that's
19    happened.
20              Dr. Courier(phonetic) used to talk to me
21    about she was not real big on CON, but by the end
22    of her term, she and I would talk about the
23    benefits of CON with health planning.  But it goes
24    back to our State Health Plan and CON.  If we're
25    going to have it, we need to use it strategically
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   to assist essential services.  And if it's not an
 2   essential service and if it doesn't need to be
 3   there, why do we have it.  And so we need, you
 4   know -- it needs to be something that's vital and
 5   changing to the evolving health care market.
 6            And some of the problems that we have
 7   and some of the restrictions are national problems
 8   and CMS issues and not just CON.  And some of the
 9   things we think that are causing us restraints --
10   you know, physician ownerships of hospitals is a
11   CMS or national issue.  There's the Stark laws are
12   all national.  The health care system is extremely
13   complicated as far as reimbursements.  I have a
14   lot of fear for survival.
15            As one -- Evan Dillard who was a friend
16   of mine from -- he used to run Forrest General
17   Hospital.  He said the problem with the health
18   care system is there's not enough money to go
19   around to get the job done.
20       Q.   On that review, y'all haven't settled on
21   any recommendations to the legislature yet, I take
22   it?
23       A.   No, we have not.
24       Q.   Okay.
25            (Exhibit 11 marked for identification.)
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1    I've not had -- in my 30 years of practice had any
 2    problems referring anyone for home health service.
 3    The biggest problem with referrals usually
 4    involves insurance.  And some home health agencies
 5    are not preferred providers, but most of the
 6    insurance companies have to have a preferred
 7    insurance -- I mean, a home health agency in an
 8    area.  But sometimes their preferred home health
 9    agency may really not be as engaged -- may not be
10    the leading home health agency in that area.  And
11    that's where patients, sometimes they want this
12    other one, but their insurance allows one.  But
13    that's just the market system and the insurance
14    companies at work.  But that's usually been the
15    only problem.  And I think the problem that I've
16    seen with home health agencies is the increased
17    scrutiny that doesn't allow them to hold on to
18    patients very long, that perhaps would benefit
19    from an extended home health care course.
20            The comment was made home health care
21    can keep a patient out of the nursing home and
22    save the -- save our system, our health system
23    money if its used appropriately.
24        Q.    Okay.  I want to talk for a moment about
25    the circumstances under which the Board may make
```

```
 1   recommendations to the legislature.  I think I

 2   heard you make references to that.  I'm trying to

 3   understand and get my arms around how it could

 4   come to be that the Board may make a

 5   recommendation from time to time to the

 6   legislature.

 7             For instance, suppose an individual

 8   provider in the home health agency setting in this

 9   particular case, suppose someone came to the

10   Department, to the staff and presented evidence

11   that they met these number one and number two

12   criteria that have been talked about here today.

13   Suppose with the moratorium in effect, suppose the

14   provider came and provided evidence to the staff

15   at the Department that they met these criteria.

16   They had the equivalent of 50 patients or more,

17   you know, need, unmet need.  Would you then -- in

18   view of the moratorium, would you expect someone

19   on the staff to at least report to you as

20   chairman, you know, this development so that you

21   can consider have -- have the Board consider

22   whether to make a recommendation to the

23   legislature?

24             MR. RICE:  Object to form.

25             THE WITNESS:  Yeah, the process would
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1    be -- the staff, if somebody came to them with a
 2    request, and the staff felt like it was a worthy
 3    request, which that would be considered a worthy
 4    request, there would be need established.  It
 5    would be brought to the CON committee that would
 6    vet it.  And we'd probably get some experts to
 7    study it and then bring that to the full Board.
 8    Since it would require lifting the moratorium, it
 9    would have to be a legislative -- and usually -- I
10    mean, we don't have a lot of legislative requests.
11    We usually have about 10 bills, and a lot of them
12    are formalities.  So it's a rare thing for us to
13    request the legislature to do something.  Usually
14    we're trying to respond to legislative requests or
15    to fulfill our role without things going to the
16    legislature.  That would be certainly appropriate,
17    it involves access to care.  And if we felt like
18    there was a need for more nursing home beds, if we
19    felt like there was a need for more home health
20    care that moratorium needed to be lifted, we
21    would -- I would have no hesitation about
22    recommending to the full Board, and they would be
23    supportive of that, to the legislature to do that.
24    But that would be done after we would do our
25    homework.  We would have -- we would probably get
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1    a task force that would study the issue.  But if
2    the data is there and the facts are there, that's
3    in the best interest of the citizens, and that's
4    what we should be doing.  And I think that would
5    be -- we take it to the legislature.  Now, would
6    the legislature respond?  Perhaps not, but perhaps
7    so.  But I think they would also have our research
8    and the data to back that up.
9         Q.   (By Mr. Davis)  As we sit here today,
10   has anyone reported to you in the home health
11   agency, you know, arena, you know, specifically,
12   that they've had third parties come make
13   presentations that have led the staff to have a
14   concern that they think they need to report to
15   your committee that they perceive an unmet need?
16        A.   This case is the first time I've heard
17   of any discussion of unmet needs or unprovided
18   services in the health care industry in
19   Mississippi.  Since 2006 I haven't heard anything.
20        Q.   When you say "this case," you mean the
21   fact that Mr. Slaughter has filed a lawsuit?
22        A.   Correct.
23        Q.   Okay.  I mean, Mr. Slaughter, did he
24   ever come to your staff and make a presentation
25   showing them evidence that there is this -- that

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1            So -- but to lift the moratorium that

2    would require a legislative action.  The

3    legislature knew we had been discussing

4    psychiatric bed need for a while.

5        Q.   Do you recall if that was a

6    recommendation that was part of the Board's

7    legislative agenda that year, or if it was a

8    suggestion that the Board just support?

9        A.   I don't remember.

10       Q.   Okay.

11       A.   I think the CON explored it in

12   supportive of it, but I'm not sure how it

13   finally -- I'd have to look at the data to see how

14   it worked out.  But we had at least three or four

15   meetings, and we had a task force.

16       Q.   Mr. Rice discussed the recent study.  As

17   recently as last week, you guys had a Board

18   meeting where some of these high level CON debates

19   were held.  Is that correct?

20       A.   Oh, yeah.  And we're getting expert

21   consultants to advise us.  They're not looking at

22   just what we do, although we're focused, but

23   what's being done around the rest of the country,

24   what are trends going on in states that are

25   retaining CON, how is it evolving.  And in states

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1    that have it that have taken it away, what have

2    been the negative consequences and the positive

3    consequences.

4        Q.   Are there any two states that are

5    exactly alike when it comes to CON retention, the

6    purposes of CON.  Are two states -- are there two

7    states that are exactly alike or do they all

8    differ, I think is my question?

9        A.   It's frequently stated that CON regs are

10   different in every single state.  Mississippi has

11   its CON and other states have their CON.  What's

12   on CON and what has moratoriums, what doesn't,

13   what is mandated has a CON, the cost allowances

14   for all of these things varies.  So they're all

15   very different.

16            I think what we share is -- and what we

17   may have different than some is a poor population,

18   a fragile health care system, and we have a

19   population with extraordinary social determinants

20   that are going to impact their ability to access

21   care.

22            Really, it's about poverty.  We are

23   struggling, so the question with CON is does CON

24   help us take care of our population in the best

25   manner.  And if it does so, I think we as a Board

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1    of Health need to say we think that it does help

2    with health planning and with health strategy, how

3    can we make it more effective and less burdensome

4    to the system.

5        Q.    You talked earlier about the three

6    full-time staff and three part-time staff that

7    work at the CON division.  And I was just going to

8    ask you if you could maybe expound a little bit on

9    the function of the moratorium with regard to the

10   CON staff and how that moratorium actually assists

11   the CON staff if you believe it does.

12       A.    Well, anyone who works at our Department

13   of Health realizes that we have significant

14   problems with staffing.  We don't have enough

15   staff.  The staff are often not extraordinarily

16   trained.  Basic competency is sometimes something

17   we are very concerned about.  Our most competent

18   employees either move up or they're hired by

19   somebody else.  The Board has had extensive

20   conversations with the personnel board and with

21   the legislature about the need to pay our

22   employees that do critical work more money and

23   also to get them help.

24             I think when we look at some of the

25   typos in some of the papers that we were looking

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   at, I think we're looking at a very overly worked
 2   staff that has a lot of -- we have three -- three
 3   full-time employees to do everything from hearings
 4   to evaluation to -- now they have a committee and
 5   they have other staff that do help, but largely,
 6   they're doing it all.  So three full-time
 7   employees that are assisted by an administrative
 8   assistant and two part-time people.
 9            The concern about -- you know, the
10   reason to raise the moratorium or get rid of the
11   moratorium would be that there would be a need for
12   more home health.  If there's not a need, then it
13   would just be more work for my staff.  From a
14   purely selfish standpoint as a Department, I don't
15   need to give my CON staff any work that's not
16   essential for the public good, and it's not going
17   to be acted on and gone forward with.
18            So we have a very lean staff, and I
19   think -- and that's not going to change.  So any
20   unnecessary work I would not want for my
21   Department.  However, if there's a need there, we
22   need to -- it would be something worthwhile for
23   the Department.
24       Q.   And if there was a need, if someone
25   could show a need, demonstrate a need to the
```

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1    come to a Board of Health meeting.  Once they have
2    the hearing, before we vote on something, we allow
3    public comment to the Board.  That was somewhat
4    hampered by COVID, but public comment is allowed
5    to address the issues that we're going to vote on.
6         Q.   Let me just ask one last question and
7    make sure I'm clear.  You said earlier that other
8    than this -- well, you said earlier that in your
9    40 years you've never heard from anyone that there
10   is a need from additional home health agencies in
11   Mississippi; is that correct?
12        A.   I do have gray hair, but it's only been
13   30 years.
14        Q.   30 years.  Thank you very much for your
15   time.
16        A.   It feels like more at times.  But in my
17   30 years, I've never heard anyone say we need more
18   home health agencies.
19             MR. SCHELVER:  No further questions.
20   Thank you for your time today.
21             (Time Noted:  4:00 p.m.)
22               SIGNATURE/NOT WAIVED
23   ORIGINAL:  MR. RICE, ESQ.
24   COPY:  MR. SCHELVER, ESQ.
25   COPY:  MR. DAVIS, ESQ.

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

1                CERTIFICATE OF COURT REPORTER

2                I, Robin G. Burwell, Court Reporter and

3    Notary Public, in and for the State of Mississippi,

4    hereby certify that the foregoing contains a true

5    and correct transcript of the testimony of LUCIOUS

6    LAMPTON, as taken by me in the aforementioned matter

7    at the time and place heretofore stated, as taken by

8    stenotype and later reduced to typewritten form

9    under my supervision by means of computer-aided

10   transcription.

11               I further certify that under the authority

12   vested in me by the State of Mississippi that the

13   witness was placed under oath by me to truthfully

14   answer all questions in the matter.

15               I further certify that, to the best of my

16   knowledge, I am not in the employ of or related to

17   any party in this matter and have no interest,

18   monetary or otherwise, in the final outcome of this

19   matter.

20               Witness my signature and seal this the 8th

21   day of January, 2024.

22

23                            _____

24                            ROBIN G. BURWELL, #1651
                              CRR, RPR, CCR
     My Commission Expires:
25   April 6, 2025