**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CHARLES SLAUGHTER**                                                        **PLAINTIFF**

**vs.**                                                        **Civil Action No. 3:20-cv-789-CWR-FKB**

**DR. DANIEL P. EDNEY, in his Official
Capacity as the Mississippi State Health
Officer**                                                        **DEFENDANT**

**MISSISSIPPI ASSOCIATION FOR
HOME CARE**                                                        **INTERVENOR DEFENDANT**

---

**MISSISSIPPI ASSOCIATION FOR HOME CARE, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION AND SUMMARY**

Charles Slaughter is a physical therapist who is asking this *federal court* to strike down

certificate of need statutes[1] regulating healthcare passed by the *Mississippi legislature* allegedly

so that he can provide physical therapy services in the home to serve an alleged increased demand

brought about by the COVID-19 pandemic.  But even setting aside the facts that demand did not

increase[2] and that he already has a means of providing the in home services he so desires without

---

[1] Mr. Slaughter asks this Court to declare that both the Mississippi Health Care Certificate of Need Law of 1979, Miss. Code Ann. §§ 41-7-171 – 41-7-209 ("CON laws"), generally, and in particular the Mississippi statutory moratorium, Miss. Code Ann. § 41-7-191(9) ("legislative moratorium"), on the issuance of CONs for home health agencies, violate the equal protection and due process clauses of the United States Constitution and the Mississippi Constitution.

[2] *See* https://msdh.ms.gov/page/resources/19385.pdf, the Mississippi Bureau of Health Facilities Licensure and Certification's 2020 Report on Home Health Agencies which at page ii states that Mississippi "home health agency visits decreased from 3,474,371 in 2010 to 2,623,784 in 2015 and further decreased to 2,368,252 visits in 2020," and that "patients served increased from 104,455 in 2010 to 123,291 in 2015 and decreased to 114,070 in 2020.  *See also* page 74 of the same report. Dr. Lucious Lampton, the current Chairman of the Mississippi State Board of Health, testified that today there remains a reduced demand for home health care from that which existed a decade ago.  Exhibit 2, deposition of Dr. Lucious Lampton at

obtaining a certificate of need[3], under rational basis review this federal Court must not strike down these laws because Mr. Slaughter cannot negate every conceivable rational basis for the enactment of these laws.  While the certificate of need laws may be inconvenient or costly for Mr. Slaughter, it is reasonably conceivable that these laws he challenges serve rational, legitimate purposes, including ensuring that the general population, and Medicaid/low-income and rural Mississippians in particular, have adequate access to quality home health care.  Citizens' equal protection and due process rights are not licenses for the courts to judge the wisdom, fairness or logic of legislative choices.  Since the passage of the certificate of need laws in the 1970s and the legislative moratorium in the 1980s, the Mississippi legislature, exercising its wisdom, has repeatedly reviewed these laws and chosen to retain the certificate of need laws, including the legislative moratorium.  Because Mr. Slaughter cannot negate every conceivable rational basis here for the existence of either the Mississippi CON laws or the legislative moratorium, this Court should grant summary judgment in favor of the Defendants.

## OVERVIEW OF CERTIFICATE OF NEED LAWS

"Certificate-of-need laws control the number of healthcare resources in a geographical area." *Tiwari v. Friedlander*, 26 F.4th 355, 358 (6th Cir. 2022), *cert. denied,* 143 S. Ct. 444 (2022). More than just a mere license to operate granted by the State, certificate-of-need regulations require the applicant to demonstrate a need for the service in a particular area to "prevent overinvestment in and maldistribution of health care facilities." *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 153 (4th Cir. 2016). Though not as prevalent as they were 40 years ago, many

---

page 49.  *See also,* https://www.commonwealthfund.org/publications/issue-briefs/2022/jun/changes-medicare-home-health-use-during-covid-19 ("Total Medicare home health visits decreased by nearly 14 percent, with more significant decreases in therapy visits relative to nursing visits").

[3] *See, e.g.,* the in-home therapy services described at https://www.in-homept.com/about-us.

states still use certificate-of-need laws to regulate different aspects of the healthcare industry. *See id.*; Emily Whelan Parento, *Certificate of Need in the Post-Affordable Care Act Era*, 105 Ky. L.J. 201, 256 (2017).  And, as relevant here, "[a]t least 16 States today have certificate-of-need laws for home healthcare services." *Tiwari*, 26 F.4th at 358 (citing Parento, *supra*, at 256; Certificate of Need State Laws, Nat'l Conf. of State Legislatures, https://www.ncsl.org/research/health/con-certificate-of-need-state-laws.aspx#Interactive% 20Map (last visited January 29, 2024)).

## FACTUAL BACKGROUND

A Certificate of Need, or CON, is a written order of the Mississippi State Department of Health ("MSDH") finding, *inter alia*, that a proposed health care service provider both (i) has demonstrated the existence of sufficient need within a geographic area consistent with the plans, standards and criteria set forth in the CON Laws and MSDH rules and regulations and (ii) is authorized to provide needed health care services in that area.

The Mississippi State Board of Health ("MSBH") is charged with various duties, including formulating public policies regarding public health matters; adopting MSDH regulations embodying those public policies; and reviewing annually Mississippi statutes affecting public health to make recommendations to the Legislature to enhance public health services.  *See* Miss. Code. Ann. §§ 41-3-5.1, 41-3-6 & 41-3-15.

MSDH regulations ("CON Manual") expressly state as a matter of "public policy" that the CON is the means chosen by the Mississippi Legislature and the MSBH to avoid unneeded duplication of health care resources, contain costs, improve the health of Mississippi residents, and to make quality health care more accessible, acceptable, and continuous for Mississippians.  15 Code Miss. R. Pt. 9, Subpt. 91, R. 1.1.  This regulation further provides in part:

The Department will disapprove a CON application if the applicant fails to provide or confirm that the applicant shall provide a reasonable amount of indigent care or has admission policies which deny access to care by indigent patients.

The Department will disapprove a CON application if approval of the request would have significant adverse effect on the ability of an existing facility or service to provide Medicaid/indigent care.

The State Health Officer shall determine whether the amount of indigent care provided or to be offered is "reasonable." The Department has determined that a reasonable amount of indigent care is an amount which is comparable to the amount of such care offered by other providers of the requested service within the same, or proximate, geographic area.

*Id.*  Thus, it is readily apparent that the MSBH and MSDH intend, in part, that the CON laws serve as a means to increase access to quality health care for Medicaid/low-income/indigent individuals. Moreover, this MSDH regulation recognizes the potential that unfettered competition could impede the ability of existing health care providers to service Medicaid/low-income/indigent individuals.

The MSDH regularly reviews and updates the official State Health Plan to identify state health needs and establishes standards and criteria for health-related activities which require Certificate of Need.  *See* Miss. Code Ann. §§ 41-7-185(g) & 41-7-173(t); 15 Code Miss. R. Pt. 9, Subpt. 91, R. 1.14 ee.

Because the legislative moratorium, Miss. Code Ann. § 41-7-191(9), is still in effect, the CON Manual currently recites that the MSDH is "[p]resently" prohibited from issuing a CON for a new home health agency.  15 Code Miss. R. Pt. 9, Subpt. 91, R. 2.2.  A similar reference to the legislative moratorium is found in the current, 2020 State Health Plan,[4] which also plainly states

---

[4] The current State Health Plan became effective July 1, 2020, well after the impact of the current pandemic was known.

that the MSDH would in fact consider new CON applications for home health agencies if the moratorium were to be lifted:

> **If the present moratorium were removed** or partially lifted, MSDH would review applications for a CON for the establishment of a home health agency and/or the offering of home health services . . . . (emphasis added).[5]

*See* Exhibit 1 to Mtn. at p. 186. The 2020 State Health Plan goes on to list, and explain the reasoning for, the many criteria (referenced in Mr. Slaughter's Complaint ¶¶ 85-92) the MSDH will consider in determining whether to issue a CON. *Id.* Notwithstanding Mr. Slaughter's claims that these criteria are onerous for him personally, these criteria were not created in a vacuum. The State Health Plan is the product of analysis and input of the 11-member MSBH, the State Health Officer, numerous staff within not just the MSDH but also from a number of other state boards and agencies, "and numerous other organizations" as well. *See* Ex. 1 to Mtn. at pp. 1-4.

While the legislative moratorium remains in effect, that does not mean it has been ignored. The Legislature has repeatedly updated the CON laws over the past 40 years.[6] In addition, the MSBH is charged by law with the annual duty "to review the statutes . . . affecting public health" and to recommend needed legislation to the Legislature. Miss. Code Ann. § 41-3-6. The MSBH does not determine its recommendations in a vacuum. In the recent deposition of Dr. Lucious Lampton, the current Chairman of the Mississippi Board of Health and a Rule 30(b)(6) designated

---

[5] Mr. Slaughter's Complaint misinterprets the State Health Plan by calling this an "administrative moratorium." There was in fact a short-lived administrative moratorium in the 1982-1987 State Health Plan. *See* Exhibit 2 to Mtn. at p. 282. That Plan explained that at that time "[t]he data available indicate that all counties had more home health agencies authorized to serve the county than were actually doing business in the county." *Id.* The legislative moratorium was enacted in 1983 as Miss. Code Ann. § 41-7-191(9). Thus, the 1986 State Health Plan plainly states that the moratorium thereafter is due solely to the "Legislative Moratorium." *See* Exhibit 3 to Mtn. at p. XIII-4.

[6] The CON laws were amended in 1989, 1990, 1992, 1993, 1994, 1995, 1996, 1998, 1999, 2001, 2002, 2003, 2004, 2006, 2007, 2010, 2011, 2012, 2014, 2015, 2016, 2019 and 2020. *See* Miss. Code §§ 41-7-173, 41-7-191 & 41-7-201.

witness to testify on behalf of the MSDH, he explained that the MSDH has long relied on the general public to call to its attention perceived health care needs. *See, e.g.,* deposition of Dr. Lampton, Exhibit 2 to Mtn. at pp. 174-177.  The MSDH reports to the MSBH, after considering concerns expressed by the public as well as its own investigation.  The MSBH then considers that information as well as the results of its own reviews in deciding whether to make recommendations to the Legislature regarding the CON laws in general, including the moratorium in particular. *See, e.g., id.* at pp. 174-177.

The current moratorium does not preclude any citizen, including Mr. Slaughter, from presenting to the MSDH evidence demonstrating a need for additional home health agencies. However, Dr. Lampton is not aware of Mr. Slaughter or others having done so.  Testifying on behalf of the MSDH, Dr. Lampton explained its position that at this time there remains no need for new home health agencies in Mississippi, and that thus there is no need to ask the Legislature to abolish the current moratorium.  When asked what the Department would do if a provider came to the Department and explained that it had met the criteria (e.g., with 50 patients of more of unmet need), he stated that "It would be brought to the CON committee that would vet it.  And we'd probably get some experts to study it and then bring that to the full Board." *Id.* at p. 176, lines 4-7.  He continued, "if we felt like there was a need for more home health care that moratorium needed to be lifted, we would -- I would have no hesitation about recommending to the full Board, and they would be supportive of that, to the legislature to do that. But that would be done after we would do our homework." *See id.* at p. 176, lines 17-25.  But Mr. Lampton was clear that "[t]his case is the first time I've heard of any discussion of unmet needs or unprovided services in the health care industry in Mississippi. Since 2006 I haven't heard anything." *See id*. at 177, lines 16-

19.  In fact, he later clarified, "[I]n my 30 years, I've never heard anyone say we need more home health agencies.  *Id*. at p. 190, lines 6 – 18.

That is not to say that the MSBH has sat idly by.  The MSBH has long had a CON committee, of which Dr. Lampton has been a member, which has periodically held meetings for the primary purpose to "protect the interests of the citizens of the state," for example, by furthering "their access to care in the state."  *See* Exhibit 2, Dr. Lampton deposition at p. 11, lines 23-25, line 19.  Outside health care providers, health care attorneys, experts and other interested members of the public have been invited to participate in CON committee meetings.  In fact, at the present time the MSBH has engaged outside experts to undertake a wide-ranging "extensive study" of the State Health Plan and the CON processes in general, including as they relate to home health agencies. *Id*. at pp. 152, line 22 – 159, line 23.  Dr. Lampton explained that those experts are not "looking at just what we do, although we're focused, but what's being done around the rest of the country, what are trends going on in states that are retaining CON, how is it evolving.  And in states that have it that have taken it away, what have been the negative consequences and the positive consequences." *Id*. at pp. 181, line 16 - 182, line 3.

Dr. Lampton explained that there is ongoing debate as part of this study whether to modify any of the CON laws, whether to phase out the CON laws over time or even whether to abolish the CON laws altogether.  *Id*.  He continued, explaining that this is partly because no two states' CON laws are alike and no two states' circumstances are alike.  He emphasized, though, that Mississippi has its important and own unique circumstances that must be considered in deciding whether to keep its CON laws in force:

> what we may have different than some is a poor population, a fragile health care system, and we have a population with extraordinary social determinants that are going to impact their ability to access care. . . . Really, it's about poverty.  We are struggling, so the question with CON is does CON help us take care of our

population in the best manner.  And if it does so, I think we as a Board of Health
need to say we think that it does help with health planning and with health strategy,
how can we make it more effective and less burdensome to the system.

*Id*. at pp. 182, line 4 – 183, line 4.

The importance of CON laws to support home health care in rural Mississippi counties

cannot be overstressed.  "Home health care has evolved over the past four decades to become an

essential element in the continuum of care for patients following an acute hospitalization, or

patients with chronic conditions." *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 5.  If the

home health care CON laws and moratorium were removed, then Mississippi's rural areas would

suffer the most adverse effects.  *See* Exhibit 4, MAHC 30(b)(6) deposition at pp. 184, line 6 – 185,

line 24 ("Because, again, to even operate with positive margins, you have to have a patient

population that's going to support that" and a reduction in patient census caused by new market

entrants would most adversely affect rural areas because "you would tend to migrate to those

geographies where the density of that patient population was greater").

As recently as the year 2020 and again in 2021, the Mississippi Legislature considered, but

refused to act on, bills to lift the statutory moratorium on the issuance of CONs for new home

health agencies.  *See* 2020 H.B. 606; 2020 H.B. 605; 2021 SB 2747; 2021 H.B. 602.  Thus, it is

clear that the Legislature has intentionally decided that the legislative moratorium should remain

in effect at least until the current legislative session.

It is against this backdrop that the constitutionality of the CON laws should be evaluated.

I.    **LEGAL STANDARD**

The standard before the Court is clear, summary judgment is appropriate under Rule 56

when "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  In cases governed by rational basis review, competing

expert reports and facts indicate that summary judgment for Defendants is necessary because the very existence of a factual question over the rationality of a state law regulating the economy "immunizes from constitutional attack the [legislative] judgment represented by this statute.'" *Vance v. Bradley*, 440 U.S. 93, 111–12 (1979). As the Supreme Court has explained, "[i]t makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 357 (1916). Accordingly, "[s]ummary judgment is an apt vehicle for resolving rational-basis claims." *Tiwari v. Friedlander*, 26 F.4th 355, 369 (6th Cir. 2022), *cert. denied,* 143 S. Ct. 444 (2022). "That's because the question is not whether a law in fact is rational. It's whether a legislator could plausibly think so." *Id.*

## II.    THE RATIONAL BASIS STANDARD

"Under [the rational-basis standard], a legislative classification must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Glass v. Paxton*, 900 F.3d 233, 244-45 (5th Cir. 2018).[7] That a *conceivable* basis can support the law means that even a basis not actually articulated by the legislature or not considered by the legislature at all can still support the challenged law. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (noting that the Supreme Court does not require "a legislature to articulate its reasons for enacting a statute [because] it is entirely irrelevant for constitutional purposes whether the conceived reasons for the challenged distinction actually motivated the legislature"). Under the rational basis standard, the requirement that the plaintiff

---

[7] Mr. Slaughter brings his constitutional claims under both the federal and state constitution. However, "[t]he analysis is simplified by the fact that '[t]he due process required by the Federal Constitution is the same due process required by the Mississippi Constitution.'" *Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2017 WL 3175915, at *5 (S.D. Miss. July 25, 2017).

negate "every conceivable basis which might support" the legislative classification is a heavy burden. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973).

"Right or wrong, rational-basis review epitomizes a light judicial touch." *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 444 (2022*)* (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993); *Williamson v. Lee Optical of Okla., Inc*., 348 U.S. 483 (1955)).  "States need not 'convince the courts of the correctness of their legislative judgments,' and courts cannot subject legislative choices "to courtroom fact-finding." *Id.* (internal citations omitted).  "A legislature's 'rational speculation *unsupported* by evidence or empirical data' suffices." *Id.*  "So long as some 'plausible' reason exists for the law—any plausible reason, even one that did not inspire the enacting legislators—the law must stand, no matter how *unfair*, *unjust*, or *unwise* the judges may see it as citizens." *Id.* (citing *Heller v. Doe*, 509 U.S. 312, 320, 324, 330 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 11, 17–18 (1992)) (emphasis added). "So it is that a law may be incorrigibly foolish but constitutional."  *Id.*

At its core, rational-basis review is rooted in separation of powers (and, when a state statute is at issue, federalism).  *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 226–27 (5th Cir. 2013) ("The deference we owe expresses mighty principles of federalism and judicial roles.").  As the Fifth Circuit has explained, "[r]ational-basis review is guided by the principle that [the judiciary does not] have a license to judge the wisdom, fairness, or logic of legislative choices." *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020).  And when "economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (internal citation omitted).[8]  *See also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42

---

[8] Indeed, the Supreme Court has recently explained that in a case where a given law would impose new costs on one group of people in order to serve the "moral and health interests of some 'disputable

(1985) (describing reluctance of the court to "closely scrutinize legislative choices" given "our federal system and with our respect for the separation of powers").

Applying this standard, this Court has upheld the statute imposing a cap on non-economic damages in a wrongful death case even where its application valued the plaintiffs' loss of their mother, sister, and child at $0. *Clemons v. U.S.*, No. 4:10-CV-209-CWR-FKB, 2013 WL 3943494, at *14–15 (S.D. Miss. June 13, 2013). Despite the Court's acknowledgement that that was "an absurd result," the rational basis "standard of review requires doubts of a statute's constitutionality to be resolved in favor of upholding the law." *See id.* This is true even where there were "doubts as to the correctness of the legislature's ostensible belief that capping non-economic damages lowers medical malpractice premiums." *See id.* And true, there the parties presented no evidence[9] where here they have. But as this Court in *Clemons* observed unless "plaintiff has proven beyond a reasonable doubt that there is *no* possible rational basis for the legislature's action," the claims under the Fourteenth Amendment "must be denied." *Id.*

**III.    CERTIFICATE OF NEED LAWS ARE ROUTINELY UPHELD.**

Despite Plaintiff's characterization otherwise, certificate of need "laws in general have been recognized as a valid means of furthering a legitimate state interest." *Tiwari*, 26 F.4th at 364 ("No court to our knowledge has invalidated a healthcare certificate-of-need law under the rational-basis requirements of the Fourteenth Amendment.") (internal citation omitted).

---

magnitude'" for another group, such policy choices "belong to the people and their elected officials." *Natl. Pork Producers Council v. Ross,* 598 U.S. 356, 382 (2023). The Court cautioned, "Judges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith in 'Mr. Herbert Spencer's Social Statics.'" *Id.* (quoting *Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting)).

[9] The Court did, however, review secondary materials, including articles that showed that damages caps "have had little effect on medical malpractice insurance premiums." *See id.* at *10 (quoting *The Cure for What Ails: A Realistic Remedy for the Medical Malpractice "Crisis,"* 23 Stan. L. & Pol'y Rev. 477, 495–96 (2012)).

The Eighth Circuit has recently upheld the constitutionality of CON laws. *See Birchansky v. Clabaugh*, 955 F.3d 751, 755 (8th Cir. 2020). There, the Iowa law at issue required a CON for opening an outpatient surgery center or hospital, but a holder of an existing CON could expand or open new facilities without obtaining a new certificate of need if opening the new facility would cost $1,500,000 or less and the new facility is either locating in the same county as the existing facility or a county contiguous to it. *Id.* Another exception permitted the holder of a CON to sell an outpatient center to a new party, who can then operate it without a certificate of need. *Id.*

In that case, the plaintiffs challenged that constitutionality of those CON laws. *See id.* at 755. The Eighth Circuit affirmed the district court's grant of summary judgment in favor of the defendants, finding that "insulating existing entities from new competition *in order to promote quality services and protect infrastructure investment* can survive rational basis review." *Id.* at 757 (internal citation omitted, emphasis added). As a result, "Iowa can rationally conclude that protecting hospitals from competition in profitable areas of practice promotes full-service hospital viability" and that the state had a "legitimate state interest in full-service hospital viability." *Id.* at 757-58.

The Fourth Circuit has similarly upheld certificate of need regulations. *See Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 548 (4th Cir. 2013). There, the court held that the district court had properly granted the motion to dismiss the due process claim where plaintiff failed to rebut the articulated purposes served the state's certificate of need program, including "ensuring geographically convenient access to healthcare for Virginia residents at a reasonable cost."

More recently, the Fifth Circuit upheld Louisiana's "facility need review" program (a regulatory scheme akin to certificates of need) applying rational basis review. At issue there was

Louisiana's requirement that before offering respite care services, individuals must first obtain a license from the Louisiana Department of Health and before the department of health would conduct its review, the prospective business must first apply to the facility need review program. *Newell-Davis v. Phillips,* No. 22-30166, 2023 WL 1880000, at *1 (5th Cir. Feb. 10, 2023), *cert. denied*, 144 S. Ct. 98 (2023). The facility need review program required there to be a need for additional respite care providers in a certain geographic area before the business could move past that stage to apply for its license. *See id.*

The plaintiff there was a licensed social worker and mother of a special needs child who desired to offer respite care services in New Orleans but was unable to apply for a license because she did not pass the facility need review stage. *See id.* The plaintiff sued, claiming that the facility need review program violated the due process clause and equal protection clause of the Louisiana and United States Constitutions. The district court applied rational basis review and found that the facility need review program was rationally related to the legitimate interest of protecting consumer welfare because it was more efficient to ensure client welfare through *post*-licensure compliance surveys than initial licensing surveys. *See id.* at *2.

The Fifth Circuit affirmed, reasoning that the facility need review program survived rational basis review because it advanced "the State's legitimate interest in enhancing consumer welfare." *Id.* at *4. The court observed that the state offered several legitimate reasons, but it seemed most convinced by the legitimate interest of enhancing consumer welfare through limiting the number of entities it had to regulate – even if it incidentally served the purpose of economic protectionism.

IV.    **MISSISSIPPI'S CON LAWS SURVIVE RATIONAL BASIS REVIEW.**

Mr. Slaughter cannot deny that the stated goals of Mississippi's CON Laws are legitimate. Though many have been identified in this case,[10] they can be grouped into four broad categories: cost efficiency, accessibility, quality, and managing the regulatory burden.   Instead, Mr. Slaughter's argument must be that it would be mere *fantasy* to believe that limiting the number of entrants into a given geographic area could control costs, increase accessibility, improve quality or help MSDH manage its regulatory burden.

To be clear, while MAHC firmly believes that CON laws are effective at achieving their stated goals, the Court does not have to be convinced as to the correctness of the legislative judgment behind certificate of need laws nor must the Court find that the laws are supported by empirical data for the laws to be upheld.   All that is required is a "rational speculation" or "plausible rationale" behind the laws.   *See Heller,* 509 U.S. at 320, 324, 330.  As applied here, the ongoing debate currently underway among the MSBH consultants regarding certificate of need laws is more than adequate proof that this standard has been met.

---

[10] *See* 15 Code Miss. R. Pt. 9, Subpt. 91, R. 1.1 stating as a matter of public policy that the CON is the means chosen by the Mississippi Legislature and the MSBH to avoid unneeded duplication of health care resources, contain costs, improve the health of Mississippi residents, and to make quality health care more accessible, acceptable, and continuous for Mississippians.   Similarly, in its written discovery responses, the State identified the following: "The CON program enables MSDH to prevent an oversaturation of HHS and limit new providers of home health services, both of which advance the State's legitimate and compelling interest in cost savings, as well as promoting access and continuity of care." *See* Exhibit 5, MSDH Responses to ROG and RFP, Response to Interrogatory 1.

MAHC also identified several legitimate ends that it contends are advanced by certificate-of-need regulations, including the following: "controlling costs, improving the health of Mississippians, increasing acceptability of healthcare, preventing unnecessary duplication, maintaining proper quality of healthcare, increasing access to care for indigent persons and persons in rural areas, enabling home health agencies to employ modern technology and to provide new available services, minimizing the burden on those providing regulatory oversight, ensuring continuity of care, and minimizing fraud and abuse." *See* Exhibit 6, MAHC's Supplemental Responses to Plaintiff's First Combined Discovery Requests.

Increasing cost efficiency, encouraging accessibility, improving quality, and managing the regulatory burden each independently presents a basis to uphold the constitutionality of the certificate of need regulatory scheme applicable to home health agencies.  In fact, the Sixth Circuit recently upheld a similar regulatory scheme, finding that a rational connection existed between the home health certificate of need laws and regulations in Kentucky and their avowed ends – increasing cost efficiency, improving quality of care, and improving the existing healthcare infrastructure.  *Tiwari*, 26 F.4th at 364.  If the Court finds it plausible that any of the given reasons would be furthered by certificate-of-need regulation, the laws must be upheld.  MAHC addresses each in turn below.

**A.    *Cost savings.***

It is rational to believe that restricting the number of home health agencies will promote cost efficiency.  More specifically, the Sixth Circuit in *Tiwari* held that "[o]ne could plausibly think that, by tailoring services to need in a given market, current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations." *Tiwari*, 26 F.4th at 364.  The Court continued, "Providers could use their enhanced purchasing power to buy supplies and equipment at reduced prices." *Id.*  Finally, the court observed, "The increased patient volume also could permit the companies to spread fixed costs across more patients." *Id.*

Daniel J. Sullivan opined similarly here.  He found that "[t]here is little question, however, that the removal of CON regulation of home health services in Mississippi will result in greater duplication of existing services and diminished volumes for existing providers, thus adversely impacting the existing providers' ability to continue providing services in poorer, less populated rural counties."  *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 15.  That is because "[t]he

removal of CON regulation would result initially in an influx of new providers that would further result in existing agencies serving fewer patients." *Id*. at p. 16. "As a consequence, the fixed expenses per patient of operating a home health agency will increase" and "would either be borne by payers and consumers or, alternatively, the financial viability of many existing providers will be threatened." *Id*.

Data about reimbursement from the Centers for Medicare and Medicaid Services ("CMS") indicates that certificate-of-need regulation has improved the cost efficiency of home health services offered in Mississippi. Mr. Sullivan's report explains that "[a] ranking of states by average Medicare reimbursement per patient in 2019 indicates that Mississippi ranks eleventh among all states in average reimbursement." *Id*. On the other hand, "[t]he states with the five highest reimbursement (i.e., cost) per patient (Nevada, Texas, California, Oklahoma, and Louisiana) do not have CON programs regulating the number of home health agencies." *Id*.

Finally, a 2016 peer-reviewed study, analyzing the period from 1992 to 2009, concluded that overall Medicare and Medicaid spending on home health care in CON states grew slower than non-CON states. *See* the HHS Public Access Author Manuscript titled *The Impact of Certificate-of-Need Laws on Nursing Home and Home Health Care Expenditures* published as *Med Care Res Rev.* 2016 February; 73(1): 85-105. doi:10.1 177/1077558715597161 at p. 8 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4916841/):

> Both Medicare and Medicaid spending per enrollee on home health care in states without CON laws was lower in 1992 and higher in 2009 than states with CON laws (Table 1). Another key finding is that growth in home health spending is the lowest in states with home health CON . . . .

Another important observation here is the following finding from this report:

> Finally, our findings contribute to the *longstanding debate among health policy researchers about the intended and unintended consequences of CON laws*.

16

*Id.* at p. 2 (emphasis added). Squarely contradicting Stratmann, the authors also found that "[o]ur findings demonstrate how a supply-based policy [i.e., non-CON] can offset and even reverse some of the effects of a payment-based policy." *Id* at p. 10. In contrast, Stratmann argues that Medicare's change from a cost-based reimbursement system to a prospective payment based system reduced costs and did away with the theory that justified the enactment of CON laws.

**B.    *Quality and continuity of care***

It is rational to believe that limiting the number of home health agencies (and thus ensuring a higher patient volume for the agencies) will improve quality. *See Tiwari,* 26 F.4th at 364 ("[t]he State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service."). The Sixth Circuit explained, "Whether by the downstream benefits of achieving scale or the quality-improving expertise and specialization that come from repeated services within a market, the State could plausibly think that the certificate-of-need program would increase quality in one way or another." *Id.*

And further, as a general matter, the data here supports that patients in CON states are more satisfied with the care they receive than those in non-CON states:

> Home health agencies in 14 of the 18 states (including the District of Columbia) with CON regulation of home health services averaged either 3.5 or 4 stars in the composite rating of quality under Home Health Compare. No state without CON regulation of home health had a 4-star rating, and only 17 of these 33 states had a 3.5-star rating.

*See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 21.[11]

Dan Sullivan also explained:

> With respect to home health services, there is a relationship between the number of patients an agency serves and its ability to offer programs and services that enhance the quality of care." For example, some home health providers have developed disease-specific treatment programs for patients recovering from cardiovascular

---

[11] Significantly, Mississippi is among those states having the highest quality ranking, 4 stars. *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 22.

> issues, behavioral health patients, and patients requiring infusion therapy. The
> financial ability to hire and support these specialized staff members is dependent
> on having a sufficient base of patients in need of such care."

*Id*. at pp. 18-19.  It is rational to believe that not only that Mississippi CON laws could improve

the quality of home health services but also that they actually have improved the quality of home

health services.

**C.**      ***Ensuring geographic access***

The CON laws ensure that all residents – including rural Mississippians – have access (and

importantly to continuity of care, stable access) to quality healthcare.  *See* Exhibit 3, Expert Report

of Daniel J. Sullivan at p. 26 ("CON regulation assists in ensuring access to care, particularly in

rural counties where some of Mississippi's most vulnerable populations reside.").  The CON laws

ensure that new home health services are available in less populated rural areas.  *Id*. at p. 25.  They

also promote access to *quality* care in those areas: "In addition, having fewer, higher volume home

health agencies maintains financial viability for existing providers, which in turn allows these

providers to maintain well-qualified staff and invest in new technology." *Id.*   If the CON laws

were eliminated, an influx of new agencies is likely, which would in turn, reduce patient volumes

for existing providers and impose greater financial challenges for providers to extend their services

to these less populated areas.  *Id*. at p. 26.  Those reductions could threaten the financial viability

of the providers serving rural residents and ultimately threaten access to care. *Id.*

Importantly, even with the moratorium, Mississippi has been able to ensure that patients

even in the most rural areas have access to home health agencies.  As Dan Sullivan observed,

"Despite the moratorium that has been in place, there is a competitive market for home health

services in each Mississippi county" as "the number of home agencies authorized to serve each

county ranges from 2 to 13."  *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 6.

D.    *Managing the regulatory burden*

Paid for largely by the government rather than out of a patient's pocket, home health services are prone to fraud, waste and abuse and thus demand regulation.

For example, in his deposition, Dan Sullivan described what happened when Indiana eliminated its certificate of need program, which resulted in a dramatic increase in the number of home health agencies in the marketplace.  *See* Exhibit 7, Deposition of Dan Sullivan, p. 43. Because it was difficult for those providers to run a viable business, many providers attempted to drive up utilization by inappropriately admitting patients to home health services – a form of fraud, waste, or abuse.  *See id.* at p. 45.

These same considerations supported upholding the home health CON laws in Kentucky. After observing that home healthcare services are heavily regulated and can only be performed in Kentucky with a doctor's prescription, the *Tiwari* court added that "[p]rices in this market often are determined by the government (Medicare and Medicaid) or private insurance companies, and patients usually pay a minor cost of the care." *Tiwari*, 226 F.4th at 364. "Price shopping for healthcare services is the exception, not the rule."  Along these lines, the court reasoned, "Heavy regulation of supply and pricing often comes with heavy regulation of the number of suppliers in the market." *Id.*

But at a more fundamental level, more providers – even apart from those providers engaging in fraud, abuse, or waste – means more work for MSDH, the entity that oversees compliance of those entities.  Dan Sullivan opined that "[s]ignificant increases in the number of home health agencies would impose a massive burden on MSDH" as they monitor the operations of providers. *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 16.  Dr. Lampton confirmed that MSDH has a very lean staff of three full time employees overseeing CON evaluation, hearings,

etc. who are already overworked. So long as there is no need for additional home health agencies, he cannot justify the additional work that would be imposed on MSDH staff if the moratorium were to be lifted. *See* Exhibit 2, Dr. Lampton deposition at pp. 183, line 5 – 184, line 23.

A regulatory scheme that allows MSDH to "focus on regulating already-licensed providers" even if it "seemingly protects incumbent providers" is exactly the type of scheme that was upheld in *Newell-Davis*. *Newell-Davis v. Phillips*, 592 F. Supp. 3d 532, 547 (E.D. La. 2022), *aff'd*, 55 F.4th 477 (5th Cir. 2022). There, though the law had "protectionist elements," it could be "linked to advancement of the public interest or general welfare" because the state could "conduct more complaint and relicensure surveys." *Id.* The *Tiwari* court similarly concluded, "[p]rotectionist though this law may be in some of its effects, that is not the only effect it has or the only goal it serves." *Tiwari*, 26 F.4th at 368.

And even if Mr. Slaughter were successful in convincing the Court that CON regulation is not successful at furthering these goals (despite the data described above) and was thus "a failed experiment," that is still is not enough for him to prevail. *Id.* at 365. That is because "[a] claimant does not prevail in a rational-basis case simply by severing the stated links between a law and its rationales with on-the-ground evidence that undermines the law—or showing that the lived experiences of the law have not delivered on its promises." *Id.* Instead, under rational basis analysis, the Court assumes that if a law did not work as planned, "democracy eventually will fix the problem." *Id.*

For all of these reasons, this Court should grant summary judgment in favor of the Defendants on Mr. Slaughter's due process claim.

V.    EQUAL PROTECTION

Mr. Slaughter also brings a claim under the Equal Protection Clause of the Fourteenth Amendment, which provides that "no State shall deny ... to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. It "essentially requires that all persons similarly situated be treated alike." *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988).   To prevail on an equal-protection claim, a plaintiff must first demonstrate that the challenged statute treats "two or more classifications of similarly situated persons . . . differently."  *Duarte v. City of Lewisville*, 858 F.3d 348, 353 (5th Cir. 2017). The Court then will consider whether a protected class or fundamental right is implicated to determine what level of scrutiny applies.  *Id.*

Mr. Slaughter argues that the CON laws violate equal protection clause in two ways.  First, he alleges that "Mississippi's moratorium on the issuance of new certificates of need for the establishment of home health agencies irrationally treats new home health agencies differently from materially indistinguishable existing home health agencies." [1] ¶ 150. Second, he claims that "Mississippi's moratorium on the issuance of new certificates of need for the establishment of home health agencies irrationally treats new home health agencies differently from other materially indistinguishable health care facilities or providers." [1] ¶ 152.  More specifically, he alleges:

> Mississippi's certificate-of-need program irrationally discriminates between different kinds of health care providers. Many health care facilities, such as physician private practice offices, personal care residential-living and assisted-living facilities, abortion facilities, veterans homes, and health care facilities owned and/or operated by the State of Mississippi or [its] agencies, do not require certificates of need. [1] ¶ 156

But the Constitution "does not require" Mississippi "to draw the perfect line" or "even to draw a line superior to some other line it might have drawn." *Armour v. City of Indianapolis*, 566

U.S. 673, 685 (2012). So long as the State has not drawn categories "along suspect lines," its classifications will survive scrutiny "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 680, 132 S.Ct. 2073 (quotation omitted). *See also Clemons v. U.S.*, No. 4:10-CV-209-CWR-FKB, 2013 WL 3943494, at *11 (S.D. Miss. June 13, 2013) ("If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.").

Similarly, in *Birchanksy*, the plaintiffs argued that the capital expenditure exception there "foster[ed] unconstitutional disparate treatment by arbitrarily distinguishing between non-hospital CON-holders and potential new entrants to the outpatient surgery market, negating the CON requirement's rational relationship to hospital viability." *Birchansky*, 955 F.3d at 758. The Eighth Circuit concluded that "[e]ven though some non-hospital CON-holders will benefit from the capital expenditure exemption, this does not sever the CON requirement's rational relationship to full-service hospital viability" because "[a] law supported by some rational basis does not offend the constitution merely because it is imperfect, mathematically imprecise, or results in some inequality." *Id.* *See also Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 547–48 (4th Cir. 2013) (plaintiff failed to state an equal-protection claim where state articulated justification for not requiring certificate of needs for nuclear cardiac facilities unlike other types of medical imaging because state could have reasonably believed that nuclear cardiac imaging was "less susceptible to the dangers of excess capacity or geographic misallocation").

Here, there are plausible explanations for treating home health agencies differently. With respect to the CON laws treating new home health agencies differently from those who already

hold a certificate of need, this is the essence of what certificate of need regulation is and the essence of what courts have routinely upheld as constitutional. *See, Birchansky*, 955 F.3d at 757–58; *Colon Health Ctrs*., 733 F.3d at 547–48; *Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1048 (8th Cir. 1997); *Tiwari*, 26 F.4th at 364.

With respect to personal care residential-living facilities and assisted-living facilities, neither of these is primarily a healthcare service. Any healthcare services that are offered are incidental. *See* 15 Code Miss. Rules Pt. 16, Subpt. 1, R. 47.5; 15 Code Miss. Rules Pt. 16, Subpt. 1, R. 47.2. These are similar to the "continuing care retirement communities" discussed in *Tiwari* that offered medical services only incidentally. In the eyes of the Sixth Circuit, "*[e]ach distinction* suffice[d] to uphold the classifications." *See id.* (emphasis added).

With respect to veterans homes and state-owned healthcare facilities, because the state is a payor, duplication of services is already discouraged. It makes sense that they would not require an additional disincentive to prevent duplication of services.

Finally, with respect to physician private practice offices, the *Tiwari* court specifically addressed this. The Sixth Circuit identified at least three explanations for treating physician offices separately: "the modest supply of physicians in parts of Kentucky, the more urgent need for physicians than home healthcare agencies throughout the State, and the more heavily regulated nature of the requirements for becoming a physician. Ample rational bases exist for treating doctors' offices and home healthcare companies differently." *Tiwari*, 26 F.4th at 370. The same is true here. In Mississippi, physicians are regulated by the Mississippi Board of Medical Licensure – not MSDH. *See, e.g., Montalvo v. Mississippi State Bd. of Med. Licensure*, 671 So. 2d 53, 55 (Miss. 1996). And the physician shortages Mississippi has faced historically are well documented. *See, e.g., Cooksey v. City of Gautier*, No. 1:16CV448-HSO-JCG, 2020 WL 1190459,

at *7 (S.D. Miss. Mar. 12, 2020);*Taylor v. Delta Regl. Med. Ctr.*, 186 So. 3d 384, 393 (Miss. App. 2016); *Scott v. Ball*, 595 So. 2d 848, 850–51 (Miss. 1992).

Here, as in *Tiwari*, the State could have "drawn [the line] differently" no doubt. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). "But that consideration is one for the State legislature, not the judiciary, to make." *Id.* To pass a law that survives rational-basis review on an equal protection claim, the State need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970).

## VI.   THE MORATORIUM

Mr. Slaughter's challenge to the moratorium and his challenge to the certificate-of-need regulatory scheme outside of the moratorium should be considered separately.   By way of reference, the initial decision to implement a moratorium was made to "limit the proliferation of new agencies that would potentially increase costs to Federal insurance programs and to avoid the potential adverse impact on small agencies serving rural counties." *See* Exhibit 3, Expert Report of Daniel J. Sullivan at p. 7.   The initial administrative moratorium expired by the time that the Mississippi Legislature decided to impose a legislative moratorium in 1983, and after several bills that extended the moratorium for a definite period of time, decided to make the moratorium indefinite.   *See id.*   Though the Legislature has considered several bills over the years that would have repealed the moratorium, the Legislature has determined that it has been, and still is, appropriate to retain it. *See id.*

Historical data for the past 40 years shows that the moratorium has not adversely impacted access to home health care, has not resulted in higher costs for home health care, and has not resulted in lower quality in the services provided. *See* Exhibit 3, Expert Report of Daniel J. Sullivan

24

at pp. 7, 16-17 & 21-22.  However, to be sure, the issue of rational basis for the moratorium is separate from whether there is a rational basis to support CON regulation of home health services, generally, in Mississippi.

With the moratorium in place for some 40 years, the foregoing discussion provides real evidence that it is helping Mississippi keep medical costs from rising as fast as in states without CONs laws for home health agencies, it is helping Mississippi maintain its status as a 4-star quality ranking by CMS, and it is supporting access to care and continuity of such care in Mississippi.

A plaintiff does not satisfy his burden under the rational basis test "simply by severing the stated links between a law and its rationales with on-the-ground evidence that undermines the law—or showing that the lived experiences of the law have not delivered on its promises." *See Tiwari*, 26 F.4th at 365.  Instead, the law "must be upheld ... if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Newell-Davis*, 2023 WL 1880000, at *3 (internal citation omitted).

Here, Slaughter has failed to carry his heavy burden of negating "every conceivable basis" that might support the CON laws.  *See id*.  As a result, this Court should grant summary judgment in favor of the Defendants.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Mississippi Association for Home Care prays that this Court will enter summary judgment dismissing all of Mr. Slaughter's claims with prejudice.

Dated:  February 2, 2024.              MISSISSIPPI ASSOCIATION FOR HOME CARE

                                       By:  */s/ Caroline B. Smith*
                                           PAUL N. DAVIS (MB #8638)
                                           THOMAS L. KIRKLAND, JR. (MB #4181)
                                           CAROLINE B. SMITH (MB #105501)
                                           ITS ATTORNEYS

## CERTIFICATE OF SERVICE

I, Caroline B. Smith, do hereby certify that on this day I caused to be served a true and correct copy of the foregoing memorandum by electronic mail to all counsel of record.

This the 2nd day of February, 2024.

*/s/ Caroline B. Smith*
Caroline B. Smith

85711215.v1