```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                   NORTHERN DIVISION


   CHARLES SLAUGHTER
                                              PLAINTIFF


   V.          CIVIL ACTION NO. 3:20-CV-789-CWR-FKB


   DR. DANIEL P. EDNEY, IN
   HIS OFFICIAL CAPACITY AS
   THE MISSISSIPPI STATE
   HEALTH OFFICER, ET AL.
                                              DEFENDANTS



          30(b)(6) DEPOSITION OF MISSISSIPPI STATE
                   DEPARTMENT OF HEALTH
                  {DR. LUCIOUS LAMPTON}


        Taken at the instance of the Plaintiff at
    Mississippi Attorney General's Office, 550 High
     Street, Jackson, Mississippi 39205, on Friday,
                   December 20, 2023,
                   beginning at 9:09 a.m.
```

REPORTED BY:

ROBIN G. BURWELL, CCR #1651

 1   a task force that would study the issue.  But if
 2   the data is there and the facts are there, that's
 3   in the best interest of the citizens, and that's
 4   what we should be doing.  And I think that would
 5   be -- we take it to the legislature.  Now, would
 6   the legislature respond?  Perhaps not, but perhaps
 7   so.  But I think they would also have our research
 8   and the data to back that up.
 9        Q.   (By Mr. Davis)  As we sit here today,
10   has anyone reported to you in the home health
11   agency, you know, arena, you know, specifically,
12   that they've had third parties come make
13   presentations that have led the staff to have a
14   concern that they think they need to report to
15   your committee that they perceive an unmet need?
16        A.   This case is the first time I've heard
17   of any discussion of unmet needs or unprovided
18   services in the health care industry in
19   Mississippi.  Since 2006 I haven't heard anything.
20        Q.   When you say "this case," you mean the
21   fact that Mr. Slaughter has filed a lawsuit?
22        A.   Correct.
23        Q.   Okay.  I mean, Mr. Slaughter, did he
24   ever come to your staff and make a presentation
25   showing them evidence that there is this -- that

Dr. Lucious Lampton - 30(b)(6) of MSDH 12/20/2023

```
 1   they can meet this 50-person need in a particular
 2   county?
 3        A.   Not that I'm aware of.
 4        Q.   Okay.  That's all I have.
 5   EXAMINATION BY MR. SCHELVER:
 6        Q.   I just have maybe a couple of questions.
 7             Dr. Lampton, you and Mr. Rice talked a
 8   great deal and went through a number of State
 9   Health Plans and home health reports, and there
10   was some discussion about potential discrepancies
11   in numbers.  Do you recall all that?
12        A.   Yes.
13        Q.   Is there any reason that a CON applicant
14   would be limited to the data contained in those
15   State Health Plans when they make an application?
16        A.   No.  I mean, they could go and let staff
17   know they have other data.  We'll take data from
18   anywhere that would disprove our data.  That's
19   part of the process.  I mean, we're trying to find
20   the best data.
21        Q.   Have you ever experienced an applicant
22   that challenges the data which is contained within
23   the State Health Plan or within a Department
24   report?
25        A.   Oh, yeah, that's common.  We've had
```

```
 1    of Health need to say we think that it does help
 2    with health planning and with health strategy, how
 3    can we make it more effective and less burdensome
 4    to the system.
 5          Q.   You talked earlier about the three
 6    full-time staff and three part-time staff that
 7    work at the CON division.  And I was just going to
 8    ask you if you could maybe expound a little bit on
 9    the function of the moratorium with regard to the
10    CON staff and how that moratorium actually assists
11    the CON staff if you believe it does.
12          A.   Well, anyone who works at our Department
13    of Health realizes that we have significant
14    problems with staffing.  We don't have enough
15    staff.  The staff are often not extraordinarily
16    trained.  Basic competency is sometimes something
17    we are very concerned about.  Our most competent
18    employees either move up or they're hired by
19    somebody else.  The Board has had extensive
20    conversations with the personnel board and with
21    the legislature about the need to pay our
22    employees that do critical work more money and
23    also to get them help.
24               I think when we look at some of the
25    typos in some of the papers that we were looking
```

1   at, I think we're looking at a very overly worked
2   staff that has a lot of -- we have three -- three
3   full-time employees to do everything from hearings
4   to evaluation to -- now they have a committee and
5   they have other staff that do help, but largely,
6   they're doing it all.  So three full-time
7   employees that are assisted by an administrative
8   assistant and two part-time people.
9           The concern about -- you know, the
10  reason to raise the moratorium or get rid of the
11  moratorium would be that there would be a need for
12  more home health.  If there's not a need, then it
13  would just be more work for my staff.  From a
14  purely selfish standpoint as a Department, I don't
15  need to give my CON staff any work that's not
16  essential for the public good, and it's not going
17  to be acted on and gone forward with.
18          So we have a very lean staff, and I
19  think -- and that's not going to change.  So any
20  unnecessary work I would not want for my
21  Department.  However, if there's a need there, we
22  need to -- it would be something worthwhile for
23  the Department.
24      Q.  And if there was a need, if someone
25  could show a need, demonstrate a need to the

```
 1   Board, you've testified that there is a process
 2   for that person to demonstrate that to the Board
 3   and then the Board can make a recommendation to
 4   the legislature to remove the moratorium, correct?
 5        A.   Correct.
 6             MR. SCHELVER:  No further questions.
 7   FURTHER EXAMINAION BY MR. RICE:
 8        Q.   Dr. Lampton, you testified about the
 9   circumstance in which someone, you know, if they
10   theoretically came into the Board and presented
11   data that was different than what the State Health
12   Plan requires and said that the Board would
13   consider that or make changes for that if needed?
14        A.   Yes.
15        Q.   Do you remember that?
16        A.   Yes.  And I think we would.  And I do
17   think we probably would need to spend some time
18   being sure of the need criteria is updated, even
19   though there is a moratorium in place in case it's
20   ever lifted.
21        Q.   And we talked earlier today about the
22   fact that the Board has the authority to change
23   the standards and criteria in the State Health
24   Plan, right?
25        A.   Yes, there's a lot that can be done
```

```
 1   come to a Board of Health meeting.  Once they have
 2   the hearing, before we vote on something, we allow
 3   public comment to the Board.  That was somewhat
 4   hampered by COVID, but public comment is allowed
 5   to address the issues that we're going to vote on.
 6        Q.   Let me just ask one last question and
 7   make sure I'm clear.  You said earlier that other
 8   than this -- well, you said earlier that in your
 9   40 years you've never heard from anyone that there
10   is a need from additional home health agencies in
11   Mississippi; is that correct?
12        A.   I do have gray hair, but it's only been
13   30 years.
14        Q.   30 years.  Thank you very much for your
15   time.
16        A.   It feels like more at times.  But in my
17   30 years, I've never heard anyone say we need more
18   home health agencies.
19             MR. SCHELVER:  No further questions.
20   Thank you for your time today.
21               (Time Noted:  4:00 p.m.)
22                SIGNATURE/NOT WAIVED
23   ORIGINAL:  MR. RICE, ESQ.
24   COPY:  MR. SCHELVER, ESQ.
25   COPY:  MR. DAVIS, ESQ.
```