IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHARLES SLAUGHTER                                                    PLAINTIFF

VS.                          CIVIL ACTION NO.: 3:20-CV-789-CWR-FKB

DR. DANIEL P. EDNEY, in his official Capacity
as the Mississippi State Health Officer,                              DEFENDANT

MISSISSIPPI ASSOCIATION OF HOME CARE                    INTERVENOR

_____

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT

_____

## INTRODUCTION

Defendant Dr. Daniel P. Edney, in his official capacity as the Mississippi State
Health Officer ("Dr. Edney"), is entitled to summary judgment because Plaintiff
Charles Slaughter cannot meet his heavy burden to negate every conceivable rational
basis for Mississippi's Certificate of Need ("CON") statutes challenged in this lawsuit.
Plaintiff contends that Mississippi's CON statutes codified at Miss. Code Ann. §§ 41-7-
171 through 41-7-209 (the "CON" laws), and particularly the statutory moratorium on
the issuance of a CON to a "new" Home Health Agency ("HHA") (Miss. Code Ann. § 41-
7-191(9) (the "Legislative Moratorium"), violate the Equal Protection and Due Process
Clauses of the Fourteenth Amendment to the U.S. Constitution and the Mississippi
Constitution. Plaintiff seeks injunctive relief and additional relief pursuant to 42
U.S.C. §§ 1983 and 1988. It is undisputed that Plaintiff's claims are subject to rational
basis review.  Because Plaintiff cannot show that the challenged CON laws are not
rationally related to a legitimate state interest, his claims must fail.

Experts have for years debated policy- and merit-based issues about the

effectiveness of CON laws. That debate continues to this very day. The Mississippi Legislature (with recommendations from the Mississippi Board of Health) is currently debating proposed amendments to the CON laws to accomplish the same legitimate State interests that existed when the challenged laws were adopted:  to contain costs borne by the State; to assure that all Mississippians have continuity of care; accessible, available, and quality healthcare facilities and services throughout the state; and to assure reasonable administrative oversight.

As set forth in detail below, when enacting the challenged laws, the State's elected representatives in the Legislature could reasonably have believed that at least one legitimate State interest would be furthered by the passing of the CON laws and the Legislative Moratorium. Plaintiff alone has the burden to show otherwise. He simply cannot establish that every single plausible state interest was irrational or was not reasonably related to the challenged CON laws. Thus, there can be no question that these laws pass constitutional muster.

With the backdrop of the dueling experts—and the Mississippi Legislature currently considering and debating these CON laws—it is clear that these issues are policy-decisions, and the Legislative prerogative of maintaining or amending the CON laws (including moratoria) is squarely where it belongs: *in the Legislature*. While the burden remains squarely on Plaintiff to negate every conceivable rational basis for the challenged CON laws, MSDH's experts and the public records nevertheless demonstrate that the statutes are rationally related to the State's legitimate interests. For these reasons and those set forth herein, Dr. Edney is entitled to summary judgment.

<u>Factual and Legal Background</u>

Plaintiff Charles Slaughter is a long-time physical therapist in Mississippi who claims that the CON laws and Legislative Moratorium unlawfully prevent him from becoming a Home Health Agency. *see* Doc. 1. The Mississippi State Board of Health ("Board of Health") has been granted, *inter alia*, authority to appoint the State Health Officer (Dr. Edney) to serve as the agency head of MSDH. Miss. Code Ann. § 41-3-5. The Board of Health (and MSDH) also consider and determine the various public policies pertaining to public health, including the consideration, publication and adoption of rules and regulations by MSDH. Miss. Code Ann. § 41-3-6. They study and review annually Mississippi's statutes related to health care and are authorized to make recommendations to the Mississippi Legislature regarding amendments or additions to existing statutes related to public health. Miss. Code Ann. § 41-3-15. Evaluations of "need" and any recommendations are reflected in the State Health Plan, which is a triennial report created by MSDH and adopted by the Board. Miss. Code Ann. §41-7-185.  The Board can also present the Legislature with suggested draft legislation to accomplish the goals of the Board at any given time—depending on the current circumstances of health care in Mississippi. *See id.* The most recent Board of Health legislative recommendations were approved on January 19, 2024, and are attached to the motion as Exhibit 1.

A Certificate of Need is a legislatively created mechanism that has a number of functions that directly relate to public health and public health policy in Mississippi. The Board of Health and MSDH adopt regulations that govern the issuance of a CON by the MSDH. *See* 5 Adm. Code. Miss. R. Pt.9 Subpart 91, R.1.1. (the "CON Manual"). The CON Manual explains that CONs are intended to "prevent unnecessary duplication

of health resources; provide cost containment; improve the health of Mississippi residents; and increase the accessibility, acceptability, continuity and quality of health services." *Id.* A copy of the operative CON Manual is attached as Exhibit 2 at p.1, ¶2. These are all reasonable state interests that justify the statutes in question. Several activities, services and "health care facilities" are directly affected by CON Laws and regulations. Miss. Code Ann. § 41-7-173.  Of the nineteen (19) types of "health care facilities" covered by CON Laws and regulations, the Home Health Agency ("HHA") is but one. *Id.*

As the authorized agency that implements statutory initiatives related to public health, the MSDH is also required to report its activities on a yearly basis in a report to the Governor and Legislature. Miss. Code Ann. § 41-3-15(1)(c)(vii). MSDH is further responsible for creating and publishing a regulatory document called the "State Health Plan" that details various public health policy goals and initiatives to accomplish said goals. Miss. Code Ann. § 41-7-185. The State Health Plan ("SHP") is generally updated and published on a regular basis (at least every three years) and expresses the state's projected "needs" standards for the issuance of CONs. *Id; see* Exh.2 p.1 ¶5. MSDH receives, reviews applications for, and issues CONs pursuant to the CON Laws, the CON Manual, and the operative SHP. Miss. Code Ann. §§ 41-7-171 through -209. Excerpts from certain SHPs are attached as Exhibit 3.

<u>History of CON in Mississippi</u>

In 1974, Congress passed the National Health Planning and Resources Development Act of 1974 ("NHPRDA") that created incentives for states to create CON programs. Pub.L. No. 93–641, 88 Stat. 2225 § 1523 (1975).  MSDH's Expert Report of Dan Sullivan attached to the Motion as Exhibit 4 ("Sullivan Rpt" at 10). During its

operation from 1975 until it was repealed by Congress in 1986, the NHPRDA required every state—including Mississippi—to adopt CON laws in order to receive federal funding. *Id.*

In 1979, the Legislature adopted the Mississippi CON Laws and the predecessor of the MSDH, the "Health Care Commission" ("HCC"), was charged with implementation. Miss. Code Ann. §§ 41-7-171 *et seq.* In accordance with the goals of the CON program, the HCC and several other healthcare related agencies met, studied, and crafted public-health policies to implement the CON Laws.[1]

In June 1980, the HCC first considered the "Administrative Moratorium," but opted instead to have the staff draft guidelines and criteria for the consideration of new HHA CON applications. (Exhibit 5 at "PLAINTIFFS002236-38, 2247-48"). In November 1980, the HCC staff began drafting and developing separate licensing laws and regulations for home health agencies. *Id.* at "002324-25". The HHA Licensing Law was ultimately recommended and adopted during the 1981 Legislative session. *Id.* at "002535-36".

In April 1981, the HCC adopted the CON Manual for the first time. Importantly, there was also consideration of the "Administrative Moratorium" that Plaintiff challenges here. *Id.* The HCC was informed at that time "that each county was covered by at least two home health agencies." *Id.* Public comments were requested. *Id.*

On June 22, 1981, the Administrative Moratorium was adopted for "a period of only six (6) months from and after July 1, 1981." Exh. 5 at "002594-95" This

---

[1] Due to the issues raised here by Plaintiff regarding the HCC's "Administrative Moratorium," and the separate issue of the adoption of the Legislative Moratorium, all the minutes and transcripts from the official meetings of the HCC were obtained from the MS Department of Archives and History. Attached to the motion as composite Exhibit "5" are excerpts of HCC Official Minutes and transcripts.

moratorium expired by its terms on December 31, 1981.

> 5.  <u>Final Adoption of Six-Month Moratorium on Home Health Certificates of Need</u>
>     Mr. Gill presented the following motion for Commission consideration:  That the Order of May 21, 1981 which amended the Order of April 30, 1981 by fixing a period of only six (6) months from and after July 1, 1981, that the Commission would not process or make a final determination on any application for a new or expanded Home Health Agency be adopted for permanent use effective from and after June 22, 1981.

*Id.* In December of 1981, the HCC extended the Administrative Moratorium by an additional 90 days "for the purpose of enabling the staff to send out and process the newly developed licensure forms." *Id.* at "002713-14". April 1, 1982, was the amended termination date. *Id.* In April, the HHA standards and criteria were studied, amended, and thereafter made available for public comment prior to final adoption. *Id at* "002829-2831". The HCC also proposed adoption of another twelve (12) month moratorium on new HHA CON applications. *Id.* On May 20, 1982, the HCC adopted an extension of the Administrative Moratorium effective "April 15, 1982 through December 31, 1982." *Id.* at "002881-82".

As mentioned, the HCC determined, based on its study of the home health industry, that then-existing home health agencies serving the Mississippi public were more than sufficient to meet the public need. Exh. 3 at pg. 282. As a result, the Commission determined that, in accordance with the stated intent of the CON requirements, no new home health agencies were needed. *Id.* Details of the Commission's rationale and action are memorialized as follows:

> The data available indicate that all counties had more home health agencies authorized to serve the county than were actually doing business in the county. *Therefore, a policy was adopted that placed a moratorium on the issuance of Certificates of Need for additional home health agencies from April 15, 1982 until Dec. 31, 1982.* For the licensure year beginning January 1, 1983, existing home health agencies shall be licensed for only those counties in which they served ten or more patients during the previous twelve-month reporting period.

> Prior to the date of January 1, 1983 the Commission shall determine the need for additional home health agencies, based upon the results stated above, it being the intent of the Commission that after January 1, 1983 existing home health agencies shall be licensed for only those counties which they are actually serving.

State Health Plan 1982-87; Exh. 3 at pg. 282.

In February 1983, the HCC extended the Moratorium sixty (60) days and for last time in February. Exh. 5 at "003114-17". There are no known additional extensions of the Administrative Moratorium by the HCC.

The **Legislative/Statutory Moratorium** was passed in 1983. Miss. Code Ann. §41-7-191(3)(currently -191(9)). In April, the HCC was informed of the passage:

```
Section 41-7-191(3): Mr. Gill stated that a moratorium on the "establishment
of, or expansion of the currently approved territory of" a home health agency
was effective from passage of the bill through July 1, 1984.
                                                  PLAINTIFFS003196
```

(Exh. 5 at "003196-97"). The transcript of the April 1983 HCC meeting states:

```
Section 41-7-191(3) - moratorium on home health agencies.  "the HCC shall not,
. . . grant approval for . . . the establishment of, or expansion of the
currently approved territory of, a health care facility as defined in sub-
paragraph (ix) of Sectin 41-7-173(g) (home health).  (we did not ask for this
and took no stand, for or against)
```

*Id.* at "003159". In May of 1983, following the passing of the Legislative/Statutory Moratorium, the HCC adopted a policy expressly recognizing that statutes supersede the HCC's Rules and Regulations if there is a conflict.

```
    b.   Statutory Law Superseding Commission Rules and Regulations
         Mr. Pugh stated that the policy merely formally recognized that statutory
         law would supersede rules and regulations adopted by the Commission when
         the two were in conflict.

         A motion was made by Mrs. Gallaspy, seconded by Mr. Darnell, to take
         final adoption action; there was no opposition, and the motion carried.
```

Exh. 5 at "003223". To date, the Legislature has not repealed or amended the

Legislative Moratorium on HHA, other than to renew it for several sessions and then to remove the repealer from the statute. *See* Miss. Code Ann. §47-1-191(9) history.

On April 9, 1986, the "Mississippi Health Services Reorganization Act of 1986" became effective. The Act was based on several years of studies conducted by various state agencies that existed prior to reorganization. The 1986 Act:

> expands significantly the moratorium on the issuance of Certificates of Need by the [newly created] Mississippi State Department of Health. The statute reads in part: "The Mississippi Health Care Commission, or its successor, shall not, for a period beginning upon the effective date of this section and ending July 1, 1987, grant approval for, or issue a certificate of need to any person for any reason except as hereinafter provided.

Exh. 3 at  State Health Plan of 1986 at pg. vii; XIIi and XII(1-6).

The 1986 State Health Plan states: "It is intended that such health planning [CON laws and the Legislative Moratorium] and health regulatory activities will improve the health of residents, increase the accessibility, acceptability, continuity, and quality of health services, prevent unnecessary duplication of health resources, and provide for some cost containment." *Id.* at "I-1". It further details the planning and fact-finding that was performed prior to the adoption of the 1986 Reorganization Act and states clearly the General CON Policies. *Id.* at I-(2-3).

Through the years, moratoria decisions have been made at the legislative level that certain CONs should not be issued and MSDH should not even consider an application. *See id.* Currently, pursuant to Miss. Code Ann. §§ 41-7-191(9) and -173, there exist no fewer than five (5) statutory moratoria covering the following: (1) skilled nursing facilities[2]; (2) intermediate care facilities; (3) intermediate care facilities for

---

[2] Mississippi has had a moratorium on nursing facilities since 1990 with one exception for one year. The moratorium is for construction of new facilities, conversions from hospital beds to nursing home beds, and expansion of beds.  Exhibit 6, HMA Summary at p.6

the mentally retarded; (4) home health agencies; and (5) the conversion of hospitals beds to intermediate nursing home care. Each of these was codified by the Legislature. Miss. Code Ann. §§ 41-7-191(9) and -173.

At the time this litigation commenced, there were *six (6)* types of health care facilities covered by the legislative moratoria. Medicaid-certified child/adolescent psychiatric or chemical dependency beds were also included. In the 2021 Legislative session, the Mississippi Legislature passed HB160.[3] One purpose of HB 160 was "to delete the moratorium on the authority of the State Department of Health to issue a health care certificate of need for the construction or conversion of child/adolescent psychiatric or chemical dependency beds participating in the Medicaid program…" *See id.* at pp. 72-73. HB160 became effective on March 25, 2021, so there are now only five (5) statutory moratoria. The Mississippi Legislature clearly can act when a need is demonstrated, and a legislative moratorium is not "perpetual."[4]

The most current version of the CON Manual confirms that the MSDH is presently prohibited from issuing a CON for a new home health agency. Exh. 2 at Rule 2.2 (15 Code Miss. R. Pt. 9, Subpt. 91, R.2.2.). An acknowledgement of the current Legislative Moratorium is also found in the most recent 2020 State Health Plan effective July 1, 2020. The 2020 SHP and CON Manual further detail the standards and determinations MSDH would have to consider in deciding whether to issue a new CON. *Id.* at Rule 8.1 "Criteria;" "General Considerations"; Exh. 3 at 1-2.

The Board of Health is charged with reviewing the statutes and regulations

---

[3] *See* http://billstatus.ls.state.ms.us/documents/2021/pdf/HB/0100-0199/HB0160SG.pdf

[4] The CON laws were further amended by the Mississippi Legislature in 1989, 1990, 1992, 1993, 1994, 1995, 1996, 1998, 1999, 2001, 2002, 2003, 2004, 2006, 2007, 2010, 2011, 2012, 2014, 2015, 2016, 2019, 2020 and in 2021 when it removed pediatric mental health and chemical dependency beds from the moratorium statute.  *See* Miss. Code §§ 41-7-173, 41-7-191 & 41-7-201.

affecting public health every year; and thereafter recommending changes or additions to statutes to the Mississippi Legislature. Miss. Code Ann. §§ 41-3-15 and 41-7-185. That determination necessarily includes the ability to recommend to the Legislature that certain moratoria be lifted—if the Board or MSDH finds that it is in the interest of public health or in furtherance of public health policy. *Id.* In fact, the Board's CON Committee is currently considering and debating issues related to CON. Exh. 1. The recommendations this year include removing three specific types of health care facilities from CON requirements (Residential Psychiatric facilities; Substance Abuse facilities; and Maternal and Infant Care facilities).[5] *Id.* Also included is an express recommendation by the Board of Health that other facilities should be studied further to re-evaluate the need for additional providers. *Id.* Pursuant its authority, the Board also instructed the staff of MSDH to review CON need-criteria across facility types, assure that the needs formulas are being updated if needed and that updated data is being used to perform the needs assessment *Id.* Further the Board has retained experts in data collection for health planning and commissioned "HMA Consultants" to prepare a detailed study of Mississippi's sister states and others in the region with an eye toward revising the State Health Plan and making it and CON in general more proactive. The HMA Executive Summary was presented to the full Board in January 2024 and is attached to the Motion as Exhibit 6.

To date, there has never been a "need" shown for additional HHA providers. *See* Deposition of MSDH 30b(6) Dr. Luke Lampton, chair of CON Committee, Board of Health member attached to the Motion as Exhibit 7 at p. 190:17-18 ("But in my 30

---

[5] For the court's further benefit, the court may review the video recordings public meetings of the CON Committee on January 17, 2024, and the related adoption of the full Board's Legislative recommendations (*see* Jan. 17 & 19, 2024: https://healthyms.com/page/19,0,124,1061.html).

years, I've never heard anyone say we need more home health agencies."). Plaintiff has demonstrated no need and a careful review of hundreds of sets of minutes from the Board's meetings demonstrates no need shown.[6] Plaintiff has never attempted to petition the Board of Health to urge there is a need for his home health agency. Exh. 7 Lampton Depo at pp 177:24-178:3.

**ARGUMENT**

## I.   Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. Nature's Way Marine, LLC*, 904 F.3d 416, 419 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). Whether the CON statutes and the Legislative Moratorium pass constitutional muster is a question of law. *Gaalla v. Citizens Med. Ctr.,* 407 F.App'x 810, 814 (5th Cir. 2011) (citing *Simi Inv. Co., v Harris Cnty., Tex.,* 236 F.3d 240, 249 (5th Cir. 2000)).  The Plaintiff alleges that the CON statutes and the Legislative Moratorium violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, as well as the due process provision in the Mississippi Constitution. [Doc. 1]. Both parties have agreed that rational basis is the appropriate standard for adjudicating these claims. [Doc. 1 at ¶¶ 150-158]. The rational basis standard under the U.S. and Mississippi Constitutions is the same. *See, e.g.*, *Wells by Wells v. Panola Cnty. Bd. of Educ.*, 645 So. 2d 883, 893 (Miss. 1994).

The rational basis standard "affirms a vital principle of democratic self-government." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014). It is not a "license" for courts "to judge the wisdom,

---

[6] *See* (https://healthyms.com/page/19,0,124,208.html (last visited 1/26/2024).

fairness, or logic of legislative choices." *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020). This is so because "rational-basis review gives broad discretion to legislatures," and "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (citation omitted).

When applying rational basis review, "courts must presume that the law in question is valid and sustain it so long as the law is rationally related to a legitimate state interest." *Planned Parenthood of Greater Texas*, 748 F.3d at 594 (citation omitted). Because a state legislature is not required "to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason[s] for the challenged [law] actually motivated the legislature." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (citations omitted). A State, moreover, is not required to produce any evidence to show that the objectives of the law will be or have been achieved. *See Heller v. Doe*, 509 U.S. 312, 320 (1993) ("A State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification."). "A law 'based on rational speculation unsupported by evidence or empirical data' satisfies rational basis review." *Planned Parenthood of Greater Texas*, 748 F.3d at 594 (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 315). Rational basis review, therefore, merely asks whether it is possible to believe that a law could advance a legitimate state interest. *See Planned Parenthood of Greater Texas*, 748 F.3d at 594 ("[T]he rational basis test seeks only to determine whether any conceivable rationale exists for an enactment.") (*citing Beach Commc'ns, Inc.*, 508 U.S. at 313 (1993)).

Of course, any conceivable reason for enacting a law "must be actually rational, not a matter of fiction." *Hines*, 982 F.3d at 273 (citation omitted); *see id.* at 274 ("A

hypothetical rationale, even *post hoc*, cannot be fantasy.") (cleaned up). But it is the plaintiff's burden to demonstrate the inverse: that every conceivable basis for a law is fictitious, i.e., irrational. *See Beach Comm'ns,* 508 U.S. at 314 (recognizing that the plaintiff "has the burden to negative every conceivable basis which might support" the challenged legislation). This is a heavy burden. As long as the court can "conceive" a rational basis for the challenged law, the law must be upheld as constitutional. *See Hines*, 982 F.3d 276 (rejecting equal protection challenge to law for which the Court could "conceive many rational bases").

In conducting rational basis review, courts are not permitted to strike down laws by resolving disputed issues of fact or weighing competing evidence. *See Beach Commc'ns, Inc.*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding"); *Planned Parenthood of Greater Texas*, 748 F.3d at 596 ("[T]here is 'never a role for evidentiary proceedings' under rational basis review.") (quoting *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995)). Instead, the mere existence of a dispute concerning the need for or desirability of a law is sufficient to establish that the law passes constitutional muster. *See Planned Parenthood of Greater Texas*, 748 F.3d at 594 ("The fact that reasonable minds can disagree on legislation, moreover, suffices to prove that the law has a rational basis.").

Last, whether a State has chosen the least restrictive means of achieving its interests is irrelevant under the rational basis test. *Id.* at 594 ("[T]here is no least restrictive means component to rational basis review."). In fact, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321 (cleaned up). Likewise, "[a] classification does not fail rational-basis review because it is not made

with mathematical nicety or because in practice it results in some inequality." *Id.*
(cleaned up).

Accordingly, "[s]ummary judgment is an apt vehicle for resolving rational-basis
claims*." Tiwari v. Friedlander*, 26 F.4th 355, 369 (6th Cir. 2022), *cert. denied,* 143 S.
Ct. 444 (2022). "That's because the question is not whether a law in fact is rational. It's
whether a legislator could plausibly think so." *Id.*

## II.   *The only universal agreement here is that rational minds (and experts) continue to debate the effectiveness of CON programs. The State's Expert Report details the specific state interests that are rationally related to the CON laws.*

The state's expert, Dan Sullivan is a long time CON consultant throughout the
U.S. and primarily in the Southeastern states. Exh. 4 Sullivan Rpt at 1. He has
studied, researched, and worked in states with and without CON laws.  He has seen
laws be changed or eliminated—such as Plaintiff here would prefer.  He has seen and
experienced the ramifications of wholesale changes to healthcare markets who remove
all CON restrictions on home health and then face problems with increased fraud,
"pop-up" providers and a lack of continuity of care due to constant turnover within an
unstable environment (*e.g.* Florida, Indiana).  *Id.*

First, Sullivan states in his Expert Report that based on his review of the
research regarding CON regulation, "I conclude that there are sound public policy
rationales supporting CON programs, although I acknowledge that experts do
disagree on the effectiveness of CON in achieving its stated goals. The fact that this
continuing debate exists among well-respected experts in and of itself supports the
conclusion that there is a rational basis for maintaining CON laws." (Sullivan Rpt at
p.8) MSDH readily acknowledges that Plaintiff has his own expert (Stratmann), who

attempts to contradict Sullivan. The state submits that when—like here—experts disagree on the efficacy of policy decisions, the Court's inquiry should rightfully come to an end. *See Planned Parenthood of Greater Texas*, 748 F.3d at 594 ("The fact that reasonable minds can disagree on legislation, moreover, suffices to prove that the law has a rational basis."); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. at 315 (holding that a legislative decision "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."); *see also* Sullivan Rpt at 27-32 ("The research cited by Stratmann does not prove that CON regulation of home health services results in higher costs and lower quality. To the contrary, these studies further underscore that the evidence is inconclusive, and that there is ongoing well-reasoned debate among experts as to the actual impact of CON regulation."; *see* Exh 6 HMA Summary Report at 5.

The issue of the effectiveness of CON programs has been debated since the early years following the implementation of state CON programs. "A review of the literature on CON programs shows that experts disagree about whether CON programs are effective in achieving their stated purposes. There is, however, evidence that CON programs can reduce health care costs, improve the quality of health care services, and improve access to health care services." Sullivan Rpt at 12. The lack of consensus about the cost impact of CON is due in part to the inherent difficulties in comparing "costs" or "prices" between states or even markets within a state. Sullivan Rpt at 14.

The recently received the 2024 HMA Executive Summary explains:

> The value of Certificate of Need programs has been heavily debated since their introduction. Generally, policymakers have held one of the following three perspectives on the effects of Certificate of Need programs *based on their economic philosophy.*

1. Certificate of Need programs are valuable because they control healthcare costs by reducing unnecessary supply of healthcare facilities and services. Adherents to this viewpoint argue that Certificate of Need programs prevent a surplus supply, which would result in a deadweight loss for society. Other Certificate of Need advocates argue that Certificate of Need application processes can benefit projects with a demonstrated community value and under-resourced communities.
2. Certificate of Need programs have a negative economic impact because they restrict supply and, therefore, competition. Opponents of Certificate of Need programs lead to a shortage of supply, which allows an incumbent to maintain control over the marketplace, set prices, and raise overall costs. Other negative impacts, they say, are related to the administrative costs of Certificate of Need program that states and applicants incur.
3. Certificate of Need programs have a neutral effect on healthcare outcomes. Under this hypothesis and with all other variables held constant, outcomes in states with and without Certificate of Need programs differ in statistically insignificant ways.

*HMA reviewed approximately 45 peer-reviewed publications and found no overwhelming evidence to favor any of the three hypotheses.*

Exh. 6, HMA Summary at p.5.

Given the complexity of health care markets and the difficulty in isolating causal relationships between observed data and CON regulation, it is not surprising that there is debate among experts regarding the effectiveness of CON programs in controlling the cost, quality, and access to health care services. (Sullivan Rpt at 15). As such, the State is entitled judgment in its favor. MSDH has ample support to show that, at the very least, there are arguments on both sides of this policy debate. This should end the analysis and dictate judgment upholding the laws.

## III. <u>*Mississippi's CON laws are rationally related to the State's interests; Plaintiff cannot negate every conceivable rational basis for the statutes.*</u>

### A. <u>Public Health and Administrative Oversight Interests</u>

Maintenance of public health and safety is a basic function of government; it is obviously a substantial state interest. *Lamar Outdoor Advert., Inc. v. Mississippi State Tax Comm'n*, 701 F.2d 314, 331 (5th Cir. 1983); Miss. Code Ann. § 41-3-15 (3).

Plaintiff admits this in his Complaint: stating that "licensing and regulation of HHAs and overall health- planning is an important part of improving or protecting the health of the public at large." [Doc 1 at ¶ 163]. The CON program in Mississippi is the key planning mechanism and likewise promotes the health, safety, and welfare of the public. Plaintiff cannot demonstrate otherwise. Mississippi's CON Manual expressly states that CONs are intended to "prevent unnecessary duplication of health resources; provide cost containment; *improve the health of Mississippi residents*; and increase the accessibility, acceptability, continuity and quality of health services." Exh 2 (emphasis added). CON "laws in general have been recognized as a valid means of furthering a legitimate state interest." *Tiwari*, 26 F.4th at 364; *see id.* ("No court to our knowledge has invalidated a healthcare certificate-of-need law under the rational-basis requirements of the Fourteenth Amendment.") (internal citation omitted).

Reasonable administrative oversight by MSDH is also furthered by the laws. The removal of CON regulation would result in an influx of new providers, which in turn, would impose a massive burden on MSDH. Sullivan Rpt p.16. *see also* Exh. 7 Lampton Depo at 183:5-184:23. For example, the Plaintiff in this case is a physical therapist. Currently there are 2,168 licensed physical therapists in Mississippi. If a small portion of physical therapists such as the Plaintiff sought to become a HHA, the resulting increase in agencies could overwhelm the MSDH's ability to adequately monitor the operations of so many providers. The same concern arises if other licensed clinical providers such as the 1,507 licensed occupational therapists also sought to become a licensed HHA. Sullivan Rpt p.16. Plaintiff has also stated "I think it would open up for other physical therapists and occupational therapists." Excerpts of Plaintiff's

Deposition attached as Exhibit 8 at 11:6-11. Thus, Plaintiff admits that he will not be the only therapist to morph into an HHA. Only a few dozen from each discipline could swamp MSDH's resources.

For support this Court may look to the recent case where a Louisiana facility-need-review program required there to be a need for additional respite care providers in a certain geographic area before the provider could move past that stage to apply for its license. *Newell-Davis v. Phillips, No. 22-30166*, 2023 WL 1880000, at *1 (5th Cir. Feb. 10, 2023), cert. denied, 144 S. Ct. 98 (2023). The district court applied rational basis review and found that the program was rationally related to the legitimate interest of protecting consumer welfare. The Fifth Circuit affirmed, reasoning that, in "the highly-regulated healthcare sector, . . . limiting the number of regulated providers can increase the quality of services for consumers[.]" *Id.* at *4.

### B.   The CON laws are constitutionally sound-due to federal penalties for not adopting them, and incentives for passing.

In 1974, Congress passed the NHPRDA, which required states to enact CON laws in order to receive federal health care funding. Pub.L. No. 93–641, 88 Stat. 2225 § 1523 (1975). The purpose was to incentivize states to adopt laws that focused on health planning and a "need-based" analysis. *Id.* The federal legislation threatened to withhold funding from any state that failed to create a CON program. *Id.* Congress's aim in passing the NHPRDA was to limit costs by preventing needless duplication of services and remedy uneven health care distribution. *Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 717 F. Supp. 2d 1159, 1161 (E.D. Wash. 2010), *aff'd in part, rev'd in part*, 654 F.3d 919 (9th Cir. 2011) (citing *North Carolina v. P.I.A. Asheville, Inc.*, 722 F.2d 59, 61.1, 62 (4th Cir.1983)). The purpose of Congress in 1974

was to restrain government expenditures via Medicaid and Medicare. *Id.*

Mississippi's CON laws were adopted via The Mississippi Certificate of Need Act of 1979. Miss. Code Ann. §§ 41-7-171 through -209. Hence, when the Mississippi Legislature adopted our CON laws in 1979, it could have rationally believed that by adopting the CON Laws, Mississippi would reap the benefits of the federal funds that incentivized the state's adoption. "The governmental interests in receiving full federal funding and discouraging the violation of … laws are unquestionably legitimate, even if the law is not the only or most desirable way to achieve these goals. *Harold v. Richards*, 334 F. Supp. 3d 635, 643 (E.D. Pa. 2018). The belief by the Mississippi Legislature in 1979 that the CON laws would further the state's financial interests, standing alone, suffices to show that the CON Laws survive rational basis. Plaintiff cannot demonstrate otherwise.

### C. CON laws assist in cost containment

CON laws (including moratoria on new providers/holders) advance the State's interests to provide *some* cost containment by restricting (and closely monitoring) the holders and licensees that can seek payment/reimbursement directly from the State via Medicaid. The goal to realistically curb some costs was acknowledged and expressed as far as back as 1986 when the MSDH acknowledged that one intent of the CON regulations was to "provide for *some* cost containment" Exh. 2 at 1986 SHP at I-1 ¶3 (emphasis added).

To understand the rationale of CONs and of the Mississippi Legislature's intent by their enactment, one must recognize that the healthcare "market" is not a "free-market." In fact, healthcare is nearly the exact opposite. In a free market, demand will drive supply. In healthcare markets, supply actually drives demand. (Sullivan Rpt at 8)

This inverse relationship is described as "supplier-induced demand" or "Roemer's Law". Essentially, "supplier-induced demand" means that new health care services tend to be utilized even if there is not a clinical need for them. *Id.* Research suggests that this phenomenon exists. *Id.* In healthcare, *the creation of additional supply will in turn spur patient demand for the services, even if the services are not strictly necessary. See id* at 8-9. As Sullivan further explains:

> In addition, consumers have limited information available to assist in choosing health care providers based on quality of care. The information that is available to consumers regarding quality is often ambiguous. And even if consumers did have sufficient information to compare different providers, they do not always independently choose which provider to use; that choice is often highly influenced by the insurer or the referring physician. As a result, there is significantly less competition based on price and quality in the market for health care services when compared to markets for other goods and services.

Sullivan Rpt at 8.

There is also evidence that CON programs can reduce the cost of health care services. Sullivan Rpt at 12. Numerous studies over the years have addressed the issue of whether CON programs effectively control health care costs. Overall, the results of these studies are mixed. *Id.* Some studies have shown that CON regulation has resulted in fewer hospitals, ambulatory surgery centers, and other major facilities per capita than exist in states without CON regulation. *Id.* These considerations based on population-based ratios tell little about the level of competition in a market, the available capacities of existing providers, and the geographic distribution of providers within a state. *Id.* Having more providers per capita does not improve access to care if the result is simply duplication of service (increased cost to the state) and an increase in unused capacity. Sullivan Rpt at 12.

There is also evidence that health care providers operate more efficiently

from a cost perspective in states with CON programs than in states without CON programs. *Id.* at 13. A recent study examined cost data from 37 states with and without CON programs. The study measured cost inefficiency by comparing costs in actual hospitals to a hypothetical "completely efficient" hospital and found the "[a]verage estimated cost-inefficiency was less in CON states. . .than in non-CON states." Sullivan Rpt at 13. Given the lack of significant competition based on price and quality in the market for home health services, supplier-induced demand results in duplication of services, unnecessary services, and rising costs. *Id.* Providers have an incentive simply to provide more services or provide more expensive services than may be needed for a particular illness or condition. *Id.* CON programs address these issues by requiring providers of new services to demonstrate genuine need for the services in the relevant planning area and the effect that a proposed new service will have on the cost of care. *Id.* at 9.

Further, health care is unlike most goods and services because consumers of health care services, *i.e.* patients, generally pay only a small portion of the cost of services out of pocket. *Id.* at 8.  Rather, the major portion of costs is paid by private insurers or the government through programs like Medicare and Medicaid. These governmental programs set their rates by regulation, not based on the charges that providers set and not through negotiated rates. *Id.* at 8. In 2020, 77% of all home health payments were provided by Medicare, Medicaid, and other governmental programs. *Id.* at 8 FN 8. As such, HHAs are much more likely to be directly compensated with government funding. *Id.* at 8. Mississippi's healthcare costs as a state are directly related to government-pay services. *See Id.* The high percentage of government payors in home health is a key distinction between home health and

many other types of health facilities. The direct monetary impact is obvious when the government is paying much of the total cost.[7]

Courts have held that cost containment is a valid state interest furthered by CON laws. *See Tiwari*, 26 F.4th at 361. The Fourth Circuit has similarly upheld CON regulations based on cost containment. *See Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 548 (4th Cir. 2013). There, the court held that plaintiff failed to rebut the articulated purposes served by the state's CON program, including "ensuring geographically convenient access to healthcare for Virginia residents at a reasonable cost." *Id.*

### D.     CON laws improve accessibility for all Mississippians.

There is little question that the removal of CON regulation of HHAs in Mississippi will result in greater duplication of existing services and diminished volumes for existing providers, thus adversely impacting the existing providers' ability to continue providing services in poorer, less populated rural counties. Sullivan Rpt at 15. Mississippi's HHA CON program benefits the patients across the state by ensuring *availability* and *continuity* and preventing "pop-up" providers who are only in business long enough to provide service to a few patients and then must close their business because of a lack of patients—thus leaving their existing patients without a provider during their time of need. *See id.*

Likewise, *CON laws promote accessibility statewide.* Densely populated areas

---

[7]  The importance of this cannot be understated. Government pays the bulk of costs associated with home health care and has for more than 40 years. Further, the state of Mississippi does not set the rates of reimbursement by CMS via Medicare or Medicaid. Neither the state, Dr. Edney, or MSDH play any role in determining who may seek reimbursement from CMS or how much any given service may be compensated by CMS. As such, Plaintiff's complaint is misplaced as his alleged injury (not being able to get reimbursed as an HHA from CMS) is not redressable here. Even if Plaintiff received everything he requests, he would still not be able to seek reimbursement as an HHA, because he does not meet basic state or federal requirements to be licensed or certified as an HHA.

with more patients are more likely to attract providers than less populous areas. Without state-imposed controls over new entrants to the market, it stands to reason that most new providers would open and offer services in high-density areas. CON laws prevent this imbalance in several ways—including by requiring showing that there is a need for more providers in a particular area and that a new provider will not adversely affect the viability of existing providers. Sullivan Rpt at 15. The state's interest is to ensure access and  availability for all Mississippians, not just in population centers, and this is exactly what CONs have done regarding HHA considering there continues to be ample providers in all 82 counties.

Failing to control entry into the market for health care services limits access to services in the long run, especially for vulnerable populations. *Id.* at 9.  As Sullivan explains:

> There are many health care services which are not profitable. One example is emergency departments, which treat a large number of uninsured patients with limited resources to pay for care. Larger providers, like hospitals, are able to cover the costs of these unprofitable services because they also provide very profitable services, like orthopedic surgery. But in an "open market," smaller providers "cherry pick" profitable patients from the larger providers. The result is that the larger providers can no longer afford to subsidize unprofitable services, like emergency rooms, and must cease offering those services or, worse, shut down altogether.

Sullivan Rpt at 9.

These same considerations are applicable to home health services. Sullivan Rpt at 9.  The patients who provide the greatest financial return to a HHA are those covered by Medicare because of its higher reimbursement rates. *Id.* Applicants for HHA CONs are required to disclose their projected mix of patients by payor. Failure of an applicant to indicate its intent to serve lower income

patients such as those covered by Medicaid or without insurance can lead to a denial of the application in Mississippi as well as other states. *Id.* at 9. Indigent care and the need for CON holders to provide services to all people across the economic spectrum is especially important to the State. *Id.* CONs promote the understanding that all CON holders—not just some—provide indigent care, which is offset by private (or otherwise more profitable) patients.[8] Absent CON regulation, HHAs would be more likely to focus on serving Medicare patients while having no incentive to serve lower income patients. *Id.* at 10. As shown above, CON laws and regulations also balance the profitability of all CON holders so that each can and will continue to provide expert health care services to all Mississippians, not just those with insurance or wealth.

If anyone could at any time enter a healthcare market, such as Plaintiff wishes for home health, then those unrestrained and unnecessary new entrants will necessarily have an impact on the overall wellbeing of existing providers, assuming, as we must, a finite number of patients in a given area. *Id.* at 9. There must be a balance—for the patients and the providers. The number of patients, as well as the profitability of those patients, must be balanced. This is what CON laws do. If Plaintiff's claims prevail, the geographic spacing, continuity of care, and statewide

---

[8] The CON Manual requires:

> The Department will disapprove a CON application if the applicant fails to provide or confirm that the applicant shall provide a reasonable amount of indigent care or has admission policies which deny access to care by indigent patients. The Department will disapprove a CON application if approval of the request would have significant adverse effect on the ability of an existing facility or service to provide Medicaid/indigent care.

> The State Health Officer shall determine whether the amount of indigent care provided or to be offered is "reasonable." The Department has determined that a reasonable amount of indigent care is an amount which is comparable to the amount of such care offered by other providers of the requested service within the same, or proximate, geographic area.

Exh 2 at pg. 1-2.

availability promoted by CONs will necessarily be undermined. *Id.* at 15. Without CON laws, lack of availability will ultimately result for those areas with low patient populations or with high numbers of Medicaid recipients. *Id.*

The Eighth Circuit court has upheld the constitutionality of a CON law on this basis, finding that "insulating existing entities from new competition in order to promote quality services and protect infrastructure investment can survive rational basis review.". *Birchansky v. Clabaugh*, 955 F.3d 751, 755 (8th Cir. 2020) (internal citation omitted); *see also Colon Health Centers of Am., LLC*, 733 F.3d at 548 (CON laws "ensur[e] geographically convenient access to healthcare for Virginia residents at a reasonable cost.")

### E.   CON laws improve quality of care.

There is also evidence that CON programs can improve the *quality* of health care services. Sullivan Rpt at 18. By limiting the provision of certain services to fewer providers with higher volumes, CON programs can effectively ensure better patient outcomes. *Id.* There is a significant body of research demonstrating that the quality of patient outcomes is related to the volume of patients/procedures. *Id.* There is strong potential for quality to suffer if the numbers of providers increase for CON-covered services and existing volume is distributed across a greater number of providers. *Id.*

With respect to home health services, there is a relationship between the number of patients an agency serves and its ability to offer programs and services that enhance the quality of care. Reductions in patient volumes can impact the quality of care. *Id.* at 9. For example, some home health providers have developed disease-specific treatment programs for patients recovering from cardiovascular

issues, behavioral health patients, and patients requiring infusion therapy. *Id.* The financial ability to hire and support these specialized staff members is dependent on having a sufficient base of patients in need of such care. *Id.*

In Mississippi, where the number of home health patients has grown slowly in recent years, the elimination of CON regulations for home health services would necessarily result in a reduction in the average number of home health patients per agency across the state, which in turn would reduce the financial performance of many existing providers. *Id.* at 19. HHAs that offer less frequently utilized but needed services such as speech therapy or mental health counseling may be forced to discontinue such services due to a reduction in the number of visits for more profitable services. *Id.*

Further, as discussed above, the administrative burden that would be placed on the MSDH, the sole agency charged with regulating HHAs, in the absence of the CON Law would impair its ability to ensure that patients are receiving quality services. There is a rational basis for limiting the number of HHAs for purposes of regulatory efficiency. *Id.* at 19; *see also* Exh. 7 Lampton Depo at 183:5-184:23.

Sullivan's Report further explains that:

> Figure 4 presents the star ratings by state, with the states providing CON regulation of home health services highlighted. Home health agencies in 14 of the 18 states (including the District of Columbia) with CON regulation of home health services averaged either 3.5 or 4 stars in the composite rating of quality under Home Health Compare. *No state without CON regulation of home health had a 4-star rating,* and only 17 of these 33 states had a 3.5-star rating.

*Id.* at 21 and Figure 4. Mississippi HHAs consistently outperform *all* non-CON states for healthcare quality, cost-efficiency, and accessibility. *Id.* Despite arguably having the least healthy senior citizen population, Mississippi is one of only six states/territories that can boast a four-star rating. *Id.* Thus, from a patient

satisfaction standpoint, Mississippi's HHAs are very highly rated. *Id.* Further, the existing Mississippi HHAs provide more visits to their patients than the national average. *Id.* Thus, Plaintiff cannot show that the link between the CON Law and the State's interest in improving healthcare quality is fictitious.

Again, the Court may look to *Tiwari,* where the Sixth Circuit held the "State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service." 26 F.4th at 364. The Court observed that, "[w]hether by the downstream benefits of achieving scale or the quality-improving expertise and specialization that come from repeated services within a market, the State could plausibly think that the certificate-of-need program would increase quality in one way or another." *Id.; see also Birchansky*, 955 F.3d at 755.

## IV.   The HHA Moratorium remains because there is not a "need" ;

The only operative moratorium on the consideration of new HHA applications for a CON is a legislative action from 1983 that is a separate consideration from the rationale supporting the CON laws. Despite Plaintiff's claims, Mississippi residents do not lack access to high quality or cost-effective home health services because of the moratorium. Sullivan Rpt at 26. No need has ever been shown.

### A.   Plaintiff's claims regarding the "Administrative Moratorium" are moot; Nothing indicates the "Administrative Moratorium" existed after April 1983

Plaintiff refers to the HCC's adopted policies discussed above as the "Administrative Moratorium". Doc 1 at ¶9. This Administrative Moratorium was in place temporarily and, by its own terms, the policy adopted by the HCC was finite and terminated the last day of April 1983. *See* CON history above; Exh. 5. There has been nothing discovered in the archives of the MSDH or the HCC that indicates any

attempt to re-adopt, or otherwise enforce the Administrative Moratorium. Plaintiff cannot prove otherwise.

The 1981 and 1982 Administrative Moratorium was intended to provide the HCC with additional time to study and determine the needs of the State, the accessibility of home health and to get an accurate count on the numbers of patients that were using home health. (Exh 2 81-87 SHP at 282). The HCC reported to the Legislature and made recommendations that no additional providers of HHA services were needed. *Id.* at XIII-1--XIII-6. This was based on the HCC's determination (after studies, notice, and public comments) that there existed adequate HHAs, such that there was not a need for new CONs. *Id.* This determination, in and of itself, is directly in accord with the CON Law requirements that "need" be established to prevent unnecessary facilities, and it is a rational basis for the Administrative Moratorium.

During the subsequent legislative session (1983), the Legislature passed a law which expressly codified the prohibition on the issuance of a new CONs for HHAs, effective on April 9, 1983. *See supra*; Miss. Code Ann. § 41-7-191(9). Other than the 1983 enactment of Legislative Moratorium, there is no separate administrative policy that prohibits the issuance of a CON for a new HHA. The HCC acknowledged the supremacy of state statute if it conflicted with a previous HCC policy. Exh 5 at "003223". The Legislature, which gave the HCC the authority over HHAs in 1979, acted in 1983 to reclaim the authority of the HCC to consider applications for HHA CONs by enacting the Legislative Moratorium. Plaintiff can make no showing that the Administrative Moratorium is still effective.

Generally, any set of circumstances that eliminates actual controversy renders an action moot. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir.

2006). The express termination, and subsequent abrogation of an administrative policy by an adopted statute, is certainly one such circumstance. Therefore, any claims made by Plaintiff's Complaint regarding the temporary policy or allegations based upon the inoperable Administrative Moratorium—which terminated by its own terms on April 30, 1983—should be resolved in favor of the state.

B.    <u>The Legislative Moratorium is valid and constitutional</u>

With regard to the operative moratorium as applied to new HHAs, the foremost rationale for both the 1982 Administrative Moratorium and the subsequent Legislative Moratorium in 1983 is that the MSDH and the Board of Health consistently find that there is not a need for additional HHA providers. Plaintiff cannot show otherwise. In fact, the existence of the Administrative Moratorium justifies the Legislative Moratorium. The statutory authority granted to the MSDH and Board of Health authorizes study, analysis, and reports on the levels of need throughout this State. Miss. Code Ann. §§ 41-3-6 and -19. With this collected information, they then make informed recommendations to the Legislature of changes needed in statutes to best meet the needs of the public and accomplish the goals of improving and protecting public health. Miss. Code Ann. § 41-3-6. Despite being armed with the most comprehensive set of information on healthcare in this state, neither the Board nor the MSDH has recommended that the Legislative Moratorium be removed due to need. No evidence otherwise exists. Plaintiff has shown no "need." Despite Plaintiff's claims, Mississippi residents do not lack access to high quality or cost-effective home health services as a result of the moratorium. (Sullivan Rpt at 26). As demonstrated above, other moratoria have been removed from time to time based on the needs of the public.

Further, despite having an opportunity to do so each session, the Mississippi Legislature has consistently rejected (for many years) proposed bills that would eliminate CON altogether or remove the HHA moratorium. *See e.g.* Bills proposed in Mississippi Legislature: 2020 HB 605, 2020 SB 2618 and 2619; 2021 HB 1305, 1306, and 309; 2021 SB 2747. This arguably demonstrates there is "no need" and the same rationale that was the basis for the CON laws in 1979 and the moratoria in 1982 and 1983 remains viable still. By preventing unnecessary or unneeded health care facilities, the State controls costs, expands access, and improves outcomes.

Moreover, many of the exact same arguable bases justifying the CON laws can equally support the existence of the HHA moratorium. As demonstrated above, the CON laws assist with cost-containment. It stands to reason that a complete prohibition on the issuance of new CONs would *also contain costs.* It was certainly reasonable for the Legislature to think this in 1983. Likewise, the CON supply restrictions have been shown to improve quality and access statewide. The Legislative Moratorium further restricts supply and supports these goals. These rational bases for the current statutory moratorium are enough to warrant judgment on these claims because Plaintiff cannot prove beyond a reasonable doubt that there is no rational basis for Mississippi's CON moratorium regarding HHAs.

Additionally, the Legislative Moratorium was intended to relieve MSDH from having to consider HHA CON applications, and thus relieve the planning staff of the burden of processing applications *for which there is no need. See* Lampton Depo Exh. 7 at 183:5-184:23. This type of statutory action to relieve or prevent an unnecessary administrative burden on MSDH is wholly justified by the Legislature. The Legislature gives authority, and it can take it away. This is a decision however, left

solely to Legislative prerogative. As described herein and by Sullivan, there is a very reasonable likelihood that if the Moratorium is eliminated, there will be a significant number of people like the Plaintiff that want to apply to become an HHA to make more profit for themselves. *See Newell-Davis* 2023 WL 1880000, at *4 ("where a government wishes to create consumer benefits by limiting new entrants to the already highly-regulated market for healthcare services, it may use any rational tool to implement that limit—so long as there is a "real" link between the tool and the benefits.")  The Court concluded:

> By limiting the number of providers … the State can focus its resources on a manageable number of providers. That focus aids the State in ensuring that consumers receive the best possible healthcare in their communities. *In other words, the State argues that resource constraints make effective oversight impossible in situations where an inundation of new applications could prevent [the Agency] from effectively supervising existing healthcare providers. That reasoning states a rational connection between a legitimate interest (improving healthcare) and a means of achieving that interest (limiting the number of new applications [the Agency] must fully evaluate.*

*Id.* at *4 (emphasis added).

The Legislature decided in 1983 that there was no need for more HHA providers and no need for MSDH to process HHA CON applications that would never be granted—hence the statutory moratorium. The Legislature could rationally believe that the State's interests would be better served by prohibiting the issuance of new CONs until a *comprehensive recommendation of HHA need* is made by MSDH, as opposed to forcing MSDH to review CON applications on a case-by-case basis. This decision was soundly within Legislative prerogative to focus MSDH's limited resources on areas and facilities where there is an established need for additional providers. *See* Exh. 1.

**V.**   *Defendant Is Entitled To Judgment As A Matter of Law On Plaintiff's Equal Protection Claim.*

Plaintiff also contends that the CON laws and the Legislative Moratorium violate the Equal Protection Clause of the Fourteenth Amendment by irrationally treating new home health agencies differently from other similarly situated healthcare facilities and providers. The Equal Protection Clause provides that "no State shall deny ... to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. It "does not forbid classifications because most laws differentiate in some fashion between classes of persons." *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016). Instead, it prohibits "governmental decision makers from treating differently persons who are in all relevant respects alike." *Id.*

"Statutory classifications are given broad deference under rational basis review and will survive if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it whether or not the basis has a foundation in the record." *Id.* (quotation marks omitted). As long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose" the challenged classification will pass rational basis scrutiny. *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012). Moreover, "[u]nder rational basis review, overinclusive and underinclusive classifications are permissible, as is some resulting inequality." *Golden Glow Tanning Salon, Inc. v. City of Columbus, Mississippi*, 52 F.4th 974, 980 (5th Cir. 2022) (citation omitted).

Plaintiff argues that the challenged laws deprive him of his constitutional right

to equal protection of law in two ways. First, he alleges that the moratorium "irrationally treats new home health agencies differently from materially indistinguishable existing home health agencies," as well as "other materially indistinguishable health care facilities or providers." [Doc. 1 at ¶¶ 150, 152]. Second, he asserts that the CON Law "irrationally discriminates between different kinds of health care providers" by exempting "physician private practice offices, personal care residential-living and assisted-living facilities, abortion facilities, veterans homes, and health care facilities owned and/or operated by the State of Mississippi or [its] agencies" from its requirements. [Doc. 1 at ¶ 152].

As an initial matter, Plaintiff's claim that the moratorium irrationally treats new home health agencies differently from those that have a CON fails for the same reasons that his due process claim does. As discussed above, the moratorium is rationally related to the same legitimate interests that the CON Law is designed to advance. Simply put, a law that satisfies the rational basis standard under the Due Process Clause also survives rational basis scrutiny under the Equal Protection Clause. *See Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989) (equal protection claim is subject to the same rational basis analysis as a due process claim).

As for personal care residential-living facilities and assisted-living facilities, neither are remotely comparable to home health agencies because they primarily offer nonmedical services to people who live in these facilities. *See* 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 48.2.11 ("The term "personal care" shall mean the assistance rendered by personnel of the licensed facility to residents in performing one or more of the activities of daily living, including but not limited to bathing, walking, excretory

functions, feeding, personal grooming, and dressing."). Any medical services they do offer to their residents are merely incidental to the nonmedical services.[9] In light of these clear distinctions, it cannot be said that it is irrational to treat these facilities differently from home health agencies.

The Sixth Circuit easily disposed of a similar argument in *Tiwari*. There, the plaintiffs argued that Kentucky law violated the Equal Protection Clause by "irrationally" requiring home healthcare companies to obtain a CON but not "continuing care retirement communities," which provide "a continuum of care depending on the needs of their residents." 26 F.4th at 370 (citing Ky. Rev. Stat. § 216B.015(11)). Although the Sixth Circuit acknowledged that these facilities "sometimes provide services to their residents comparable to the services home healthcare companies provide," it concluded that they were distinct from home healthcare companies because they "serve only the residents that already live there" and "provide a vast array of services, both medical and nonmedical, that home healthcare companies do not." *Id.* The Sixth Circuit also distinguished these facilities from home healthcare companies based on the fact that they did not receive Medicaid funding. *Id.* But the Court made clear that "*[e]ach distinction* suffice[d] to uphold the classifications." *Id.* (emphasis added).

Plaintiff's argument that it is irrational for the State to require home health agencies to obtain a CON, while not requiring the same of veterans homes and State-

---

[9] *See* 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 47.5.1 (defining a personal care residential living home as facility "accepting individuals who require personal care services or individuals, who due to functional impairments, may require mental health services to compensate for activities of daily living"); 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 47.2.1 ("The term 'assisted living' shall mean the provision of personal care and the addition of supplemental services to include, but not be limited to, the provision of medical services (i.e., medication procedures and medication administration), and emergency response services.").

owned healthcare facilities, fares no better. It is certainly rational for the State to regulate private healthcare providers in a different manner than State-owned veterans homes and healthcare facilities. Private healthcare providers and facilities are much more likely to engage in duplication of services to the detriment of the State treasury because their profits are largely dependent upon the number of claims they submit to Medicare and Medicaid. In contrast, State-owned facilities lack a profit motive and are incentivized to avoid duplication of services based on the fact that the State must pay for a significant portion of the services they provide.[10]

Last, the Court should summarily reject Plaintiff's equal protection claim to the extent it is predicated on the fact that the State does not require physicians to obtain a CON in order to open up an office. The Sixth Circuit in *Tiwari* held that there are "[a]mple rational bases . . . for treating doctors' offices and home healthcare companies differently." 26 F.4th at 370. The Court specifically identified three valid reasons for Kentucky's decision to exempt physician's offices from its CON law: "the modest supply of physicians in parts of Kentucky, the more urgent need for physicians than home healthcare agencies throughout the State, and the more heavily regulated nature of the requirements for becoming a physician." *Id*. The Sixth Circuit's reasoning applies with full force here. Physicians in Mississippi are regulated exclusively by the Mississippi Board of Medical Licensure, which has adopted a detailed set of regulations governing the practice of medicine.  *See* 30 Miss. Admin.

---

[10] To the extent Plaintiff's equal protection claim is predicated on the differential treatment of HHAs and abortion facilities, it fails. To begin with, the State no longer has any licensed abortion facilities now that abortion is prohibited. Miss. Code Ann. § 41-41-45. In any event, abortion facilities in Mississippi did not receive Medicaid funding. *See Harris v. McRae*, 448 U.S. 297, 302 (1980) (describing the Hyde Amendment). That distinction alone is sufficient to provide a rational basis for the classification. See *Tiwari*, 26 F.4th at 370.

Code Pt. 2601, R. 1.1, *et seq.* Moreover, Mississippi's need for more physicians is well known and has persisted for a substantial amount of time. *See, e.g., Cooksey v. City of Gautier*, No. 1:16CV448-HSO-JCG, 2020 WL 1190459, at *7 (S.D. Miss. Mar. 12, 2020); *Taylor v. Delta Regl. Med. Ctr.*, 186 So. 3d 384, 393 (Miss. App. 2016); *Scott v. Ball*, 595 So. 2d 848, 850–51 (Miss. 1992). The same cannot be said for Home Health Agencies. Accordingly, Plaintiff cannot possibly meet his burden of establishing that it is irrational for the Legislature to not treat physician's offices the same as home health agencies.

Plaintiff's argument, at bottom, is that the Legislature should have "drawn" the line separating those facilities and providers who must obtain a CON from those that do not "differently." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). "But that consideration is one for the State legislature, not the judiciary, to make." *Id.* A state, moreover, does not need to require nearly all healthcare providers and facilities to obtain a CON in order for the CON laws and Legislative Moratorium to survive rational basis scrutiny. *See Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970) (noting that a State does not need to "choose between attacking every aspect of a problem or not attacking the problem at all" to satisfy rational basis review). For these reasons, Defendant is entitled to summary judgment on the Plaintiff's equal protection claim.

## CONCLUSION

As demonstrated here, the Mississippi Legislature enacted laws relative to health care industries that were intended to provide balance in the industry and allow the State to meet its public health policy goals. CON laws do this in several ways, and Plaintiff cannot carry his burden to show otherwise. The laws also authorize the Board of Health and MSDH to look at all complexities in this industry and adapt the State's

policies to changing times and conditions. The debate among experts and the Legislature as to the virtue of these questioned laws continues to this day. The Equal Protection and Due Process Clauses of the Fourteenth Amendment, however, are not intended to provide a mechanism by which individuals can render state statutes null and void without overcoming a very high bar. Further, the Fourteenth Amendment does not provide courts the opportunity to question or conduct fact-finding as to the wisdom of the State's legislative body. There must be a demonstration that there is no conceivable or arguable rational reason for the enactment of the challenged statutes. Plaintiff Slaughter cannot do this. As shown, there are numerous rational reasons why the CON laws and the moratoria were adopted. This Court should therefore uphold the validity of the CON Laws and the Legislative Moratorium.

DATE: February 2, 2024

Respectfully Submitted,

Dr. Daniel P. Edney, in his official capacity as the Mississippi State Health Officer

BY:    LYNN FITCH, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI

BY:    /s/ Stephen Schelver
Special Assistant Attorney General

STEPHEN F. SCHELVER, MSB # 101889
GERALD KUCIA, MSB # 8716
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3522
Facsimile: (601) 359-2003
Stephen.Schelver@ago.ms.gov
Gerald.Kucia@ago.ms.gov

## CERTIFICATE OF SERVICE

I, Stephen Schelver, Special Assistant Attorney General for the State of Mississippi, do hereby certify that on this date I electronically filed the foregoing with the Clerk of this Court using the ECF system thereby serving a copy to all counsel of record.

This the 2nd day of February 2024.

/s/ Stephen Schelver
Stephen Schelver