**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

---

CHARLES SLAUGHTER,

*Plaintiff,*

*v.*                    NO. 3:20-CV-789-CWR-FKB

ORAL ARGUMENT REQUESTED

DR. DANIEL P. EDNEY,
IN HIS OFFICIAL CAPACITY AS THE
MISSISSIPPI STATE HEALTH OFFICER, ET AL.

*Defendants.*

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Plaintiff Charles Slaughter is a licensed physical therapist and an entrepreneur. In 1989, he started his own physical therapy clinic in south Jackson, Mississippi. He has dreamed of expanding his services to offer in-home physical therapy to homebound patients. Recognizing a need for this very service in the wake of the COVID-19 pandemic, Plaintiff decided to finally pursue his dream. But two things stand in his way –Mississippi's moratorium on new home health agencies and its certificate-of-need (CON) law. The moratorium has banned new home health agencies in the state for the past forty-three (43) years. Even if this moratorium did not exist, the CON law would require aspiring home health entrepreneurs to prove their services are "needed" before they can operate, while leaving established players completely free to game the system in order to keep fledgling agencies out. These laws prevent Plaintiff from opening a safe, needed business and harm Mississippians by worsening quality, cost, and access for home health care – even during a global pandemic. These laws' sole purpose is to protect existing providers from competition.

Faced with this impenetrable barrier, Plaintiff sued to protect his constitutional right to be free from protectionist laws. Confirming that this case is "an outlier," this Court recognized from the outset that the laws may well be harming the public to benefit "rent-seeking" businesses. *See* MJP Order (Doc. 32) at 10–13. Plaintiff now shows that Mississippi's moratorium and CON law do just that. Speculation aside, the undisputed facts show that both laws are irrational. In fact, the moratorium is so irrational that the State's own witnesses are unwilling to defend it. The CON law, meanwhile, would not only leave Plaintiff's fate in the hands of his competitors, it would do so without advancing the interests it supposedly serves. In fact, both laws worsens those very goals. The challenged laws are not debatable policy choices. They are unconstitutional protectionism.

## BACKGROUND

## I.    THE COVID-19 PANDEMIC AND AN AGING POPULATION SPURRED PLAINTIFF TO EXPAND HIS SERVICES TO HOMEBOUND AND ELDERLY MISSISSIPPIANS.

Home health agencies offer health and health related services, prescribed by a physician or other authorized medical provider, delivered "in the individual's place of residence." Miss. Code Ann. §41-71-13. In Mississippi, home health agencies provide skilled nursing services and at least some subset of physical, occupational, or speech therapy; medical social services; home health aide services; medical supplies and appliances; certain drugs and biologics; or medical care from a hospital resident in training. *Id*. Home health agencies primarily provide care to patients with chronic conditions, which tend to be elderly patients. Stratmann Rep. (Ex. 1) at 27. Mississippi has a rapidly aging population, and thus, the need for home health services in the state has steadily grown. *Id*. Moreover, during the COVID-19 pandemic, there was an "increased need for home health" since Mississippi physicians "utilized home health more frequently." Lampton Depo. (Ex. 2) at 104:6–21. Home health services can also delay the need for elderly patients to be placed in nursing homes, which are prone to outbreaks of COVID-19. *Id*. at 105:1–14.

Plaintiff, Charles Slaughter, is a licensed physical therapist and opened his own physical therapy clinic in south Jackson, Mississippi, in 1989. Slaughter Depo. (Ex. 3) at 72:23. Early in his career, he did some consulting work for home health agencies and believed that the existing agencies were overbooked and did not provide enough time-intensive, quality care to their patients. *Id*. 17:23–21:13. Once he opened his own practice, he began seeing former home health patients who had not received certain therapies he focuses on and believed would have helped them. *Id*. at 19:5–23; 36:13–37:14. Due to this, Mr. Slaughter began dreaming of expanding his clinic's services to provide better quality care to homebound patients. *Id*. at 22:19–25:15. Recognizing the increased need for home health during the COVID-19 pandemic, he decided it was time to make his dream a reality. *Id*. at 88:20–89:1.

## II.    Mississippi's Moratorium Stands In Plaintiff's Way.

As it turns out, however, it is illegal for Mr. Slaughter or anyone else to open a home health agency in Mississippi. Miss. Code § 41-7-191(9). This moratorium has been in place for forty-three (43) years, despite the fact that the number of patients has *quadrupled* during that time.[1]  Yet today there are only *one-third* the number of home health agencies in Mississippi as existed before the moratorium.[2] Accounting for agencies owned by the same company, there are only *one-fifth* as many agencies today.[3]

---

[1] *Compare* Lampton Depo. Exhibit 2 (Excerpts of State Health Plans) (Ex. 4) at 1982-87 State Health Plan pg. 281 (23,462 patients in 1981) *with* 2020 Report on Home Health Agencies (Ex. 5) at pg. i (94,280 patients in 2020).

[2] *Compare* Lampton Depo. Exhibit 2 (Excerpts of State Health Plans) (Ex. 4) at 1982-87 State Health Plan pg. 282 (135 agencies in 1981) *with* 2020 Report on Home Health Agencies (Ex. 5) at pg. i (46 agencies in 2020).

[3] *See* 2020 Report on Home Health Agencies (Ex. 5) at 110–112 (27 agencies in 2020).

While national trends and the closure of home health agencies owned by the Mississippi State Department of Health (Health Department) may have played a role, Mississippi's moratorium has "[c]ertainly" contributed to the "conglomeration" of agencies in Mississippi. Lampton Depo. (Ex. 2) 163:2–22. Mississippi is the only state that has imposed 43-year-long moratorium on new home health agencies. State RFA Resps. (Ex. 6) at 9. It also fewer home health agencies per capita than 39 other states.[4] The "monopoly of . . . [agencies] who had received CONs before the moratorium" has made those CONs "worth considerable amounts to a willing buyer[.]" *Caracci v. C.I.R.*, 118 T.C. 379, 410 (U.S. Tax Ct. 2002) *rev'd on other grounds by Caracci v. C.I.R.*, 456 F.3d 444 (5th Cir. 2006). The career paths of the witnesses in this very case illustrate the point. Every industry witness started with a family-owned agency incorporated in Mississippi that – through mergers and acquisitions – became either the largest or one of the largest home health agencies in America. *See* Knight Depo. (Ex. 8) at 19:21–26:7; Thornton Depo. (Ex. 9) at 48:21–50:12; Wood Depo. (Ex. 10) at 12:18–13:18 (former industry employee).

The moratorium was first enacted for a period of six months in 1981 by the Mississippi Health Care Commission (MHCC), which was the predecessor agency to the Mississippi State Department of Health. The resolution the Commission adopted expressly stated that it had the limited purpose of allowing a short period of time for the agency to develop licensure and CON standards for the industry. It was never intended to create a permanent and exclusive class of agencies. *See* 1981 Moratorium Resolution (Ex. 11), PLAINTIFFS002561 ("The purpose of this moratorium is to allow time for development, adoption, and implementation of licensure regulations and standards and for the development and adoption of well-conceived criteria by which certificate of need applications for home health services shall be reviewed."). When

---

[4] Lampton Depo. Exhibit 13 (Ex. 7) (Sullivan Appendices, pg. 8, no. 51, CMS Home Health Care Compare, MAHC 002069. Data available at https://data.cms.gov/provider-data/topics/home-health-services.).

considering adoption of the resolution, "there was discussion by Commission and staff regarding the possibility of the moratorium eliminating the development of agencies capable of providing superior care to that being provided by some existing agencies," but the Commission approved the resolution anyway in order "to give the staff an opportunity to compile information on home health agencies." April 30, 1981 MHCC Meeting Minutes (Ex. 12) at PLAINTIFFS002535-002536.

At the time, home health agencies were "cash cows" that could serve as "the financial centers" for entire hospitals. Lampton Depo. (Ex. 2) 30:16–12. This was because Medicare reimbursed home health agencies on a cost-basis. While this system was "designed to reimburse providers of home health care services for their costs, including administrative salaries and overhead," it "nevertheless permitted the operators of such agencies to generate executive-level salaries and benefits for themselves. It also permitted them to accumulate substantial assets in their businesses[.]" *Caracci*, 118 T.C. at 404. This cost-basis system was much more lucrative than the flat-fee prospective payment system (PPS) that Medicare had begun using to reimburse other providers. Lampton Depo. (Ex. 2) 30:16–12.

At the same time, the number of patients needing home health services was increasing due to in part to Medicare's newly enacted flat-fee PPS for hospitals, the Diagnostic Related Groups (DRG), which encouraged hospitals to discharge patients "quicker and sicker." *See* MAHC Disc. Resp. (Ex. 13) at RFA 16. As a result, discharged patients more frequently needed home health services during their recovery. *Id*.

Hospitals quickly began losing money under the new DRG system. *See e.g.* November 17, 1983 MHCC Meeting Minutes (Ex. 14) at PLAINTIFFS003325 (hospital administrator explaining "the hospital had lost money on all patients except one under the DRG reimbursement" and requesting approval to engage in home health care during moratorium.). In response, hospitals

began forming or purchasing their own home health agencies in order to "reduce their costs". Pugh Depo. (Ex. 15) at 18:12–19:2. "They were able to take advantage of a mechanism known as 'cost-shifting.' This attribute enabled a buyer such as a hospital (which generally received reimbursement under the PPS) to shift some of its costs to a cost reimbursement system for payment by the Medicare program." *Caracci*, 118 T.C. at 389–90.

While the Mississippi Health Care Commission intended to have a short-lived moratorium as it gathered information on the home health industry, the moratorium was extended several times for administrative reasons. During that time, representatives of the Mississippi Home Health Association (since renamed as the Mississippi Association for Home Care (MAHC), the Intervenor-Defendant here) appeared at numerous meetings over several years insisting that the moratorium be extended. *See e.g.* May 21, 1981 MHCC Meeting Transcript (Ex. 16) at PLAINTIFFS002581 ("The State Association is in full support of a moratorium on CON for the establishment of new home health agencies , be it 12 months, be it 6 months…. [W]e don't believe every hospital needs a home health agency."). On every occasion, they were opposed by representatives of the Mississippi Hospital Association, which wanted the moratorium lifted. *See e.g.* November 18, 1982 MHCC Meeting Minutes (Ex. 17) at PLAINTIFFS003033 ("Mississippi Hospital Association stated that the MHA supported the lifting of the moratorium on issuance of Certificates of Need for home health agencies.").

In 1983, Commission staff determined that eighteen Mississippi counties had an unmet need for home health services. *See* Map of Counties Meeting Recommendations, (Ex. 18), PLAINTIFFS003107. Later that year, just before MHCC's administrative moratorium expired, the Mississippi legislature enacted a statutory version of the same moratorium. The Health Care Commission "did not ask for" the moratorium and "took no stand on" it. *See* April 17, 1983 MHCC

6

Meeting Transcript (Ex. 19) at PLAINTIFFS003159. MAHC's then-president told the Commission that she "was actively involved in the initiation of the moratorium out of this last legislative session." Nov. 17, 1983 MHCC Meeting Minutes (Ex. 14) at PLAINTIFFS003326.

In 1984, the Health Care Commission voted to "go on record as being opposed to the continuation of a legislative moratorium on home health agencies beyond July 1, 1985 or to a policy moratorium imposed by the Commission beyond that time." *See* January 19, 1984 MHCC Meeting Minutes (Ex. 20) at PLAINTIFFS003423. In 1985, as the legislative moratorium continued to linger, agency staff submitted a recommendation to the Commission that it continue to oppose the moratorium, even though lifting the moratorium would result in additional hospitals engaging in home health:

> Under [the CON review] criteria it is very likely that some approvals would result and that some additional hospitals would engage themselves in home health activities. However, it is the opinion of staff that the concept of Health Planning and Certificate of Need review is to provide applicants an opportunity to demonstrate need for a given service and if the need is demonstrated to the satisfaction of the State Health Plan and the Health Care Commission that approval of the proposed service should be authorized. Consequently, staff would recommend no change in the current position of the Health Care Commission which is to 'not support' continuation of the moratorium on home health care.

MHCC 1984 Staff Recommendation (Ex. 21) at PLAINTIFFS003770. As the Commission's Interim Director put it, "'across the board' moratoriums are in conflict with planning principles." *Id*. at PLAINTIFFS003767. Because the Commission was already "on record (January 19, 1984) as being opposed to the continuation of a legislative moratorium on home health agencies," the Commission maintained its opposition, but no further action was needed by Commission members in order to do so.

From 1992 through 2005, the Commission's successor agency, the Mississippi State Department of Health, recommended that the legislature exempt small, county-owned hospitals

from the moratorium. Lampton Depo. Exhibit 2 (Ex. 4) at 1992–2005 State Health Plans. This was presumably recommended in order "to encourage a struggling rural hospital's survival." Lampton Depo. (Ex. 2) at 118:16–119:10. The legislature never acted on this recommendation.

In 1999, home health agencies were moved from a cost reimbursement system to a prospective payment system known as Home Health Resource Groups (HHRG). *Caracci*, 118 T.C. at 390. This was "hurtful" to the finances of home health agencies. Knight Depo. (Ex. 8) at 147:12–15. As a result, home health agencies are no longer "cash cows" sought after for the purpose of "pushing [] hospital[s] along." Lampton Depo. (Ex. 2) at 39:16–40:12.

The legislative moratorium remains in effect to this day.

### III.    MISSISSIPPI'S CON PROGRAM WOULD ALSO STAND IN PLAINTIFF'S WAY.

Even if the moratorium were repealed, Plaintiff would have to contend with the CON law. The Health Department reviews CON applications against sixteen (16) criteria. 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 8.1. To have any chance of being approved, the applicant has to meet the first criteria: compliance with a document called the State Health Plan, which requires proving a "need" for the service using the plan's required methodology.

For home health agencies, the State Health Plan calculates the rate of home health use among elderly people in Mississippi and nine surrounding states. Lampton Depo. Exhibit 2 (Ex. 4) at 2022 State Health Plan, pg. 183. The plan treats that rate as the right amount of use. *Id*. The applicant then has to use the same methodology to calculate the rate of home health use among elderly people in the county proposed to be served. *Id*. If the county has a lower usage rate than the regional average, the plan treats that underuse as "need." *Id*. The applicant then uses another method set by the State Health Plan to determine if that "need" is "equivalent" to 50 patients. If it is less than 50 patients, a new agency cannot open. *Id*.

Existing agencies are allowed to game the system, however. While startups are banned from opening unless the "need" has reached the hypothetical 50-patient threshold, existing agencies may increase their staffing and capacity to absorb any new "need" below that same threshold. Sullivan Depo. (Ex. 22) at 103:7–14. As a result, incumbent agencies hold the power to keep new competitors from entering the market. Stratmann Rep. (Ex. 1) at 29.

Even the application process is difficult and expensive. Attorneys and consultants are typically retained to help prepare the application. Sullivan Depo. (Ex. 22) at 62:13–63:12. Once the Department deems an application complete, it notifies the public and any "affected persons." 15 Miss. Admin. Code Pt. 9, Subpt. 91, Rs. 3.7 & 3.12. Any "affected person" may then request a public hearing to oppose the application. *Id*. at R. 3.12. In practice, the affected persons who oppose applications are existing providers—typically an applicant's future competitors. Sullivan Depo. (Ex. 22) at 74:20–75:5. The application often results in a public hearing that amounts to a full-blown trial before a hearing officer, featuring counsel, expert witnesses, exhibits, live testimony, and written motions. *Id.* at 70:20–85:16.

## IV.    THE CHALLENGED LAWS ARE PROTECTED BY ESTABLISHED COMPETITORS.

CON laws became widespread in the 1960s and '70s, especially after the federal government encouraged states to adopt them. Stratmann Rep. (Ex. 1) at 4. At the time, Medicare reimbursed all providers on a cost-basis, meaning it paid providers no matter how much capital they invested, even if the capital investments (like new but unused hospital beds) were excessive. *Id.* at 3–4. The idea of CONs was that limiting services to what was "needed" would reduce the resulting unnecessary costs. *Id.* But even then, experts were warning that "vested interests," including in home health, would use CON laws to "control their turf, limit competition, and consequently stifle innovation." *Id.* at 18. A simpler solution was to just stop using cost-based

reimbursement, which Congress did in the '80s, when it phased in the current fee-for-service model. *Id*. at 4–5. So the original rationale for CON laws has not been relevant for decades, *id.*, and most states no longer require CONs for home health.[5]

The federal government has opposed CONS ever since. *See* MJP Order (Doc. 32) at 8–9. That has included a 1988 FTC report concluding that CONs were likely raising hospital costs rather than lowering them; a 2004 FTC and DOJ report concluding that "CON programs are generally not successful in containing health care costs and … risk entrenching oligopolists and eroding consumer welfare"; a 2015 comment that "incumbent firms seeking to thwart or delay entry by new competitors may use CON laws to achieve that end"; and a 2018 HHS, Treasury, and Labor report concluding that "CON laws have failed to produce cost savings, higher quality healthcare, or greater access to care." Stratmann Rep. (Ex. 1) at 6–7. The FTC also re-urged its concerns considering the COVID-19 pandemic. MJP Order (Doc. 32) at 9.

So why does Mississippi still have the moratorium and CON law?  "It is no secret that significant financial interests are at stake when it comes to CON laws." MJP Order (Doc. 32) at 10. The record demonstrates that incumbent agencies support the moratorium and CON law because those laws ensure they get a bigger piece of the pie. Thornton Depo. (Ex. 9) at 90:12–13 (without CON, "It's the same pie and slicing more pieces."); *see also id*. at 91:3 – 13 ("Q. And that's why you believe that a certificate of need is needed to have enough census for these home health agencies is to ensure their profitability?[] A. Yes. Q. To ensure that they don't lose business to new competitors?[] Yes.").

---

[5] *See* National Conference of State Legislatures, Certificate of Need (CON) State Laws (2023), available at:https://www.ncsl.org/research/health/con-certificate-of-need-state-laws.aspx.

The financial beneficiaries of Mississippi's moratorium and CON law work tirelessly to keep them in place. Lampton Depo. (Ex. 2) at 52:20–53:20 ("very powerful" interest groups use "politics" to prevent repeal of moratoriums); *see also* Knight Depo (Ex. 8) at 89:3–17 (MAHC lobbies in support of the moratorium and CON "every year"); *Caracci*, 118 T.C. at 390 (MAHC member personally lobbied "in the interests of keeping the CON moratorium in place, thus preserving the monopoly of [his agency] and others who had received CONs before the moratorium."). The primary "advocacy accomplishment" MAHC promotes on its website is "[c]ontinued protection of the Certificate of Need through state legislative efforts and strong legislative lobby presence." MAHC Website (Ex. 23), PLAINTIFFS004511. It maintains a political action committee as well. Knight Depo. (Ex. 8) at 89:18–19. MAHC intervened in this case, in part, because "if Plaintiff prevailed, it would result in increased competition to MAHC's members[.]" *Id*. at 98:8–12. In the first year of this litigation alone, MAHC voluntarily spent more than its *entire annual revenue* on legal fees to defend the moratorium and CON law. *Id*. at 74:5–9; 79:3–4. Knight Depo. Exhibit 3 (Ex. 24) at 1, 9. In short, the moratorium and CON law are anti-competitive relics kept in place by determined incumbents.

## LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."

11

*Id.* Courts will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* A factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

Plaintiff's federal substantive due process and equal protection claims are governed by the rational-basis test. His state constitutional claims are governed by the same standard. *See Jackson Mun. Airport Auth. v. Bryant*, 2017 WL 3175915, at *5 (S.D. Miss. July 25, 2017); *Stallworth v. Bryant*, 936 F.3d 224, 227 n.5 (5th Cir. 2019). Under that test, Plaintiff must show that Mississippi's moratorium and CON law are not rationally related to a legitimate state interest. MJP Order (Doc. 32) at 7. The test affords "great deference" to the State, but it is not "a rubber stamp." *Id.* Courts at every level invalidate economic regulations under it. *See id.*; Pls.' Resp. State MJP (Doc. 23) at 9–10; nn. 1, 3–4. (collecting cases). The test does not prevent plaintiffs from using "evidence of irrationality" to negate every conceivable basis for the law. MJP Order (Doc. 32) at 8 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153, (1938)). Nor does it "demand judicial blindness to the history of a challenged rule or the context of its adoption" or "require courts to accept nonsensical explanations for regulation." *Id.* (quoting *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013)). "[A] hypothetical rationale, even *post hoc*, cannot be fantasy." *Id.* at 223. And "'although the legitimate purpose can be hypothesized, the rational relationship must be real'—not simply assumed." *Newell-Davis v. Phillips*, 2023 WL 1880000 at *4 (5th Cir. 2023).

## I.    THE MORATORIUM IS NOT RATIONALLY RELATED TO ANY LEGITIMATE PURPOSE.

No official explanation for the permanent moratorium is provided by statute or regulation. The Defendants have suggested that the moratorium serves the same official purposes as the CON law: lowering cost, increasing access, and improving quality. MAHC Disc. Resps. (Ex. 13) at Int.

3; State Disc. Resps. (Ex. 24) at Int. 3. They also say that the moratorium prevents fraud and reduces the Health Department's regulatory burden. *Id.* If those justifications are impermissible or not rationally related to the moratorium, then the moratorium is unconstitutional. MJP Order (Doc. 32) at 8. The undisputed record clearly establishes that the moratorium fails for both reasons.

### A.  The Moratorium Does Not Benefit the Public in Any Way.

The empirical research indicates that moratoria on health care services decrease the quality of the care provided while failing to decrease the cost of that care. Stratmann Rep. (Ex. 1) at 22, 25. And while Defendants say Mississippi's home health moratorium does the opposite, their own expert was unwilling to agree with them. His 33-page report does not identify any legitimate purpose served by the moratorium. Sullivan Rep. (Ex. 25) at 4. At his deposition, he admitted that he has no evidence to support such a purpose. Sullivan Depo. (Ex. 22) at 147:15 ("I guess I don't have evidence."). In fact, he has never seen "any piece of objective evidence anywhere in the world" indicating that moratoriums have any "beneficial effect on the home health industry." *Id.* at 149:15–21. Further, he could not even hypothesize a legitimate purpose for Mississippi's home health moratorium. *Id.* at 151:3–4 ("I'm not sure why they need a 42-year moratorium."). Presumably for that reason, he testified that he does not personally support the moratorium. ("I'm not in favor of having [a] blanket moratorium."). *Id.* 150:24–25.

He was not the only State witness to say so. The State designated the Chairman of the Mississippi State Board of Health – who also serves as the Chairman of the Board's CON Committee – as its primary representative. Even he expressed personal opposition to the moratorium. Lampton Depo. (Ex. 2) at 25:18–24 ("Q. [Y]ou would prefer not to have a legislative moratorium and let the State Department of Health make those kind of decisions? A. Well, if you

look at need, we should have a process that looks at need and be able to make that decision."); *id.* at 43:2–4 ("I still think for a CON process to work, moratoriums are legislative overreach.").

Defendants claim that by limiting competition, the moratorium allows home health agencies to generate enough profit and economies of scale to provide indigent care and serve rural areas. MAHC Disc. Resps. (Ex. 13) at Int. 8. But that is a rationale for the CON law (and, as discussed below, an irrational one) – not the moratorium. CON applications are already reviewed for "[t]he probable effect of the proposed facility or service on existing facilities providing similar services[.]" 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 8.1. Defendants have provided no legitimate justification for preventing the Department of Health from even *evaluating* those applications.

Similarly, Defendants suggest the moratorium is justified as a method of fraud prevention because "[t]he more agencies there are, the more difficult" it is to detect fraud. Knight Depo. (Ex. 8) at 25:19–20. But, as discussed below, there is *no* evidence that CONs (or moratoriums) have any effect on fraud at all. Moreover, Defendants admit that fraud and abuse exist in *every* industry. *Id.* at 123:22–124:5. By their logic, then, a moratorium would be justified in every sector of the state's economy. They also admit that "fraud and abuse will always be a problem in the home health industry." *Id.* at 125:21–25. To prevent fraud, then, the State would need to keep the moratorium in place *forever*. All without any reason to believe that any of the preemptively restricted Mississippians would actually commit any fraud at all. If that is not irrational, nothing is. *See St. Joseph Abbey*, 712 F.3d 215, 225 (finding law irrational where there was a "disconnect" between the challenged restriction and the government's concerns).

Having no evidence that the moratorium is rationally related to a legitimate public health purpose, Defendants instead simply note that Mississippi's home health sector is ranked well by the Centers for Medicaid and Medicare Services. But this is an observation about Mississippi, not

Mississippi's moratorium. They claim it must mean that the moratorium "has not been detrimental." Sullivan Depo. (Ex. 22) at 147:12–24. Unlike the research Plaintiff cites, however, the Defendants' observation makes no effort to isolate the effect of the moratorium. As a result, Defendant's expert admits that, short of having a "crystal ball," there is no way to know if this claim is true. *Id*. at 232:6–8. More importantly, even if it were true, it would miss the mark. Plaintiff does not have to prove that the moratorium is destroying home health care in Mississippi. He only needs to show that the moratorium causes *some* harm to consumers – all while providing no public benefit and crushing the dreams of aspiring entrepreneurs. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). Plaintiff has done that with empirical evidence showing that moratoriums harm the public. Defendants have responded with irrelevant observations and admissions that they have no evidence to the contrary. There is no rational debate.

### B.  Government Convenience is Not a Legitimate Purpose for the Moratorium.

The State has also speculated that lifting the moratorium could cause "exponential growth" of new home health agencies, which might "overwhelm" the Health Department's regulatory resources. State RFA Resps. (Ex. 6) at 19–20. That prediction, however, has been flatly contradicted by the undisputed testimony of the Department's own representatives and expert. Lampton Depo. (Ex. 2) at 39:4–8 ("Q. [I]f there were no moratorium and no CON for home health agencies, do you think there would be a proliferation of new home health agencies? A. No, I don't."); Wood Depo. (Ex. 10) at 61:10–17 ("Q. [I]f just the moratorium on home health were removed, would that make it impossible to conduct effective oversight of home health agencies? [] A. I don't think it would be impossible."); Sullivan Depo. (Ex. 22) at 134:13–20 (burden to CON division would "simply be having to calculate the need by county, and then review applications that came in.").

Despite this, Defendants assert that the moratorium can still satisfy rational basis so long as it "minimiz[es] the burden" on the Department in any way at all. MAHC Disc. Resps. (Ex. 13) at Int. 3. That is wrong. Even if the moratorium does make the government's job easier in some respect, that alone cannot justify the moratorium. *See e.g. Vlandis v. Kline*, 412 U.S. at 451 (1973) (the state's interest in "administrative ease" does not satisfy due process); *Plyler v. Doe*, 457 U.S. 202, 227 (1982) ("preservation of resources standing alone can hardly justify" the denial of equal protection). That is because rational basis review requires economic laws to be rationally related to a "*consumer* benefit" – not government convenience. *See e.g. Newell-Davis*, 2023 WL 1880000 at *4. (emphasis supplied).

In *Newell-Davis*, a panel of the Fifth Circuit upheld a health care "facility need review" regulation based on the state agency's argument that its "resource constraints [made] effective oversight *impossible*" absent the regulation. *Id*. at *4 (emphasis supplied). In doing so, the Court made clear that the regulation was *not* upheld merely for the purpose of "bureaucratic ease." *Id*. Rather, without the regulation, the agency would "not be able to ensure the health, safety, and welfare of respite-care recipients *at all*," an outcome that could be "detrimental – even deadly – to *consumers*." *Id*. (first emphasis original). Moreover, the Court stressed that the regulation, like any economic law, had to have "a 'real' link" to "consumer benefits[,] based on specific facts" – the consumer benefit cannot be "simply assumed." *Id*.

The undisputed testimony in this case reveals that the Health Department does not face a situation remotely like the one in *Newell-Davis*. As one Department representative explained, if removal of the moratorium led to a large influx of new home health agencies (which he had no reason to believe would happen), it would merely "slow things down" for the Department's licensure surveys for agencies. Wood Depo. (Ex. 10) at 101: 15–23; 94:16–18. To begin with, this

hypothetical influx is pure "fantasy." *St. Joseph Abbey*, 712 at 215. The Department's primary representative disputed it, and no other evidence has contradicted him. Lampton Depo. (Ex. 2) at 39:4–8. However, even if it did occur, the resulting inconvenience would not justify the moratorium. In direct contrast to the facts in *Newell-Davis*, the Department admits that even if *both* the moratorium *and* CON law were removed, it would "not be impossible" to conduct its surveys (Wood Depo. (Ex. 10) at 39:18–25; 53:14–19; 60:9–14); it would still be able to provide "effective oversight" (*Id.* at 61:18–24); the slow down would not be "deadly" for patients (*Id.* at 61:25–62:3); and in fact, it would not "affect patients in Mississippi *at all*." (*Id.* at 38:23–39:1) (emphasis supplied).

Another State representative explained that the agency simply prefers, "[f]rom a *purely selfish* standpoint," to avoid reviewing additional CON applications absent certainty that some may demonstrate a "need." Lampton Depo. (Ex. 2) at 184: 9–17 (emphasis supplied). However, a purely selfish desire for "[a]dministrative ease and certainty cannot, in and of itself, save [a law] from invalidity under the Due Process Clause[.]" *Vlandis*, 412 U.S. at 441.

Moreover, a rational basis must be based on "specific facts[,]" not "simply assumed." *Newell-Davis*, 2023 WL 1880000 at *4. Defendants' application-review rationale is based entirely on an assumption. They have suggested there is no "need" for more home health agencies in any Mississippi county (and thus no need to review applications), but they have offered no evidence at all that this is true. While the State Health Plan used to include written assessments of the "need" for home health agencies for every county, no county-level assessments have been included in the plan since 1992. *Id.* at 119:11–120:17; Lampton Depo. Exhibit 2 (Ex. 4) *passim*. No witness knew when the Department last calculated the "need" for individual counties.[6] Sullivan Depo. (Ex. 22)

---

[6] The Chair of the Board of Health, Dr. Lampton, recalls seeing county "needs" assessments five to ten years ago, when the Board was voting on whether to shut down Department-run home health agencies.

at 26:18–23 ("As far as I know, it's been a long time since they've done that because of the moratorium."); Lampton Depo. (Ex. 2) at 33:2–7 ("I do not [know]."); Hardy Depo. (Ex. 26) at 60:7–14 ("I'm not sure. I do not know."); Knight Depo (Ex. 8) at 106: 3–11 ("I don't know."). Nor was the Department able to produce any county "need" assessments during discovery.

In fact, it has not even been *possible* for the Health Department (or anyone else) to determine the "need" for home health agencies in an individual county since at least 2018. The Department's methodology relies on projected population data from surrounding states, which the Department has not collected since 2018 and does not even know if those states still maintain. Lampton Depo. (Ex. 2) at 92:11–97:23; 91:20–24.

Moreover, the home health "need" criteria have not changed since 1985. *See* Lampton Depo. Exhibit 2 (Ex. 4) *passim*. As a result, the Department is not even sure that if it *were* currently possible for it to assess need in individual counties, it would be doing that correctly to begin with. Lampton Depo. (Ex. 2) at 49:7–17 ("We may – if the moratorium is lifted and then we sort of focus in perhaps a little bit more laser-like on need and are we assessing it correctly. Which we're doing any way, but we may not have looked at, you know, in the most recent period."); *see also id.* at 188:24–25 (on the need to update the home health "need" criteria: "As you and I looked at, that's been around a long time, too.").

In short, if the purpose of the moratorium is to avoid evaluation of applications attempting to demonstrate "need" in individual counties – based on an unsupported assumption that there is no "need" in those counties – then it is logically circular and irrational.

---

Lampton Depo. (Ex. 2) at 120:25–122:23. The assessments were only for the counties in which the Department's home health agencies were located. *Id.* Aside from that instance, he has never seen an assessment of "need" for any county. *Id.*

The State has also suggested that if an aspiring home health entrepreneur proved to the Board of Health that there was a "need," the Board would ask the legislature to repeal the moratorium, and if that effort was successful, the applicant could prove the "need" a second time through the CON process. Lampton Depo. (Ex. 2) at 184:24–185:5. This hypothetical scenario offers little assurance to fledgling home health agencies, however. As discussed above, the legislature has repeatedly ignored the Department's recommendations regarding the moratorium. And plainly, an irrational law is not saved from invalidity simply because its administering agency might theoretically support its legislative repeal one day. That is true of *any* law.

### C. The Moratorium is Not Rationally Tailored to Preserve Regulatory Resources.

Even if the State's desire to limit the demand for its regulatory resources were intended to benefit consumers in some way, it would still fail rational basis scrutiny because the moratorium is not a "rational way to put that limit into practice." *Newell-Davis*, 2023 WL 1880000 at *4, n.2. The *Newell-Davis* Court did not reach this question as to Louisiana's need review regulation, since the parties did not address it. *Id*. But even assuming Louisiana's need review regulation was rationally tailored to the goal of resource preservation, that would say nothing about Mississippi's moratorium. Louisiana sought to benefit consumers by "*limiting* new entrants" to the market for respite care services. *Id.* at *4. (emphasis supplied). Its regulation allowed the state agency to "exercise its discretion" when evaluating potential providers. *Id* The regulation was also "responsive and flexible" to demonstrations of the community's need for the applicants' services. *Newell-Davis v. Phillips*, 592 F. Supp. 3d 532, 548 (E.D. La. 2022). Mississippi, by contrast, has imposed a *blanket ban* on new entrants to the home health industry for a span of 43 years. Its moratorium does not grant the Health Department any discretion at all, let alone allow the agency to respond flexibly to consumer's needs. The moratorium requires *every* CON application to

denied, without consideration of the Health Department's current regulatory resources, budget, workload, or capacity. Hardy Depo. (Ex. 26) at 33:16–42:5. If the moratorium's purpose is simply to prevent depletion of agency resources, its reach is extraordinarily overbroad for the task.

### c. The Moratorium Inexplicably Targets Home Health Startups.

The moratorium irrationally distinguishes between home health agencies who received a CON before 1981 and those who did not. *See Louisiana Seafood Management Council, Inc. v. Foster*, 917 F. Supp. 439, 446 (E.D. La. 1996) (recognizing Equal Protection violation where the economic regulation irrationally distinguished between similarly situated groups). There is no reason to believe that pre-1981 agencies would provide better care, lower costs, or more access than post-1981 agencies. The moratorium has been in place for 43 years. Whatever merits it may or may not have had when it was enacted, today it simply propagates a permanent and arbitrary classification of haves and have nots. Additionally, the moratorium irrationally targets the home health industry, as opposed to any other providers. Defendants' own expert could not explain why:

> Q. Okay. Would a moratorium on any other type of healthcare service in Mississippi decrease the regulatory burden to the Mississippi State Department of Health?
>
> A. Well, I guess, yeah, that's certainly true.
>
> Q. Should Mississippi impose a moratorium on every other healthcare provider regulated by the Mississippi State Department of Health?
>
> A. No.
>
> Q. Why not?
>
> A. I mean, there's no reason to do that, other than to achieve a specific objective. [] And I'm not aware of why – I know the Legislature has been, you know, requested several times to lift the moratorium, and they haven't done it. I don't know all the reasons why that is. But, I mean, I'm not in favor of having blanket moratorium.

Sullivan Depo. (Ex. 22) at 150:6–25.

## II.    THE CON IS NOT RATIONALLY RELATED TO THE PURPOSES IT SUPPOSEDLY SERVES.

The State contends that the purpose of the CON law is to "reduce costs, increase access, [and] improve the quality of home health care[.]" MJP Order (Doc. 32) at 8. Defendants also say that it reduces instances of fraud and abuse and preserves regulatory resources. MAHC Disc. Resps. (Ex. 13) at Int. 3; State Disc. Resps. (Ex. 24) at Int. 3. If the CON law fails to advance those purported goals or fails to be a rational way to achieve them, the law is unconstitutional. *Id*. at 11. The record clearly establishes that failure.

### A.  CON Laws Make No Sense In Home Health.

CON laws do not make sense in home health to begin with because home health is a low-capital industry. CON laws were originally designed to "centralize large capital investment(s)" that came with "enormous fixed costs," such as hospitals and PET scanners. Stratmann Rep. (Ex. 1) at 16–17. The theory was that since the federal government and private insurance reimbursed healthcare expenses based on their costs, providers would make excessive capital investments and try to recoup them by charging higher service rates. *Id*. at 5, 15.

That entire premise is now irrelevant, since health care providers are now reimbursed on a flat fee basis, regardless of their costs. *Id*. But even if that original premise still held value simply to avoid costly and unnecessary infrastructure from going unused, it would not apply here. Home health does not require large investments and has little fixed cost because it is based almost entirely on labor. *Id*. at 17. The Defendants' expert admits that the initial investment for a home health agency is small but claims that the "ongoing expenses" can be significant. Sullivan Rep. (Ex. 25) at 25. That may be true if an agency experiences growth and the resulting increases in staff. But it is irrelevant, since that cost is still made up overwhelmingly by labor. Stratmann Rep. (Ex. 1) at

17. Thus, if a home health agency experiences a decline in demand, it will simply scale back its operations. *Id*.

**B. The CON Law is Not Rationally Related to Reducing Cost.**

The evidence is clear that CON laws do not lower cost.  In 2016, a meta-analysis of 20 peer-reviewed studies spanning 40 years of academic scrutiny found that "[t]he overwhelming weight of evidence suggests that CON laws are associated with both higher per unit costs and higher total expenditures." *Id*. at 7–8. The Defendant's expert agrees that the existing body of research shows that CONs do not reduce costs. Sullivan Depo. (Ex. 22) at 108:16–19.

Lowered costs are even less likely in home health, and the research bears that out too. Studies of home health CON laws routinely conclude that "CON regulation appears to be associated with higher costs" and that "[p]ermitting free entry by home health agencies … most likely would *lower* [costs]" and that "[r]emoving entry regulations for home health would have negligible system wide effects on health care costs." Stratmann Rep. (Ex. 1) at 20–26. Plaintiff's expert—a Ph.D. economist and leading CON researcher—reviewed every academic study of home health CON laws and concluded that "the literature specific to home health shows that CONs at best fail to improve the system, and more likely make healthcare worse." *Id.* at 30.

Nor is this basic economics lost on the courts. The Fourth Circuit, holding that a CON law violated the Dormant Commerce Clause, accepted the obvious point that blocking competitors does not lead to lower prices:

> [R]estricting market entry does nothing to insure that services are provided at reasonable prices. Without rate regulation, higher rather than lower prices will more likely result from limiting competition. [The state's] goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose.

*Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 985 F.2d 164, 167 (4th Cir. 1993).

Defendants have suggested that, by limiting agencies, CON laws at least promote economies of scale – that banning new businesses is worthwhile because one billing department is cheaper than two. Sullivan Depo. (Ex. 22) at 175:2–16. This is wrong in theory and practice. Even in theory, strict pursuit of scale is absurd: there would be *one* home health agency, just as there would be one restaurant, one university, one law firm, and one CON consultant. *Id.* at 207:10–12 (Defense expert admitting "there's economies of scale that could be realized in other industries."). In practice, not only are these supposed efficiencies not lowering cost in other sectors of health care, there is also specific research finding "no evidence that CON regulation contributes to efficiency in the realization of scale economies" for home health agencies. Stratmann Rep. (Ex. 1) at 20–22.

Put simply, the CON law is clearly not lowering costs. It is likely raising them.

## C. The CON Law is Not Rationally Related to Increasing Access.

The CON law explicitly operates to prevent the "duplication of health resources" which it deems "unnecessary." Miss. Admin. Code Pt. 9, Subpt. 91, R. 1.1. That means less access by definition. "Restricting market entry … necessarily limits the available service because it limits the number of [providers] from which a [customer] can seek service." *Medigen*, 985 F.2d at 167.

The evidence bears this out. Mississippi is ranked "towards the bottom" nationally for home health agencies per capita. Lampton Depo. (Ex. 2) at 162:14–15; Lampton Depo. Exhibit 13 (Ex. 7). Nationally, CON states have about half as many home health agencies per Medicare beneficiary, and they have less competitive home health markets.[7] And CON states (undisputedly) have fewer hospital beds, fewer hospitals with MRI machines, fewer medical imaging providers, and lower utilization of medical imaging. Stratmann Rep. (Ex. 1) at 12–13.

---

[7] Daniel Polsky et al., *The Effect of Entry Regulation in the Health Care Sector: the Case of Home Health*, 110 J. Public Econ. 1 (2014).

Those deficiencies extend to the most vulnerable populations. Consider rural Mississippi. Defendants have suggested that the CON law encourages home health agencies to open in underserved rural areas. But CON laws are (undisputedly) associated with less rural care: fewer rural hospitals, fewer rural surgery centers, and less access to rural hospice care. Stratmann Rep. (Ex. 1) at 10–11. Which makes sense because, again, CON laws *prohibit* care. There is no rational reason that a law prohibiting agencies from opening in one place would encourage them to open in other, financially unattractive places. Stratmann Rebuttal (Ex. 27) at 11–12; Sullivan Dep. (Ex. 22) at 180:17–25 ("I don't know if I can make that causal link that they opened in a rural area because they couldn't get a CON in an urban area."); *see also Walgreen Co. v. Rullan*, 405 F.3d 50, 60 (1st Cir. 2005) (holding that pharmacy CON law "cannot reasonably be thought to advance" purpose of ensuring pharmacies in underserved areas).

Indigent populations fare no better. Defendants have said that the CON law enables agencies to serve Medicaid and uninsured patients. But the research shows that CON laws are not increasing charity care or leading to cross-subsidization of Medicaid patients. Stratmann Rep. (Ex. 1) at 11–12; Stratmann Rebuttal (Ex. 27) at 10–11. Defendants may assume otherwise, but in the real world, laws that block new services decrease access to service.

Moreover, as this Court has noted, "this case involves artificial limitations on at-home health care during the height of a global pandemic." MJP Order (Doc. 32) at 13. The record illustrates how the CON law and moratorium did exactly that. On March, 24, 2020, Mid-Delta Home Health Incorporated requested an emergency waiver of the CON laws and moratorium. *See* Mid-Delta Letter Requesting Emergency Waiver (Ex. 28) at MSDH 000470. Mid-Delta sought permission to care for patients in Hinds County and Pike County, which are outside of the geographic territory authorized by its CON. *Id*. As Mid-Delta explained:

> [O]ur agency is receiving numerous calls from upset hospital discharge planners / caseworkers, physicians, and infusion companies asking our home health agency to provide home health services to patients who reside in Pike County and Hinds County. These health care professionals who have contacted us have each told us similar things: they are trying to free up hospital beds and send patients home or keep them from being admitted to the hospital, but the home health agencies licensed in those areas do not want to 'accept' their patients for various reasons. Our agency has accepted a number of these patients in our licensed service area, and we are taking care of them and utilizing the appropriate PPE gear.

> Our agency is not licensed for Pike or Hinds counties due to the Mississippi CON laws. However, we are licensed to provide coverage in counties that are contiguous to Pike County and Hinds County and maintain offices and staff in those contiguous counties.

*Id*.

On March 31, 2020, having yet to receive a decision on this request, Mid-Delta's attorney sent an email to the Department of Health expressing frustration that patients were suffering as a result of Mississippi's "antiquated 1983 moratorium" on expansion home health territories:

> As a human being, a taxpayer, and an attorney, I really do not understand bureaucracy or the AG's office holding this up given the gravity of this situation. They are not going to find anything in the MS Code that says patients and a hospital should suffer because of an antiquated 1983 moratorium on 'home health expansion' in the MS Code.

> Any help that your office can give will surely be appreciated by the patients and the employees at the hospitals who are struggling to make it through this struggle that we are in. We don't really stand to profit from this – just trying to do our part to help where we are needed – which is what the other agencies should be doing. We run our business from the heart and not from a profit and loss analysis.

Mid-Delta Email Requesting Emergency Waiver (Ex. 29) at MSDH 000470.

On April 8, 2020, the State Health Officer issued a letter denying Mid-Delta's request. The only explanation provided was that limiting Mid-Delta to its current "home health territory [would] not prevent, hinder or delay action necessary to cope with the COVID-19 pandemic." *See* Letter Denying Mid-Delta Emergency Waiver (Ex. 30) at MSDH 000469. The Health Department's witnesses do not know if the Department even investigated the report that patients were suffering

due to the CON law and moratorium before denying the emergency waiver. Hardy Depo. (Ex. 26) at 53:4 ("I do not know."); Lampton Depo. (Ex. 2) at 161:1–2 ("I do not know any specifics of this case."). Nor was the Department able to produce records of any such investigation.

Mississippi's COVID-19 experience is also consistent with new research about the impact of CON laws during the pandemic. Plaintiff's expert, Dr. Stratmann, published a peer-reviewed study demonstrating that CON laws resulted in lower hospital bed capacity, and therefore hospitals that were more likely to work at full capacity and to reject needy patients. Stratmann Rep. (Ex. 1) at 13–14. This finding is particularly relevant to this case, given that home health services are known to decrease hospitalizations, and thus demand for hospital beds. *Id*. at 14. Other recent research also finds that "states with high healthcare use due to COVID that reformed their CON laws during the pandemic had a reduction in mortality resulting from COVID-19, septicemia, diabetes, chronic lower respiratory disease, influenza or pneumonia, and Alzheimer's Disease, relative to non-reforming CON states." *Id*.

The Department's own records further illustrate the limits on access to care imposed by Mississippi's CON law and moratorium. According to those records, in 2020 alone, 2,337 Mississippians were denied a referral to a home health agency because they "lived outside [the] licensed service area." 2020 Report on Home Health Agencies (Ex. 5) at 2. Another 811 patients were denied a referral because the "needed service [was] unavailable." *Id*.

**D.  The CON Law is Not Rationally Related to Improving Quality.**

CON laws also reduce the quality of care patients receive. Whether it is deaths from heart failure, heart attack, pneumonia, or complications of surgery, CON states undisputedly do worse (and that is controlling for the health of the patient population). Stratmann Rep. (Ex. 1) at 10. In states with the most CON regulation, patients are less likely to rate hospitals highly. *Id.* Put simply,

in states where CON laws regulate provider entry into healthcare markets, incumbents "'tend to provide lower-quality services.'" *Id.* (quoting a 2016 study). Which the federal government has been saying for decades. *Id.* at 7 (quoting federal view that "CON laws have failed to produce cost savings, higher quality healthcare, or greater access to care, whether in underserved communities or in underserved areas.")

This failure extends to home health specifically. Three studies have examined whether CON regulation improves home health care, and not one of them finds that it does. Stratmann Rep. (Ex. 1) at 22–25. The first, from 2014, finds that "[r]emoving entry regulations for home health would have negligible system wide effects on health care costs and quality." *Id.* at 23. The second, also from 2014, finds that CON laws are not associated with meaningfully improved quality, and that, in the most competitive markets, there is "a more rapid deterioration of quality when entry is restricted by CON." *Id.* at 22–23. The third study, from 2018, finds that CON laws are linked to more low-quality and fewer high-quality home health agencies. *Id.* at 25.

Defendants have supposed otherwise, but supposition does not trump the record. There is no evidence that Mississippi's CON law leads to home health agencies with better technology, Sullivan Dep. (Ex. 22) at 185:15–19, or more specialized services, *id.* at 186:1–5. Indeed, the most common argument that CON regulation boosts quality makes no sense in the context of home health. The theory is that, by concentrating particularly complicated surgeries like coronary artery bypass grafts at fewer hospitals, CON laws lead to more practiced surgery wings, and thus better outcomes. But even if "practice makes perfect" were a rational reason to ban new hospitals, there is simply "no evidence of a volume–outcome relationship" in home health, an industry that

provides relatively simple medical services.[8] Stratmann Rep. (Ex. 1) at 17; *see also* Sullivan Dep. 181:2–5 (on any contrary literature: "I'm not familiar with it."). And even if none of this were true, using CON as a Rube Goldberg scheme for quality would be irrational because there is already a separate licensure system directly designed for that. Wood Depo. (Ex. 10) at 77:10–20 (purpose of licensure is to "assure [providers] meet" standards that are an "indicator of adequate care."). *See St. Joseph Abbey*, 712 F.3d 215, 225 (finding law irrational where there was a "disconnect" between the challenged restriction and the government's concerns).

### E. The CON Law is Not Rationally Related to Preventing Fraud.

No academic literature has shown a relationship between CON laws and less fraud. Stratmann Rebut. (Ex. 27) at 13. Nevertheless, at his deposition, Defendants' expert discussed a 2016 report from the Health and Human Services (HHS) Inspector General discussing twelve states with a prevalence of characteristics "consistent with" Medicare fraud (not substantiated fraud). Sullivan Depo. (Ex. 22) at 100:22–103:6. The report did not even mention CONs, much less study any relationship between CONs and fraud-prevention. *Id*. Nor did Defendants' expert conduct any analysis of the report to determine if there was any such relationship. *Id*. And he admits that no part of the CON program is directed towards preventing fraud among CON-holders. *Id*. In short, any notion that the HHS report establishes fraud prevention as a rational basis for the CON program makes no sense, even as conjecture.

Similarly, MAHC's representative, Rebecca Knight, testified that, in her "personal view," the CON law prevents fraud. Knight Depo. (Ex. 8) at 149:16–150:9. According to her, home health agencies in Florida and Texas (which are non-CON states) have drawn scrutiny from Medicare for

---

[8] Even if there were a volume–quality relationship, it would not matter because "nurses tend to work at full capacity even in small scale agencies." So "there is little rationale for concentrating volume at a small number of agencies through entry restrictions." Stratmann Rep. (Ex. 1) at 18 n.40 (quoting a 2014 study).

having high rates of fraud. *Id*. at 195:15–196:21. Because Mississippi has not drawn scrutiny from Medicare, Ms. Knight has concluded that Mississippi's CON law prevents fraud. *Id*. at 199:11–201:15. Of course, Ms. Knight's personal views are inadmissible lay opinion testimony. But her theory is also pure conjecture. As explained by Ms. Knight – who works for the largest home health agency in America – her hypothesis as to how the CON law prevents fraud is that it keeps "small entities" from entering the market – entities she believes are incapable of learning and complying with the industry's regulatory framework, and would also burden regulators with additional oversight. *Id*. at 26:5–7; 202:7–203:13. Thus, according to her, "having more small home health agencies is a bad thing for Mississippi[.]" *Id*. at 202:22–203:13.

Defendants, however, have not identified any evidence that small agencies would commit unintentional fraud. Nor have they provided any reason to believe it would be impossible for investigators at the Mississippi Attorney General's Office to protect the public from fraud if more home health agencies existed. *See* Wood Depo (Ex. 10) at 77:21–78:13. As discussed above, government convenience is not a legitimate purpose for the CON law, and thus, any argument about the "burden" to regulators is irrelevant absent a "a 'real' link" to "consumer benefits[,] based on specific facts[.]" *Newell-Davis*, 2023 WL 1880000 at *4. In short, if Ms. Knight's testimony on this subject accomplished anything, it was simply to illustrate the hostility that large, incumbent home health agencies have toward the mere notion of startups being allowed in the industry.

### F. The CON Law is Not Rationally Related to Preserving Regulatory Resources.

As with the moratorium, Defendants have not shown that any reduction in their licensure survey workload resulting from the CON law actually benefits the public. And even if they had, Mississippi's CON law is not rationally tailored to that end. If the moratorium were lifted, the Department still would not consider its current regulatory resources, budget, workload, or capacity

when evaluating CON applications. Hardy Depo. (Ex. 26) at 33:16–42:5. Thus, the CON law is far too broad to be rationally justified solely on the basis of preserving regulatory resources.

**G. The CON Law Has Inexplicable Exceptions.**

Not only is the law irrational because of what it does, it is also irrational because of what it does not do. If the law were really concerned with, say, reducing costs, it would cover similarly situated healthcare providers. But it does not do that. Instead, because of plain politics, some providers are more equal than others. *See Louisiana Seafood Management Council, Inc.*, 917 F. Supp. at 446 (recognizing Equal Protection violation where the economic regulation irrationally distinguished between similarly situated groups).

Take doctors' offices, which are exempt from CON regulation. Miss. Code §§ 41-7-173(h). Doctors' offices and home health agencies are both less capital-intensive than other healthcare services. Sullivan Depo. (Ex. 22) at 196:11–18.  The technology and services that doctors and home health agencies need to invest in is similar. *Id*. 202:1-5. Both doctors and home health agencies are regulated by a licensure process. *Id*. at 196:8–10. In fact, Defendants' expert testified that from a health planning standpoint, he "can't say there's a difference" that justifies the distinction between home health agencies and physicians. *Id*. at 202:11-23. Instead, he believes that "political considerations" were "part of it." *Id*. at 202:24–203:7.

**III.    COURTS REJECT PROTECTIONISM LIKE THIS AS ILLEGITIMATE.**

As the State's primary witness put it, when it comes to CON laws and moratoriums: "There's politics about it." Lampton Depo. (Ex. 2) at 53:5. In truth, at least when it comes to the home health moratorium and CON law, politics is *all* there is to it. Given the overwhelming evidence that the moratorium and CON law provide no public benefit – and in fact, harm

consumers – the only remaining explanation is that they are illegitimate "naked economic preferences." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

In *St. Joseph Abbey*, a district court ruled that there was no rational connection between a law that restricted casket sales to licensed funeral directors and the state's interest in protecting public health and safety. *Id.* at 215. While the state had argued that the licensure requirement was related to consumer protection and public health, "[n]o evidence was presented to demonstrate that requiring the purchase of caskets from licensed funeral directors aids the public welfare." *Id.* at 158. The licensure process did not require training in the consumer protection issues the state purported to care about and any health and safety concerns were already protected by the relevant health and safety laws. *Id.* The Fifth Circuit affirmed, ruling that "[t]he great deference due state economic regulation" does not require courts to accept "nonsensical explanations for regulation" or "demand judicial blindness to the history of a challenged rule or the context of its adoption." 712 F.3d at 226.

A district court has even invalidated a CON law far less burdensome than the ones involved here. In *Bruner v. Zawacki*, the plaintiff successfully challenged a law that, like CON, required household goods movers to prove they were needed. 997 F. Supp. 2d 691, 699 (E.D. Ky. 2014). The state contended that the law was necessary to prevent "excess entry" into the marketplace, which the state said had harmful effects on consumers. *Id.* at 700. The court found that in practice, need review did not actually consider whether an applicant would create any of these harmful effects. Instead, the process functioned to protect incumbent businesses from competition. *Id.* at 701; *see also New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) (invalidating need review for sellers of ice); *Moore v. Grillis*, 39 So.2d 505, 511 (Miss. 1949) (invalidating law restricting the preparation of tax returns because the law "tend[ed] to establish a monopoly"); *City of Vicksburg*

*v. Mullane*, 63 So. 412, 415 (Miss. 1913) (invalidating unequal restrictions for plumbers because the law would "tend to monopoly.").

In *Tiwari v. Friedlander*, the Sixth Circuit upheld a Kentucky CON law for home health agencies, finding that it passed rational basis review, "perhaps with a low grade." 26 F.4th 355, 363 (6th Cir. 2022). However, the Sixth Circuit, quoting this Court, specifically distinguished the facts of *Tiwari* from the facts of this case:

> In one sense, [*Slaughter v. Edney*] . . . confirms what we accept today: Certificate-of-need laws teeter on the edge of rationality. In another sense, that case confirms what we cannot resolve today: How will all other certificate-of-need laws fare under that review? Mississippi's restriction, it deserves note, ventured beyond Kentucky's, banning *all* new entry into the market for the last several decades regardless of any 'need' for the service. *Slaughter*, 2022 WL 135424, at *2. As the court put it, "Mississippi's 40-year-old moratoria is an outlier." *Id.* at *5.

*Id.* at 369 (emphasis original).

That remains true today. New home health agencies are still banned in Mississippi. Mr. Slaughter cannot even undergo the process that was held unconstitutional in *Bruner*. And, unlike the facts in *Tiwari*, even if Plaintiff were able to apply, incumbents are left completely free to game the system to keep him out. This case is indeed "an outlier." MJP Order (Doc. 32) at 13. If CON laws are irrational anywhere, it is here. Mr. Slaughter is entitled to summary judgment.

## CONCLUSION

Plaintiff respectfully requests that the Court grant summary judgment in his favor.

RESPECTFULLY SUBMITTED, this the 9th day of February, 2024.

  /s/ *Aaron R. Rice*             A. Seth Robbins
Aaron R. Rice                  MS Bar No. 103096
MS Bar No. 103892              WATSON JONES PLLC
MISSISSIPPI JUSTICE INSTITUTE  2829 Lakeland Drive,
520 George St.                 Suite 1502
Jackson, MS 39202              Flowood, Mississippi 39232
Tel: (601) 969-1300           Tel: 601.939.8900
aaron.rice@msjustice.org      srobbins@wjpllc.com      *Attorneys for Plaintiff*

32

## <u>CERTIFICATE OF SERVICE</u>

I, Aaron R. Rice, counsel for Plaintiff, hereby certify that the foregoing document has been filed using the Court's ECF filing system and thereby served on all counsel of record who have entered their appearance in this action to date.

This the 9th day of February, 2024.

     /s/ *Aaron R. Rice*
Aaron R. Rice