IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHARLES SLAUGHTER                                                    PLAINTIFF

VS.                              CIVIL ACTION NO.: 3:20-CV-789-CWR-ASH

DR. DANIEL P. EDNEY, in his Official Capacity
 as the Mississippi State Health Officer,                            DEFENDANT

MISSISSIPPI ASSOCIATION OF HOME CARE              INTERVENOR

_____

DEFENDANT'S RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____

Dr. Daniel P. Edney, in his official capacity as the Mississippi State Health
Officer, ("Dr. Edney" or "MSDH"), responds to the Motion for Summary Judgment filed by
Plaintiff and urges the Court to uphold the laws of the State of Mississippi. This case is subject
to "rational basis" review and plaintiff cannot carry his heavy burden.  Plaintiff has crafted a
narrative that a Legislative Moratorium on the issuance of new CONs for home health
agencies is unconstitutional. But each state in our Republic is unique. Each has its own local
issues and local interests—and therefore must be able to craft legislation as their elected
officials see fit. The Legislative Moratorium and the CON Laws are matters of legislative
prerogative and Plaintiff has not and cannot meet his burden to prove the irrationality of the
posited State interests furthered by the laws. As demonstrated in the competing motions for
summary judgment filed by Dr. Edney and MAHC, there is ample evidence in support of the
Legislature's rationale at the times when it acted. It cannot be said that the rationales of the
Legislature are not "fairly debatable." At the very least, on both the Legislative Moratorium
and the CON Laws in general, there exists valid arguments for and against the maintenance
of the laws. Reasonable "experts" in healthcare planning can disagree as to the merit of the

laws. At bottom, the ongoing *policy debate* about CON requirements means the laws here should be upheld. As demonstrated, the Legislature can act when it deems appropriate, and not act when the policy arguments asserted by Plaintiff fail to sway the body's majority.

1. <u>Plaintiff's Motion was Untimely.</u>

On October 26, 2023, this Court entered a Text Only Order resetting the major CMO deadlines. *See* Docket Entry on October 26, 2023. Following a telephonic conference on the Fourth Joint Motion for Extension of Deadlines [71], requesting a fifth scheduling order in this case filed in 2020 the Court granted the motion [71] and by agreement of counsel, entered the following Scheduling Order: "(1) All discovery must be completed by 1/1/2024; (2) All dispositive motions and Daubert-type motions must be filed by 2/2/2024; … No further extensions will be granted." *Id.*

On February 2, 2024 (the motion deadline), both Dr. Edney (for MSDH/the State) and the intervenor, Mississippi Association of Home Care (MAHC), filed their separate Motions For Summary Judgment and supporting memoranda. *See* Doc. 82, 83, 84, & 85. MAHC also filed its *Daubert* motion to exclude and memorandum in support. Doc. 86 & 87. At 8:30 p.m. on the filing deadline day, MSDH and MAHC were first notified that Plaintiff's attorney did not expect he would be able to comply with the motion deadline. Plaintiff's counsel represented at that time that he would file his motion on the next day, Saturday, February 3, 2024. On Saturday morning, counsel for MAHC assented to Plaintiff's proposal, with the understanding that Plaintiff's counsel would not review the filings that were made by MSDH or MAHC on February 2nd. By the following Monday, still nothing was filed.

One week later, on February 9, 2024, Plaintiff finally filed his Motion and

Memorandum seeking summary judgment. Doc. 88 & 89. This filing was untimely based on the Court's October 26 Order. The Court's deadlines must mean something. While Dr. Edney is sympathetic to the situation with Plaintiff's counsel, the fact remains that the deadline was missed by a full week. No request for an extension was lodged. No motion for leave to file beyond the deadline was made. Dr. Edney believes that some motion seeking relief from the Court should have been filed, and that under the rules of this Court, the motion was inexcusably tardy. Dr. Edney therefore asserts that the Court would be well within its discretion to disregard the Motion filed by Plaintiff.

2. <u>Plaintiff Cannot Meet His Burden of Persuasion/demonstration.</u>

"Plaintiff's federal substantive due process and equal protection claims are governed by the rational-basis test." Doc. 89 at 12. Under that test, Plaintiff admittedly must show that Mississippi's moratorium statute and CON law are not rationally related to a legitimate state interest. *Id.* When a properly enacted statute is challenged on the basis of its constitutionality the legislative action is accorded "a strong presumption of validity." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314–15 (1993). The statutes "must be upheld ... if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Glass v. Paxton,* 900 F.3d 233, 244-45 (5th Cir. 2018). The CON Law and the Legislative Moratorium must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests. *See Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022)*; see also Beach Comm'ns,* 508 U.S. at 314. (noting that the Supreme Court does not require "a legislature to articulate its reasons for enacting a statute [because] it is entirely irrelevant for constitutional purposes whether the

conceived reasons for the challenged distinction actually motivated the legislature"). Plaintiff here challenges an economic statute pursuant to the rational basis test and therefore faces a difficult undertaking: he must "negative every conceivable basis which might support" the legislation. *Id.*; *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973). He has failed to do so.

"Rational-basis review is guided by the principle that [courts] don't have a license to judge the wisdom, fairness, or logic of legislative choices." *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020). So, when "economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). As the Court is aware, the ongoing debate about this issue and other medical spending related topics is currently raging in Mississippi. *See passim* Doc. 85.[1]

Plaintiff's Motion presents cherry-picked bits of information accumulated after the adoption of the laws to craft a fanciful narrative that *the only reason* for numerous ills in the Home Health Agency ("HHA") industry is the Legislative Moratorium. Plaintiff gives lip-service to the CON Laws in general and frankly provides nothing to support his position that the State's enumerated or otherwise now argued interests are irrational. His focus now

---

[1] State spending on healthcare is clearly still debatable. The Court only need look to the recent announcement by the Mississippi Senate that—after many years of debate and refusal to do so—it will bring forward a bill this session to expand Medicaid coverage up to 138 percent of the federal poverty level. https://magnoliatribune.com/2024/02/15/congratulations-to-brandon-presley-mississippi-democrats/ On February 28, 2024, two days prior to this filing, the Mississippi House passed HB 1725 to expand Medicaid. https://magnoliatribune.com/2024/02/28/mississippi-house-passes-speaker-whites-medicaid-expansion-bill/ Whether or not it ultimately passes is irrelevant. The analogous point with this lawsuit is that there are many advocates (with rational arguments) on both sides the issue as to Medicaid expansion and the CON/HHA Moratorium.
https://billstatus.ls.state.ms.us/2024/pdf/history/HB/HB1725.xml

appears to be on the moratorium's alleged unconstitutionality due to its existence since 1983. In fact, Plaintiff's best argument to overturn the Legislative Moratorium is to repeatedly reference it as the "43 year" moratorium. Evidence or conjecture that the Legislative Moratorium has caused some form of "harm" in the eyes of Plaintiff *does not prove that the law is irrational.* It only counterbalances the evidence presented by MSDH and its expert to the contrary. Doc. 85; Sullivan Rpt. at Doc. 84-4. And the length of time since the moratorium was enacted is likewise irrelevant. Plaintiff can cite to no constitutional requirement that any state is required to periodically review and amend certain economic statutes based on some arbitrary number of years. Dr. Edney has discovered no such precedent either—quite the opposite. Federal courts are not in the business of mandating states must include sunset provisions in all economic statutes or else risk an otherwise valid law be deemed violative of the Due Process Clause. *See infra discussion on Murillo v. Bambrick*, 681 F.2d 898, 911 (3d Cir. 1982)(no obligation for states to constantly reconsider adopted statutes).

Plaintiff further relies erroneously on this Court's interim Order denying 12b(6) motions as a source of support for Rule 56 summary judgment. His reliance on this Court's earlier Order denying the 12(b)(6)/12(c) pre-discovery motion is misplaced as it is not "law of the case." *See Lockheed Martin Corp. v. Network Solutions, Inc.,* 141 F.Supp.2d 648, 654 (N.D. Tex. 2001) (rejecting argument that "court implicitly agreed with plaintiff as to the potential merits of its claims" by denying defendant's motion to dismiss because law of the case doctrine does not bar court from reaching a "different conclusion[]" on summary judgment). A Rule 12(b)(6) motion only tests the sufficiency of the allegations in the pleadings. Summary judgment cases and trials test the sufficiency of the evidence. *See May v. City of Arlington, Texas*, 398 F. Supp. 3d 68, 87 (N.D. Tex. 2019), supplemented, No. 3:16-CV-1674-

L, 2019 WL 1429662 (N.D. Tex. Mar. 28, 2019). Plaintiff has had his extensive discovery and now must demonstrate that the factual change in circumstances or the alleged irrationality of the laws, completely negate any plausible state interest that the legislature could have believed at the time of adoption would be furthered by the laws challenged here.

The rational basis test does not prevent plaintiffs from using "evidence of irrationality" to negate every conceivable basis for the law. MJP Order (Doc. 32) at 8 (*citing United States v. Carolene Prods. Co.,* 304 U.S. 144, 153, (1938)). And Plaintiff's attempt to use evidence of irrationality is admirable, but it does not *negate all rationality* of the CON Laws or the Legislative Moratorium. At best, Plaintiff has tarnished certain features—such as "access"— but Dr. Edney's cross motion (and that of MAHC) in favor of the State definitively shows that there are several plausible benefits to the State and/or its public. Doc. 84, 85, 82, 83. In support of its Response per Rule 10, MSDH hereby incorporates by reference the aforementioned filings, as well as Docs. 18, 19 (MSDH MJP), 86, 87 (MAHC *Daubert* Motion), and all supporting documentation referenced or attached thereto; and the following exhibits attached to Plaintiff's motion. Doc. Nos. 88-[2-26].

3. <u>The State Has No Duty to "Prove" Anything Here.</u>

Plaintiff asserts that "courts will not, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Doc 89 at 12. But that is only in the normal context of Rule 56. In a rational basis challenge, the State does not have to prove anything to establish the laws are valid. First, rational-basis review does not require a State to produce evidence that a law will (or does) achieve its objectives. *See Heller v. Doe*, 509 U.S. 312, 320 (1993) ("A State ... has no obligation to produce evidence to sustain the rationality of a statutory classification."); *Beach Commc'ns,* 508 U.S. at 315

(holding that a legislative decision "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."). Rational-basis review asks only whether it is possible to imagine that Certificates of Need (or a lack thereof via a moratorium) could contain state costs and/or improve patient care across Mississippi. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (it was irrelevant "[w]hether *in fact* the Act will promote more environmentally desirable milk packaging," because the legislature "*could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives.") (emphasis in original). The CON Laws and the Moratorium statute easily satisfies that standard given that the parties' experts locked horns on this issue. *See infra;* Doc.85 at 14-16. Plaintiff's inability to now disprove that each of the State's purported interests is completely divorced from the text of the CON Law and/or Legislative Moratorium, is fatal to his action now and must result in judgment in favor of the State.

Second, rational-basis review does not allow courts to invalidate a law by weighing evidence or resolving disputed questions of fact. Thus, the usual Rule 56 standards do not apply here. The mere existence of disagreement over the need for or desirability of a law is enough to establish a "reasonably conceivable state of facts that could provide a rational basis." *Beach Commc'ns*, 508 U.S. at 313; *see also Clover Leaf Creamery*, 449 U.S. at 464 ("Litigants may not procure invalidation of . . . [a law] merely by tendering evidence in court that the legislature was mistaken."). As the Seventh Circuit has explained, *"to say that such a dispute exists--indeed, to say that one may be imagined--is to require a decision for the state.* Outside the realm of "heightened scrutiny" there is therefore never a role for evidentiary proceedings." *Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45

F.3d 1124, 1127 (7th Cir. 1995)(district court should not have conducted a trial, and we disregard its conclusions)(emphasis added). The rational-basis analysis in this lawsuit should thus fairly end as the State's long-time health planning expert opined that the CON requirements help to ensure *inter alia,* cost-containment, continuity of care, accessibility, and acceptability of services by protecting patients from substandard practitioners. Doc. 85 at 14-16; Doc. 84-4.

Third, rational-basis review does not require a State to use the least restrictive means of advancing its interests. *See Ileto v. Glock, Inc.,* 565 F.3d 1126, 1152 n.8 (9th Cir. 2009); *Tolchin v. Supreme Court of the State of N.J.,* 111 F.3d 1099, 1114 (3d Cir. 1997); *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.,* 938 F.2d 1239, 1243 (11th Cir. 1991). Plaintiff's fundamental assertion is that the state's restrictions on new HHAs is too restrictive, arguing for a "free market" approach to home health in Mississippi. As shown, the CON Laws and the Legislative Moratorium are *not* singling out HHAs.  HHAs happen to be one of the facility types for which the Legislature has severely restricted supply. There are four other health care facilities that are also—for the time being—restricted under the moratorium statute. Miss. Code Ann. §§ 41-7-191(8). All the current facilities on the list are primarily "government" pay facilities.  In industries where the government is the primary payor (Medicare and Medicaid dominant, such as HHA) the state's direct benefit in limiting the number of providers (who can bill the government) is to reduce or contain the costs to the government. Sullivan Rpt. Doc. 84-4 at 8:FN.8, 12-15. Additionally, the cost containment interests served by CON Laws are similarly served by the complete prohibition (moratorium) on the issuance of a new CON for HHA. There is clearly a rational basis for the laws at issue and the fact that the Plaintiff can posit

another option he believes will achieve the same goals in a different manner is, again, not proof that the laws are unconstitutional.

In sum, there is no room for the Court to weigh opposing evidence or make findings that Plaintiff's "proof" is more convincing than the State's. Ultimately, it would not matter whether those findings are right or wrong; they would be irrelevant because a legislature's decision "is not subject to courtroom factfinding" when applying rational-basis review. *See Nat'l Paint & Coatings Ass'n,* 45 F.3d at 1127 (*quoting Beach Commc'ns,* 508 U.S. at 315). It is certainly possible to imagine that a law restricting the number of HHA providers will control State healthcare costs, further consumer safety and improve patient outcomes; that is all the State needs to establish a rational basis. Whether or not the laws actually accomplish these purposes is totally irrelevant here, as is Plaintiff's presented evidence.

4. **The Moratorium and CON Laws Have Not Been Rendered Irrational By Any Change in Circumstances.**

Slaughter invokes the so-called "changed circumstances" doctrine in support of his claims that the Moratorium and the CON Laws lack a rational basis. That doctrine can be traced to the U.S. Supreme Court's decision in *United States v. Carolene Products Company*, 304 U.S. 144 (1938). *Carolene Products* involved a constitutional challenge to the Filled Milk Act, which prohibited the sale of milk supplemented with nondairy oil or fat. *Id.* at 145-46. The Government defended the statute on the grounds "that the use of filled milk as a substitute for pure milk is generally injurious to health and facilitates fraud on the public." *Id.* at 149. The Supreme Court upheld the constitutionality of the statute, reasoning that "the question is at least debatable whether commerce in filled milk should be left unregulated, or in some measure restricted, or wholly prohibited" and "was for Congress" to decide. *Id.* at 154. In *dicta*, however, the Court observed that

"the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *Id.* at 153.

In the nearly one hundred years since, courts have considered the "changed circumstances" doctrine sparingly. In recent years, federal courts have expressed their reluctance to invalidate laws under rational basis review based solely on changed circumstances. For example, Judge Calabresi identified the following problems with applying the doctrine:

> It is not, however, easy for courts to step in and say that what was rational in the past has been made irrational by the passage of time . . . . Precisely at what point does a court say that what once made sense no longer has any rational basis? What degree of legislative action, or of conscious inaction, is needed when that (uncertain) point is reached?

*United States v. Then*, 56 F.3d 464, 468 (2d Cir. 1995) (J. Calabresi, concurring).

Similarly, the Third Circuit has hesitated to strike down statutes in light of changed circumstances because doing so would "impose[] an unwarranted obligation upon legislative bodies: the obligation constantly to reassess the continuing validity of the factual premises underlying each piece of legislation enacted over the years." *Murillo v. Bambrick*, 681 F.2d 898, 911 (3d Cir. 1982); *see Heffner v. Murphy*, 745 F.3d 56, 62 (3d Cir. 2014) (upholding funeral home regulations enacted in 1952 that were regarded as "antiquated in light of how funeral homes now operate" because "[t]hat is not  . . . a constitutional flaw"). "[J]ust as the Constitution neither demands nor expects perfection on the part of a legislature engaged in adopting laws . . . , so too the Constitution neither demands nor expects omniscient oversight on the part of a legislature once those laws have taken effect." *Murillo*, 681 F.2d at 911. Even the Ninth Circuit has called the

doctrine into doubt. *See Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regulation*, 763 F.2d 1106, 1111 (9th Cir. 1985) ("The Supreme Court has been ambivalent on whether changed circumstances can transform a once-rational statute into an irrational law.").

Federal district courts have also generally refused to invalidate statutes under the "changed circumstances" doctrine. For example, in *Danker v. City of Council Bluffs, Iowa*, the plaintiffs challenged the constitutionality of an ordinance banning pit bulls, arguing that, even if the ordinance had a rational basis when it was enacted, it was no longer rational in light of changes in the scientific understanding of certain pit bull breeds. 569 F. Supp. 3d 866, 881 (S.D. Iowa 2021), *aff'd*, 53 F.4th 420 (8th Cir. 2022). The district court rejected this argument because it "invite[d] the kind of 'courtroom fact-finding,' years later, that the court is not permitted to engage in under rational basis review, in the first instance." *Id.* at 882 (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 315). Further, the court concluded that it would not "short-circuit the democratic process in this case and impose its view of facts" and that "[t]he proper venue for the dog owners' 'current science' and 'change of circumstances' arguments to overturn the pit bull ban is the responsible legislative body, not the court." *Id.*; *accord Jones v. Schneiderman*, 888 F. Supp. 2d 421, 429 (S.D.N.Y. 2012) ("But if the evolution of MMA and the understanding of its risks have rendered the 1997 law unnecessary or unwise, Plaintiffs' proper recourse is with the legislature because the 'Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process[.]'") (quoting *Beach Commc'ns*, 508 U.S. at 314).

The only cases in which federal district courts have declared laws unconstitutional under the "changed circumstances" doctrine are those in which it was

indisputable that the factual circumstance on which the law was predicated no longer existed. In *Santos v. City of Houston*, the owner of a jitney (taxi) service challenged the constitutionality of an ordinance enacted in 1924 that prohibited jitneys with a seating capacity of less than 15 passengers from operating on the streets of Houston. 852 F. Supp. 601, 603 (S.D. Tex. 1994). The ordinance had been passed by the city at the insistence of streetcar companies in order to protect them from competition, but when this suit was filed, there were no streetcars still operating. *Id.* at 603. The district court declared the ordinance unconstitutional based, in part, on the city's "conce[ssion] that the ordinance [wa]s archaic and no longer relevant." *Id.* at 608. The district court held that even if the ordinance originally had a rational basis, that rationale had been completely undercut by the changes to the transportation industry during the intervening seventy years. *See id.* at 609 ("Thus, even if the ordinance ever had a purpose, legitimate or not, its utility has passed.") (citing *Carolene Prod. Co.*, 304 U.S. at 154). No similar drastic change has occurred in HHA such that the Moratorium or CON Laws undisputedly no longer have any application or are obsolete.

Here, Slaughter argues that, even if the Moratorium and CON Laws were rational when enacted, they no longer have a rational basis because of changed circumstances. Plaintiff's Motion then proceeds to rely solely on *post hoc* evidence in a failed attempt to "prove" that the laws do not accomplish their goals. *Post hoc* evidence should not even be considered, much less weighed, in a rational basis analysis. *See supra.* But even so, Slaughter has failed to meet his burden of showing that the home health care industry in Mississippi has fundamentally changed in the last forty years, such that it is not "debatable" whether the challenged laws still have a rational

connection to at least one legitimate state interest. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 175 (5th Cir. 1996) (holding that, if the question "whether a rational relationship exists between the policy and a conceivable legitimate governmental objective" is "at least debatable," the policy passes constitutional muster).

Slaughter contends that the laws have been rendered irrational because of COVID[2], or because the number of (private) HHAs operating in Mississippi is now only 46 agencies, and the number of patients receiving home health services has increased since enactment. However, none of these changes have severed the rational relationship between limiting the number of providers (through CON and the Moratorium) and the State's legitimate interests in cost-containment, ensuring continuity and availability of care, and protecting health and safety. *See infra*. While it is true that the number of licensed HHAs in Mississippi has fallen to 46, there is still "a competitive market for home health services" throughout Mississippi. Doc. 84-4 at 6. In 72 of Mississippi's 82 counties, there are at least four HHAs currently providing services. *Id.* In the other ten counties, there are at least two or three HHAs. *Id.* Moreover, the reduction in the number of HHAs in Mississippi has not impaired patient access to home health services. *See id.* at 19 ("Mississippi had the highest rate of Medicare patients served per 1,000 population in the United States). Accordingly, Slaughter cannot prove that these changes in circumstances have rendered the Moratorium and CON Laws irrational.

Slaughter also argues that CMS's reduction in the Medicare/Medicaid reimbursement rate for home health services has undermined the rationale for enacting

---

[2] Sullivan has explained that contrary to Plaintiff's attempted reliance on COVID as a convenient excuse to bolster his position in this case, COVID is a non-factor—red-herring—distraction. Doc.84-4 at 6. Plaintiff cannot show there was a "need" for his services even during COVID. *Id.* Utilization of HHA services *decreased* across the State and nation. *Id.*

the Moratorium and the CON Laws. However, just the opposite is true. Because HHAs are not paid as much by Medicare and Medicaid, they need sufficient patient volume to make up for this reduction and ensure that they can remain profitable enough to continue providing services to those patients. Doc. 85 at 25-26. By limiting the number of HHAs, the Moratorium and the CON Laws guarantee HHAs sufficient market share, and thereby advance the State's interest in ensuring continuity, quality, and availability of care. *See Tiwari v. Friedlander*, 26 F.4th 355, 364 (6th Cir. 2022) (finding that HHAs can "use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations"). This argument is without merit.

Finally, Slaughter argues that, because the federal government repealed the CON requirement, that change in law undercuts the rationale for Mississippi's CON Law and Moratorium. But the existence of the federal law requiring States to adopt CON regulations was just one valid factual predicate for Mississippi's adoption of its CON Law and the imposition of the Legislative Moratorium. As shown, the Legislature could easily justify adopting the CON Laws based solely on the federal monetary incentives to the State. Doc. 85 at 18-19.  To prevail on his claims, Slaughter must negate every conceivable rational basis which might support the CON Laws and the Moratorium. He has not done so.

In sum, although some changes in the home healthcare industry have occurred since the enactment of the CON Laws and the Moratorium, those changes have not called into question the rationality of those laws. It remains "at least debatable" whether there is a need for more HHAs in Mississippi. Indeed, the continued need for the

Moratorium has been the subject of discussion and legislative re-evaluation for many years.[3] However, given the ongoing debate in Mississippi about CON Laws in general and the Moratorium specifically at issue here, it would be improper for this Court intervene and strike down these laws as outdated or obsolete. The proper forum for Plaintiff's "changed circumstances" argument is the Mississippi Legislature, not this Court.

## 5. The Legislative Moratorium is Valid, not Unconstitutional.

Turning now to the main thrust of Plaintiff's Motion, his assertion that the Legislative Moratorium violates constitutional provisions is meritless.[4] By not even attempting to address enumerated state interests served by the CON Laws, Plaintiff tacitly concedes that he cannot defeat the CON Laws as a whole.  Plaintiff instead claims first that the sheer numbers demonstrate Moratorium is irrational.  Slaughter states *ad nauseum* that it has been 43 years the enactment of the 1983 statutory amendment, and that over that time the number of patients using home health services has quadrupled. Doc. 89 at 3. To demonstrate his perceived absurdity of the Moratorium, he then states that there were 135 Home Health Agencies then, and only 46 now.  *Id.*  What Plaintiff has failed to disclose here is that at the time when HHAs were added to the CON Laws in 1979 and 1983, there were over 80 MSDH run home health agencies. 1986 Doc. 84-3 at 1981-86 SHP at p. 232; Lampton Depo at 31:13-33:1; 121:7-21.  These state-

---

[3] As recently as the year 2020 and again in 2021, the Mississippi Legislature considered, but refused to act on, bills to lift the statutory moratorium on the issuance of CONs for new home health agencies. *See* 2020 HB 606; 2020 HB 605; 2021 SB 2747; 2021 HB 602. For the current 2024 session, there currently exist almost 40 bills that concern the CON Laws or moratoria.  *See e.g.* 2024 SB 2887; SB 2870; HB27; HB 322; HB 922; HB 1412.

[4] *See* Miss. Code §41-7-191(1)(d)(ix) which imposes the CON requirement for home health agencies and §41-7-191(9) which imposes the moratorium on granting new CONs for home health agencies.

run HHAs were the first to offer home-health services and were run out of each county's health department. *Id.* Around five years ago the last of them was shuttered as there was no longer a need due to ample coverage by existing private HHA providers. *Id.* Comparing "apples to apples," there were 55 private entity providers in 1983—and 46 currently. This hardly undermines the rationality of the Moratorium.

Plaintiff goes one step further, however, manipulating statistics to claim that there are only "1/5 the number of HHAs now when accounting for consolidation in ownership." By Plaintiff's logic every Kroger grocery store in the state would only be counted as "one" store since they are owned by the same company. That is "fuzzy math" and disingenuous. In point of fact, there are currently 107 branch agencies operating throughout the state. Doc. 84-4 at 6.

**6.** **Economic Protectionism Does Not Invalidate the Rationally Adopted CON Laws**

Plaintiff transitions into what is perhaps his primary general argument, that the challenged laws are nothing more than economic protectionism. Doc. 89 at 9, 30. Plaintiff cites "all the existing providers" support of the moratorium as some sort of proof that the statute is irrational. *Id.* at 9-10. But again, the relevant inquiry whether *any* purported state interest is "fairly debatable." MSDH and MAHC have demonstrated that economic protectionism is not the purpose of the Moratorium. Doc. 84, 85, 82, 83. Certainly, it is not the *only* purpose.

Plaintiff is correct that economic protectionism *by itself,* might not be a legitimate state interest. Doc. 89 at 31. But it is not the case here that the "only remaining explanation is that they are 'naked economic preferences.'" *Id.* quoting *St. Jospeh Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). The Fifth Circuit has "recognized that a

law is not necessarily irrational merely because it is "motivated in part by economic protectionism." *Newell-Davis v. Phillips,* 2023 WL 1880000 at *4 (5th Cir. 2023) *quoting Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Houston,* 660 F.3d 235, 240 (5th Cir. 2011). *See Martin v. Mem'l Hosp. at Gulfport*, 86 F.3d 1391, 1399–400 (5th Cir. 1996)(upholding CON law and acknowledging "the Mississippi [CON] statutes demonstrate that the state legislature clearly contemplated anticompetitive conduct."). Both the Moratorium and the CON Laws in general, provide cost containment to the government, assure accessibility, availability, and continuity of care as described in the cross-motions filed by MSDH and MAHC. Importantly, administrative oversight and the resulting consumer benefits that arise from maintaining a reasonable number of providers, is also benefitted by the Moratorium (and the CON Laws). Even if Plaintiff could prove the result of the laws is some measure of economic protectionism—which he cannot do—any other rational reason for the laws is enough to warrant deference to legislative prerogative.

Plaintiff's reliance on *St. Joseph Abbey* is here misplaced. That case concerned restricting intrastate casket sales to licensed funeral directors. The Fifth Circuit concluded that the challenged restriction was not rationally related to consumer protection or public health and safety because Louisiana did not have any consumer protection or health and safety regulations specifically applicable to casket retailers. 712 F.3d at 224 ("No rule addresses casket retailers or imposes requirements for the sale of caskets beyond confining intrastate sales to funeral homes."). Hence, the court held that, because of a complete dearth of any explanation other than economic protectionism, the restrictive statute was unconstitutional. *Id. at 223.* This case is

distinguishable because it involves "a highly-regulated healthcare sector," in which the government pays for 77% of the care, and in which "government resource constraints can be detrimental . . . to consumers." *Newell-Davis*, 2023 WL 1880000, at *4. As demonstrated by MSDH, the CON Laws and the Moratorium have distinct and numerous interests that could reasonably be believed would be advanced by the adoption of both laws at issue.

Plaintiff further provides this court with a string-cite of cases that he asserts support his position, starting with the *Bruner v. Zawacki* case. Doc. 89 at 31. But every single one of the cases cited for support by Plaintiff have nothing to do with government direct spending on services, such as HHA. Household movers, sellers of ice, tax preparers, and plumbers are all inapposite. *See id.* None of these cases relied upon by Plaintiff are comparable with this current lawsuit because none of them addressed the state's interests when the state is on the hook to pay the bills for the restricted service.

Plaintiff's misplaced reliance on this Court's Order denying the 12(b)(6) motions is previously addressed, but Plaintiff nevertheless further cites the case of *Tiwari v. Friedlander* wherein, *in dicta,* the Sixth Circuit quoted directly from this Court's interim Order of denial that "Mississippi's 40-year moratoria is an outlier." Doc 89 at 32. 26 F.4th 355, 363, 369 (6th Cir. 2022). This is perhaps the most compelling argument Plaintiff makes of the time that has elapsed since adoption, except Plaintiff has buried the lede. The Sixth Circuit in *Tiwari* upheld on summary judgment the same constitutional challenge made here, with the same experts, as to Kentucky's CON restrictions, which likewise limited entry into Kentucky's home health sector. *Id.* And while the Sixth Circuit felt obliged to distinguish this case from that one in *dicta*, it is

not binding on this Court in any way. It certainly does not establish that the statute is unconstitutional any more than if Plaintiff had called the Moratorium an outlier himself. It is nothing more than a circular quote of this Court's interim Order, which relied upon the interim order denying the 12(b)(6) motion of Kentucky's AG in the *Tiwari* District Court. Interim Orders denying a motion to dismiss are simply not precedential or authoritative for usage in this or any another case. *See Lockheed Martin,* 141 F.Supp.2d at 654. The fact is that Moratorium is not without mechanism for amendment should the experts or the Legislature agree that a need is present for more HHA providers; and it is not unconstitutional simply because it appears at first blush that the law is an "outlier."

Lastly, the fact that current HHA providers are not opposed to the existence of the Moratorium is not proof that the Legislature's actions were irrational in 1979, 1983 or in 1986. That tid-bit is proof of nothing. Of course, the existing providers have similar interests to those posited by the state as valid reasons for the statutes at issue. But Plaintiff fails to recognize that the motivation of the existing providers could just as easily be because they want to maintain their patient census so that they remain economically viable. The State has shown that continuity of care is one of the important reasons for the CON Law and Moratorium. Doc. 85 at 22-24. Likewise, the State has a legitimate interest in keeping bad actors or fly-by-night HHA operators from poisoning the industry by committing fraud or providing poor services to consumers. *Id.* The fact that various parties' interests may align is not proof of irrationality or pure economic protectionism.

7.    <u>The Moratorium has Several Rational Bases that Might Serve State Interests.</u>

Plaintiff has repeatedly claimed the Legislative Moratorium is "permanent" or "perpetual". This is again hyperbole by Plaintiff. As with any law passed by the peoples' representatives, the law stands unless and until the body decides to repeal or amend it. As shown in the MSDH motion, history is replete with examples of the Legislture changing the CON laws, including other moratoria. Doc. 85 at 8-9. Some amendments were to remove facilities; some to add facilities; and some to change to provisions applicable to certain industries (*e.g.* nursing home threshold moved to 60 beds and off the moratorium). *Id; see also* Lampton Depo, Doc. 88-2 at 25:14-27:23.[5] The process set up by the Legislature works, and it is entirely reasonable that the Legislature could and would rely upon subject matter experts at the Board of Health and MSDH to recommend if/when HHAs should be removed from the Legislative Moratorium at §41-7-191(8). Doc 85 at 10-11.

Plaintiff specifically claims there is "no public benefit" to the Moratorium. Doc. 89 at 13. And that "[h]e only needs to show that the moratorium causes *some* harm to consumers – all while providing no public benefit and crushing the dreams of aspiring entrepreneurs. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013)." *Id.* This is a misstatement of his burden, based on a case that did not even deal with an industry where the state government is a major payor to providers. Medicaid and Medicare don't pay for caskets directly. The asserted interests furthered by the laws at issue here are much different from an industry (such as coffins) where there is primarily

---

[5] "[T]he moratorium on nursing homes is directly related to Medicaid expenditures, which I'm sure you're aware of. So, they tried to provide the fewest numbers of nursing homes because the primary provider at nursing homes is the Medicaid system, which it does have state dollars going into it." *Id.* at 26:25-27:6.

a consumer payor, and the government is not directly paying for the service. As such, Plaintiff must show on summary judgment that all the interests posited in favor of the laws are irrational and completely without merit. Plaintiff has failed to meet his burden. Plaintiff cannot cite this Court to any case where cost control of direct governmental payments is found to be unconstitutional. This is because the equation is completely different when the government is the payor, such as HHA.

Next, Plaintiff asserts that MSDH's expert Dan Sullivan provides no support in his report for the Moratorium. Sullivan allegedly admitted he has no 'evidence' to support the moratorium. Doc. 89 at 13. Primarily, this is wrong factually. *See* Doc. 84-4 at pp. 3 (3); 7, 16, 19, 31. Even so, the State's expert does not need firsthand "evidence" of why the Legislature added HHA to the Moratorium statute in 1983. The State's rationale is also supplied by common sense, rational speculation, and by the people that process the CON applications at the MSDH. The people that study and consider and are charged, by statute, to make determinations and recommendations to the Legislature based on "boots on the ground" observations and the best data available. Doc. 85 at 10.

Dr. Lampton clearly testified as to his 30-year understanding of the original rationale for the Moratorium was that there was a proliferation of home health agencies at a time when there was no need for additional agencies and the legislators. Lampton Depo at pp. 41-43 & 47. There continues to be "no need" and Plaintiff cannot prove otherwise. Regardless, it is at least "fairly debatable," and thus is a legislative judgment. Additionally, the HMA reported that 10-18 applications were received for each of the past 8 years. Doc. 84-6; *see also* Doc.84-4 at 24. Each year MSDH planning division receives and processes somewhere between 10 and 18 applications for a CON, across all

19 facility types that are required to have a CON. *Id.* The removal of the Legislative Moratorium on HHAs would thus necessarily increase the burden to process all the new HHA applications, even though there is no need for additional providers and Plaintiff has not even attempted to show "need."

Moreover, the CON Application process is not simply "rubber-stamping" by any means. It requires a substantial amount of compliance with various standards and regulations. There is a "pre-application" process to that can be utilized by the applicant to assure compliance prior to final submission. Doc. 84-4 at 24-25. The process takes time. *Id.* The statutory process requires public notice and an opportunity to be heard. *Id.* at 25. Any affected party, including existing providers, can receive a hearing before the Board. *Id.* A decision by the Board is then followed by a guaranteed right of appeal to Chancery Court. Miss. Code Ann. § 41-7-201. The point of this background is to demonstrate that just the CON Application is long process and can be taxing on both MSDH and the Board of Health.

As explained by Dr. Lampton, a 2- or 3-person operation[6] that is currently handling at most 18 applications a year, would be substantially affected even if there are only *nine* new applications in any given year. That's a 50% increase. There are over 4000 licensed PTs and OTs in Mississippi, including the Plaintiff. When other licensed

---

[6] Lampton Depo. Doc. 88-2 at 39:13-20. "A: Well, we do a very limited staff at the Department. Our whole CON process is handled by, I think, three full-time employees. And I think we have three others. So six people, half of them part time, do everything there is to do with CON. So they don't -- we don't have a lot of staff with time on their hands to do things that aren't critically important." *See also id.* at 97:2-10; *Id.* at pp. 183 -184 "The concern about -- you know, the reason to raise the moratorium or get rid of the moratorium would be that there would be a need for more home health. If there's not a need, then it would just be more work for my staff. From a purely selfish standpoint as a Department, I don't need to give my CON staff any work that's not essential for the public good, and it's not going to be acted on and gone forward with. So we have a very lean staff, and I think -- and that's not going to change. So any unnecessary work I would not want for my Department." 184:9-21.

professionals realize that Plaintiff has allegedly discovered a way to turn more profit (by increasing reimbursement from CMS as an HHA) it is completely reasonable to anticipate that many more than just nine others will follow Mr. Slaughter's lead. Processing unnecessary applications is a burden on the MSDH staff, the Board of Health, and the Court system. It is very logical to imagine that the Legislature might eliminate this unwarranted burden via the HHA Moratorium.

Plaintiff has repeatedly harped on the fact that there are now "only" 46 Home Health Agencies that operate throughout the state. Assuming *arguendo* plaintiff succeeds—and the doors are thrown open to all comers to become a qualified provider for Medicaid/Medicare as an HHA—only a small increase in providers would substantially increase the regulatory oversight by MSDH. *See* licensing director Glenn Woods Depo., Doc. 88-10 at 40:4-23. MSDH is not a private entity and does not have the ability to simply hire more qualified examiners on a whim. *Id.* at 61:3-9 ("it would stretch our resources very thin…"); 64:25-65:6 (not able to fill open positions). Not to mention that MSDH is hiring nurses as examiners and cannot come close to competing with private nursing on salary. *Id.* at 63:13-20; 66:2-6 ("what we've seen it tends to be salary driven. … the state cannot, you know, match what a nurse can get in the private sector right now."). A small increase could significantly impact the ability of the MSDH to provide effective oversight and protect HHA patients and the public health in general by assuring that consumers benefit from cooperative and effective regulatory oversight of HHAs.[7] HHAs send employees *into the homes of the most vulnerable* of Mississippi's

---

[7] Glenn Wood Depo at p. 53:8-13 "Q: Would it be impossible to conduct those complaint investigations if the moratorium were removed? A: I would still say it would make it more difficult. We would do the best we could with the resources that we had, but I don't know if it would be impossible or not … until we're actually faced with that."

patients. Hence, the Legislature's decision that Mississippi does not need 200 or 300 Home health agencies—to assure high quality services by maintaining a reasonable number of approved providers is therefore completely rational. *See also* Lampton Depo Doc. 88-2 at 189 ("in my 30 years, I have never heard anyone say we need more home health agencies."); *supra* FN 6. Thus, the Moratorium, which indisputably curtails the number of providers to a manageable number, is a valid legislative prerogative and does not violate constitutional provisions.

8.    <u>Maintaining a Reasonable Level of Providers Such That Administrative Oversight is Effective to the Benefit of HHA Patients is a Legitimate Purpose.</u>

Plaintiff continues that "even if the moratorium does make the government's job easier in some respect, that alone cannot justify the moratorium." *See e.g. Vlandis v. Kline*, 412 U.S. at 451 (1973) (the state's interest in "administrative ease" does not satisfy due process); *Plyler v. Doe*, 457 U.S. 202, 227 (1982) Doc. 89 at 15. However, when there is a consumer benefit related to the ability to maintain reasonable state oversight, the state's interest is valid. *Newell-Davis,* 2023 WL 1880000 at *4 ("In healthcare, limiting the number of regulated providers can increase the quality of services for consumers in a way that may not necessarily translate to other industries.").

In *Newell-Davis,* a panel of the Fifth Circuit upheld a health care "facility need review" regulation based on the state agency's argument that its "resource constraints [made] effective oversight impossible" absent the regulation. *Id.* at *4. Again, that case did not pertain to government payor services such as HHA. It had to do with "respite homes" located in New Orleans and oversight thereof. Respite homes are not "medical" facilities. *Id.* They are basically adult day-care. Thus, the state did not have the similar interests to CON as there was no cost containment or continuity/availability issues to

consider. Furthermore, and importantly, the Fifth Circuit said clearly that so long as there is a rational belief that the laws would benefit the consumer because of an economic statute which limits providers, and further the government's ability to provide oversight and not be overwhelmed, that is certainly a legitimate state interest. *Id.*

This is exactly what the Legislative Moratorium arguably does here. *See supra* at Section 7. It indisputably prevents consideration of new HHA applications for a CON. By this, it prevents the need for MSDH to consider unlimited amounts of applications for a CON that is not needed. *Supra* FN 6. The complicated process of the CON application, resultant hearings, public notice, and ultimately appeal to the Chancery Court are undoubtedly a waste of taxpayer resources if there is a universal agreement that there is no need for additional HHA providers. *Id.*

Separately, but related, an increase in HHA licensees that would require additional regulatory oversight would clearly cause an unreasonable burden to the agency. *See supra* at Section 7. Right now, MSDH conducts close oversight for 46 well-maintained and compliant HHAs and 107 branch offices. A small increase would necessarily cause problems. A big influx (*e.g.* another 50 licensees) would double the number of licensees and create an untenable situation.

The Legislature, in addition to maintaining the Legislative Moratorium for a number or years, also funds MSDH via appropriations. The Legislature can thus determine for itself that MSDH is at an optimal level to balance workload and competent administrative oversight to benefit Mississippi's public consumers. It is not a stretch to imagine that with twice as many licensees, MSDH's oversight could become overly burdensome, or in some cases impossible to maintain if all CON restrictions disappear

as Plaintiff requests. Again, the point here is that the Legislature is authorized determine that MSDH is at the appropriate staffing level and that there is simply no need for staff to be over-tasked because Plaintiff and those PT/OTs like him want to be able to recover additional funds from CMS reimbursement.

Plaintiff further argues that Moratorium is "not rationally tailored to preserve regulatory resources." Doc. 89 at 19. He claims that even if the State's desire to limit the demand for its regulatory resources were intended to benefit consumers in some way, it would still fail rational basis scrutiny because the moratorium is not a "rational way to put that limit into practice." *Id. citing Newell-Davis*, 2023 WL 1880000 at *4, n.2. Plaintiff then admits that *Newell-Davis* does not even address this issue, but nevertheless launches into a hypothetical analysis based on *dicta. Id.* There is no government payor in *Newell-Davis* and it's a wholly different set of circumstances. The Fifth Circuit nevertheless held that so long as there is some conceivable consumer benefit to the consumers of home health, related to the Moratorium, the law is to be upheld. *Id.* The similar consumer benefit here is that the Legislative Moratorium maintains providers at a reasonable number, so that the MSDH can effectively supervise HHA providers.

Moreover, despite Plaintiff's attempt to suggest otherwise, there is no requirement that the Legislature's solution to a perceived problem be accomplished by the "least restrictive means". *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott,* 748 F.3d 583, 594 (5th Cir. 2014)("[T]here is no least restrictive means component to rational basis review."). In fact, the State does not have to prove or disprove that the Moratorium accomplishes anything. Instead, all the state needs to

show is that the adoption of the Legislative Moratorium could rationally have been thought to maintain administrative oversight at a reasonable level, or to contain costs borne by the State as a result of its direct payor role in HHA. Both have been shown to exist and Plaintiff's argument therefore falls short.

As shown in the MSDH motion and here, if the Moratorium on HHA CON were to be struck down, there is clearly a very real chance that there will be a substantial number of new applicants who, like Plaintiff, cannot meet the requirements of CMS or the CON Laws, and are not needed based on current assessment. 18 applications across all industries are the most applications reviewed in recent history according to HMA report. Doc. 84-6. So, it would only take 20 new CON applications to exceed the busiest year in memory for MSDH. Separately, since there are only 46 agencies now according to Plaintiff, the theoretical grant of the CON and subsequent licensure of only those 20 new providers would be a 50% increase in the number of HHAs that would have to monitored. There are over 4000 licensed Physical Therapists or Occupational Therapists that would all immediately qualify to apply if Plaintiff's claim about the moratorium is given merit by this Court.

And even if, as a matter of a fact, Plaintiff could *prove* that there would be *no increase in MSDH workload*, it would *still* be rational for the Legislature, in its wisdom, to believe that by limiting the number of providers in any of the 19 covered health care facility types, the Moratorium (and the CON Laws in general) would prevent a substantial amount of burden or additional work on MSDH's planning and licensing divisions. *Supra* Section 7 and FN 6. Especially where there has never been a need shown. *Id.* Like the *Newell-Davis* case, the Legislature here could easily believe that,

because there are ample providers, and no demonstrations of a "need" for additional HHA providers, Mississippi consumers would benefit by virtue of close/constant oversight by MSDH of the state-limited number of HHA providers, as opposed to allowing open market access and less oversight.

Furthermore, regarding removal of the Legislative Moratorium, the Legislature could rationally believe that it should rely upon the Board of Health and MSDH to advise the bill-writers and policy makers in the legislative assembly if there is a global policy change needed for HHAs. Certainly, the regulators and planners would prefer discretion be provided to them, and Plaintiff attempts to make hay of this.  Doc. 89 at 13-14.  But personal preferences are irrelevant, as is the policy of a Commission that it preferred to be provided with discretion. Their preferences are understandable as all these people are/were regulators and appreciate discretion. But even a disagreement among the Legislature on the one hand, and the Board (or MSDH) on the other as to who should maintain discretion simply does not equate to irrationality when it comes to the *Legislature*. Lampton Depo Doc. 88-2 at 24:16-20 ("As far as moratoriums, you know, that's a legislative decision. It's not a CON decision.").

A board or agency's discretion to do or not do certain things is expressly authorized by the Legislature. In some instances, such as in 1979, discretion was afforded to the planning commission to oversee HHAs. The commission at the time installed the Administrative Moratorium and repeatedly reported to the Legislature that there was no need for additional HHA providers. Doc 85. at 5-7.  Hence, in 1983, the Legislature *took back* the discretion that it had extended four years prior. *Id.* at 8.

For all the reasons described this action by the Legislature can only be seen as intentional and rational.

**9.    The Legislative Moratorium Does Not "Target" Plaintiff or Home Health Start-ups.**

Plaintiff argues next that the Moratorium "inexplicably targets home health startups" such that it is unconstitutional.  Doc. 89 at 20.  However, Plaintiff has not pointed to any other similarly situated individuals who are treated differently. *See* Doc. 85 at 32-33. Instead, he points only to the distinction of those HHAs that existed prior to 1983, and those that apparently were conceived after the enactment of the Legislative Moratorium.  Doc. 89 at 20. The only distinguishing difference Plaintiff can cite is *the existence* of the authorized HHAs in 1983 at the time of adoption of Legislative Moratorium, and the *non-existence of* all other HHAs (or CON applicants) post-1983. This is not an example of inexplicable targeting.

Further, the text of statute itself proves definitively there is no target.  Miss. Code Ann 41-7-191(8).  The statute does not even directly *apply* to the Plaintiff.  In fact, the statute only applies to MSDH in that it prohibits MSDH expressly by its terms. The statute expressly states that unless an express exemption in another subsection applies, "no application shall be considered" for a new HHA CON. It similarly prohibits the other four enumerated facility-types. Doc. 85 at 8-9. The statute is on its face is a prohibition on MSDH considering new applications in an industry where there is no known or shown "need" for additional providers. The BOH and MSDH have never seen a demonstration of "need" for additional providers and have never made the recommendation to the Legislature that the HHA industry needs additional agencies. Lampton Depo. Doc. 88-2 at 198.

It is completely rational therefore that in 1983, and each time § 41-7-191 was amended without changing this provision, the Legislature could rationally believe that the Legislative Moratorium on HHA was in the best interest of the State and its citizens. The Legislature likewise could rationally decide not to remove the moratorium on new HHA CON applications unless and until there is a categorical recommendation of additional need within the HHA industry by the Board of Health. In the absence of such a recommendation, there is no ground for Plaintiff to invalidate the actions of the Legislature. *See supra FN 3.*

The only other alternative is that the Legislature could be convinced at any time by Plaintiff and his cohorts that their public policy argument is better than the State's existing policy on the HHA moratorium. Again, that's the way the legislative process works. Rational basis review by this Court is not an opportunity to weigh the merits of both sides of an obvious policy debate. *Planned Parenthood of Greater Texas*, 748 F.3d at 594 ("The fact that reasonable minds can disagree on legislation, moreover, suffices to prove that the law has a rational basis.").

As mentioned, Sullivan and Lampton's personal opinions about the Legislative Moratorium are wholly irrelevant to rational basis review. *See* Doc. 89 at 13. Everyone has an opinion, and some are more relevant than others. But in our form of government, only the elected representatives of the people are allowed to adopt new laws or amend existing ones. Further illustrating Plaintiff's error in asserting HHAs are singled out for abuse: there are four (4) other health care industries that are also on the Legislative Moratorium statute. Doc 85 at 8-9. This includes a complete ban on expansion of nursing beds with an exception for 1990. *Id;* HMA Report Doc, 84-6. It is hardly a targeted

situation when industries come and go from the Moratorium statute (which is extensive) based on changes in demographics, preferences, or demand for services.  Doc. 85 at 8-9. As explained, when this case was first filed, there were 6 facilities on the moratorium. *Id.*  In 2021, adolescent psych beds were removed from the list by the Legislature. *Id.* The moratorium is not "permanent" or "perpetual" when the Legislature can and will amend the list of facilities on the moratorium when there is a clear need or a recommendation from the Board that a facility be removed from the restrictions. The fact that the Legislature has not yet agreed with Plaintiff's policy position—and removed the HHA moratorium—does not render the law irrational.

Further, as shown by this year's recommendations to the Legislature, the Board clearly has no concerns about recommending that *entire facility types be removed from the CON law* requirements altogether.  Doc. 84-1; Doc 85 at pp. 3, 10.  Dr. Lampton also testified that in his role as chairman of the Board of Health, and CON Committee, he would have no problem recommending to the Board that the moratorium be removed, if there is sufficient demonstration of additional "need." Lampton Depo. 88-2 at 176-177:8. The system in place is set up such that the Board of Health reviews, studies and considers all data impacting the State as a whole. For the Legislature to rely on the obvious experts on the Board to make a global recommendation as to HHA needs—as opposed to having to conduct hearings *ad hoc* on each application—is rational and the Legislative prerogative must be respected. Unless or until the either the Board is convinced that a need for new HHAs is present such that it recommends removing HHA from the moratorium statute, or the Legislature is convinced to remove it based on the will of the majority, the HHA Legislative Moratorium should remain in place.

Lastly, Plaintiff has gone to great lengths to demonstrate that his side believes the Moratorium does harm to patient "access" in Mississippi.  Doc. 89 at 23. Even if Plaintiff is correct that he has proved the moratorium harms "access" or disproved the administrative benefits to consumers by limiting applications and licenses, the very real cost containment functions, continuity of care by maintaining patient censuses, and statewide availability benefits (and others) are still viable state interests that are furthered by both sets of laws at issue. *See* Doc. 85 at 18-27.

As described in a number of places, the CON Law and Moratorium provide "cost containment" to the government where the government is a payor of the vast majority of costs. This direct payor relationship is unique. Doc. 85 at 19. Cost containment here works by limiting the number of providers that can seek reimbursement from the State. *Id.* Despite assertions otherwise, cost containment does not have to be for the consumer. Cost containment may be for the government's benefit and is directly related to the number of providers seeking reimbursement. It is likewise related to keeping out of these highly regulated industries, providers that are unscrupulous or out-right frauds. Doc. 84-4 at 4(4).  As described by Sullivan, HHA is one of the industries that has been susceptible to bad-actors preying not only on HHA consumers, but also by virtue of out-right fraudulent submissions for HHA reimbursements. *Id;* Doc. 85 at 14.  It does not take an expert to understand that if an HHA does not have a fixed location for business, and all medical services are taking place in the patient's home, it is very difficult to determine whether the services billed have actually been performed prior to CMS issuing repayment. This potential fraud is very real and can be seen in the real experience of the state of Florida when it removed all barriers to entry such as Plaintiff

advocates here. *See* MAHC designee Becky Knight Depo., Doc 88-8 at pp. 12, 171-176 (discussion of effects on HHA without CON restrictions.).

Plaintiff argues that maintaining profitable margins, sufficient patient census, and economies of scale are only interests that relate to the rationale for the CON Law—not the Moratorium. Doc. 89 at 14. This interesting in that it admits at least three state interests are valid—but it is still wrong. CON Laws undoubtedly limit the number of providers in HHA, subject to the standards which apply in any given application. Plaintiff has repeatedly complained that the standards are too stringent because he has to prove "need." If, as shown in MSDH motion, and admitted by Plaintiff, CON laws limitation of providers improves cost containment, and keeps existing HHA's from going bankrupt, then it necessarily follows that a separate law (the Legislative Moratorium), which expressly prohibits the issuance of any new CON must also serve the same purposes. The fact that one law is redundant of another does not invalidate the rational basis for either of the laws. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery,* 226 F.3d 429, 440 (6th Cir. 2000)("belt-and-suspenders approach to regulation passes muster, because the redundant nature of the statute does not preclude its being rationally related to protecting Ohio consumers."); *see also Mech. Contractors Ass'n of New Jersey, Inc. v. New Jersey,* 541 F. Supp. 3d 477, 488 (D.N.J. 2021)(collecting cases).

## 10.    The CON Laws Are Constitutional

As demonstrated, MSDH is entitled to summary judgment in its favor as a result of the various state interests that were rationally believed would be furthered by the CON Laws. Doc. 84,85,82,83. Plaintiff has argued that the CON standards too difficult to show there is a "need" for additional HHAs. Plaintiff has even never tried. Lampton

Depo., Doc. 88-2 at 177:16-178:3.  A demonstration of need related to CON laws has previously been validated by this Circuit. *See Martin,* 86 F.3d at 1399–400. Plaintiff's failure to establish "need" is fatal to his claims.

Plaintiff further complains that the CON Application is expensive and difficult. Does that make it unconstitutional? No. As demonstrated above, the application process is also taxing on MSDH, the Board of Health and the courts.  Moreover, it is much easier to get a CON in Mississippi than in other states. Doc. 84-4 at 24. Plaintiff argues that existing competitors can "expand" to absorb any "need" that might exist. But this expansion of census is not instant and not automatic.  Sullivan Rpt. 84-4 at 31-32. Any alleged absorbing of need would have to get MSDH and Board approval prior to expansion patient census.

Additionally, even if Plaintiff is correct and he receives all the relief he has requested here, he won't qualify to be a HHA because he cannot meet the minimum threshold standards. Mr. Slaughter is not a nurse. The first requirement of a HHA is to provide "skilled nursing services". Doc. 84-4 at 5. CMS also requires the same qualifications. *Id.* Even if the CON Law and moratorium were removed, Slaughter won't qualify for reimbursement because he cannot meet basic requirements to provide nursing care.  As such, even if Plaintiff successfully defeats the Legislative Moratorium, so long as the CON requirements remain, Plaintiff will not qualify or have in alleged injury redressed. So, his arguments against the moratorium are truly moot.

Plaintiff again argues that the CON laws are protected by established competitors and that must mean the economic protectionism is the lone goal. Dr. Edney has previously addressed this issue. As described above and elsewhere, the cost

containment benefit is to the government where the government is the payor. Plaintiff again cites an inapplicable case *Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 985 F.2d 164, 167 (4th Cir. 1993). That case does not concern government payors for the service at issue and pertains to the public service commission of West Virginia's price controls. The State is not trying to control prices paid by consumers necessarily, the state is trying to control the number of reimbursement requests coming from trusted, verified and needed providers. Unlike *Medigen* or any other public service commission case, there is no claimed state interest here in "providing universal service at reasonable rates." *Id.*

Plaintiff states generally that "most states no longer have CON restrictions." In fact, 35 states have some form of CON or a related mechanism with regard to healthcare facilities. Doc. 84-4 at 10. Plaintiff can point to no case law supporting overturning CON as unconstitutional. Likewise, he also reiterates that the FTC and other agencies allegedly oppose CON. But Sullivan's report details that the FTC's order is unfounded, partial, and was hotly contested by a dissenting opinion that mirrors the position taken by MSDH. *Id* at 10-12. If anything, a federal agency's contested recommendation is not determinative, and in fact further demonstrates that the exact same debate Plaintiff now argues is settled, has been raging within multiple industries since the federal government mandated CON laws be passed by all states in 1975. As shown in the Motion of MSDH, there is an independent rationale for the CON Laws that it was wholly reasonable (and pretty obvious) that the Legislature could have been motivated to pass the CON Laws solely for the purposes of benefiting the State by assuring federal access

to federal funds that would have been withheld if the Mississippi Legislature did not adopt the CON Law.  Doc. 85 at 18-19.

The "access to care" interest of the state is much more complicated than Plaintiff pretends. Plaintiff may be correct in his reliance on *Medigen* and other cases to support his claim that "restricting market entry…necessarily limits available service because it limits the number of [providers] from which a [customer] can seek service."  Doc. 89 at 23.  But that statement is only true in a pure "free market" economic context. *See* Doc. 84-4 at 8-9.  *Medigen* is not a government payor situation and is inapplicable here. Instead, the HHA market is primarily one where the State is left paying the bill. Hence, the considerations are completely different from non-government pay industries, such as coffins, ambulances, or respite homes. Healthcare industry operations are, as explained by Sullivan, essentially the *opposite* of free markets. *Id.* Doc. 85 at 19-20.  As such, Plaintiff's assertion of similarity is misplaced.

Plaintiff also cites *Walgreen Co. v. Rullan*, 405 F.3d 50, 60 (1st Cir. 2005) (holding that pharmacy CON law "cannot reasonably be thought to advance" purpose of ensuring pharmacies in underserved areas) for the proposition that less providers equates to less access. This issue has been discussed frequently and is without merit. A private pharmacy is not primarily a government payor facility. Also, the CON laws expressly require that each applicant provide indigent services as a condition of their receiving a CON.  Doc. 85 at 24. Hence, the CON requirement provides a means for the State to assure access to indigent people, and availability of services to all Mississippians, not just those with insurance or money. *Id.* The determination in *Walgreen v. Rullan* is wholly inapplicable to the situation at hand.

As to the CON Law's improvement of healthcare quality, Plaintiff argues that in states where CON laws regulate provider entry into healthcare markets, incumbents "'tend to provide lower-quality services.'" Doc. 89 at 27. He claims this rationale extends to HHA via three studies relied upon by Plaintiff's expert Strattman. *Id.* All this *post hoc* study is wholly irrelevant to the question at hand: could the Legislature in 1979 have rationally believed that the CON Laws might improve quality of services for consumers. And on this point, the MSDH expert Sullivan has detailed the number of ways that CON laws may improve quality of services. Doc. 84-4 at 9, 18-23. At worst, this is another example of experts clashing and relying upon competing studies to support their own policy arguments. The issue of whether CONs improve quality of healthcare services is supported on both sides and should therefore be resolved in favor of the State. *Planned Parenthood of Greater Texas*, 748 F.3d at 594.

In conclusion, the CON Laws are supported by no less than six rational state interests that could reasonably have been considered to be furthered by the CON Laws. Many of the same state interests (plus additional consumer benefits furthered by reasonable oversight) apply to the Legislative Moratorium. The fact that both sides have evidence and experts to support their own policy positions is determinative and should resolve this matter in favor of the CON Laws and the Legislative Moratorium. Plaintiff's motion is simply not sufficient to meet the difficult burden that this Court rightfully requires prior to invalidating a lawfully (and rationally) adopted state statute. Plaintiff's motion should therefore be denied.

Respectfully submitted,
Dr. Daniel P. Edney, in his official capacity as the
Mississippi State Health Officer

BY:    LYNN FITCH, ATTORNEY GENERAL FOR
       THE STATE OF MISSISSIPPI

BY    /s/ Stephen Schelver
      Special Assistant Attorney General

STEPHEN F. SCHELVER, MSB # 101889
GERALD KUCIA , MSB # 8716
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3522
Facsimile: (601) 359-2003
Stephen.Schelver@ago.ms.gov
Gerald.Kucia@ago.ms.gov

## CERTIFICATE OF SERVICE

I, Stephen Schelver, Special Assistant Attorney General for the State of

Mississippi, do hereby certify that on this date I electronically filed the foregoing with

the Clerk of this Court using the ECF system thereby serving a copy to all counsel of

record.

This the 1st day of March 2024.

/s/ Stephen Schelver
 Stephen Schelver