**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CHARLES SLAUGHTER**                                                    **PLAINTIFF**

**vs.**                                          **Civil Action No. 3:20-cv-789-CWR-ASH**

**DR. DANIEL P. EDNEY, in his Official
Capacity as the Mississippi State Health
Officer**                                                                **DEFENDANT**

**MISSISSIPPI ASSOCIATION FOR
HOME CARE**                                        **INTERVENOR DEFENDANT**

---

**MISSISSIPPI ASSOCIATION FOR HOME CARE, INC.'S
MEMORANDUM IN SUPPORT OF RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

## <u>INTRODUCTION AND SUMMARY</u>

Charles Slaughter's Motion for Summary Judgment must be denied because Slaughter failed to negate the existence of a rational basis for the Mississippi legislature's adoption of Certificate of Need ("CON") laws for home health agencies, including the current moratorium on the issuance of new certificates of need for home health agencies.[1]

---

[1] Slaughter began his own memorandum explaining that the gist of his complaint in this action is that he believes Mississippi's CON laws prevent him from "offer[ing] in-home physical therapy to homebound patients." [89] at p. 1. Likewise, Slaughter's expert opined that "Mississippi's moratorium on the issuance of CONs for home health agencies has made it illegal for potentially interested providers to assist in meeting this [i.e., physical therapy services] increased demand." [87-2] at p. 27. Both Slaughter and Stratmann got it wrong. It is not illegal for Mr. Slaughter to perform physical therapy services in the home without obtaining a CON. *See, e.g.,* the Mississippi in-home physical therapy services advertised by In-Home Physical Therapy, LLC ("IHPT") at https://www.in-homept.com/about-us (last accessed February 13, 2024), [87-18]. IHPT's website shows that it does not provide nursing services and does not provide indigent care, so it is not a home health agency (that is, IHPT does not hold a CON). Thus, an additional reason Slaughter's motion should be denied is that he can already provide the in-home physical therapy services which is the subject of his complaint.

It is undisputed that Mississippi's CON laws[2] have legitimate purposes. The Mississippi State Department of Health[3] ("MSDH") states Mississippi's goals for its CON program for home health agencies as follows:

> to improve the health of Mississippi residents; to increase the accessibility, acceptability, continuity and quality of health services; to prevent unnecessary duplication of health resources; and to provide cost containment.

*See* 2022 State Health Plan[4], Exhibit 1 at p. 2. These are the same goals set forth in Mississippi's early State Health Plans. *See, e.g.*, Exhibit 2 at p. 1. Slaughter's memorandum does not argue that any of these goals are not rational. Instead, he argues that there is no rational basis for believing that Mississippi's CON program for home health agencies serve any of these goals. *See* [89] at pp. 15 ("[Slaughter] only needs to show that the moratorium causes some harm to consumers – all the while providing no public benefit") & 21 ("if the CON law fails to advance those purported goals or fails to be a rational way to achieve them, the law is unconstitutional").

Importantly, Slaughter's own expert admitted that Mississippi's CON laws "may have been well-intentioned forty years ago" when they were adopted – and this is dispositive. *See* [87-2] at p. 2; *see also* [87-3] at pp. 34 & 142-146. More specifically, Slaughter's expert, Thomas Stratmann, admitted that in the 1970s-1980s legislatures had a rational basis, or at least

---

[2] Miss. Code § 41-7-171, *et seq.* sets forth Mississippi's health care CON laws. Mississippi's moratorium on new home health agencies is part and parcel of Mississippi's CON laws. *See* Miss. Code § 41-7-191(1)(d)(ix) (imposing the CON requirement for home health agencies) and § 41-7-191(9) (imposing the moratorium on granting new CONs for home health agencies).

[3] Miss. Code § 41-7-187 charges MSDH with the duty to develop and implement the certificate of need program. When Miss. Code §41-7-171, et seq. was originally adopted, these duties were imposed on MSDH's predecessor, Mississippi Health Care Commission. *See* Exhibit 2.

[4] Miss. Code §41-7-185(g) imposes a duty on the MSDH to prepare and update a State Health Plan, which according to §41-7-173(t) is the "sole and official statewide health plan for Mississippi which identifies priority state health needs and establishes standards and criteria for health-related activities which require certificate of need review . . . ."

in his words a "scientific basis," for applying Roemer's law[5] in adopting CON laws.  *Id*.  Other than this admission, neither Stratmann's report nor Slaughter's memorandum contain any analysis at all relative to whether there existed a rational basis for the Mississippi legislature to adopt the CON laws either in general or specific to home health agencies—which is the only matter to be resolved in this action.

Instead, Slaughter is forced to base his argument on his selection and interpretation of *post hoc* studies analyzing *post hoc* evidence, that is, statistical evidence of results achieved after the enactment of Mississippi's home health CON laws.  He argues that this *post hoc* evidence shows that the laws are not effective in accomplishing Mississippi's stated goals.  But his arguments do not relate to the question at issue in this case: whether there was a rational basis for the legislature to adopt the CON laws in the first place.  As a result, Slaughter's motion for summary judgment should be denied.

Even if Slaughter were to persuade this Court to consider after-the-fact evidence of how effective Mississippi's home health CON laws have been, MAHC can still show that Mississippi is among several states with home health CON laws that lead the entire nation in quality of care,

---

[5] In a nutshell, Roemer's Law is an economic principle that, as applied to hospitals, if more beds are added, then the additional beds will be filled.  Given that the health care sector of our country is heavily regulated, governments came to believe that by controlling entry into the health care market, the fewer providers could develop a sufficient patient census to help contain the growth of providers' costs by spreading their costs among the larger patient census, and thereby, to help enable providers expand access to new services, to help enable providers expand service to rural areas and improve quality.  *See Martin v. Mem'l Hosp. at Gulfport*, 86 F.3d 1391, 1399–400 (5th Cir. 1996) ("Certificate of need programs are federally funded, state-administered regulatory mechanisms providing for review and approval by health planning agencies of capital expenditures and service capacity expansion by hospitals and other health care facilities. Their primary purpose is to discourage unnecessary investment in health care facilities and to channel investment so as to preserve and improve the quality of institutional health care").

access to care, acceptability of care and continuity of care.[6]  That is, Mississippi's home health

CON laws are indeed furthering the state's goals.

But at minimum, there is ongoing legitimate debate among both economists and home

health experts regarding the efficacy of home health CON laws. That alone mandates that

Slaughter's motion for summary judgment be denied.

## ARGUMENT

### I.    Legal Standard

Slaughter acknowledges that the rational basis test applies to his due process and equal

protection attacks on Mississippi's home health CON law, including the current moratorium.

Slaughter's memorandum does not argue that the MSDH's stated goals for its home health CON

program are not legitimate or that a rational basis failed to exist at the time the program was

adopted. Instead, he argues that *post hoc* evidence shows that the Mississippi home health CON

program does not meet the stated goals.

But this is not the standard by which the law is measured.  Indeed, the Supreme Court of

the United States has explained, "litigants may not procure invalidation of the legislation merely

by tendering evidence that the legislature was mistaken."  *Minnesota v. Clover Leaf Creamery Co*.,

449 U.S. 456, 464 (1981). As a result, the issue in this case is not whether Mississippi's CON

program is in fact effective; rather, the issues are (i) whether Mississippi's stated goals for its home

health CON laws are legitimate public purposes and (ii) whether the Mississippi legislature could

rationally have decided that Mississippi's CON program might further those purposes.  *See*

*generally, id*. at 466; *see also generally F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)

---

[6] CMS, by far the largest stakeholder payor of home health costs, publishes extensive data showing that Mississippi's home health agencies provide better quality of care, access to care, acceptability of care and continuity of care than states that do not have CON laws. *See* Exhibit 3, Exhibit 4, Exhibit 5 and Exhibit 6.

("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); *and see Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016)("'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it' *whether or not the basis has a foundation in the record*," (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993) (emphasis added)).[7]

    **II.**    **Courts have uniformly upheld constitutional due process and equal protection challenges to home health CON laws and health care CON laws generally because they are rationally related to legitimate public interests in the highly regulated health care sector.**

        **A.  Home health CON laws**

This is not a case of first impression.  Kentucky's home health CON laws have recently survived a similar constitutional challenge brought in a Kentucky district court – and that decision was affirmed by the United States Court of Appeals for the Sixth Circuit.  *See Tiwari v. Friedlander*, 26 F.4th 355 (6th Cir.), *cert. denied*, 143 S. Ct. 444 (2022) (affirming summary judgment finding that the CON laws were rationally related to legitimate governmental interests).  No case has found home health CON laws to be unconstitutional.

In the Kentucky case, the plaintiff sought a CON to open a home health agency for the unique purpose of serving a community of Nepali-speaking persons.  The CON was denied because the state agency found a lack of need.  The Sixth Circuit affirmed.  *See id*.

---

[7] *See also Hatten v. Rains*, 854 F.2d 687, 691 (5th Cir. 1988) ("The statute withstood rational basis review, even without any scientific evidence."); *see also Sheffield v. City of Fort Thomas, Ky.*, 620 F.3d 596, 614 (6th Cir. 2010) ("to pass rational-basis scrutiny, ordinances need not be supported by scientific studies or empirical data; nor need they be effective in practice"); *Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 487–88 (1955) (explaining that a statute passes rational basis scrutiny where "there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"); *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 77 (2001) (laws do not lack a rational basis merely because they are "out of harmony with a particular school of thought").

The Sixth Circuit first observed that the state's desires of increasing cost efficiency and improving quality of care were legitimate goals and that the "only question is whether the law serves this objective, whether a rational connection exists between its ends and its avowed means—namely, increasing cost efficiency, improving quality of care, and improving the healthcare infrastructure in place." *Id*. at 363–64. The court then made the following findings regarding the rational connection between the need restriction, on the one hand, and cost efficiency and quality of care, on the other.

> *Start with cost efficiency.* One could plausibly think that, by tailoring services to need in a given market, current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations. Providers could use their enhanced purchasing power to buy supplies and equipment at reduced prices. The increased patient volume also could permit the companies to spread fixed costs across more patients.
>
> *Move to quality of care.* The State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service. Whether by the downstream benefits of achieving scale or the quality-improving expertise and specialization that come from repeated services within a market, the State could plausibly think that the certificate-of-need program would increase quality in one way or another.

*Id.*

Tiwari made the exact same arguments as Slaughter makes here, even using the same expert who expresses here the same opinions and the same grounds for his opinions as he did for Tiwari, all based on *post hoc* evidence that he argues show that the home health CON law goals are not being met. However, the Sixth Court specifically responded:

> The problem for the challengers is that this is not the inquiry. "The Constitution does not prohibit legislatures from enacting stupid laws." *N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 209, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (Stevens, J., concurring). A claimant does not prevail in a rational-basis case simply by severing the stated links between a law and its rationales with on-the-ground evidence that undermines the law—or showing that the lived experiences of the law have not delivered on its promises. The courts would be busy indeed if a law could be invalidated whenever evidence proves that it did not work as planned. Our custom instead is to assume that democracy eventually will fix the problem. That

is because our Federal "Constitution presumes that, absent some reason to infer antipathy," flawed laws will "eventually be rectified by the democratic process." *Vance*, 440 U.S. at 97, 99 S.Ct. 939.

*Id*. at 365. But the Sixth Circuit did not stop there.  The court went on to hold that Tiwari's cost-benefit attack must also fail because the Fourteenth Amendment does not even impose a cost-benefit requirement:

> The other problem with [Tiwari's] argument turns on the limited role the Fourteenth Amendment has to play in this area. Whatever the substantive limits of the Due Process Clause may be, they do not establish a cost-benefit imperative. The defect with certificate-of-need laws is rarely that there is *no* rational benefit to them in a heavily regulated industry like healthcare. The real problem, and the most potent explanation for criticizing them, is that the costs of these laws—needless barriers to entry, protectionism for incumbents, the improbability of lowering prices by decreasing supply—*outweigh* their modest regulatory benefits. Yet it is precisely such weighing of costs and benefits that is so beyond judicial capacity. Who among us can identify a principled basis for concluding that some laws involve an irrational weighing of costs and benefits while others do not? Once we identify a plausible rational benefit of a law, the policymaking calculation of whether to adopt the law in the face of competing costs is eminently a legislative task, not a judicial one. Any other approach would require us not just to decide whether a plausible rational basis exists but then to balance out the totality of costs and benefits, a value-laden task that no two judges could ever do in the same way—and that even the same judge might do differently at different times during his tenure. It is one thing when legislatures enact laws on an ad hoc and inconsistent basis. It is quite another when judges remove them from the democratic process on an ad hoc and inconsistent basis.

*Id*. at 365-366.  In response to Tiwari's argument that the CON law harms quality of care, the Sixth Circuit also held:

> But we cannot say that it is irrational for a legislator to think otherwise about the law's merits, at least in the healthcare market, a market that has been heavily regulated for decades and in which the State is a buyer and a seller. . . .
>
> . . . Healthcare is uniquely complex, with "its own idiosyncrasies," and with many different metrics upon which to gauge success. *Colon Health Ctrs.*, 813 F.3d at 158. It is at least rationally possible for legislators in Kentucky (and 15 other States) to think that "the unique aspects of the health care market [ ] affect the behaviors of consumers and producers in ways not encountered in other industries." (internal citation omitted)

*Id*. at 366.

When faced with similar challenges supported by similar evidence, both the district court and the court of appeals found that the plaintiffs had fallen short of the requirements imposed by the rational basis test.

### B.  Courts have uniformly upheld health care CON laws generally

With respect to challenges to CON laws in the healthcare sector generally, courts have similarly held the laws are rationally related to legitimate governmental interests – and have done so by granting summary judgment. *See, e.g., Newell-Davis v. Phillips*, 592 F. Supp. 3d 532 (E.D. La.), *aff'd*, 55 F.4th 477 (5th Cir. 2022), *opinion withdrawn and superseded on denial of reh'g*, No. 22-30166, 2023 WL 1880000 (5th Cir. Feb. 10, 2023), *cert. denied*, 144 S. Ct. 98, 217 L. Ed. 2d 25 (2023); *Birchansky v. Clabaugh*, No. 417CV00209RGERAW, 2018 WL 10110860 (S.D. Iowa Oct. 17, 2018), aff'd, 955 F.3d 751 (8th Cir. 2020); *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535 (4th Cir. 2013); *Goodin v. State of Oklahoma ex rel. Oklahoma Welfare Comm'n, Dep't of Institutions, Soc. & Rehab. Servs.*, 436 F. Supp. 583 (W.D. Okla. 1977); *Madarang v. Bermudes*, 889 F.2d 251 (9th Cir. 1989) ("The Commonwealth has a legitimate interest in preventing the establishment of unneeded facilities. . . . The CON regulations are rationally related to preventing "duplication of facilities and services and to encourage the development of such facilities where they are needed").

For example, just last year, in *Newell-Davis*, 2023 WL 1880000, at *4, the Fifth Circuit upheld Louisiana's "Facility Need Review" law (akin to a CON law) against due process and equal protection attacks, in part by recognizing that, unlike other commerce, the health care sector is highly-regulated, which justified the Facility Need Review as a rational tool to seek to achieve perceived benefits such as increasing quality:

> . . . where a government wishes to create consumer benefits by limiting new entrants
> to the already highly-regulated market for healthcare services, it may use any

rational tool to implement that limit—so long as there is a "real" link between the tool and the benefits.

. . . .

In healthcare, limiting the number of regulated providers can increase the quality of services for consumers in a way that may not necessarily translate to other industries.

In sum, there is a well-established pattern of upholding CON laws in the healthcare sector.

### C. Economic protectionism does not render CON laws unconstitutional.

Slaughter argues that Mississippi's home health CON law is unconstitutional because it grants economic protectionism to a limited group of providers, but the Fifth Circuit rejected this same argument in *Newell-Davis*:

> However, we have recognized that a law is not necessarily irrational merely because it is "motivated *in part* by economic protectionism." *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 240 (5th Cir. 2011) (emphasis added). Sivad-Home has not established that economic protectionism is the only motivation behind the FNR program.

*Id*. Candidly, the very nature of any CON law obviously imposes some degree of so-called protectionism. But in a highly regulated market like home health care where the government has a heavy role in assuring accessibility, acceptability, continuity and quality of care as well as setting prices and being the responsible source of payment for care,[8] some degree of protectionism is actually needed to ensure stability.

In *Martin v. Mem'l Hosp. at Gulfport*, 86 F.3d 1391, 1399–400 (5th Cir. 1996), the court explained that the "primary purpose [of CON laws] is to discourage unnecessary investment in health care facilities and to *channel* investment so as to preserve and improve the quality of institutional health care." (emphasis added). While this case was not addressing the constitutional

---

[8] In 2020, Medicare was responsible for paying for 74.2% of all home health care in the state, private insurers paid another 23.5%, and Medicaid paid for 1.95%. *See* Exhibit 7 at pp. ii & 43.

question raised by Slaughter, it does implicitly recognize the rational basis for CON laws generally notwithstanding some degree of protectionism.    Referring to Mississippi CON laws, the court approvingly observed that:

> The Mississippi statutes demonstrate that *the state legislature clearly contemplated anticompetitive conduct* by (1) authorizing a hospital to enter an exclusive contract with a single individual to operate any aspect, division or department of its operations, including its ESRD facility, and (2) requiring a hospital to obtain a certificate of need, based on criteria such as population base and projected caseload, prior to establishing a health facility.

*Id.* at 399 (emphasis added). This observation is significant because the main thrust of Slaughter's complaint is that Mississippi's CON program for home health care is anticompetitive.   MAHC acknowledges that the existing moratorium prevents the entry of new home health agencies, but that is merely one corollary of the moratorium.   While the Mississippi legislature does not maintain a history of the underlying rationale for the passage of statutes, in 1983 the Legislature clearly believed that there was not a need for additional home health agencies at that time and the foreseeable future and thus sought to ease the regulatory burden on the MSDH to have to process CON applications for such agencies.

Slaughter and Stratmann both acknowledge that if the home health CON law were removed, new competition will cause existing agencies to lose patient census, forcing each existing agency to "simply scale back its operations." [89] at p. 22 & Exhibit 8 at p. 17.   However, they ignore economic common sense that the first operations for the existing providers to scale back would likely be (i) service to the remote rural areas that can only be justified by having sufficient patient census in the more populated areas and (ii) types of services that can only be economically justified by sufficient patient census.   Either way, common sense leads to the conclusion that the likely result is less access to care for a significant group.

### D.  "Basic economic theory" does not render CON laws irrational.

Slaughter and his expert argue that home health CON laws are not rational because they defy "basic economic theory" of "supply and demand" and their "sole purpose is to protect existing providers from competition."  *See* [89] at p. 1 and Exhibit 8 report at pp. 2-3, 7-8, 15, 20 & 30. But "basic economic theory" recognizes that healthcare behaves differently.

N. Gregory Mankiw is the Robert M. Beren Professor of Economics at Harvard University. Mankiw is the author of the textbook *Principles of Economics*, Cengage Learning, 10th Edition (2023) used in Harvard's two course study of Principles of Economics and having sold over two million copies.  As one might expect, just like Slaughter's expert, Stratmann, Mankiw's text is a strong advocate for free competitive markets based upon a "standard benchmark model of supply and demand."   However, unlike Stratmann, Mankiw devotes an entire Chapter 12 on "The Economics of Healthcare" in which he begins by candidly acknowledging that the health care market differs "radically" from the standard benchmark model of supply and demand:[9]

> **The standard theory of how markets work is the model of supply and demand**, which we studied in Chapters 4 through 7. That model has several notable features:
>
> > **1.** The main interested parties are the buyers and sellers in the market.
> > **2.** Buyers are good judges of what they get from sellers.
> > **3.** Buyers pay sellers directly for the goods and services being exchanged.
> > **4.** Market prices are the primary mechanism for coordinating the decisions of market participants.
> > **5.** The invisible hand on its own leads to an efficient allocation of resources. For many goods and services, this model offers a reasonably good description.
>
> **Yet <u>none</u> of the five features of the standard model reflects what occurs in the market for healthcare.** The healthcare market has consumers (patients) and producers (doctors, nurses, etc.). But various factors complicate the analysis of their interactions. In particular:
>
> > **1.** Third parties—insurers, governments, and unwitting bystanders—often have an interest in healthcare outcomes.
> >
> > **2.** Patients often don't know what they need and cannot evaluate the treatment they are getting.

---

[9] *See* Exhibit 9, excerpt from *Principles of Economics* at p. 228.

**3.** Healthcare providers are often paid not by the patients but by private or government health insurance.

**4.** The rules established by these insurers, more than market prices, determine the allocation of resources.

**5.** In light of these issues, the invisible hand can't work its magic, so the allocation of resources can be highly inefficient.

**Healthcare is not the only good or service in the economy that departs from the standard model of supply, demand, and the invisible hand.** (Recall our discussions of externalities in Chapter 10 and public goods in Chapter 11.) **But healthcare may be the most important one that departs radically from this benchmark.** Examining the special features of this market is a good starting point for understanding why the government plays a large role in the provision of healthcare and why health policy is often complex and vexing. (emphasis added).

Mankiw goes on to explain the reason the health care market works so radically different than the benchmark model of supply and demand is because of "externalities galore," and in healthcare, as he describes, "externalities are rampant." *See* Exhibit 9 at p. 229. A few of these externalities include the large role of the government and private insurers in setting prices, paying for services, and providing, but also controlling, access to care and quality of care. Another significant externality is that many people view health care as a fundamental right.

Neither Stratmann's report nor Slaughter's memorandum takes into account, or even addresses, the indisputable fact that the healthcare market departs radically from their economic theory of open markets with unregulated competition based on supply and demand.

### III. The Moratorium is a red herring – the real issue for Mr. Slaughter is Mississippi's entire home health CON law

#### A. Slaughter's real attack is against Mississippi's need requirement, but he has not provided evidence of need

After first several pages bemoaning Mississippi's long-standing moratorium on the issuance of CONs for new home health agencies, Slaughter acknowledges that the heart of his attack is really the entire home health CON law. [89] at p. 8. That is, even if this Court were somehow to find the moratorium unconstitutional, Slaughter acknowledges that he would still be

denied a CON because he says he cannot meet the need requirements of the State Health Plan for a new home health agency. If this Court determines, as it should, that the MSDH had a rational basis for including need requirements in the State Health Plan for a new home health agency, then this Court should declare Slaughter's constitutional challenge to the moratorium to be moot. That is, it would not serve any legitimate purpose to address the moratorium given that Slaughter admits he cannot meet Mississippi's need requirement.

Slaughter complains that Mississippi's home health CON law requires that he prove the existence of a need. [89] at p. 8.  However, that train left the station so many years ago that today no additional authority to those cited above should need to be cited supporting that there was a rational basis for legislatures to believe need requirements are appropriate in the health care sector. Indeed, Slaughter failed to cite any authority at all that need requirements in general, much less Mississippi's specific need requirements, are unconstitutional.

### B.  Past positions taken by the MSDH and personal views of others regarding the moratorium are not material.

Slaughter argues that "the moratorium is so irrational that the State's own witnesses are unwilling to defend it." [89] at p. 2.  But Slaughter overstates the testimony – and its significance.

In support of this argument, Slaughter first observed that in the 1980s the Mississippi Health Care Commission (predecessor to the MSDH) stated the position that it preferred not to have a legislative moratorium so that it would retain control of such decisions. [89] at p. 7. However, that is a far cry from saying the moratorium is irrational.

Second, Slaughter touts a small excerpt from the deposition of Dr. Lampton expressing his personal belief that a moratorium is "overreach." [89] at pp. 13-14. Dr. Lampton was a Rule 30(b)(6) designee who gave a deposition on behalf of MSDH.  Dr. Lampton was appointed a member of the Mississippi State Board of Health ("MSBH") in 2006 and has remained a member

to this day.  *See* Exhibit 10, Lampton deposition, at p. 7. He served as Chairman from 2007 to 2017 and was recently reappointed Chairman.  *Id.*  He has served as Chairman of the Board's CON Committee from 2007 to the present.  *Id.*

Slaughter misinterprets Dr. Lampton's testimony as support for his argument that there is no "legitimate purpose served by the moratorium." [89] at p. 13. Dr. Lampton actually testified to the contrary.  In view of Slaughter's twisting of Dr. Lampton's testimony, further discussion is warranted.

To be sure, MAHC is well aware that Dr. Lampton did testify to his personal view that he preferred not to have a moratorium so that such decisions would be made by the MSDH.  However, his testimony in no way suggests that the moratorium is irrational.  In fact, Dr. Lampton explained to the contrary that his understanding of the original rationale for the moratorium was that there was a proliferation of home health agencies at a time when there was no need for additional agencies and the legislators "just were trying to restrain inappropriate development of unnecessary services . . . the moratorium was that it was largely put there because there was not a need":

> Q. Okay. But in the 1980s and the early '90s, when home health agencies were kind of the cash cows as you said, would you maybe expect a proliferation of home health agencies back then?

> A. Well, I think it occurred, and I think that's why they had the moratorium from my understanding. And there probably were concerns. There were much more concerns, as I said, in the original process about the impact on Medicaid dollars. And at a national level CON was being pushed for Medicare. They just were trying to restrain inappropriate development of unnecessary services. You know, that was the thought then. But I do think -- my understanding from discussions over the years about the moratorium was that it was largely put there because there was not a need. That we had such a proliferation during the high period that the state was well covered and blanketed. And what I've seen is a retraction, like I said, with the -- it's a major historical thing that the Department of Health which was one of the largest home health care providers in the entire state shuttered theirs.

> Q. So that legislative moratorium you believe may have been needed to deal with that proliferation in the '80s, but you don't think it's needed anymore?

THE WITNESS: I still think we should have had it based on need. If there wasn't a need, why do you have a moratorium. Now, the only reason that the moratorium is good is if there is no need, we don't need people making a lot of applications. And thinking about staff time. You know, I don't -- if it's not going to make any difference if we don't have need. But I would like to think that -- but I still think for a CON process to work, moratoriums are legislative overreach.

Q. (By Mr. Rice) Okay.

A. Now, they had their reasons. And the reasons might have been very good. And sometimes -- and I think what the legislative process was thinking was that the need was met.

. . . .

. . . And I think one of the reasons that the moratorium has lasted so long is there hasn't been an extraordinary need. There have been enough providers to provide the services in all the regions of the state. And I think that's why there hasn't been impetus to remove it. But I think somebody -- it is our duty to be assessing that need. And we are assessing that need. I do not know how we do it on an annual basis, though, or semi -- whatever time period we do that.

*Id*. at pp. 41-43 & 47.  It is readily apparent that while Dr. Lampton personally believes a moratorium is an unnecessary legislative "overreach," the moratorium was rationally established in the 1980s and is still in force because there remains a lack of need for additional home health agencies to this day.

Dr. Lampton offered strong evidence of the lack of need for additional home health agencies by explaining that the excess of home health agencies was the very reason the MSDH, which used to own many home health agencies in districts covering the entire state, has shut them all down specifically due to lack of need:

Q. You had talked about, again, going back to if there's a moratorium are we looking at need. Do you know if the Department is assessing need for home health?

A. Yes, I have specifically asked with my involvement here as what was our need. And currently right now there is no need for additional home health services, is what our need formula states. As a practicing physician, one thing -- and I'm on – I'm a medical director at one home health agency and I've been at a another. St. Luke's Home Health in McComb, I'm the medical director there. What I have seen is the number of home -- home health is kind of undergoing a lot of stress

right now. I think hospices has had a significant impact, insurers have had a significant impact. And St. Luke's Home Health that I work for used to have a massive [patient] census. And its census has gone down significantly. I don't think I've had any problem getting any patient on home health ever during my practice. You know, I think there have always been a good number of home health agencies. And, in fact, the number of home health agencies -- Dr. Cobb was the one that sort of started home health in the state within the Department and he was afraid -- he was thinking about access to care. And if you recall, if you look in there, there's -- the Department has a significant history of being involved in home health services. Each county had a home health agency, and it evolved where they became districts. And so down where we were in south Mississippi, it was district -- whatever our district is. But each district ended up – and they were very good home health agencies. That's one thing the Department did exceedingly well. But Dr. Cobb's reasoning to do it was he wanted to provide the service until it was no longer needed. And he didn't really feel that was our role as an agency, but that he thought that it needed to be established in Mississippi. So he started it -- doing a lot of the department work. Now, since I've been on the Board of Health we have stepped back and I don't think we do -- I think we have closed our final home health agency. That was a significant thing that the Department was doing.

THE WITNESS: And y'all may know, do we have any more? I guess I shouldn't ask them. Forgive me. But I remember when we closed them -- and I didn't want to close them for the Department. I felt like that it was something that -- they were in rural areas. But looking at the data then, and I think that was five years ago, there was absolutely no need for them anymore. And the work they were doing was being fulfilled by other home health agencies. And with the reluctance, the Board voted to shut down its home health agencies because of the lack of need.

*Id*. at pp. 30-33.

MDHS's testimony, through Dr. Lampton, was clear: there is no current need for additional home health agencies.

### C.  Slaughter failed to provide evidence of need

Despite beginning his memorandum telling the Court he wants to open "a safe, *needed* business," [89] at p. 1, Slaughter tacitly acknowledges that he has no evidence of a need for a new home health agency. [89] at p. 8.  That is, instead of offering the Court any evidence of need for a new home health agency, he challenges Mississippi's need requirement as unconstitutional under the due process and equal protection clauses. One can readily see the circularity of Slaughter's

argument first telling the Court there is a need for a new home health agency and then complaining that he is required to show a need. Indeed, other than hand-waving about Covid -19, Slaughter has not even attempted to present this Court any evidence of a need that would justify opening a new home health agency in Mississippi.  This realization should take the Court full circle to conclude that Slaughter's attack on the moratorium is moot at this time because nothing will be accomplished going down this rabbit trail given that, after obtaining all the discovery he desired, Slaughter has not shown the Court any evidence of a need for additional home health agencies. Moreover, why should the Legislature focus its attention on the moratorium at a time when there is no real evidence of significant unmet needs?

The lack of need for a new home health agency after more than forty years of the moratorium clearly shows that Mississippi's home health CON laws, which currently include the moratorium, have achieved stability for home health patients' access to needed care.

Lest there be any doubt, Dr. Lampton directly testified that for at least the past 30 years there has not been a need for an additional home health agency:

> Q. To your knowledge, have you ever -- staff ever received comments challenging the criterion or the numbers that are used in the State Health Plans? Are you aware of any public comments challenging those numbers in the State Health Plans?
>
> MR. DAVIS: Are you referring to the -- as it relates to home health agencies?
>
> Q (By Mr. Schelver) Yes, yes, as it relates to home health agencies?
>
> A. No, I'm not aware of any. But we've gotten a lot of comments about a lot of things over the years. And the other thing is you can come to a Board of Health meeting. Once they have the hearing, before we vote on something, we allow public comment to the Board. That was somewhat hampered by COVID, but public comment is allowed to address the issues that we're going to vote on.
>
> Q. Let me just ask one last question and make sure I'm clear. You said earlier that other than this -- well, you said earlier that in your 40 years you've never heard from anyone that there is a need from additional home health agencies in Mississippi; is that correct?
>
> A. I do have gray hair, but it's only been 30 years.

Q. 30 years. Thank you very much for your time.

A. It feels like more at times. But in my 30 years, I've never heard anyone say we need more home health agencies.

*See* Exhibit 10 at p. 189.

### D. The growth of home health population and consolidation of CON-holding home health agencies are not evidence of need

Instead of showing this Court any need for a new home health agency, Slaughter simply argues generally that the home health patient population has grown substantially from the early 1980s to the present and that the number of CON-holding home health agencies has declined. [89] at pp. 3-4.  This is not evidence of a need, but rather is proof that the CON law is working in that the existing home health agencies have been able to maintain stability in the Mississippi home health sector by steadily growing with the growth in patient population.

Slaughter suggests that consolidation of home health agencies is somehow negative.  In fact, courts have recognized that part of the rationale of CON laws is that the laws will tend to "to channel investment so as to preserve and improve the quality of institutional health care." *Martin*, 86 F.3d at 1399–400; *see also Tiwari*, 26 F.4th at 363-364 ("current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations . . . . The increased patient volume also could permit the companies to spread fixed costs across more patients. . . . The State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service").

Dr. Lampton confirmed that consolidation is a natural occurrence under CON laws because of the positive effects of economies of scale:

Q. And we had talked earlier today, I think at the very beginning of the deposition about some of the pressures in the home health industry that caused that to happen nationally. And I guess my question is, with this -- if this information is

accurate and Mississippi is towards the bottom of that, you know, with more consolidation than the rest of the nation, do you think there's a reason for why Mississippi is more consolidated?

[Objection omitted]

THE WITNESS: Well, I think I've said several times that I think the economies of scale and the math are more helpful for a larger company than a smaller company.

Q. (By Mr. Rice) That's true nationally, right?

A. Yeah. The complexity of services. I would also wonder with declining censuses, or at least what as a provider I have seen in my practice where the home health agency seemed to be taking care of -- there's more competition for their censuses and their patients. The more competition in some settings in health care doesn't always allow those companies to make money. And the ones that have a lot of providers, I'm amazed that there are not any closures. But, I mean, every state is different, every situation is different. But I know my involvement as a medical director at St. Lukes, I've seen that company lay off staff and struggle. And it's a fine home health agency and operates well. So there are a lot of stresses on that health care environment.

Exhibit 10 at pp. 164-165.

> ### E. Slaughter complains that Mississippi's need requirement treats him differently from existing home health agencies.

Slaughter complains that he is required to prove that existing "'need' is 'equivalent' to 50 patients," while home health CON holders can "increase their staffing and capacity to absorb any new 'need' below that same [need] threshold." [89] at pp. 8-9. But that is precisely one of the reasons for the CON law need requirement. That is, part of the rationale behind the law is that by limiting the number of home health agencies, individual agencies can help contain their costs by spreading costs among more patients. For example, in a rural setting, it is easy to perceive that a physical therapist making a trip to a remote part of a county can be much more efficient if his agency has enough patients to be able to schedule additional patients one trip instead of having to make multiple trips down the same time-consuming route. If demand increases over time, it fulfills one of the goals of the law if an existing agency can simply absorb that new need. It is also easy to perceive that with more and more patients, the existing home health agency can better afford to

provide new and expanded services. This ultimately benefits the overall patient population. Again, the Fifth Circuit expressly recognized this rationale in *Martin*, 86 F.3d at 1399–400 ("primary purpose [of CON laws] is to discourage unnecessary investment in health care facilities and to channel investment so as to preserve and improve the quality of institutional health care"); *see also Tiwari*, 26 F.4th at 363-364 ("One could plausibly think that, by tailoring services to need in a given market, current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations . . . . The increased patient volume also could permit the companies to spread fixed costs across more patients. . . . The State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service").

### F.  The moratorium did not impede access to home health during Covid-19

Slaughter argues that Covid-19 created a dramatic unmet need for additional home health services. [89] at pp. 2-3 & 26.  However, Mississippi's annual report on home health agencies for the year ended December 31, 2020, the peak period of Covid-19, shows only a small increase of the total unduplicated patients served from 89,410 in 2015 to 94,280 in 2020. *See* Exhibit 7 at pp. i & 2.  More telling is that the total number of home health admissions actually declined from 123,291 in 2015 to only 114,070 in 2020,[10] and the total number of home health visits decreased from 3,474,371 in 2010 to 2,623,784 in 2015 and further down to 2,368,252 visits in 2020. *Id.* at p. ii, 40, 65 & 74.

Dr. Lampton also confirmed the decline in need for home health care over the past decade:

A. . . . I mean, from my personal experience and from talking with staff, I doubt there's going to be a need for more home health services in the state based on that. It's just the health care environment doesn't really seem to need that right

---

[10] The number of admissions is more than the number of patients because some patients are admitted more than once during the year.

> now because there is a retraction in demand for home health services compared to a decade ago.

*See* Exhibit 10 at p. 49. *See also*, Exhibit 11 ("Total Medicare home health visits decreased by nearly 14 percent, with more significant decreases in therapy visits relative to nursing visits").[11]

### G. The Mississippi moratorium on home health agency CONs is subject to annual review

While the Mississippi legislative moratorium remains in effect, that does not mean it has been ignored. The Mississippi Legislature comes into session annually and has repeatedly updated the CON laws over the past 40 years.[12] In addition, the MSBH is charged by law with the annual duty "to review the statutes . . . affecting public health" and to recommend needed legislation to the Legislature. Miss. Code Ann. § 41-3-6. The MSBH does not determine its recommendations in a vacuum. In his deposition, Dr. Lampton explained that the MSDH has long relied on the general public to call to its attention perceived health care needs. *See, e.g.,* Exhibit 10 at pp. 174-177. The MSDH reports to the MSBH, after considering concerns expressed by the public as well as its own investigation. The MSBH then considers that information as well as the results of its own reviews in deciding whether to make recommendations to the Legislature regarding the CON laws in general, including the moratorium in particular. *See, e.g., id.* at pp. 174-177.

The current moratorium does not preclude any citizen, including Mr. Slaughter, from informally presenting to the MSDH evidence demonstrating a need for additional home health agencies. However, Dr. Lampton was not aware of Mr. Slaughter or others having done so.

---

[11] *See* https://www.commonwealthfund.org/publications/issue-briefs/2022/jun/changes-medicare-home-health-use-during-covid-19 (last accessed March 1, 2024).

[12] The CON laws were amended in 1989, 1990, 1992, 1993, 1994, 1995, 1996, 1998, 1999, 2001, 2002, 2003, 2004, 2006, 2007, 2010, 2011, 2012, 2014, 2015, 2016, 2019 and 2020. *See* Miss. Code §§ 41-7-173, 41-7-191 & 41-7-201.

Testifying on behalf of the MSDH, Dr. Lampton explained its position that at this time there remains no need for new home health agencies in Mississippi, and that thus there is no need to ask the Legislature to abolish the current moratorium. When asked what the Department would do if a provider came to the Department and explained that it had met the criteria (e.g., with 50 patients of more of unmet need), he stated that "[i]t would be brought to the CON committee that would vet it. And we'd probably get some experts to study it and then bring that to the full Board." *Id.* at p. 176, lines 4-7. He continued, "if we felt like there was a need for more home health care that moratorium needed to be lifted, we would -- I would have no hesitation about recommending to the full Board, and they would be supportive of that, to the legislature to do that. But that would be done after we would do our homework." *See id.* at p. 176, lines 17-25. But Dr. Lampton was clear that "[t]his case is the first time I've heard of any discussion of unmet needs or unprovided services in the health care industry in Mississippi. Since 2006 I haven't heard anything." *See id*. at 177, lines 16-19. In fact, he later clarified, "[I]n my 30 years, I've never heard anyone say we need more home health agencies. *Id*. at p. 190, lines 6 – 18.

That is not to say that the MSBH has sat idly by. The MSBH has long had a CON committee, of which Dr. Lampton has been a member, which has periodically held meetings for the primary purpose to "protect the interests of the citizens of the state," for example, by furthering "their access to care in the state." *See* Exhibit 10 at p. 11, lines 23-25, line 19. Outside health care providers, health care attorneys, experts and other interested members of the public have been invited to participate in CON committee meetings. In fact, at the present time the MSBH has engaged outside experts to undertake a wide-ranging "extensive study" of the State Health Plan and the CON processes in general, including as they relate to home health agencies. *Id*. at pp. 152, line 22 – 159, line 23. Dr. Lampton explained that those experts are not "looking at just what we

do, although we're focused, but what's being done around the rest of the country, what are trends going on in states that are retaining CON, how is it evolving. And in states that have it that have taken it away, what have been the negative consequences and the positive consequences." *Id*. at pp. 181, line 16 - 182, line 3.

Dr. Lampton explained that there is ongoing debate as part of this study whether to modify any of the CON laws, whether to phase out the CON laws over time or even whether to abolish the CON laws altogether. *Id*. He continued, explaining that this is partly because no two states' CON laws are alike and no two states' circumstances are alike. He emphasized, though, that Mississippi has its important and own unique circumstances that must be considered in deciding whether to keep its CON laws in force:

> what we may have different than some is a poor population, a fragile health care system, and we have a population with extraordinary social determinants that are going to impact their ability to access care. . . . Really, it's about poverty. We are struggling, so the question with CON is does CON help us take care of our population in the best manner. And if it does so, I think we as a Board of Health need to say we think that it does help with health planning and with health strategy, how can we make it more effective and less burdensome to the system.

*Id*. at pp. 182, line 4 – 183, line 4.

The importance of CON laws to support home health care in rural Mississippi counties cannot be overstressed. "Home health care has evolved over the past four decades to become an essential element in the continuum of care for patients following an acute hospitalization, or patients with chronic conditions." *See* Exhibit 12, Expert Report of Daniel J. Sullivan at p. 5. If the home health CON laws and moratorium were removed, then Mississippi's rural areas would suffer the most adverse effects. *See* Exhibit 13, Becky Knight deposition at pp. 184, line 6 – 185, line 24 ("Because, again, to even operate with positive margins, you have to have a patient population that's going to support that" and a reduction in patient census caused by new market

entrants would most adversely affect rural areas because "you would tend to migrate to those geographies where the density of that patient population was greater").

As recently as the year 2020 and again in 2021, the Mississippi Legislature considered, but refused to act on, bills to lift the statutory moratorium on the issuance of CONs for new home health agencies.  *See* 2020 H.B. 606; 2020 H.B. 605; 2021 SB 2747; 2021 H.B. 602.  Thus, it is clear that the Legislature has intentionally decided that the legislative moratorium should remain in effect at least until the current legislative session.

### IV.   Mississippi's CON laws for home health agencies are rationally related to MSDH's goals

As previously noted, much of Slaughter's constitutional challenges to Mississippi's home health CON law, including the moratorium, are based on *post hoc* literature and what he claims is *post hoc* "empirical evidence." [89] at pp. 13 & 15. As previously explained, this Court should reject Slaughter's arguments based on *post hoc* literature and so-called empirical evidence. Nevertheless, to the extent the Court may decide to indulge these arguments or otherwise choose to analyze these arguments to attempt to glean whether portions of the arguments are proper, MAHC will respond to those arguments as part of its overall following discussion.

### A.  There is a rational basis for the moratorium

Through Miss. Code Ann. §41-7-171, et seq., the Mississippi Legislature delegated to the MSDH responsibility to establish a State Health Plan including setting the desired public health goals to be achieved as well as the means of achieving those goals by implementing CON criteria. The MSDH did so and continues to update the State Health Plan periodically.  No one questions the authority of the Legislature to delegate this authority to MSDH.

Likewise, it should be obvious that, having delegated powers to the MSDH, the Legislature had and has the continuing authority to place limits on the delegated powers of MSDH. Thus, in

the 1980s the Legislature decided to issue a moratorium on the issuance of new CONs for home health agencies. That does not mean that the State Health Plan public health goals or CON criteria are in any way modified or abridged. It simply means that the Legislature determined that home health care was so rapidly evolving that the Legislature wanted hands on involvement in any further expansion of the number of home health agencies.

Mississippi is largely a rural state with several larger population centers. While Mississippi statutes do not offer a legislative history, it is entirely plausible to believe that by taking direct control over the number of home health agencies, the Legislature could thereby assure CON holders a sufficient patient census so as to encourage them to expand coverage to all corners of the state and gradually grow in a stable manner keeping up with growth in demand over time. As previously noted, over time, the CON holders sufficiently achieved that goal such that the MSDH shut down all of its own home health agencies that had been serving districts spread all across the state. To use Slaughter's term "empirical evidence," MAHC will discuss below the truly independent and substantial "empirical evidence" garnered by the Centers for Medicare and Medicaid Services ("CMS") showing that, under the current moratorium, Mississippi along with other CON states is leading the nation in the quality, accessibility, acceptability and continuity of home health care.

Without citing any authority, Slaughter argues that Mississippi's moratorium must have some unique rational basis separate and independent from all of the rational bases for the remainder of Mississippi's home health CON laws. [89] at pp. 14-15. In fact, the rational bases are essentially the same plus the additional plausible basis discussed above. The rational bases held in common are addressed in separate sections below.

**B.  Mississippi's home health CON law makes sense.**

Slaughter argues that CON laws "do not make sense in home health." [89] at p. 21. Slaughter's argument unwittingly caught him in his own trap when he declared "if a home health agency experiences a decline in demand [which would be the result of opening up home health to wide open competition], *it will simply scale back its operations*." [89] at p. 22 (emphasis added). MAHC agrees that is precisely what would happen. Defendants' expert, Dan Sullivan said it best:

> There is little question, however, that the removal of CON regulation of home health services in Mississippi will result in greater duplication of existing services and diminished volumes for existing providers, thus adversely impacting existing providers' ability to continue providing services in poorer, less populated rural counties.

Exhibit 12 at p. 15. MAHC need not say more.

### C. Mississippi's home health CON laws are rationally related to the goal of cost containment.

Slaughter argues "[t]he evidence is clear that CON laws do not lower costs." [89] at p. 22. This raises two questions. What is this "clear evidence"? Why is he talking about "lower costs" instead of Mississippi's goal of cost "containment"?

### 1. Slaughter has no "clear evidence"

For "clear evidence," Slaughter first cites his expert, Stratmann's report where he opines as to what "[e]conomic theory predicts." *Id*; *see also* Ex. 8, Stratmann report at p. 7. However, as discussed above, Professor Mankiw explains that the health care sector defies basic economic theory. Exhibit 9 at p. 228. To be sure, Stratmann backs his theory by citing a "working paper" authored by one of his colleagues listing a number of published articles. *See* Exhibit 14. However, none of these articles addresses home health care costs and certainly not home health care costs in Mississippi. Instead, they all purport to analyze only hospital and nursing home data. *Id.*

Second, Slaughter tells this Court that the defendants' expert, Dan Sullivan, agrees that "the existing body of research shows that CONs do not reduce costs." [89] at p. 22. Nothing could

be further from the truth.  Slaughter referred the Court to the following four lines of Sullivan's deposition:

> 16 So I mean, these studies say what they
> 17 say, but I've just never seen anything that I
> 18 thought definitely proved that Certificate of Need
> 19 doesn't have some effect on costs.

It is perfectly clear that Sullivan did not agree with Stratmann, but rather he said the articles cited in Stratmann's colleague's working paper do not prove that a generic[13] CON law "doesn't have some effect on costs."  Even more importantly, Slaughter omitted the important context immediately preceding the four lines quoted above:

> Q. Okay. Does that kind of literature affect – these peer-reviewed studies [referring to the studies listed in Stratmann's colleague's working paper], do they affect your opinions about CON and its effect on cost and prices?
>
> A. I certainly take it into consideration, but, you know, I think in my report, I describe the limitations with the available data that these various studies are based on. You know, you – at best, you're working with very imperfect data. Some cases, it's only a subset of the total universe of patients that are being served, if you're looking at Medicare data. The data in these administrative data sets is not particularly robust in terms of allowing for controls of – of differences among states, and there's also the concern that I have about the fact that not all CON programs are equal. There's a lot of variation in CON programs from state to state, and there's regional variation in utilization of services that goes beyond whether they have Certificate of Need regulation or not. You know, if you look at some of the Dartmouth analyst – analysis, they point out that even within the same state, there might be dramatic differences in utilization rates and consumption rates of various types of services. So I mean, these studies say what they say, but I've just never seen anything that I thought definitely proved that Certificate of Need doesn't have some effect on costs.

Exhibit 15 at pp. 107-108. Here, Sullivan plainly explained that it is not proper to use the articles on which Stratmann relies to draw conclusions concerning the impact of a generic CON law on costs because the data used in these articles is not robust and there is too much variation in CON

---

[13] The term "generic" is used here because there is no indication in either the question asked or Mr. Sullivan's answer that Mr. Sullivan was referring to Mississippi's home health CON program given that the articles he was referencing only analyzed hospital and nursing home CON laws.

laws from state to state.  This is entirely consistent with Mr. Sullivan's report wherein he cited articles which concluded that CON regulation reduces cost to payers or that CON programs afford providers the ability to operate more efficiently from a cost perspective. *See* Exhibit 12 at p. 13. Ultimately, Sullivan concluded that both the articles he cited and the articles Stratmann cited suffer from the same weaknesses referenced in his testimony above resulting in a lack of consensus and ongoing debate among experts:

> Given the complexity of health care markets and the difficulty in isolating causal relationships between observed data and CON regulation, it is not surprising that there is debate among experts regarding the effectiveness of CON programs in controlling costs. . . .

*Id.* at p. 15.

Third, Slaughter argues that his expert's report cites several articles which concluded that home health CON laws may not lower costs. [89] at p. 22.  These articles are addressed in more detail in MAHC's memorandum in support of its motion to exclude Dr. Stratmann. [87 ] at pp. 12-20.  Suffice it to say here that none of these articles analyzed Mississippi's home health CON program.

## 2.  Mississippi's home health CON program does provide for cost containment.

Even if it were correct that the CON laws do not lower costs to those who pay for the healthcare services, as Slaughter contends, that entire argument is not relevant because it wholly fails to address the fact that Mississippi's goal regarding cost is different.  Mississippi's stated goal is "cost containment," not "lower costs."  "Cost containment" is a reference to the ability of the providers to "contain," that is manage or control, their own costs, which is primarily achieved

through economies of scale.[14] When a provider is able to contain its costs, it is better able to serve a broader public in rural areas.

To be sure, following his irrelevant discussion regarding "lower costs," Slaughter does briefly argue that Mississippi's home health CON program does not "promote economies of scale." [89] at p. 23. Slaughter relies on an internal memorandum written by Federal Trade Commission employees and one article which both *predict* that there will not be any economies of scale for home health agencies in a CON state.

However, defendants' expert, Dan Sullivan, testified to his personal knowledge and experience in working with home health agencies that the CON program does in fact lead to economies of scale:

> Q. Okay. So does a more recent study like this with a conclusion like it has here, does that affect your analysis of the relationship between CONs and the ability to realize economies of scale?
>
> A. It does not.
>
> Q. Why not?
>
> A. Because based on my understanding of the operations of home health agencies, I believe that there are economies of scale that can be achieved.
>
> Q. And that's based on your personal observations?
>
> A. Well, personal observations and actual experience working with existing home health agencies.
>
> Q. Have you done -- aside from your experience working with home health agencies, have you done any analysis on the relationship between CONs and the ability for HHAs to realize economies of scale?
>
> A. I mean, I certainly looked at the issue of fixed costs versus variable costs in home health agencies before when I was offering testimony about economic feasibility of a proposed project, but that's the extent of the analysis that I've done.
>
> Q. You said you had looked at it, I believe is what you just said.
>
> A. I analyzed it.
>
> Q. Okay. When you say "analyze," what does that entail?

---

[14] Cost containment is obviously also a desire of the payors such as Medicare and Medicaid.

A. I got actual historical data, looked at the categories of expenses and was able to classify those into fixed and variable categories.

Q. Did you publish anything from those findings?

A. I did not.

Q. What were your findings?

A. There was a material level of fixed expenses in home health agencies. I mean, it's not like a hospital or an ambulatory surgery center, but it's not an insignificant level of -- of fixed expenses.

Q. Do you have any reason to believe that a CON regulation for home health agencies in Mississippi would be any more or less effective than a CON regulation for home health agencies in other states?

A. I think -- I think I -- at least one basis would be the rural nature of Mississippi. I mean, there are some other states, most of those are in the Southeast, that have large numbers of rural counties, and so I think it's certainly important to Mississippi, it would be important to those other states that have significant numbers of rural residents that are the most vulnerable to losing access to home healthcare.

Exhibit 15 at pp. 175-179.

Moreover, Dr. Lampton testified regarding the importance of achieving economies of scale in the home health care sector:

. . . Whether it's a positive thing or not, the economies of scale play a role with home health right now. And it's very difficult for a mom-and-pop operation to make the math work. It's just the layers of complexity -- and there are layers of complexity. . . . And with all of that the health care environment changes where one of the bigger factors, I think, with home health right now is the insurance reimbursement. I find it – you know, if you're having to send people to a house and the time it takes to do that and the declining reimbursement, the home health agencies are really struggling. And they used to could keep people for long periods. They have much shorter periods. And so their ability to maintain their staff with large censuses has been really impacted. So it's a very difficult market, you know.

. . . .

. . . . And the economy of scale -- also the economy of scale can help with being able to handle the administrative burden and the cost of operation and the competence of an organization, if they have policies that sort of require certain -- I mean, that's one of the reasons you see some of the bigger hospices, some of the bigger home health agencies are better run because they have policies that are broader and more informed from often national or statewide operations rather than just I'm a business person running a business.

. . . .

Now, behind the scenes -- and I say this from a personal standpoint, it's frequently discussed in all aspects of health care, you know, for a hospital to survive it's got to maintain a census for this. And in the health care world, that's what most people from clinic ownership to -- if they don't see a certain number of – if they don't have a certain census they can't pay their overhead. Most of them are aware – you know, most rehab facilities know, this is how many patients we've got to maintain in order to pay our bills. Any health care provider that says he's not aware of census and numbers, that's part of the math, you know, and part of the market forces at work with what they're dealing with. And it's more complicated than that, of course, okay? But so much of it goes back to census. If you maintain a certain census you can survive, and if you don't -- that's why probably CON has survived so long is the fear of fragile health care institutions with very little margins. And they're worried about losing any patients and it affecting their ability to survive.

Exhibit 10, Lampton deposition t pp. 35, -36, 51 & 167-168.

### D.  Mississippi's home health CON is rationally related to improving access to care

Slaughter has not negated that the CON laws are rationally related to improving and maintaining access to care.  Slaughter theorizes that, "by definition," CON regulation limiting the number of home health agencies means less access to care. [89] at p. 23. As if to make his point, Slaughter observes that "Mississippi is ranked 'towards the bottom' nationally for home health agencies per capita." This is an irrelevant red herring.  It is a red herring because home health agencies are not the providers, but rather they provide the providers.  Thus, the fact that Mississippi has fewer home health agencies simply means that each agency has more nurses, physical therapists, occupational therapists and other medical providers on staff to meet the demands in their coverage area.

If being "ranked 'towards the bottom' nationally for home health agencies per capita" meant Mississippians have less access to home health care, then one would expect Mississippi to rank "towards the bottom" in the number of home health agency visits per capita.  To this end, the latest available Mississippi annual report on home health agencies shows that in 2020 more than

75% of home health agency visits were reimbursed by Medicare.  Thus, actual CMS data is highly relevant to Slaughter's theory and actually negates it by showing that Mississippi is ranked the very highest state in the nation in age 65+ patients per capita receiving home health care. *See* Exhibit 12 at pp. 19-21.  This is a strong showing of effectiveness of Mississippi's goal of improving access to care through its CON program, which includes the moratorium.

Slaughter next makes an interesting, but factually incorrect, argument that "CON laws are (undisputedly) associated with less rural care." [89] at p. 24.  He says his argument "makes sense because, again, CON laws *prohibit* care." *Id*. However, nothing in Mississippi's home health CON law prohibits needed care, rather the law simply limits the number of agencies responsible for employing the providers who take the care to the patient. Slaughter's argument is "interesting" because Slaughter's only support for the argument is his expert, Stratmann's report discussing rural hospitals and rural surgery centers and a court opinion regarding rural pharmacies.  However, home health care is very different from *hospitals, surgery centers and pharmacies*.

Home health agencies take the provider to the patient's home instead of the patient coming to the provider.  The argument against limitations on the number of hospitals, surgery centers and pharmacies is typically that it may harm rural patients' access to care because of the distance they have to travel to receive the care.  The need is the opposite in the case of home health care.  The home health agency needs to have a sufficient patient census in order to be able to afford to send providers to rural areas to give those patients access to care.[15]

The whole purpose of Slaughter's pursuit of this action is to open up free market competition and thereby to substantially lessen the patient census of existing CON holders. Slaughter admits that if he is successful, then the existing CON holders' only remedy will be to

---

[15] *See* Exhibit 16, Deposition of Warren Thornton at p. 89 at ll. 8-20 ("an AccentCare in Copiah County couldn't function with 25 patients.").

"scale back [their] operations," which necessarily means cutting out unprofitable services to rural areas.

Slaughter next says that "this Court has noted, 'this case involves artificial limitations on at-home health care during the height of a global pandemic.' MJP Order (Doc. 32) at 13." [89] at p. 24. That was not in fact a finding of this Court. Instead, this Court merely observed that was its interpretation of what Slaughter was alleging in his Complaint, which of course the Court was required to accept as true for the sole purpose of deciding MAHC's motion to dismiss.

On pages 24 – 26 of his memorandum, Slaughter discusses inadmissible, unsworn hearsay regarding correspondence from a home health agency to the MSDH for the purpose of attempting to prove the existence of a home health care crisis in Mississippi during the Covid-19 pandemic. This Court should not consider this argument and Exhibits 28 and 29 because they are based on inadmissible, unsworn hearsay.

Finally, Slaughter cites data from Mississippi's 2020 annual report on home health agencies. MAHC certainly agrees that these annual reports are a source of relevant data. As if to suggest Mississippi did not meet patient home health care access to care needs during the pandemic, Slaughter observed that in 2020 "2,337 Mississippians were denied referral to a home health agency because they 'lived outside [the] licensed service area'," and "[a]nother 811 patients were denied a referral because the 'needed service [was] unavailable.'" [89] at p. 26. However, nothing in the report suggests that any patients did not receive home health care that they needed. Instead, this is simply a conglomeration of individual home agency reports. Thus, the mere fact that a patient was outside the authorized service area of one home health agency does not mean that the patient did not then contact a home health agency in his service area. The mere fact that

needed service was not provided by one agency does not mean the patient did not receive the care from another agency that provides that type of service.

Contrary to Slaughter's arguments, the 2020 annual report for Mississippi home health agencies does show that instead of Covid-19 increasing the need for home health care visits, the number of visits during the 2020 height of Covid-19 actually decreased from 2,623,784 in 2015 down to 2,368,252 visits in 2020. Exhibit 7 at p. ii, 40, 65 & 74.

Slaughter's evidence simply does not negate that it is rational to believe that the CON laws promote access to care by stabilizing patient census at existing agencies to ensure they can continue offering the variety of services to the same geographic scope.

### E. Mississippi's home health CON law is rationally related to improving quality, acceptability and continuity of care

Slaughter argues that Mississippi's home health CON program is not rationally related to improving quality of health care. It should be noted that Slaughter nowhere argues that Mississippi's home health CON law is not rationally related to improving acceptability and continuity of care. For those reasons alone, Slaughter's motion for summary judgment should be denied.

Regarding quality of care, notwithstanding his claim that he was going to show this Court "empirical evidence," Slaughter's memorandum failed to show any metrics and comparisons at all by which to assess his claim that Mississippi's home health CON law has no rational relationship to improving quality. More importantly, Slaughter totally ignored the important and undisputed "empirical evidence" provided in the well-recognized metrics and comparisons by which CMS, the payor of the vast majority of home health claims, measures home health agencies nationwide regarding quality of care, access to care, acceptability of care and continuity of care published on the CMS website.

CMS has been gathering data to measure the quality of home health care on a state by state basis for a number of years.  Archived annual reports of portions of this data dating back to 2012 are available on-line.  *See* Exhibit 5.[16]   These reports summarize data provided by patients nationwide scoring home health agencies in five categories: (i) percentage of patients who ranked their HHA either 9 or 10 on a 0 to 10 scale with 10 being the highest, (ii) percentage of patients who would definitely recommend their HHA to family and friends, (iii) percentage of patients who said their HHA provided care in a professional way, (iv) percentage of patients who said their HHA communicated well, and (v) percentage of patients who reported their HHA discussed medicines, pain and home safety. *Id*.  Mississippi has either led the nation or tied within the top five states in every category from 2012 to the most recent report through June 2023. In almost every year the other top contenders were Alabama, Kentucky, Louisiana, Vermont, West Virginia, all states with a CON law for home health agencies.[17]

In 2015 CMS began publicly reporting a new home health care Star Rating System measuring the quality of home health care services provided nationwide, on a scale from 1 to 5 with 5 being the highest, based on a number of the key metrics, including (i) how often home health care begins in a timely manner, (ii) how often patients improve walking and moving around, (iii) how often patients improve getting in and out of bed, (iv) how often patients improve bathing, (v) how often physician recommended actions are completed timely, as well as other metrics. *See* Exhibit 3.[18] The system ranks individual home health agencies and also provides each state a Star Rating as well as state by state comparisons for each of the metrics. *Id*.  One can readily observe

---

[16] https://homehealthcahps.org/General-Information/Archived-Publicly-Reported-Data (last accessed February 26, 2024).

[17] *See* https://www.ncsl.org/health/certificate-of-need-state-laws.  Louisiana refers to its law as a Facility Need Review or FNR instead of a CON..

[18] [2014-12-11. Home Health Compare Star Ratings _ CMS]. https://www.cms.gov/newsroom/fact-sheets/home-health-compare-star-ratings (last accessed 2-27-2024).

that these metrics are also relevant to the issues of improved access to care, acceptability of care and continuity of care.

CMS chose these metrics, in part, because it made a finding that (i) these measures include "sufficient data" for a "substantial proportion of . . . patients . . . and agencies," (ii) these measures "have high face validity and clinical relevance," (iii) these measures are "stable and [do] not show substantial random variation over time." *Id.* The data is generated through nationwide patient surveys in which patients respond to questions concerning each of the metrics listed above as well as others.

CMS has published and now archived these Star Rating Reports from 2015 to 2024. *See composite* Exhibit 6.[19]  Mississippi has received a 4 Star Rating in every report from 2018 to the present. No state has received a Star Rating higher than 4. The only other states to receive a 4 Star Rating in all reports since 2018 were Alabama and Tennessee, both of which have a home health CON law.  Almost all of the other states and territory receiving a 4 Star Rating in any one or more years since 2017 have a home health CON law. Moreover, Mississippi has consistently ranked highest or among the highest in each of the key five metrics listed above in these reports.

The significance of the CMS data cannot be overstated.  Although Slaughter and his expert both either ignored or down-played CMS data, they have recognized its importance in the past. The Ohsfeldt and Li (2018) article, *State Entry Regulation and Home Health Agency Quality Ratings* (the "Ohsfeldt study") on which Stratmann relied heavily in his report was based solely on CMS quality ratings for home health agencies from 2010 to 2013.

---

[19]        *See*        https://data.cms.gov/provider-data/search?fulltext=Home%20Health%20Care%20-%20State%20by%20State%20Data (last accessed 2-27-2024) and https://data.cms.gov/provider-data/archived-data/home-health-services (last accessed 3-1-2024).

**F.  The fact that reasonable minds can differ requires that Slaughter's motion for summary judgment be denied.**

As discussed in MAHC's memorandum in support of its motion to exclude Dr. Stratmann, the peer-reviewed Rahman study on which Stratmann relied expressly concluded:

> Finally, our findings contribute to the *longstanding debate among health policy researchers* about the intended and unintended consequences of CON laws.

[87] at pp. 14-15.  This finding plainly confirms that there still exists debate among reasonable experts regarding the effectiveness of CON program goals regarding reducing costs.  This should be dispositive against any suggestion that no rational basis existed, or even no longer exists for that matter, for the adoption of Mississippi's home health CON program based on the goal of reducing costs alone.  *See Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) ("The fact that reasonable minds can disagree on legislation, moreover, suffices to prove that the law has a rational basis . . . .  This rule of restraint is particularly important in the realm of constitutional adjudication for a simple reason. If legislators' predictions about a law fail to serve their purpose, the law can be changed").

## <u>CONCLUSION</u>

For all the reasons set forth above, MAHC respectfully requests that the Court deny Slaughter's motion for summary judgment.

This the 1st day of March, 2024.

MISSISSIPPI ASSOCIATION FOR HOME CARE

By: */s/ Paul N. Davis*
PAUL N. DAVIS (MB #8638)
THOMAS L. KIRKLAND, JR. (MB #4181)
CAROLINE B. SMITH (MB #105501)

ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
1020 Highland Colony Parkway
Post Office Box 6010
Ridgeland, Mississippi 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) paul.davis@butlersnow.com
(E) tom.kirkland@butlersnow.com
(E) caroline.smith@butlersnow.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Paul N. Davis, do hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 1st day of March, 2024.

*/s/ Paul N. Davis*
Paul N. Davis

86255429.v1