**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
NORTHERN DIVISION

---

CHARLES SLAUGHTER,

*Plaintiff,*

v.                    NO. 3:20-CV-789-CWR-ASH
                      ORAL ARGUMENT REQUESTED

DR. DANIEL P. EDNEY,
IN HIS OFFICIAL CAPACITY AS THE
MISSISSIPPI STATE HEALTH OFFICER, ET AL.                    *Defendants.*

---

**PLAINTIFF'S RESPONSE TO STATE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

### INTRODUCTION

Plaintiff Charles Slaughter is a licensed physical therapist who wants to expand his services to offer in-home physical therapy. But Mississippi is the only state in the nation that has imposed a moratorium on new home health agencies for the past 43 years. Even if the moratorium did not exist, the state's CON law would bar him from opening unless he could prove he was needed.

Thus, the question here is whether the moratorium and CON law are a rational way to improve the healthcare system. In trying to answer that question, the State ignores the real-world facts and instead offers a world in where speculation wins no matter how one-sided the facts. The rational-basis test is not, as the State suggests, a hollow standard. It is an inquiry that courts are both trusted and obligated to undertake. Plaintiffs may negate each asserted justification using evidence and reason. Mr. Slaughter has done so here.

Because the moratorium and CON law serve only to protect existing providers from competition, they fail rational basis review. But the right to earn a living is a fundamental right and should be protected accordingly.

**ARGUMENT**

**I.    THE CONSTITUTION PROTECTS A FUNDAMENTAL RIGHT TO EARN A LIVING.**

In *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the Supreme Court clarified the framework for determining when a right is "fundamental" and thus entitled to a heightened protection: it must be "deeply rooted in this nation's history" and "essential to our Nation's 'scheme of ordered liberty." *Id.* at 2246. The right to earn a living fits squarely within that framework. Born in the struggle for freedom from the crown in England and later used to protect freedmen from the Black Codes, it arguably has more of a historical pedigree than other unenumerated rights deemed fundamental. *See Golden Glow Tanning Salon, Incorporated v. City of Columbus, Mississippi*, 52 F.4th 981 (5th Cir. 2022) (Ho, J., concurring). Under the Fifth Circuit's current approach, however, laws that interfere with the right to earn a living in a chosen occupation are subject to rational basis scrutiny. *Id.* at 979. Thus, while the CON law and moratorium are invalid under any level of scrutiny, Plaintiff explains below that the right to earn a living is a fundamental liberty, to preserve that argument for appeal. Plaintiff also shows that judicial inquiry under any level of scrutiny should be undertaken recognizing that the core purpose of the right to earn a living is to protect against total bans on entry into lawful occupations.

**A.  The Right to Earn a Living Is Deeply Rooted in Our Nation's History and Tradition.**

The right to earn a living has "deep roots in our Nation's history and tradition." *Id.* at 981. The right to enter a "known established trade" was "among the most cherished principles in English law," dating back as far as the 14th century. *See, e.g.*, Timothy Sandefur, *The Right to Earn a Living*, 6 Chap. L. Rev. 207, 209-17 (2003).

This right was recognized over a century before the Founding; was developed and defended by English common law courts; and remained sacred to the Founders. *Id.* at 982–83.

"Representative John Bingham, one of the primary drafters of the Fourteenth Amendment, later explained that 'our own American constitutional liberty. . . is the liberty. . . to work an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil.'" *Id.* at 983 (quotation omitted).

**B.  The Right to Earn a Living is Essential to our Nation's Scheme of Ordered Liberty.**

In addition to being deeply rooted, the right to earn a living is also essential to our Nation's scheme of ordered liberty. Indeed, it is "essential to ensuring the ability of the average American citizen to exercise most of their other rights." *Id.* at 984. The Supreme Court has recognized that "[t]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41 (1915). The right has even been called "the most precious liberty that man possesses." *Barsky v. Board of Regents of Univ.,* 347 U.S. 442, 472 (1954) (Douglas, J., dissenting). The Supreme Court continues to recognize the importance of this right today. *E.g. Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 280 n.9 (1985) ("[T]he pursuit of a common calling is one of the most fundamental [] privileges" protected by the Fourteenth Amendment.").

The right to earn a living is fundamental. It was carried over from English common law and is deeply rooted in American tradition. It is a prerequisite for the exercise of most other cherished rights. It should be protected accordingly.

**C.  The Right to Earn a Living Emerged to Prevent Total Bans on Entering Occupations.**

Throughout American history, states have imposing licensing requirements on certain professions "for the protection of society." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).  So

long as the standards for qualification are "appropriate" and "attainable[,]" the Supreme Court has held that licensing laws do not "deprive one of his right to pursue a lawful vocation." *Id.*

Total bans on entering a profession, however, are far removed from this tradition. Rather than setting standards equally attainable by all, a ban on market entry bestows the right to work in an occupation on a "privileged class" and "shut[s] the door" to everyone else. *Smith v. State of Texas*, 233 U.S. 630, 638 (1914). History and tradition show that this is precisely what the right to earn a living was developed to protect against.

The right to earn a living emerged in "the struggles between the Crown and the courts over the problem of monopoly[,]'" *Golden Glow Tanning Salon,* 52 F.4th at 981 (Ho, J., concurring) (quotations omitted), a term that was understood at the time to include not only exclusive grants to a single provider, but also exclusive grants to a favored group of providers, like a guild. *See The Tailors of Ipswich Case*, 77 Eng. Rep. 1218, 1219 (K.B. 1614) (Coke, C.J.). In the century following the Founding, state courts consistently defended the right to earn a living free from total bans on entry to the market. *See McRee v. Wilmington & Raleigh R.R. Co.*, 47 N.C. (2 Jones) 186, 190 (1855) ("'[T]he people' who were then exercising the highest act of sovereignty – that of making a government for themselves, forbade the creation of monopolies and put an end to all such as then existed."); *Norwich Gaslight Co. v. Norwich City Gas Co.*, 25 Conn. 19, 37 (1856) (holding that "the whole theory of a free government is opposed to such [exclusive] grants[.]"); *Davis v. City of New York*, 14 N.Y. 506, 524 (1856) (holding a city "had no power to grant ... a [monopoly] franchise[.]"); *Shepherd v. Milwaukee Gas Light Co.*, 6 Wis. 539, 547 (1858) ("Odious as were monopolies to the common law, they are still more repugnant to the genius and spirit of our republican institutions[.]").

4

In 1868, the Fourteenth Amendment was ratified. Protecting against total bans on entering occupations was one of the primary aims of the framers. After slavery was abolished, states sought to subjugate freed blacks through "Black Codes" which deprived them of numerous rights, including the right to enter lawful occupations. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 234 (U.S. 2023) (Thomas, J., concurring). "The Black Code of Mississippi, for example, 'imposed all sorts of disabilities' on blacks, 'including. . . barring them from following certain occupations[.]'" *Id*. (quotation omitted). "Congress responded with the landmark Civil Rights Act[,]" which it later constitutionalized in the form of the Fourteenth Amendment to further guarantee its protections. *Id*. at 234, 238.

Shortly after the Fourteenth Amendment was ratified, the Supreme Court upheld a monopoly in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). But in doing so, the Court did not deny the existence of the right to earn a living or its longstanding common law history of protecting against total bans on entering trade. It said only that the right wasn't protected by the Privileges or Immunities Clause. The Court continued to recognize the right to earn a living under the Due Process and Equal Protection Clauses. *See e.g. Dent*, 129 U.S. at 122.

Sixty years later, the Supreme Court to struck down an Oklahoma need review law for ice manufacturers. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 278 (1932). The law required applicants to prove that there was a need for ice in the community they proposed to serve. *Id*. at 272. If the licensing commission determined that existing facilities could meet the community's needs, it could deny the application. *Id*. Finding that the law did not protect the public, the Court held that "a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business. . . cannot be upheld consistent with the Fourteenth Amendment." *Id.* at 278.

History and tradition show that the core purpose of the right to earn a living is to protect against outright bans on entering occupations. Under any level of scrutiny, that protection should endure today.

## II.    EVIDENCE CAN PROVE A LAW IS IRRATIONAL.

Even under rational basis scrutiny, Mississippi's CON law and moratorium fail because they do not bear a "rational relation to a constitutionally permissible objective." *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013). The State argues, however, that "the mere existence of a dispute concerning the need for or desirability of a law is sufficient to establish that the law passes constitutional muster." *See* State's Mot. for Summ. J. (Doc. 85) ("State's MSJ") at 13. (emphasis supplied). Thus, according to the State, this Court is "not permitted" to look at facts or evidence at all. *Id*. The Court, however, considered and rejected this theory when it denied the State's motion for judgment on the pleadings. *See* MJP Order (Doc. 32) at 8 ("[T]he Court may delve into evidence of irrationality.") (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153, (1938)). And even if that were not so, the State would still be wrong.

### A.  Rational Basis Review Is a Meaningful Standard – Not a Rubber Stamp.

The State's motion describes the rational-basis test as a standard of review that, in effect, upholds any legislation subject to it. If the State's view were correct, no law would ever be held to violate the United States Constitution under rational basis review. But the State's view is not correct. The federal courts are not rubber stamps for the political branches. *See Hines v. Quillivan*, 982 F.3d 266, 278 (5th Cir. 2020) (Elrod, J., dissenting in part) (rational basis review "is a level of scrutiny, not a rubber-stamping exercise"). On the contrary, the U.S. Supreme Court and the Fifth Circuit have made clear that it is emphatically the *duty* of federal courts to strike down legislation that irrationally restricts individual rights, including the right to earn an honest living

free from unreasonable government regulation. The State's argument ignores the reality that there have been dozens of successful rational-basis challenges at the Supreme Court[1] and in the Fifth Circuit.[2] In fact, the State does not even mention the Fifth Circuit's definitive framework for reviewing the constitutionality of economic restrictions under rational basis review: *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013).

Fundamentally, the State's error stems from its misreading of *dicta* in *FCC v. Beach Communications* noting that a law "may be based on rational speculation unsupported by evidence or empirical data." State's MSJ at 13 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993)). This does not mean, as the State would have it, that courts in rational-basis cases make no inquiry into the underlying facts of the cases before them. Instead, read in context, the *Beach Communications dicta* merely reaffirms the uncontroversial proposition that rational-basis review, unlike heightened scrutiny, is satisfied so long as there is a factually plausible legitimate explanation for a law. In other words, courts do not generally evaluate rational-basis cases by subjecting legislators to cross-examination about what "actually motivated" them, and they

---

[1] *See United States v. Morrison*, 529 U.S. 598, 614-15 (2000); *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); *United States v. Lopez*, 514 U.S. 549, 567 (1995); *Quinn v. Millsap*, 491 U.S. 95, 108 (1989); *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*, 488 U.S. 336, 345 (1989); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449-50 (1985); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985); *Williams v. Vermont*, 472 U.S. 14, 24-25 (1985); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985); *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Zobel v. Williams*, 457 U.S. 55, 61-63 (1982); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (per curiam); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *James v. Strange*, 407 U.S. 128, 141-42 (1972); *Lindsey v. Normet*, 405 U.S. 56, 77-78 (1972); *Mayer v. City of Chicago*, 404 U.S. 189, 196-97 (1971); *Reed v. Reed*, 404 U.S. 71, 76-77 (1971); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970).

[2] *See, e.g., Stratta v. Roe*, 961 F.3d 340 (5th Cir. 2020); *Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x 367 (5th Cir. 2015); *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 746 (5th Cir. 2008); *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 251 (5th Cir. 2000); *Wheeler v. Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. Unit B Dec. 1981); *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1039-40 (5th Cir. 1980), *rev'd on other grounds*, 455 U.S. 283 (1982); *Doe v. Plyler*, 628 F.2d 448, 459 (5th Cir. 1980); *Harper v. Lindsay*, 616 F.2d 849, 855 (5th Cir. 1980); *Thompson v. Gallagher*, 489 F.2d 443, 449 (5th Cir. 1973).

similarly do not require the government to meet an affirmative evidentiary burden "explaining the distinction on the record." *Beach Commc'ns,* 508 U.S. at 315 (internal citations and quotation marks omitted).

But nothing about these basic truths – and nothing in the *Beach Communications* opinion – invalidates or even contradicts the longstanding principle that plaintiffs have the opportunity to introduce evidence showing that the government's explanation for its law is actually *implausible. See, e.g., Carolene Prods. Co.,* 304 U.S. 144, 153 (1938) ("Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry…." (internal citations omitted)); *accord Zobel v. Williams*, 457 U.S. 55 (1982) (rejecting proposed explanations for state-benefits distribution as implausible); *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (U.S. 1985) (rejecting plausibility of explanation for denying deny a group home permit).

*Beach Communications* did not purport to overrule this line of cases. And, indeed, in the wake of *Beach Communications,* the Supreme Court has continued to examine facts in the rational-basis context. *See, e.g., Romer v. Evans,* 517 U.S. 620, 632-33 (1996) (explaining that the government prevails in rational-basis cases where government classifications are "narrow enough in scope and grounded in a sufficient factual context for [the Court] to ascertain some relation between the classification and the purpose it served").

**B.** ***St. Joseph Abbey v. Castille* Is the Fifth Circuit's Definitive Framework for Reviewing the Constitutionality of Economic Restrictions Under Rational Basis Review.**

Government defendants often invoke dicta from *Beach Communications* and other familiar Supreme Court cases to cast the rational basis test as a rubber stamp. But those arguments were laid to rest in *St. Joseph Abbey v. Castille*, the Fifth Circuit's controlling framework for applying rational basis review. 712 F.3d at 215, 223, 226. *See also Brantley v. Kuntz*, 98 F. Supp. 3d 884,

891 (W.D. Tex. 2015) ("*St. Joseph Abbey's* nuanced articulation and application of the rational basis test controls."). There, the Court addressed the government's reliance on the Supreme Court's decision in *Williamson v. Lee Optical*, "generally seen as a zenith of [ ] judicial deference to state economic regulation[.]" *St. Joseph Abbey*, 712 F.3d at 221. The Court explained that it did not matter how the Supreme Court *described* the rational basis test in *Lee Optical;* rather, what matters is how the Supreme Court *applied* the test. *See id.* at 223 ("*Williamson [v. Lee Optical]* insists upon a rational basis.").

Based on its examination of rational basis precedent, the Court recognized that the test is deferential but real. To begin with, the court's analysis is "informed by the setting and history of the challenged rule." *Id.* Thus, "[w]hile the state is free to rely on a 'hypothetical rationale, even post hoc,' the ends-means connection 'cannot be fantasy,' and courts need not take a state's justifications at face value where they seem implausible or impermissible." *Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153, at *3 (W.D. Tex. 2023) (quoting *St. Joseph Abbey*, 712 F.3d at 223, 226).

Using the same methodology as the Fifth Circuit in *St. Joseph Abbey*, the Supreme Court invalidates government action under the rational-basis test in three circumstances: (1) when the law lacks a legitimate governmental interest;[3] (2) when there is no logical connection between the

---

[3] *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (holding no legitimate interest in animus against the mentally handicapped); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (holding no legitimate interest in anti-gay animus); *City of Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (holding no legitimate interest in dividing bona fide state residents into different classes); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 882 (1985) (holding no legitimate interest in discriminating against out-of-state companies); *Zobel v. Williams*, 457 U.S. 55, 65 (1982) (holding no legitimate interest in creating permanent classes of bona fide residents); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (holding no legitimate interest in anti-hippie animus); *id.* at 535 n.7 (finding "traditional morality" rationale constitutionally dubious).

law and an asserted government interest;[4] or (3) when the law lacks proportionality (it imposes harm that vastly outweighs any plausible public benefit).[5]

### C. Evidence Plays a Role in Rational-Basis Review.

Because rational basis is a real test, evidence plays a role. "[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* Thus, "[w]hen a plaintiff provides a court with undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference." *Lucid Group USA, Inc.*, 2023

---

[4] *Zobel v. Williams*, 457 U.S. 55, 61-62 (1982) (giving oil money to past residents, but not new residents, not logical basis for attracting new residents to Alaska); *United States v. Morrison*, 529 U.S. 598, 612--13 (2000) (finding no rational basis for nexus with interstate commerce because asserted bases logically incompatible with limits on Commerce power); *United States v. Lopez*, 514 U.S. 549, 564 (1995) (same); *Quinn v. Millsap*, 491 U.S. 95, 108 (1989) (finding no logical connection between ability to grasp politics and land ownership); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449 (1985) (finding no logical basis for permit denial because home was too big when identical homes routinely granted permits); *Williams v. Vermont*, 472 U.S. 14, 24-25 (1985) (encouraging Vermont residents to make in-state car purchases not logical basis for tax on car that Vermont resident purchased out-of-state before becoming Vermont resident); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (finding no logical connection between ability to grasp politics and land ownership); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (stimulating the agricultural economy not logically connected to whether people in a household are related or unrelated); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971) (if inability to pay is no basis to deny transcript to felony defendant, then inability to pay no logical basis for denying transcript to misdemeanor defendant); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970) (finding no rational interest underlying property ownership requirement for political office).

[5] *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (saving state money by denying illegal immigrant children an education is a "wholly insubstantial [benefit] in light of the costs involved to these children, the State, and the Nation" of creating an illiterate subclass); *Allegheny Pittsburgh Coal, Co. v. Cnty. Comm'n*, 488 U.S. 336, 345-46 (1989) (concluding that tax scheme resulting in one person paying 35 times the property tax of his neighbor was arbitrary); *James v. Strange*, 407 U.S. 128, 141–42 (1972) (saving state funds by denying indigent defendants exceptions to the enforcement of debt judgments grossly disproportionate to the harms it inflicts on debtors); *Lindsey v. Normet*, 405 U.S. 56, 77--78 (1972) (deterring a few frivolous appeals insufficient to justify a surety requirement that allows many frivolous appeals, denies many meritorious appeals, and showers a windfall on landlords); *Reed v. Reed*, 404 U.S. 71, 76–77 (1971) (reducing the workload of the probate courts by excluding women from service as administrators in certain cases is completely arbitrary).

WL 5688153, at *3 (citing *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999)).

That is why the Fifth Circuit relies on empirical evidence in rational basis cases, and even did so in *St. Joseph Abbey*. 712 F.3d at 217. In that case, the Court held irrational a Louisiana law that made funeral homes the exclusive sellers of caskets. *Id*. The state argued that banning unregulated third parties from selling caskets could, hypothetically, prevent deceptive sales tactics. But the Court disagreed in part because of empirical FTC findings showing that the hypothesized deception was not happening in the real world. The findings "shed[] much light on the disconnect between the post hoc hypothesis" of fraud-prevention and the law's actual, protectionist effects. *Id*. at 226; *see also St. Joseph Abbey v. Castille*, 835 F. Supp. 2d 149, 154-55 (E.D. La. 2011) (trial court explaining that the FTC's "findings and actions ... provide salient evidence" and relying on testimony from an "expert on the economics" of the regulated industry).

The same is true in federal courts across the nation. *See, e.g., Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (relying on expert evidence that a law was increasing prices[6]); *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009) (valid claim that "the state of science in 2009 is such that the [challenged] bans are no longer rational."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. Dep't of Health*, 64 F. Supp. 3d 1235, 1247-54 (S.D. Ind. 2014) (empirical research contradicted safety justification for medical requirements); *Pedersen v. OPM*, 881 F. Supp. 2d 294, 342-43 (D. Conn. 2012) (government research refuted hypothesis that benefit denials would preserve funds); *Burstyn v. City of Miami Beach*, 663 F. Supp. 528, 534 (S.D. Fla. 1987) (expert testimony contradicted hypothesis that zoning would protect tourism).

---

[6] Referring to expert affidavit available at available at 2001 WL 34905205.

To be sure, a law does will fail rational basis review solely because it "may be unwise." *Lee Optical*, 348 U.S. at 488. But the test "insists upon a rational basis." *St. Joseph Abbey*, 712 F.3d at 227.  And evidence that a law is ineffective does "shed light" on whether it is rational. *Id.* at 225 ("FTC findings. . . shed[] much light on the disconnect between" law and its asserted basis.); *see also Plyler v. Doe*, 457 U.S. 202, 228-29, 228 n.24 (1982) (holding law irrational in part because evidence showed it was "ineffective[]" and "the State failed to offer any *credible* supporting evidence.") (emphasis supplied) (internal quotation marks omitted).

### III.   THE STATE'S MORATORIUM JUSTIFICATIONS FAIL RATIONAL BASIS REVIEW.

No other state besides Mississippi has imposed a more than four-decade-long moratorium on new home health agencies. Pls.' Mot. for Summ. J. (Doc. 89) ("Pls.' MSJ") at 4. That fact alone raises serious doubts about the rationality of the ban on home health agencies. *De Weese v. Palm Beach*, 812 F.2d 1365, 1369 (11th Cir. 1987) (absence of similar laws "is a strong suggestion that the [challenged] ordinance is arbitrary and irrational"); *Roller v. Allen,* 96 S.E. 2d 851, 859 (N.C. 1957) (finding absence of similar laws "persuasive" in striking down licensing requirement for tile installers and observing that "if the regulation is in the public interest, it does seem strange indeed that no sister state has discovered that fact"); *In re Alien Children Ed. Litigation*, 501 F. Supp. 544, 578–79 (S.D. Tex. 1980) (rejecting plausibility of an asserted rationale where "no other state [had] such a statute" and there was "no evidence" of harm to those states.). Those doubts are confirmed by the State's failure to offer a single justification for the moratorium that is not thoroughly undermined by the unrebutted testimony of their own witnesses, precluded by controlling law, or factually implausible.

**A.  Insufficient Need for New Agencies is an Illegitimate and Implausible Basis.**

The State asserts that it's "foremost rationale" for the moratorium is its assessment that "there is not a need" for more home health agencies. State's MSJ at 29. But, even if this were true, it would not justify the moratorium standing alone. No public purpose is served by banning entrance into a market *solely* "on the ground that there are enough [providers] in the business." *New State Ice Co.*, 285 U.S. at 279 (1932); *see also Lee Optical*, 348 U.S. at 488 (laws must be directed toward correcting some "evil").

Even if exclusion on this basis alone did serve a public purpose, the State's claim that it knows new agencies are unneeded is contradicted by the undisputed facts. The State Health Plan has not included an assessment of the "need" in each of Mississippi's counties since 1992. Pls.' MSJ at 17–18. The Department was unable to produce any assessments made since that time, and its representatives did not even know when the Department last conducted such as assessment. *Id*. The Department's retained expert believes "it's been a long time since they've done that because of the moratorium[,]" which likely explains why even he was unable to say whether more home health agencies are needed in the Jackson-Metro Area. Sullivan Depo. (Doc. 89-22) at 26:18–23; 168:1–12. As a factual matter, the Department has clearly not made any assessment of "need" since at least 2018, the year it stopped collecting data its "need" methodology relies on. *Id*. at 18.

The State argues that Plaintiff has not proven there *is* a "need" for his services. This ignores Plaintiff's testimony that he is personally aware of Mississippians who need home health services but are not receiving them. Slaughter Depo. (Doc. 89-3) at 121:21–122:1. The State has never disputed this testimony, and in fact, admits that unserved patients may exist in the state. State's RFA Resps. (Doc. 89-6) at 24. Moreover, the Department's own records show that thousands of patients are denied a referral to a home health agency each year, either because the service they

need is unavailable or because they live outside the licensed service area. Pls. MSJ at 26. The Department's records further show that patients were unable to access home health services during the COVID-19 pandemic. *Id.* at 25.

As Plaintiff has provided "undisputed context that betrays" the State's claim that new providers are unneeded, "the [S]tate can no longer expect the court's deference" for this implausible justification. *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

**B.  Reviewing Less Applications Does Not Justify Banning Agencies from the Market.**

The State argues that the moratorium allows its staff to do less work "processing applications." State's MSJ at 30. This is not a constitutionally permissible basis for the moratorium. *See e.g. Vlandis v. Kline*, 412 U.S. at 451 (1973) ("administrative ease" does not satisfy due process); *Plyler v. Doe*, 457 U.S. 202, 227 (1982) ("preservation of resources standing alone can hardly justify" the denial of equal protection). The State cites *Newell-Davis v. Phillips*, 2023 WL 1880000 at *4 (5th Cir. 2023) to support the proposition that it may ban new agencies solely to achieve a reduction in applications. State's MSJ at 31. But *Newell-Davis* makes clear that a law must be rationally related to a "consumer benefit[,]" not just "bureaucratic ease" for its own sake. The State does not even claim that consumers benefit from any reduction in the number of applications it reviews. And any such claim would be both logically implausible and contradicted by the Department's own representative, who testified that this goal was "purely selfish[.]" Lampton Depo. (Doc. 89-2) at 184: 9–17.

Even if administrative ease were a legitimate purpose, it is factually implausible that the moratorium reduces the Department's workload to any significant degree. The State argues that there is a "very reasonable likelihood" that removal of the moratorium would lead to a "significant number of people" applying for CONs to "make more profit for themselves." State's MSJ at 31.

But the State's own representative testified that this is highly unlikely, since modern home health agencies have extremely low profit margins. Lampton Depo. (Doc. 89-2) at 39:4–8.

Moreover, the State's only explanation for eliminating applications from home health agencies, as opposed to other providers, is that there is "no need" for new home health providers. State's MSJ at 31. But this is a mere assumption. Pls. MSJ at 17–18. A rational basis must be based on "specific facts[,]" not "simply assumed." *Newell-Davis*, 2023 WL 1880000 at *4. A moratorium on *any* providers would decrease the number of applications the Department reviews. Sullivan Depo. (Doc. 89-22) at 150:6–25. "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Romer*, 517 U.S. at 633.

Nor is the moratorium a "rational way" to preserve the Department's resources. *Newell-Davis*, 2023 WL 1880000 at *4, n.2. The moratorium requires the agency to deny *every* application, even if new agencies are needed and the Department has ample resources, budget, and capacity to review their applications. Hardy Depo. (Doc. 89-26) at 33:16–42:5.

Finally, the burdens imposed by the moratorium are grossly disproportionate to any benefit from reviewing fewer applications. S*ee, e.g., Plyler v. Doe*, 457 U.S. 202, 230 (1982) (public benefit was "wholly insubstantial in light of the costs involved"). The moratorium imposes massive harm, both on aspiring agencies and the larger public. It has completely banned *any* new home health provider from entering the market for 43 years, regardless of any communities' need for those services. Hardy Depo. (Doc. 89-26) at 33:16–42:5. This is a far greater harm than that caused by need review law in *Newell-Davis*, which sought to limit new entrants in a way "responsive and flexible" to demonstrations of the community's need for the applicants' services. 592 F. Supp. 3d 532, 548 (E.D. La. 2022). These harms vastly outweigh any plausible public benefit that could possibly be achieved simply by reducing the burden of reviewing applications –

a burden which the State's own expert described as minimal. Sullivan Depo. (Doc. 89-22) at 134:13–20 (burden to planning staff would "simply be having to calculate the need by county, and then review applications that came in").

### C. Furthering the CON Law's Goals is an Irrational and Disproportionate Basis.

The State says it "stands to reason" that a "complete prohibition" on new home health agencies would further achieve the same goals that the CON law purportedly serves. State's MSJ at 30. But the evidence demonstrates that restricting the supply of home health services does *not* serve those interests. Pls. MSJ at 21–32. Thus, the moratorium is not rationally related these goals.

Even if the moratorium *did* advance the same interests asserted for the CON law, that would not rationally justify the disproportionate harm it causes. S*ee, e.g., Plyler*, 457 U.S. at 230 (1982) (public benefit was "wholly insubstantial in light of the costs involved"). The CON law at least allows the Department to attempt to respond to changing consumer needs for additional home health services. The moratorium, on the other hand, *prohibits* the Department from doing so. This greatly outweighs any minimal public benefit the moratorium could possibly achieve. And while the CON law at least allows for the *possibility* that an aspiring agency could enter the market, the moratorium removes all hope. This flies in the face of the longstanding constitutional protection against total bans on entering trade. *See e.g. Golden Glow Tanning Salon,* 52 F.4th at 981 (Ho, J., concurring). And no court has ever upheld a law "banning *all* new entry into the market for the last several decades regardless of any 'need' for the service." *Tiwari v. Friedlander*, 26 F.4th 355, 363 (6th Cir. 2022) (distinguishing this case) (emphasis original).

While the State portrays the moratorium as some temporary measure that will be lifted the moment a "need" arises, State's MSJ at 30, the statute itself contains no mechanism to ensure that. Miss. Code § 41-7-191(9). Nor does it contain any repealer or "sunset" provisions. *Id.* And the

undisputed facts betray the State's mere assumption that it will ever be lifted. The moratorium was originally intended to be in place for *six months*. Pls. MSJ at 4. It has now been in place for *43 years*. It is protected by "very powerful" interest groups who work tirelessly keep it in place. Lampton Depo. (89 -2) at 52:20–53:20; *see also* Pls. MSJ at 11. The legislature has ignored repeated calls from the Department and its predecessor agency to abolish or amend it. Pls. MSJ at 7–8. At this point, any notion that it is a temporary measure is pure "fantasy." *St. Joseph Abbey*, 712 F.3d at 223 (5th Cir. 2013).

### D. The Moratorium's Targeting of Home Health Agencies Remains Inexplicable.

The State argues that the moratorium's targeting of home health agencies is justified because the moratorium advances the same goals as the CON law. State's MSJ at 33. Setting aside that neither of the laws advance these goals, the State's explanation is a non-sequitur. The State does not even attempt to explain why it would seek to further achieve the goals of the CON program by banning new home health agencies as opposed to any other providers. *See* State's MSJ at 30. "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Romer*, 517 U.S. at 633.

Nor can this targeting be justified based on the State's mere assumption that there is "no need" for new home health providers. State's MSJ at 31; Pls. MSJ at 17–18. A rational basis must be based on "specific facts[,]" not "simply assumed." *Newell-Davis*, 2023 WL 1880000 at *4.

### E. Plaintiff's Challenge to the "Administrative Moratorium" is not Moot.

The State argues that Plaintiff's challenge to the "administrative moratorium" adopted by the Health Care Commission is moot, as it expired in 1983. State's MSJ at 27. The State misunderstands the relief Plaintiff seeks, which is understandable given the shorthand employed by the Complaint.  While the Complaint used the term "administrative moratorium" to refer to the

since-expired moratorium adopted by the Health Care Commission (*see, e.g.*, Complaint (Doc. 1) at ¶ 9), it used the same term to refer to 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2, which is an administrative rule in the Mississippi Administrative Code entitled "Moratoria[.]" (*see id*. at ¶ 25). The administrative rule in the Mississippi Administrative Code has never been repealed. It states: "[t]he Department [of Health] likewise is prohibited from granting approval for or issuing a CON to any person proposing the establishment or expansion of [a]. . . home health agency[.]" 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2.

In the portion of the Complaint that describes the relief Plaintiff seeks, the Complaint specifically identifies the *administrative rule* in the Mississippi Administrative Code as the "administrative moratorium" challenged here. Complaint (Doc. 1) at ¶ 25 ("Plaintiff seeks declaratory and injunctive relief against the enforcement of. . . the administrative moratorium on the issuance of new certificates of need for the establishment or expansion of home health agencies – 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2 – as [it is] applied to restrict persons, including Plaintiff, from providing simple, safe home health services."). The Complaint does not seek relief against the since-expired moratorium adopted by the Health Care Commission.

The administrative rule in the Mississippi Administrative Code directs that the Department is prohibited from granting home health CONs. It has never been repealed. Plaintiff's claim seeks to enjoin enforcement of the regulation for the purpose of denying home health CONs.

## IV. THE STATE'S CON LAW JUSTIFICATIONS FAIL RATIONAL BASIS REVIEW.

Plaintiff laid out the overwhelming evidence that the CON law is irrational in his cross-motion for summary judgment. (Doc. 89). The State attempts to portray the debate as mixed, with some evidence supporting Plaintiff and some evidence supporting the State. The problem is that Plaintiff's evidence is solid, and the State's' is built on sand. Much of it is irrelevant, unserious, or

both. Some of it is speculation refuted by the State's own testimony. It is simply not enough to create a genuine dispute or rational debate.

### A. There Is No Genuine "Debate" Justifying the CON Law.

The State argues that it is entitled to summary judgment merely because it has designated an expert witness, Mr. Daniel Sullivan, who supports the CON law. State's MSJ at 14. But the existence of dueling experts does not render the Court incapable of evaluating the legitimacy of the factual claims before it. *See, e.g., Cornwell v. Hamilton*, 80 F. Supp.2d 1101, 1112, 1109 n.23 (S.D. Cal. 1999) (holding law irrational and noting that defendants' experts' contentions were "refuted by" other evidence or were "unsubstantiated views" appearing "grounded more on ideology than facts."); *Dias v. City and Cnty. of Denver*, 2010 WL 3873004, at *7 (D. Colo. 2010) ("With this record, a reasonable trier of fact may find that Plaintiffs' experts are correct and" that "given the current state of the science [the challenged law] is not rationally based to serve the legitimate government purpose.").

That is especially true here. Mr. Sullivan is a "quintessential expert for hire" without "objective, verifiable evidence" that the conclusions he prepared "for this litigation" rest on "scientifically valid principles." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007). Mr. Sullivan is a consultant to CON applicants and objectors; his business consults on 30 to 50 applications each year and generates approximately $600,000 of annual revenue. Sullivan Depo. (Doc. 89-22) at 58:1-2; 57:13-15. He has never published any academic research about CON laws or whether they work. Of the three papers he has published, none concern CONs or home health. Sullivan Rep. (Doc. 89-25) at 37. And the superficial analysis he relies on is "worthless" and "does not provide a rational basis for judgment." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.).

Nor can the challenged laws escape judicial review based on the State's claim that there is continued debate about the effectiveness of CON laws. State's MSJ at 15. The State relies on Dr. Sullivan's report for the proposition that "experts disagree[.]" *Id.* But, as discussed below, the literature does not support that claim. As for others who may "debate" the effectiveness of CON laws, this is unsurprising. As this Court has observed: "It is no secret that significant financial interests are at stake when it comes to CON laws." MJP Order (Doc. 32) at 10. "Rent-seeking businesses make a sort-of 'extra-legal' contract with politicians: money and votes for the politicians, regulations that ensure a monopoly for the interest group." *Id.* (quotation omitted). Thus, the question is not whether there is a *debate*, but whether there is a *rational debate*. As Plaintiff demonstrates, there is not.

### B.  Reducing the Department's Regulatory Burden Does Not Justify the CON Law.

The State speculates that elimination of the CON law may lead to an "influx of new providers, which in turn . . . could swamp MSDH's resources." State's MSJ at 17–18. But, as Plaintiff showed in his motion for summary judgment, this logic has been debunked by the State's own representatives. Pls. MSJ at 15; Lampton Depo. (Doc. 89-2) at 39:4–8 (no influx of new providers); Wood Depo. (Doc. 89-10) at 39:18–25; 53:14–19; 60:9–14 (resources would not be overwhelmed). This testimony was unrebutted. When there is "undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference." *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

### C.  The Original Incentives for Adoption Do Not Justify the CON Law.

The State also argues that the CON law survives rational basis review because, when the law was adopted in 1979, federal funding was contingent on the State enacting a CON law. State's MSJ at 18. But Congress long ago repealed this requirement. "[T]he constitutionality of a statute

20

predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *Carolene Prods.,* 304 U.S. at 153 (1938). *See also Leary v. United States*, 395 U.S. 6, 38 n.68 (1969) (a statute is subject to constitutional attack if legislative facts upon which statute was based no longer exist); *C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) ("[a] statute valid when enacted may become invalid by change in the conditions to which it is applied").

### D.  The Con Law is Not Rationally Related to Decreasing Costs.

The State's first proposed interest in the CON law is lowering costs. In his opening brief, Plaintiff presented a comprehensive argument why the State could not rationally believe that happens in the real world: CONs were designed for capital-intensive fields under a different reimbursement system; across four decades, the "overwhelming" weight of peer-reviewed empirical evidence associates CON laws with higher costs even in the fields they were designed for; a review of every study of home health CONs finds no decrease in costs; numerous federal agencies have recognized that CONs do not lower costs, and the Fourth Circuit rejects that CONs lower costs even in theory. Pls. MSJ 21–23.

Based on the report of its expert, the State claims that the results of academic studies "are mixed." State's MSJ at 20. Not so. The supposed conflict in the academic literature is illusory. Plaintiff's expert—one of the country's leading CON researchers – demonstrated this point-by-point in rebuttal report. The State's assertion rests only on:

- A consultant's report commissioned by incumbent CON holders[7], incapable of surviving academic peer review, that does not discuss home health agencies at all;

---

[7] Sullivan Depo. (Doc. 89-22) at 118:3-7.

- A study on hospitals (not home health agencies), which concluded that CONs led to increased efficiency (not lower costs);

- A third non-academic paper that is not about CONs at all.

Stratmann Rebuttal (Doc.89-27) at 4–6. Beyond these three irrelevant sources, the State has no other response about costs. Whatever "debatable" means in the context of rational-basis review, it cannot mean that three off-topic articles, one of them by paid consultants, are enough for reasonable decisionmakers to ignore "overwhelming" evidence from actual experts, as well as the research specific to home health.

      **E.  The CON Law is Not Rationally Related to Increasing Access.**

Similarly beyond debate is the lack of relationship between the CON law and improving access. In its motion for summary judgment, Plaintiff showed that CON laws clearly do not increase access to home health care. This is obvious simply as a logical matter: it is hard to seriously believe that a law that bans home health agencies would lead to more home health care. *See Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 985 F.2d 164, 167 (4th Cir. 1993) ("Restricting market entry … necessarily limits the available service."). But there is unrebutted research too. CON states have fewer hospital beds, fewer hospitals with MRI machines, fewer medical imaging providers, and lower utilization of medical imaging. They have fewer rural hospitals, fewer rural surgery centers, and less rural access to hospice care. They have fewer home health agencies and less competitive home health markets. They do not have more charity care or cross-subsidization of Medicaid patients. *See* Pls. MSJ at 23–26.

The State's own records demonstrate this decreased access to care. They show that thousands of patients are denied a referral to a home health agency each year, either because the service they need is unavailable or because they live outside the licensed service area. *Id.* at 26.

During the COVID-19 pandemic, the Department received a report that the CON law was preventing patients from receiving home health services. *Id*. at 24–26. That report is consistent with new peer-reviewed research published by Plaintiff's expert demonstrating that hospitals in CON states were more likely to reject needy patients due to a lack of bed capacity. *Id*. at 26.

The State raises four arguments, but none holds water. First, the State speculates that the CON law allows incumbent home health agencies to generate excess profit which they can then use to serve more indigent patients. State's MSJ at 22. But as Plaintiff demonstrated in his motion for summary judgment (at 24) the research shows that CON laws are not increasing charity care. Stratmann Rep. (Ex. 1) at 11–12; Stratmann Rebuttal (Ex. 27) at 10–11. Given the "undisputed context that betrays" the State's hypothesis, "the [S]tate can no longer expect the court's deference[.]" *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

Next, the State speculates that the CON law may ensure the availability of services by preventing providers from entering the market and then failing. State's MSJ at 22. The State offers no reason to believe that this would occur, or that if it did, any patients would be harmed by having to change providers. And even if this rationale did provide some minimal public benefit, it would be vastly outweighed by the harms the CON law imposes both on the public and aspiring agencies. S*ee, e.g., Plyler*, 457 U.S. at 230 (1982) (public benefit was "wholly insubstantial in light of the costs involved"). The State also says it "stands to reason" that the CON law promotes access to care in rural areas. State's MSJ at 22–23. Plaintiff showed this is an irrational basis in his motion for summary judgment. Pls. MSJ at 24. The research shows that CONs are linked to less rural care. Stratmann Rep. (Doc. 89-1) at 10–11. The theory – banning agencies in profitable areas will make them open in unprofitable areas—makes no sense. *See Walgreen Co. v. Rullan*, 405 F.3d 50, 60 (1st Cir. 2005) ("The refusal to grant a proposed pharmacy market entry at its desired location will

not encourage the proposed pharmacy to relocate to an underserved area ...."); *see also* Stratmann Rebuttal (Ex. 27) at 11–12.

Finally, the State speculates that without the CON law, new home health agencies could "cherry pick" the most lucrative patients from the existing agencies, leaving the existing agencies less financially able to care for Medicaid and uninsured patients. State's MSJ at 24–25. Because home health agencies are required to "indicate their intent" to serve indigent patients as a condition of receiving a CON, that State argues that absent the CON law, home health agencies would stop providing care to unprofitable patients. *Id.* But the State's own expert admits that, if this were a real concern, the State could simply require applicants for home health licenses to indicate an intent to serve indigent patients, like it currently requires CON applicants to do. Sullivan Depo. (Doc. 89-22) at 136:6–11. Given this straightforward alternative, it would be utterly irrational to impose the sprawling and burdensome CON regime simply as a Rube Goldberg method of achieving something that could easily be achieved by direct means. *See Craigmiles*, 312 F.3d at 227 ("The Supreme Court, employing rational basis review, has been suspicious of a legislature's circuitous path to legitimate ends when a direct path is available.") And in any event, this speculation is refuted by the record. Research shows that CON laws do not promote indigent or Medicaid care. Stratmann Rep. (Ex. 1) at 11–12; Stratmann Rebuttal (Ex. 27) at 10–11.

As with cost, this is not a genuine dispute. The State offered speculation. Plaintiff offered evidence. Given the "undisputed context that betrays" the State's hypotheses, "the [S]tate can no longer expect the court's deference[.]" *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

## F.  The CON Law is Not Rationally Related to Improving Quality.

Finally, there is quality. In Plaintiff's motion for summary judgment, he explained that, controlling for patient health, CON states have more deaths from heart failure, heart attack,

pneumonia, and complications of surgery. Patients rate CON hospitals highly less often. CON suspensions during the pandemic appear to have saved lives. The research specific to home health unanimously finds that CONs are not linked to improved quality. Pls. MSJ at 26–28.

And, of course, Mississippi already ensures quality through a separate licensure process. *Id*. at 28. "[T]he existence of other applicable consumer-protection and public-safety laws can undermine the asserted relationship between these [same] legislative goals and the law at issue." *Lucid Group USA, Inc.*, 2023 WL 5688153 at \*5 (citing *St. Joseph Abbey*, 712 F.3d at 226).

The State makes three arguments. The first is that limiting competition allows home health agencies to maintain sufficient "patient volume" (and resulting profits) to invest in specialized programs and services like "disease specific treatment programs." State's MSJ at 25–26. But evidence shows this argument is entirely implausible. The unrebutted testimony from the State's own representative is that under modern reimbursement rates, health care providers have little interest in starting new home health agencies and thus, elimination of the CON law and moratorium would not lead to a significant increase in the number of agencies. Lampton Depo. (Doc. 89-2) at 39:4–8. At most, a few people like Mr. Slaughter, may "jump in the water." *Id*. at 39:9. In 2020, there were *nearly 100,000* patients served in Mississippi. 2020 Report on Home Health Agencies (Doc. 89-5) at pg. i (94,280 patients served). It is simply irrational to believe that a few hundred of those patients going to the few startups willing to "jump in the water" would lead to quality cutbacks at existing agencies. "[A] hypothetical rationale, even post hoc, cannot be fantasy." *St. Joseph Abbey*, 712 F.3d at 223 (5th Cir. 2013).

Ultimately, though, there is a more fundamental problem. This whole hypothesis presumes that patients would be better off at the agencies the CON law bans. The State's concern is that if the CON law were not fencing startups out, some patients would choose those startups over their

current provider. And that reshuffling—patients choosing new options that are better for them—would leave incumbent agencies less able to operate. It is hard to see how patients moving to better agencies could be a net loss to quality.

The State's next argument relies on the same premise. The State again speculates that elimination of the CON law may lead to an "influx of new providers, which in turn . . . could swamp MSDH's resources" and "impair its ability to ensure that patients are receiving services." State's MSJ at 17–18, 26. But again, this logic has been debunked by the State's own representatives. Lampton Depo. (Doc. 89-2) at 39:4–8 (no influx of new providers); Wood Depo. (Doc. 89-10) at 38:23–39:1 (any increase would not "affect patients in Mississippi at all."). This testimony was unrebutted. When there is "undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference." *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

The State's final argument is another observation from Mr. Sullivan: according to Medicare quality rankings for home health agencies, Mississippi is ranked well and, nationwide, CON states slightly outperform non-CON states. *Id.* at 20. Again, however, Mr. Sullivan chose not to follow standard practices in the field. Mr. Sullivan knows that controlling for differences between states is important. Sullivan Depo. (Doc. 89-22) at 109:10-14. ("[I]s it important when you're researching the effects of CONs, to try to control for differences between the states? A. It is."); *see also Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) (even under rational basis review "[s]tatistical studies" that "fail to correct for salient factors" are "worthless" and "do not provide a rational basis for a judgment"). Despite knowing this is "important" to do so, Mr. Sullivan did not attempt to control for these differences do so before drawing conclusions from the Medicare ratings. Sullivan Depo. (Doc. 89-22) at 190:19-21.

Mr. Sullivan also knows that in order to "make conclusions" from data, it is "important" to check for a statistically significant relationship. Sullivan Depo. (Doc. 89-22) at 172:1-7. Despite knowing this, he did not check the Medicare ratings for statistical significance. *Id*. at 170:12-13. Rather than implementing any of the techniques that he knows are "important" for this kind of work, Mr. Sullivan admits his conclusions were drawn "off the top of my head." *Id.* at 190:19-22.

There is, however, research that has done these things. Plaintiff's expert reviewed it for the Court, and it is unequivocal that home health CONs do not improve quality. One study concluded that "[r]emoving entry regulations for home health would have negligible system wide effects on health care costs and quality." Stratmann Rep. (Doc. 891) at 23. Another found that CONs make home healthcare worse. *Id.* at 25. Again, the rational-basis test means that courts defer to the state's *rational* decisions; it is not a mandate to "accept nonsensical explanations[.]" *St. Joseph Abbey*, 712 F.3d at 226. There is no rational world where an industry consultant drawing conclusions "off the top of [his] head" refutes an entire body of peer-reviewed research.

To recap: the objective evidence finds that CONs do not improve quality either as a general matter or specifically in home health. Faced with this, the State offers meaningless observations from an industry consultant alongside theories debunked by its own witnesses. This is not a debate.

### G.  The CON Law's Exemptions Remain Inexplicable.

Finally, the State does not offer a rational explanation for exempting physicians from the CON law. When it comes to physicians, the State argues that a CON is unnecessary because physicians are "heavily regulated" by a licensing agency. State's MSJ at 35. But, as just discussed, the evidence is clear that CONs do not improve quality. Pls. MSJ at 26–28. Quality concerns cannot be a rational basis for subjecting home health agencies (but not physicians) to the CON

law. The State's second argument underscores just how inconsistent the law's rationales are. The State says a CON law is unnecessary for physicians because "Mississippi's need for more physicians is well known[.]" Stat's MSJ at 36. But that need is in rural areas. And yet, when it comes to home health agencies, the State argues that the CON law *increases* access to care in rural areas. *Id*. at 23. It is irrational to believe that a CON law would simultaneously increase access for home health agencies and decrease access for physicians. But this different treatment is easily explained by the "political considerations[.]" Sullivan Depo. (Doc. 89-22) at 202:24–203:7.

## CONCLUSION

The rational-basis test "does not demand judicial blindness to the history of a challenged rule. . . nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226–27. Plaintiff has shown that Mississippi's home health CON law and moratorium are irrational. There is the context of self-interested incumbents pushing the laws. There are the immense burdens of both laws. There is a mountain of evidence they do not work. There is the expert view of the federal government for 30 years. And in response, the State offers "top of my head" conclusions from an industry consultant and theories their own witnesses refute.

The Court should grant summary judgment for Plaintiff.

RESPECTFULLY SUBMITTED, this the 1st day of March, 2024.

| | |
|---|---|
|   /s/ *Aaron R. Rice* | A. Seth Robbins |
| Aaron R. Rice | MS Bar No. 103096 |
| MS Bar No. 103892 | WATSON JONES PLLC |
| MISSISSIPPI JUSTICE INSTITUTE | 2829 Lakeland Drive, |
| 520 George St. | Suite 1502 |
| Jackson, MS 39202 | Flowood, Mississippi 39232 |
| Tel: (601) 969-1300 | Tel: 601.939.8900 |
| aaron.rice@msjustice.org | srobbins@wjpllc.com     *Attorneys for Plaintiff* |

**<u>CERTIFICATE OF SERVICE</u>**

I, Aaron R. Rice, counsel for Plaintiff, hereby certify that the foregoing document has been filed using the Court's ECF filing system and thereby served on all counsel of record who have entered their appearance in this action to date.

This the 1st day of March, 2024.

 /s/ *Aaron R. Rice*           
Aaron R. Rice
