**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| CHARLES SLAUGHTER, | | *Plaintiff,* |
| | *v.* | NO. 3:20-CV-789-CWR-ASH |
| | | ORAL ARGUMENT REQUESTED |
| DR. DANIEL P. EDNEY, IN HIS OFFICIAL CAPACITY AS THE MISSISSIPPI STATE HEALTH OFFICER, ET AL. | | *Defendants.* |

**PLAINTIFF'S RESPONSE TO INTERVENOR-DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Charles Slaughter is a licensed physical therapist who wants to expand his services to offer in-home physical therapy. But Mississippi is the only state in the nation that has imposed a moratorium on new home health agencies for the past 43 years. Even if the moratorium did not exist, the state's CON law would bar him from opening unless he could prove he was needed.

Thus, the question here is whether the moratorium and CON law are a rational way to improve the healthcare system. In trying to answer that question, the Intervenor-Defendant (MAHC) ignores the real-world facts and instead offers a world where speculation wins no matter how one-sided the facts are. The rational-basis test is not, as the MACH suggests, a hollow standard. It is an inquiry that courts are both trusted and obligated to undertake. Plaintiffs may negate each asserted justification using evidence and reason. Mr. Slaughter has done so here.

Because the moratorium and CON law serve only to protect existing providers from competition, they fail rational basis review. But the right to earn a living is a fundamental right and should be protected accordingly.

**ARGUMENT**

I. **THE CONSTITUTION PROTECTS A FUNDAMENTAL RIGHT TO EARN A LIVING.**

In *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the Supreme Court clarified the framework for determining when a right is "fundamental" and thus entitled to a heightened protection: it must be "deeply rooted in this nation's history" and "essential to our Nation's 'scheme of ordered liberty.'" *Id.* at 2246. The right to earn a living fits squarely within that framework. Born in the struggle for freedom from the crown in England and later used to protect freedmen from the Black Codes, it arguably has more of a historical pedigree than other unenumerated rights deemed fundamental. *See Golden Glow Tanning Salon, Incorporated v. City of Columbus, Mississippi*, 52 F.4th 981 (5th Cir. 2022) (Ho, J., concurring). Under the Fifth Circuit's current approach, however, laws that interfere with the right to earn a living in a chosen occupation are subject to rational basis scrutiny. *Id.* at 979. Thus, while the CON law and moratorium are invalid under any level of scrutiny, Plaintiff explains below that the right to earn a living is a fundamental liberty, to preserve that argument for appeal. Plaintiff also shows that judicial inquiry under any level of scrutiny should be undertaken recognizing that the core purpose of the right to earn a living is to protect against total bans on entry into lawful occupations.

**A. The Right to Earn a Living Is Deeply Rooted in Our Nation's History and Tradition.**

The right to earn a living has "deep roots in our Nation's history and tradition." *Id.* at 981. The right to enter a "known established trade" was "among the most cherished principles in English law," dating back as far as the 14th century. *See, e.g.*, Timothy Sandefur, *The Right to Earn a Living*, 6 Chap. L. Rev. 207, 209-17 (2003).

This right was recognized over a century before the Founding; was developed and defended by English common law courts; and remained sacred to the Founders. *Id.* at 982–83.

"Representative John Bingham, one of the primary drafters of the Fourteenth Amendment, later explained that 'our own American constitutional liberty. . . is the liberty. . . to work an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil.'" *Id*. at 983 (quotation omitted).

    **B. The Right to Earn a Living is Essential to our Nation's Scheme of Ordered Liberty.**

In addition to being deeply rooted, the right to earn a living is also essential to our Nation's scheme of ordered liberty. Indeed, it is "essential to ensuring the ability of the average American citizen to exercise most of their other rights." *Id*. at 984. The Supreme Court has recognized that "[t]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41 (1915). The right has even been called "the most precious liberty that man possesses." *Barsky v. Board of Regents of Univ.,* 347 U.S. 442, 472 (1954) (Douglas, J., dissenting). The Supreme Court continues to recognize the importance of this right today. *E.g. Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 280 n.9 (1985) ("[T]he pursuit of a common calling is one of the most fundamental [] privileges" protected by the Fourteenth Amendment.").

The right to earn a living is fundamental. It was carried over from English common law and is deeply rooted in American tradition. It is a prerequisite for the exercise of most other cherished rights. It should be protected accordingly.

    **C. The Right to Earn a Living Emerged to Prevent Total Bans on Entering Occupations.**

Throughout American history, states have imposing licensing requirements on certain professions "for the protection of society." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). So

3

long as the standards for qualification are "appropriate" and "attainable[,]" the Supreme Court has held that licensing laws do not "deprive one of his right to pursue a lawful vocation." *Id.*

Total bans on entering a profession, however, are far removed from this tradition. Rather than setting standards equally attainable by all, a ban on market entry bestows the right to work in an occupation on a "privileged class" and "shut[s] the door" to everyone else. *Smith v. State of Texas*, 233 U.S. 630, 638 (1914). History and tradition show that this is precisely what the right to earn a living was developed to protect against.

The right to earn a living emerged in "the struggles between the Crown and the courts over the problem of monopoly[,]'" *Golden Glow Tanning Salon,* 52 F.4th at 981 (Ho, J., concurring) (quotations omitted), a term that was understood at the time to include not only exclusive grants to a single provider, but also exclusive grants to a favored group of providers, like a guild. *See The Tailors of Ipswich Case*, 77 Eng. Rep. 1218, 1219 (K.B. 1614) (Coke, C.J.). In the century following the Founding, state courts consistently defended the right to earn a living free from total bans on entry to the market. *See McRee v. Wilmington & Raleigh R.R. Co.*, 47 N.C. (2 Jones) 186, 190 (1855) ("'[T]he people' who were then exercising the highest act of sovereignty – that of making a government for themselves, forbade the creation of monopolies and put an end to all such as then existed."); *Norwich Gaslight Co. v. Norwich City Gas Co.*, 25 Conn. 19, 37 (1856) (holding that "the whole theory of a free government is opposed to such [exclusive] grants[.]"); *Davis v. City of New York*, 14 N.Y. 506, 524 (1856) (holding a city "had no power to grant ... a [monopoly] franchise[.]"); *Shepherd v. Milwaukee Gas Light Co.*, 6 Wis. 539, 547 (1858) ("Odious as were monopolies to the common law, they are still more repugnant to the genius and spirit of our republican institutions[.]")

In 1868, the Fourteenth Amendment was ratified. Protecting against total bans on entering occupations was one of the primary aims of the framers. After slavery was abolished, states sought to subjugate freed blacks through "Black Codes" which deprived them of numerous rights, including the right to enter lawful occupations. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 234 (U.S. 2023) (Thomas, J., concurring). "The Black Code of Mississippi, for example, 'imposed all sorts of disabilities' on blacks, 'including. . . barring them from following certain occupations[.]'" *Id*. (quotation omitted). "Congress responded with the landmark Civil Rights Act[,]" which it later constitutionalized in the form of the Fourteenth Amendment to further guarantee its protections. *Id*. at 234, 238.

Shortly after the Fourteenth Amendment was ratified, the Supreme Court upheld a monopoly in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). But in doing so, the Court did not deny the existence of the right to earn a living or its longstanding common law history of protecting against total bans on entering trade. It said only that the right wasn't protected by the Privileges or Immunities Clause. The Court continued to recognize the right to earn a living under the Due Process and Equal Protection Clauses. *See e.g. Dent*, 129 U.S. at 122.

Sixty years later, the Supreme Court struck down an Oklahoma need review law for ice manufacturers. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 278 (1932). The law required applicants to prove that there was a need for ice in the community they proposed to serve. *Id*. at 272. If the licensing commission determined that existing facilities could meet the community's needs, it could deny the application. *Id*. Finding that the law did not protect the public, the Court held that "a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business. . . cannot be upheld consistent with the Fourteenth Amendment." *Id.* at 278.

5

History and tradition show that the core purpose of the right to earn a living is to protect against outright bans on entering occupations. Under any level of scrutiny, that protection should endure today.

## II.    THE EXISTENCE OF COMPETING EXPERTS DOES NOT PRECLUDE JUDICIAL REVIEW.

MAHC argues that it is entitled to summary judgment merely because there are "competing expert reports and facts[.]" MAHC's Mot. Summ. J. (Doc. 83) ("MAHC's MSJ") at 8–9. But the existence of competing experts does not render the Court incapable of evaluating the legitimacy of the factual claims before it. *See, e.g., Cornwell v. Hamilton*, 80 F. Supp.2d 1101, 1112, 1109 n.23 (S.D. Cal. 1999) (holding law irrational and noting that defendants' experts' contentions were "refuted by" other evidence or were "unsubstantiated views" appearing "grounded more on ideology than facts."); *Dias v. City and Cnty. of Denver*, 2010 WL 3873004, at *7 (D. Colo. 2010) ("With this record, a reasonable trier of fact may find that Plaintiffs' experts are correct and" that "given the current state of the science [the challenged law] is not rationally based to serve the legitimate government purpose.")

That is especially true here. MACH's expert, Mr. Sullivan is a "quintessential expert for hire" without "objective, verifiable evidence" that the conclusions he prepared "for this litigation" rest on "scientifically valid principles." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007). Mr. Sullivan is a consultant to CON applicants and objectors; his business consults on 30 to 50 applications each year and generates approximately $600,000 of annual revenue. Sullivan Depo. (Doc. 89-22) at 58:1-2; 57:13-15. He has never published any academic research about CON laws or whether they work. Of the three papers he has published, none concern CONs or home health. Sullivan Rep. (Doc. 89-25) at 37. And the superficial analysis he relies on

6

is "worthless" and "does not provide a rational basis for judgment." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.).

### III. THE EVALUATION OF REFORM OPTIONS DOES NOT PRECLUDE JUDICIAL REVIEW.

MAHC also suggests that it is entitled to summary judgment simply because the Mississippi State Board of Health is considering whether to recommend modification or repeal of any of the CON laws. MAHC's MSJ at 7; 14. As an initial matter, it is difficult to see how the Board's decision to evaluate these options – including possible repeal – indicates that those laws are rational. If anything, this suggests there is concern that the laws are *irrational*. More importantly, MAHC does not claim that this evaluation has resulted in any findings supporting the rationality of the CON laws. *Id*. Whatever the Board's decision to initiate an evaluation means; it is not "proof that [the rational basis] standard has been met." *Id.* at 14.

### IV. MAHC'S MORATORIUM JUSTIFICATION FAILS RATIONAL BASIS REVIEW.

No other state besides Mississippi has imposed a more than four-decade-long moratorium on new home health agencies. Pls.' Mot. for Summ. J. (Doc. 89) ("Pls. MSJ") at 4. That fact alone raises serious doubts about the rationality of the ban on home health agencies. *De Weese v. Palm Beach*, 812 F.2d 1365, 1369 (11th Cir. 1987) (absence of similar laws "is a strong suggestion that the [challenged] ordinance is arbitrary and irrational"); *Roller v. Allen,* 96 S.E. 2d 851, 859 (N.C. 1957) (finding absence of similar laws "persuasive" in striking down licensing requirement for tile installers and observing that "if the regulation is in the public interest, it does seem strange indeed that no sister state has discovered that fact"); *In re Alien Children Ed. Litigation*, 501 F. Supp. 544, 578–79 (S.D. Tex. 1980) (rejecting plausibility of an asserted rationale where "no other state [had] such a statute" and there was "no evidence" of harm to those states.). Those doubts are confirmed by MAHC's failure to offer any real justification for the moratorium.

### A. "It Must Be Helping" Is Not a Rational Basis.

MAHC does not even attempt to meaningfully defend the moratorium. Instead, MAHC simply asserts that, because Mississippi's home health sector is ranked well by some metrics, the moratorium "must be helping[.]" MAHC's MSJ at 25. "Courts need not take a [defendant's] justifications at face value where they seem implausible or impermissible." *Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153, at *3 (W.D. Tex. 2023) (quoting *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223, 226 (5th Cir. 2013). It is entirely implausible to believe that the moratorium could be rationally intended to improve Mississippi's home health sector based solely on the fact that aspects of the sector are not ranked poorly. It is particularly implausible given "the history of a challenged rule or the context of its adoption" – incumbent providers demanding adoption of a moratorium banning competitors and then tirelessly warding off repeal for the past 43 years. *St. Joseph Abbey*, 712 F.3d at 226.

Even if "it must be helping" were a plausible rationale, "plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* at 226. Plaintiff has presented empirical research indicating that moratoriums on health care services decrease the quality of the care provided while failing to decrease the cost of that care. Stratmann Rep. (Ex. 1) at 22, 25. MAHC has presented no contrary evidence. "When a plaintiff provides a court with undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference." *Lucid Group USA, Inc.*, 2023 WL 5688153, at *3 (citing *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999)).

### A. The Moratorium's Targeting of Home Health Agencies Remains Inexplicable.

MAHC does not offer a specific rationale for imposing a moratorium on home health agencies as opposed to any other providers. Presumably, MAHC relies on its argument that the

8

moratorium "must be helping." But this fails to explain why Mississippi would seek to "help" the home health industry by way of the moratorium, but not other providers. Without a rationale for this targeting, the moratorium fails. "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Romer*, 517 U.S. at 633.

V. **MAHC'S CON LAW JUSTIFICATIONS FAIL RATIONAL BASIS REVIEW.**

Plaintiff laid out the overwhelming evidence that the CON law is irrational in his cross-motion for summary judgment. (Doc. 89). MAHC's evidence fails to demonstrate otherwise. Much of it is irrelevant, unserious, or both. Some of it is speculation refuted by testimony from the State's witnesses. It is simply not enough to create a genuine dispute or rational debate.

**A. The Con Law is Not Rationally Related to Decreasing Costs.**

MAHC's first proposed interest in the CON law is lowering costs. In his opening brief, Plaintiff presented a comprehensive argument why the MAHC could not rationally believe that happens in the real world: CONs were designed for capital-intensive fields under a different reimbursement system; across four decades, the "overwhelming" weight of peer-reviewed empirical evidence associates CON laws with higher costs even in the fields they were designed for; a review of every study of home health CONs finds no decrease in costs; numerous federal agencies have recognized that CONs do not lower costs, and the Fourth Circuit rejects that CONs lower costs even in theory. Pls. MSJ 21–23.

Relying on the report of its expert, Mr. Sullivan, MAHC argues that Medicare reimbursement data shows Mississippi's average reimbursement per patient ranks well nationally. MAHC's MSJ at 16. But this data is meaningless because Mr. Sullivan did not control for differences between states or test for a statistically significant relationship to CON laws. Sullivan Depo. (Doc. 89-22) at 170:12–172:7. Mr. Sullivan knows that it is important to do both of those

9

things. *Id*. He simply chose not to. *Id*. Moreover, the data is about efficiency, not cost. Sullivan Depo. (Doc. 89-22) at 169:22–170:1. It measures the number of visits per patient, not the cost of providing each visit. *Id*. That measure can differ widely among states, simply based on differences in their patient populations. Stratmann Rep. (Doc. 89-27) at 7.

MAHC also relies on an irrelevant finding from a 2016 study. MAHC's MSJ at 16. The study analyzed Medicare and Medicaid spending on home health agencies and nursing homes in CON and non-CON states from 1992–2009. *See* Rahman et al. (2016), *The Impact of Certificate-of-Need Laws on Nursing Home and Home Health Care Expenditures* (Doc. 86-14) ("Rahman Study") at 2. MAHC relies on the study's finding that spending on home health care grew faster in non-CON states than in CON states. MAHC's MSJ at 16. What MAHC leaves out is that, during the same period, spending on nursing homes grew slower in non-CON states than in CON states. Rahman Study at 7. The findings simply demonstrate that CON laws divert spending away from home health agencies and toward nursing homes. Stratmann Rep. (Doc. 89-1) at 24. If anything, the authors note that "persistence of CON laws may *increase* future aggregate spending[,]" since nursing homes are more expensive than home health. Rahman Study at 10.

Beyond these two irrelevant sources, MAHC has no other response about costs. Whatever "debatable" means in the context of rational basis, it cannot mean that a rational "debate" is created by a meaningless observation from an industry consultant and a study indicating that CON laws may *increase* spending.

### B. The CON Law is Not Rationally Related to Improving Quality.

In Plaintiff's motion for summary judgment, he explained that, controlling for patient health, CON states have more deaths from heart failure, heart attack, pneumonia, and complications of surgery. Patients rate CON hospitals highly less often. CON suspensions during

the pandemic appear to have saved lives. The research specific to home health unanimously finds that CONs are not linked to improved quality. Pls. MSJ at 26–28.

And, of course, Mississippi already ensures quality through a separate licensure process. *Id*. at 28. [T]he existence of other applicable consumer-protection and public-safety laws can undermine the asserted relationship between these [same] legislative goals and the law at issue." *Lucid Group USA, Inc.*, 2023 WL 5688153 at *5 (citing *St. Joseph Abbey*, 712 F.3d at 226).

MAHC makes two arguments. The first is another observation from Mr. Sullivan: according to Medicare quality rankings for home health agencies, Mississippi is ranked well and, nationwide, CON states slightly outperform non-CON states. MAHC's MSJ at 17. Again, however, Mr. Sullivan chose not to follow standard practices in the field. Mr. Sullivan knows that controlling for differences between states is important. Sullivan Depo. (Doc. 89-22) at 109:10-14. ("[I]s it important when you're researching the effects of CONs, to try to control for differences between the states? A. It is."); *see also Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) (even under rational basis review "[s]tatistical studies" that "fail to correct for salient factors" are "worthless" and "do not provide a rational basis for a judgment"). Despite knowing this is "important" to do so, Mr. Sullivan did not attempt to control for these differences do so before drawing conclusions from the Medicare ratings. Sullivan Depo. (Doc. 89-22) at 190:19-21.

Mr. Sullivan also knows that in order to "make conclusions" from data, it is "important" to check for a statistically significant relationship. Sullivan Depo. (Doc. 89-22) at 172:1-7. Despite knowing this, he did not check the Medicare ratings for statistical significance. *Id*. at 170:12-13. Rather than implementing any of the techniques that he knows are "important" for this kind of work, Mr. Sullivan admits his conclusions were drawn "off the top of my head." *Id*. at 190:19-22.

11

There is, however, research that has done these things. Plaintiff's expert reviewed it for the Court, and it is unequivocal that home health CONs do not improve quality. One study concluded that "[r]emoving entry regulations for home health would have negligible system wide effects on health care costs and quality." Stratmann Rep. (Doc. 891) at 23. Another found that CONs make home healthcare worse. *Id.* at 25. Again, the rational-basis test means that courts defer to the state's *rational* decisions; it is not a mandate to "accept nonsensical explanations[.]" *St. Joseph Abbey*, 712 F.3d at 226. There is no rational world where an industry consultant drawing conclusions "off the top of [his] head" refutes an entire body of peer-reviewed research.

MAHC's second argument is that limiting competition allows home health agencies to maintain sufficient "patient volume" (and resulting profits) to invest in specialized programs and services like "disease specific treatment programs." MAHC's MSJ at 17. But evidence shows this argument is entirely implausible. The unrebutted testimony from the State's own representative is that under modern reimbursement rates, health care providers have little interest in starting new home health agencies and thus, elimination of the CON law and moratorium would not lead to a significant increase in the number of agencies. Lampton Depo. (Doc. 89-2) at 39:4–8. At most, a few people like Mr. Slaughter, may "jump in the water." *Id.* at 39:9. In 2020, there were *nearly 100,000* patients served in Mississippi. 2020 Report on Home Health Agencies (Doc. 89-5) at pg. i (94,280 patients served). It is simply irrational to believe that a few hundred of those patients going to the few startups willing to "jump in the water" would lead to quality cutbacks at existing agencies. "[A] hypothetical rationale, even post hoc, cannot be fantasy." *St. Joseph Abbey*, 712 F.3d at 223 (5th Cir. 2013).

Ultimately, though, there is a more fundamental problem. This whole hypothesis presumes that patients would be better off at the agencies the CON law bans. The MAHC's concern is that

if the CON law were not fencing startups out, some patients would choose those startups over their current provider. And that reshuffling—patients choosing new options that are better for them—would leave incumbent agencies less able to operate. It is hard to see how patients moving to better agencies could be a net loss to quality.

To recap: the objective evidence finds that CONs do not improve quality either as a general matter or specifically in home health. Faced with this, the MAHC offers meaningless observations from an industry consultant alongside a theory debunked by the State. This is not a debate.

### C.  The CON Law is Not Rationally Related to Increasing Access.

Similarly beyond debate is the lack of relationship between the CON law and improving access. In its motion for summary judgment, Plaintiff showed that CON laws clearly do not increase access to home health care. This is obvious simply as a logical matter: it is hard to seriously believe that a law that bans home health agencies would lead to more home health care. *See Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va.*, 985 F.2d 164, 167 (4th Cir. 1993) ("Restricting market entry … necessarily limits the available service."). But there is unrebutted research too. CON states have fewer hospital beds, fewer hospitals with MRI machines, fewer medical imaging providers, and lower utilization of medical imaging. They have fewer rural hospitals, fewer rural surgery centers, and less rural access to hospice care. They have fewer home health agencies and less competitive home health markets. They do not have more charity care or cross-subsidization of Medicaid patients. *See* Pls. MSJ at 23–26.

Records from the State demonstrate this decreased access to care. They show that thousands of patients are denied a referral to a home health agency each year, either because the service they need is unavailable or because they live outside the licensed service area. *Id.* at 26. During the COVID-19 pandemic, the Department received a report that the CON law was

13

preventing patients from receiving home health services. *Id*. at 24–26. That report is consistent with new peer-reviewed research published by Plaintiff's expert demonstrating that hospitals in CON states were more likely to reject needy patients due to a lack of bed capacity. *Id*. at 26.

MAHC relies on speculation from its expert that the "CON program ensures appropriate geographic distribution of" home health agencies. MAHC's MSJ at 18. Plaintiff disproved this in its opening brief. Pls. MSJ at 24. The research shows that CONs are linked to less rural care. The theory – banning agencies in profitable areas will make them open in unprofitable areas – makes no sense. *See Walgreen Co. v. Rullan*, 405 F.3d 50, 60 (1st Cir. 2005) ("The refusal to grant a proposed pharmacy market entry at its desired location will not encourage the proposed pharmacy to relocate to an underserved area ...."); *see also* Stratmann Rebuttal (Grace Ex. 10) at 15.

MAHC's expert also speculates that the CON law allows agencies' to maintain sufficient patient volume to invest in well-qualified staff and new technology. MAHC's MSJ at 18. But this is implausible for the same reason as MAHC's earlier patient volume argument: the State's witness testified that removing the CON law and moratorium would not lead to a significant increase in the number of agencies. Lampton Depo. (Doc. 89-2) at 39:4–8.

As with cost, this is not a genuine dispute. MAHC offered speculation. Plaintiff offered evidence. Given the "undisputed context that betrays" the MAHC's hypotheses, "the [S]tate can no longer expect the court's deference[.]" *Lucid Group USA, Inc.*, 2023 WL 5688153 at *3.

### D. The CON Law is Not Rationally Related to Precenting Fraud, Waste, and Abuse.

MAHC suggests that the CON law prevents fraud, waste, and abuse by keeping out unprofitable providers who may be tempted to engage in fraud, waste, or abuse. MAHC's MSJ at 19. MAHC relies on its expert, Mr. Sullivan, who claims to have seen this happen with unspecified agencies in Indiana "15 or 20 years ago" after CON repeal. Sullivan Depo. (Doc. 89-22). Setting

aside the obvious unreliability of this testimony and the piling of conjecture on conjecture, this rationale fails for a more basic reason. Mississippi's CON law does not contain any provisions intended to prevent fraud, waste, or abuse. Sullivan Depo. (Doc. 89-22) at 96:19–97:6. In contrast, numerous state and federal laws are specifically targeted at deterring and preventing fraud, waste, and abuse. "[T]he existence of other applicable consumer-protection and public-safety laws can undermine the asserted relationship between these [same] legislative goals and the law at issue." *Lucid Group USA, Inc.*, 2023 WL 5688153 at *5 (citing *St. Joseph Abbey*, 712 F.3d at 226). The notion that Mississippi's CON law can be rationally intended to prevent fraud, waste, or abuse is entirely implausible. "Courts need not take a [defendant's] justifications at face value where they seem implausible or impermissible." *Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153, at *3 (W.D. Tex. 2023) (quoting *St. Joseph Abbey*, 712 F.3d at 223, 226).

### E. Reducing the Department's Regulatory Burden Does Not Justify the CON Law.

MAHC also argues that elimination of the CON law may lead to a significant increase in the number of agencies, which would burden the Department's staff. MAHC's MSJ at 19. For this proposition, MAHC relies on opinions contained in Mr. Sullivan's report. But his report cites no source for this opinion. Sullivan Rep. (Doc. 84-4) at 17. Instead, he testified: "I think this just goes with my general understanding of what would happen with CON eliminated." Sillivan Depo. (84-22) at 129:5–10. But, as Plaintiff showed in his motion for summary judgment, Mr. Sullivan's unsupported speculation has been debunked by the State's own representatives. Pls. MSJ at 15; Lampton Depo. (Doc. 89-2) at 39:4–8 (no influx of new providers); Wood Depo. (Doc. 89-10) at 39:18–25; 53:14–19; 60:9–14 (resources would not be overwhelmed).

### F. The CON Law's Exemptions Remain Inexplicable.

Finally, the MAHC does not offer a rational explanation for exempting physicians from the CON law. When it comes to physicians, the MAHC argues that a CON is unnecessary because physicians are more heavily regulated by their licensing agency. MAHC's MSJ at 23. But the evidence is clear that CONs do not improve quality. Pls. MSJ at 26–28. Quality concerns cannot be a rational basis for subjecting home health agencies (but not physicians) to the CON law. MAHC's second argument underscores just how inconsistent the law's rationales are. MAHC says a CON law is unnecessary because "the physician shortages Mississippi has faced historically are well documented." MAHC's MSJ at 23. But that need is in rural areas. And yet, when it comes to home health agencies, the MAHC argues that the CON law *increases* access to care in rural areas. *Id*. at 18. It is irrational to believe that a CON law would simultaneously increase access for home health agencies and decrease access for physicians. But this different treatment is easily explained by the "political considerations[.]" Sullivan Depo. (Doc. 89-22) at 202:24–203:7.

## CONCLUSION

The rational-basis test "does not demand judicial blindness to the history of a challenged rule. . . nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226–27. Plaintiff has shown that Mississippi's home health CON law and moratorium are irrational. There is the context of self-interested incumbents pushing the laws. There are the immense burdens of both laws. There is a mountain of evidence they do not work. There is the expert view of the federal government for 30 years. And in response, the MAHC offers "top of my head" conclusions from an industry consultant and theories the State's witnesses refute.

The Court should grant summary judgment for Plaintiff.

RESPECTFULLY SUBMITTED, this the 2nd day of March, 2024.

| | |
|---|---|
| /s/ *Aaron R. Rice* | A. Seth Robbins |
| Aaron R. Rice | MS Bar No. 103096 |
| MS Bar No. 103892 | WATSON JONES PLLC |
| MISSISSIPPI JUSTICE INSTITUTE | 2829 Lakeland Drive, |
| 520 George St. | Suite 1502 |
| Jackson, MS 39202 | Flowood, Mississippi 39232 |
| Tel: (601) 969-1300 | Tel: 601.939.8900 |
| aaron.rice@msjustice.org | srobbins@wjpllc.com *Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

I, Aaron R. Rice, counsel for Plaintiff, hereby certify that the foregoing document has been filed using the Court's ECF filing system and thereby served on all counsel of record who have entered their appearance in this action to date.

This the 2nd day of March, 2024.

/s/ *Aaron R. Rice*
Aaron R. Rice