IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**CHARLES SLAUGHTER**                                                                                    **PLAINTIFF**

vs.                                                                                     Civil Action No. 3:20-cv-789-CWR-ASH

**DR. DANIEL P. EDNEY, in his Official
Capacity as the Mississippi State Health
Officer**                                                                                                          **DEFENDANT**

**MISSISSIPPI ASSOCIATION FOR
HOME CARE**                                                                                       **INTERVENOR DEFENDANT**

**MISSISSIPPI ASSOCIATION FOR HOME CARE, INC.'S
REBUTTAL IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

If Plaintiff Charles Slaughter wants to expand his services to offer in-home physical therapy, he can do so – without any intervention from this Court. But instead, he comes to this federal Court, asking it to override the judgment of the Mississippi legislature and invalidate Mississippi's certificate-of-need ("CON") laws regarding home health agencies and its moratorium on the issuance of new CONS for home health agencies. But recent cases from the Fifth and Sixth Circuit show that Mississippi's CON laws are on good footing. Further, Slaughter says "the question here is whether the moratorium and CON law are a rational way to improve the healthcare system." [96] at 1. This is not the issue. Instead, the issue is whether Slaughter can negate every rational basis for the enactment of these laws. He has failed to do so. Moreover, his arguments regarding the moratorium alone are moot because he has admitted he cannot show that a need for a new CON exists.

1

***The rational basis standard applies.***

As an initial matter, even assuming that Slaughter has not waived his claim that a standard other than rational basis should apply, his new "fundamental right" argument is squarely foreclosed by existing precedent. In 2022, the United States Court of Appeals for the Fifth Circuit held that "[t]he Supreme Court does not now recognize a fundamental right to work and has consistently applied rational basis review 'to state legislation restricting the availability of employment opportunities." *Golden Glow Tanning Salon, Inc. v. City of Columbus, Mississippi*, 52 F.4th 974, 979 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1085 (2023). This is dispositive of the standard. Rational basis review applies to Slaughter's claims.

Although Slaughter's response purports to apply rational basis review, Slaughter's brief actually attempts to impose a standard other than the rational-basis review that has been condoned by the Supreme Court for the United States. For example, Slaughter claims he "laid out the overwhelming evidence that the CON law is irrational" and that MAHC's evidence otherwise is "irrelevant, unserious, or both" and that some is "speculation." [96] at 9. This, he says, "is simply not enough to create a genuine dispute or a rational debate." [96] at 9. But in this, Slaughter is attempting to create a new standard of review in which the rational bases of state legislators for enacting a law can be second-guessed by a federal court's acceptance of a plaintiff's presentation of *post-hoc* empirical evidence. Such a standard runs contrary to the well-established body of case law applying rational basis review.

The Supreme Court has repeatedly rejected the use of *post-hoc* empirical research under rational basis review. *See, e.g., F.C.C. v. Beach Commun., Inc.*, 508 U.S. 307, 315 (1993) (holding that "rational speculation unsupported by evidence or empirical data" is sufficient to sustain a law under the rational basis test) (internal citations omitted); *Minnesota v. Clover Leaf Creamery Co.*,

2

449 U.S. 456, 463 (1981) (upholding a ban on plastic nonreturnables on rational basis review despite the argument that there was no "empirical connection" between the ban on plastic nonreturnables and the purposes articulated by the legislature). *See also Glass v. Paxton*, 900 F.3d 233, 246 (5th Cir. 2018) ("when conceiving of hypothetical rationales for a law, the assumptions underlying those rationales may be erroneous so long as they are 'arguable'").

Federal courts have consistently refused consideration of *post-hoc* empirical data when deciding cases under rational basis review because "there would be no end to judicial interference with legislation touching no end of subject matters." *Colon Health Centers of Am., LLC v. Hazel*, 813 F.3d 145, 159 (4th Cir. 2016)."Our federal system would end up as the loser." *Id.* Slaughter's proposed standard of review based on *post-hoc* empirical data would remove rational basis review from the "paradigm of judicial restraint" into a paradigm of judicial activism, which the Supreme Court has cautioned against. *Beach Commc'ns*, 508 U.S. at 314.

Slaughter cannot seriously dispute that the CON laws are supported, at a minimum, by rational speculation.[1] Remarkably, despite Slaughter's insistence that "the overwhelming evidence [shows] that the CON law is irrational," *see* [96] at 9, he fails to address the single-most on point decision on the matter: *Tiwari v. Friedlander*, 26 F. 4th 355, 358 (6th Cir. 2022).[2] But

---

[1] Although MAHC is not required to offer *post-hoc* evidence to counter Slaughter's *post-hoc* evidence, MAHC's memorandum [94] in support of its response to Slaughter's motion for summary judgment does provide substantial *post-hoc* evidence that the rational goals for Mississippi's home health CON law and moratorium are not speculation but rather that the goals are in fact being met.

[2] Slaughter's reliance on two federal appellate decisions addressing CONS--*Walgreen* and *Medigen* – is misplaced as both of those cases were dormant commerce clause cases and not cases in which the court was applying a rational basis standard. *See Walgreen Co. v. Rullan*, 405 F.3d 50, 59–60 (1st Cir. 2005); *Medigen of Kentucky, Inc. v. Pub. Serv. Commn. of W. Virginia*, 985 F.2d 164, 165 (4th Cir. 1993).

*Tiwari* is not an outlier.[3] Such rational speculation is the reason why federal courts have uniformly upheld healthcare CON laws against every challenge under the Fourteenth Amendment in recent years. *See Colon Health Centers*, 733 F.3d 535; *Birchansky v. Clabaugh*, 955 F.3d 751 (8th Cir. 2020); *Truesdell v. Friedlander*, No. 3:19-CV00066-GFVT, 2020 WL 5111206 (E.D. Ky. Aug. 31, 2020).

Slaughter has never articulated why it would be irrational in the 1970s and 1980s for the legislature to believe that there would be a plausible connection between limiting the number of home health agencies and furthering its interest in (i) containing costs and (ii) ensuring that agencies have a sufficient patient census so as to be able to improve quality, acceptability and continuity of care and provide adequate access to care in rural areas. That Slaughter devoted his brief to arguing that the CON laws are not effective appears to be a tacit admission that the legislature had a rational basis for promulgating them. This tacit admission is furthered by Slaughter's expert's explicit concession that when the CON laws were passed, it was rational to believe they would work as planned. *See* [87] at 2 (discussing Stratmann's "admission that Mississippi's CON laws were 'well-intentioned forty years ago'").

Any reliance by Slaughter on *St. Joseph Abbey* is unavailing. *See, e.g,* [96] at 12 (citing *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223, 226 (5th Cir. 2013)). There, monks selling caskets challenged Louisiana's requirement that only licensed funeral directors and establishments sell caskets intrastate. 712 F.3d at 218. The Fifth Circuit did not consider *post-hoc* evidence. Instead, the only evidence the Court considered was "the setting and history of the challenged rule." *Id.* at 223. That is, the Court contextualized the regulations at issue and concluded that the regulations

---

[3] It is interesting to note that, in opposing MAHC's motion to dismiss this action, Slaughter relied heavily on the *Tiwari* District Court opinion denying a motion to dismiss in that case. *See* [29] at 9-13. Slaughter's silence now regarding the summary judgment and Sixth Circuit opinion in *Tiwari* is deafening.

4

lacked any rational basis. The context included a number of significant observations. Louisiana did not regulate the use of caskets or any other enclosure for burial remains. It had no requirements for how caskets were designed or constructed. It did not require caskets to be sealed. Louisiana permitted individuals to make their own caskets or purchase caskets from out-of-state suppliers. Despite there being virtually no regulations on how caskets were to be constructed or even used, there was a regulation that provided that intrastate sales of caskets could be made only by a state-licensed funeral director at a state-licensed funeral home. But none of the licensure requirements to become a funeral director related to caskets or training regarding caskets. *See id*.

Two purposes were offered to justify the restriction: consumer safety and public health and safety. With respect to consumer safety, the Fifth Circuit found that rationale was "betrayed by the undisputed facts" including that there was no rule addressing the sale of caskets beyond confining intrastate sales to funeral homes and that funeral directors were not required to have *any* training with respect to caskets or counseling grieving customers. *See id.* at 224. Similarly, the proffered justification of "public health and safety" was belied by the fact that Louisiana did not even require a casket for burial, did not impose requirements on their construction or design, did not require a casket to be sealed before burials, and did not require any training in caskets for funeral directors. *Id.* at 226.

To be clear, the arguments in *St. Joseph Abbey* were not about whether the laws actually achieved improvements in consumer safety or public health. Instead, the arguments were about showing that there was no link – speculative or proven – between the regulation and the desired outcome.[4]

---

[4] Similarly, in *Cornwell*, cited by Slaughter, the plaintiff was able to show that its profession – hairbraiding – did not involve haircutting, shampooing, dying, manicures, pedicure, makeup, facials or hair removal and thus was not fairly considered "cosmetology" such that the

But even assuming that Slaughter's *post-hoc* evidence is relevant to the issues being decided by this Court, Slaughter still cannot carry his burden to negate every conceivable basis with that evidence.

### *It is rational to believe that limiting the number of market participants in a market predominantly paid for with government dollars is a way to contain costs.*

Slaughter claims he has presented a "comprehensive argument why the MAHC could not rationally believe that [CONs are lowering costs]." [96] at 9. But in claiming that "every study of home health CONs finds no decrease in costs," Slaughter places more weight on the scholarship than it can bear. *Id.*

Slaughter's response concedes, as it must, that the authors of a 2016 article found that spending on home health care grew faster in non-CON states than in CON states. *See* [96] at 10 (citing Rahman et al. (2016), *The Impact of Certificate-of-Need Laws on Nursing Home and Home Health Care Expenditures*). Slaughter now states only that the finding is "irrelevant" even though his expert, Thomas Stratmann, heavily relied on this study in his report. *See* [86-2] at 24.

But Rahman is not the only scholar to conclude that CON laws contain home health costs. Another study on which Stratmann heavily relied, published by Susan Ettner et al. in 2020 in Home Health Care Services Quarterly, determined that there was "evidence that both [nursing home] and [home health] CON laws did constrain per-patient [home health costs]." [86-15], at 11 of 15. Further, the authors reasoned that the "significant association of [home health] CON laws with lower per-patient costs might support our conjecture that there could be efficiencies resulting from reducing the travel time of home health workers between patients." *Id*. The Rahman and Ettner

---

cosmetology licensing and curriculum could rationally be believed to advance the state's articulated interests in health and safety. *See Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1109-1118 (S.D. Cal. 1999).

studies squarely refute Slaughter's claim that the "'overwhelming' weight of peer-reviewed empirical evidence associates CON laws with higher costs." [96] at 10.  Slaughter cannot simply disregard these 2016 and 2020 studies on which his own expert relied in favor of obsolete studies that rely on data from years or decades earlier and prior to significant changes in the home health market in the United States and now claim that he has "negated every conceivable basis."

Slaughter's argument that "the Fourth Circuit rejects that CONs lower costs even in theory" ignores a more recent (and a more applicable) decision from that court.  In *Colon Health Centers of America*, the Fourth Circuit upheld a CON law, explaining that "[m]any of the classic features of a free market are simply absent in the health care context, and that fact counsels caution when courts are urged to dismantle regulatory efforts to counter perceived gaps and inefficiencies in the healthcare market." *Colon Health Centers*, 813 F.3d at 158 (concluding it was not irrational for legislature to believe the CON program reduced capital costs and the costs to consumers of medical services).

Slaughter's arguments regarding the opinions of the Defendants' expert, Daniel Sullivan, are similarly misplaced.  Slaughter says that Sullivan's opinions are meaningless because he "did not control for differences between states or test for a statistically significant relationship to CON laws." [96] at 9.  But Slaughter's argument ignores the Medicare data presented by Mr. Sullivan and the fact that it is consistent with the 2020 Ettner study in showing that the five states with the higher reimbursement per patient are all states that do not have home health CON programs regulating the number of home health agencies.  *See* [93-12] at 16-17.  Slaughter's suggestion that that home health CONs law increases costs is not supported by the data.

### *It is rational to believe that the CON laws stabilize the patient census of agencies and thus promotes quality.*

Slaughter inaccurately claims that "[t]he research specific to home health unanimously finds that CONs are not linked to improved quality." [96] at 11. Despite claiming that the research is "unequivocal that home health CONs do not improve quality," Slaughter has identified only three studies that tried to measure the quality of home health agencies. [89] at 27. Two of these studies, both from 2014, are of limited relevance because they rely on data from the early 2000s, before the Affordable Care Act was implemented and before any resulting changes were felt. *See* Kyoungrae Jung & Daniel Polsky, Competition and Quality in Home Health Care Markets, [86-12]; Daniel Polsky et al., The Effect of Entry Regulation in the Health Care Sector: The Case of Home Health, [86-13]. One of the studies *predicted* that "removing CON for home health would have *negligible* systemwide effects on health care costs and quality." [86-13] at 1 (emphasis added). That is hardly unequivocal support of Slaughter's argument that CON laws make the quality of home health agencies worse. The other outdated study determined that the effect of competition on home health quality is mixed:

> We find that the relationship between competition and home health quality is nonlinear and its pattern differs by quality measure. Competition has positive effects on functional improvements and the number of visits in most ranges, but in the most competitive markets, functional outcomes and the number of visits slightly drop. Competition has a negative effect on discharges without hospitalization that is strongest in the most competitive markets.

[86-12] at 1. The study concluded that "[f]urther evaluation of and more evidence on how home health care markets function are essential to guide the development of policies to improve quality." [86-12] at 11. Neither is this "unequivocal support" that a CON requirement does not improve the quality of home health services.

The last study cited by Slaughter relied upon Medicare quality data from Home Health Compare by the Centers for Medicare and Medicaid Services ("CMS") for years 2010 through

8

2013. Robert Ohsfeldt & Pengxiang Li, State Entry Regulation and Home Health Agency Quality Ratings, [86-19]. The authors concluded that home health agencies in states with CON were more likely to receive lower quality ratings compared to HHAs in states without CON, but they admitted that "further study is needed" as "the estimated impact of entry restrictions on [home health] quality [may be] substantially overstated" due to the presence of other factors. *Id.* at 14-15. Daniel Sullivan did the further analysis and listed the results in his expert report. Sullivan used the updated CMS Home Health Compare data (the same type of data relied upon in the study cited by Slaughter) and showed that the updated Home Health Compare data demonstrate the opposite conclusion from the Ohsfeldt study. [93-12] at 19-24. In other words, the current data now shows a clear correlation between higher quality and home health CON regulation.

Similarly, Slaughter oversimplifies the issue when he says that "of course, Mississippi already ensures quality through a separate licensure process." [96] at 11. The two attempt to accomplish the same goal at a high level but through different means. Without the CON laws, the State's attempts to impose certain quality measures would go unrealized if the home health agencies do not have a sufficient patient census to allow them to comply. Indeed, it is foreseeable that home health agencies would likely close rather than invest in quality if they lack adequate patient volume. Indeed, an article cited by Slaughter's expert observed that "when the market becomes competitive and profit declines, exit is more attractive to agencies than investing in quality, compared to sectors where high financial losses accompany exit." [86-12] at 3.

Slaughter's response ignores the value that home health CON laws add when they succeed in stabilizing the market and insulating it from the entry and exit of new agencies. In so doing, the CON laws promote continuity of care – a fact that is ignored when Slaughter says that it is irrational to believe that a "few start ups" jumping in the waters of home health could "lead to quality

9

cutbacks at existing agencies" and that patient "reshuffling" to new agencies (that may or may not be able to survive).  *See* [96] at 12-13.

***It is rational to believe that stabilizing the home health market promotes access to care.***

Slaughter has not even attempted to negate that it is rational to believe that using CON laws to ensure adequate patient volume will stabilize the market and ensure increased access to care especially in rural areas of Mississippi.

As an initial matter, access to care, from the point of view of a patient in a rural area, does not have any relationship to the number of agencies operating in an area.  If the agencies have capacity to provide care, the number of *options* is not the controlling factor.  The rural patient is delighted to have access period.

And Slaughter offers no evidence from the patient's point of view.  Slaughter claims that "thousands of patients are denied a referral to a home health agency each year, either because the service need is unavailable or because they lived outside the licensed service area." *See* [96] at 13, [89] at 26, [88-5].  But the data to which Slaughter refers shows how many referrals a single agency denied*, see* [88-5] at 126 (showing that data is regarding patients denied by agency not data concerning whether patients received needed care), but it does not speak to whether the patient was directed to another home health agency.

Slaughter claims that the defendants are relying on "speculation from [their] expert" when they argue that the CON laws ensure sufficient access to home health services, but Sullivan's observations are supported by the data showing every county has multiple agencies as well as the testimony of Dr. Lampton.  *See* [94] at 15-16.

The foregoing is in contrast to Slaughter's wholly unsupported contention that "[t]he research shows that CONs are linked to less rural care." [96] at 14 . Note that in this quote Slaughter

10

carefully omitted any reference to "*home health* CONs." He did so because he relies on studies of hospital CONs, not home health CONs. Neither Slaughter nor his expert provided any support to the contention that home health CONs are linked to less rural care. The only support Slaughter offers for that proposition is that the "theory . . . makes no sense" – a statement supported by a reference to a dormant commerce clause case applying an entirely different standard than rational basis. *See* [96] at 14.

Slaughter contends that while "MAHC offered speculation[,] plaintiff offered evidence," but even assuming speculation were not enough for MAHC to carry its burden (which it undoubtedly is), Slaughter mischaracterizes the record evidence when he suggests that only he has offered evidence with respect to access. Slaughter has not carried his burden with respect to access.

### *It is rational to believe that limiting the number of agencies manages the regulatory burden and allows the State to mitigate against fraud, waste, and abuse.*

Slaughter has not negated the rational basis of managing the regulatory burden. With respect to the rationale that the CON laws deter fraud, waste, and abuse, all Slaughter can say in response is that this rationale is supported by only conjecture and that rationale fails because the law "does not contain any provisions intended to prevent fraud, waste, or abuse." [96] at 15. But Slaughter is wrong in presuming that something more than conjecture is required. He is also wrong in believing that every rational basis must be expressly stated in the law. Further, he misunderstands MAHC's argument. Limiting the number of suppliers in the market alone without any additional requirements allows closer scrutiny of those suppliers and thus fraud, waste, and abuse can be deterred. *See* [83] at 19 (citing *Tiwari*, 226 F.4th at 364).

### *Slaughter has not shown there is no rational basis for the moratorium.*

Mr. Slaughter's challenge to the moratorium and his challenge to the certificate-of-need regulatory scheme outside of the moratorium should be considered separately. Despite Slaughter's

11

argument otherwise, there was a purpose for the moratorium: to "limit the proliferation of new agencies that would potentially increase costs to Federal insurance programs and to avoid the potential adverse impact on small agencies serving rural counties." *See* Expert Report of Daniel J. Sullivan, [93-12] at 7. The initial administrative moratorium expired by the time that the Mississippi Legislature decided to impose a legislative moratorium in 1983, and after several bills that extended the moratorium for a definite period of time, decided to make the moratorium indefinite. *See id.* Though the Legislature has considered several bills over the years that would have repealed the moratorium, the Legislature has determined that it has been, and still is, appropriate to retain it. *See id.*[5]

With the moratorium in place for some 40 years, the above discussion provides real evidence that it is helping Mississippi keep medical costs from rising as fast as in states without CONs laws for home health agencies, it is helping Mississippi maintain its status as a 4-star quality ranking by CMS, and it is supporting access to care and continuity of such care in Mississippi.

Here, Slaughter has failed to carry his heavy burden of negating "every conceivable basis" that might support the CON laws. *See id*. As a result, this Court should grant summary judgment in favor of the Defendants.

***Slaughter has not shown that there is no rational basis for the exemptions.***

Slaughter's response to MAHC's arguments regarding the CON exemptions is not compelling. The only new argument is that "[i]t is irrational to believe that a CON law would simultaneously increase access for home health agencies and decrease access for physicians." [96]

---

[5] Slaughter argues that "incumbent providers" have been "tirelessly warding off repeal [of the moratorium] for the last 43 years," *see* [96] at 8, but the testimony shows that MAHC *reduced* its spending on lobbying in the last ten years given what the lobbyist was doing in exchange for his annual flat fee. *See* [93-13], p. 87-89.

at 16. Mississippi's home health CON law and moratorium promote access by stabilizing the market – a market far different from a physician's clinic, that is, a market where health care services are brought to the patient's home instead of the patient going to the clinic. The markets are different and are justifiably treated accordingly.

Here, as in *Tiwari*, the State could have "drawn [the line] differently" no doubt. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). "But that consideration is one for the State legislature, not the judiciary, to make." *Id.* To pass a law that survives rational-basis review on an equal protection claim, the State need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970).

## CONCLUSION

For all the reasons set forth above, MAHC respectfully requests that the Court grant its motion for summary judgment.

This the 22nd day of March, 2024.

MISSISSIPPI ASSOCIATION FOR HOME CARE

By: */s/Caroline B. Smith*
    PAUL N. DAVIS (MB #8638)
    THOMAS L. KIRKLAND, JR. (MB #4181)
    CAROLINE B. SMITH (MB #105501)

    ITS ATTORNEYS

OF COUNSEL:

BUTLER SNOW LLP
1020 Highland Colony Parkway
Post Office Box 6010
Ridgeland, Mississippi 39158-6010
(P) (601) 948-5711
(F) (601) 985-4500
(E) paul.davis@butlersnow.com

(E) tom.kirkland@butlersnow.com
(E) caroline.smith@butlersnow.com

## **CERTIFICATE OF SERVICE**

I, Caroline B. Smith, do hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 22nd day of March, 2024.

*/s/Caroline B. Smith*
Caroline B. Smith
