**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

CHARLES SLAUGHTER, *Plaintiff,*

v.   NO. 3:20-CV-789-CWR-ASH
ORAL ARGUMENT REQUESTED

DR. DANIEL P. EDNEY,
IN HIS OFFICIAL CAPACITY AS THE
MISSISSIPPI STATE HEALTH OFFICER, ET AL.   *Defendants.*

**PLAINTIFF'S REPLY IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

As a nation of free people, we enjoy the right to choose our field of employment subject only to reasonable regulation. The State ignores this basic truth, portraying economic rights as subject to the whims of government officials. In its view, the State may require new home health agencies to demonstrate that they are "needed," even if evidence conclusively "proves" that this requirement serves no legitimate purpose. Moreover, the State can ban new agencies for decades without even allowing them to offer proof that they are "needed," so long as the government already knows – based on a rudimentary mathematical formula – that they aren't. The State's failure to maintain the data that same formula depends on is of no moment, so long as one of the State's witnesses has "never heard anyone say" more agencies are needed. Nor does it matter that the State's own witnesses refute its asserted justifications for the laws. And if all else fails, hypothetical paperwork reductions suffice to justify the laws. Real harms to consumers and entrepreneurs, meanwhile, are irrelevant. All of this, the State says, is perfectly "rational." Thankfully, that assessment is based on several fundamental errors, as Plaintiff explains below.

**ARGUMENT**

**I.     THE STATE MAKES NO ATTEMPT TO REBUT PLAINTIFF'S EVIDENCE.**

The State's response does not even attempt to refute the evidence presented in Plaintiff's Motion for Summary Judgment, Doc. 89 ("Pl's. MSJ").[1] Instead, the State asserts that evidence is "totally irrelevant" under rational-basis scrutiny. State's Resp. at 9. Thus, throughout its response, the State continues to rely solely on hypothetical justifications that have been thoroughly contradicted by the record. What's more, the State says those hypothetical justifications are irrebuttable. "[E]ven if, as a matter of fact, Plaintiff could *prove*" the challenged laws did not advance them, the laws "would *still* be rational[.]" *Id*. at 27 (emphasis original).

Further still, even the State's *own* evidence is futile. The fact that *both* the State's retained expert *and* its star fact witness flatly oppose the moratorium is swept aside as "wholly irrelevant to rational basis review." *Id.* at 30. Testimony from other State witnesses that directly contradict its "regulatory burden" rationale are completely ignored. *See* Pl's. MSJ (Doc. 89) at 17. In short, the rational-basis test is an impenetrable fortress, so there is no need for the State to repel an assault.

The Supreme Court has made clear, however, that the rational-basis test "is a presumption of fact," meaning that it imposes "a rebuttable presumption" that the challenged statute is constitutional. *Borden's Farm Prods. v. Baldwin*, 293 U.S. 194, 209 (1934). That State's view transforms the test into exactly what the Court has said it is *not:* "a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault" by "treating any fanciful conjecture as enough to repel [legal] attack." *Id.* While plaintiffs in rational-basis cases "must carry the burden" of demonstrating that a challenged law is unconstitutional, they may do so "by a resort to common knowledge or other matters which may be judicially noticed, or to other

---

[1] Plaintiff has also filed a Fed. R. Civ. P. 6(b) motion (Doc. 99).

legitimate proof, that the action is arbitrary." *Id. See also States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) ("the existence of facts supporting the legislative judgment is to be presumed . . . *unless* in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis.") (emphasis supplied).

As the Fifth Circuit has confirmed, the presumption of constitutionality in cases of economic regulation *can* be rebutted where the evidence is strong enough to negate any plausible state interest. *See e.g. St. Joseph Abbey*, 712 F.3d at 223. This makes sense. It is one thing for a court to accept a rational explanation for a given law when that explanation is supported – or, at a minimum, not contradicted – by the record, leaving it to the legislative branch to determine what is an advisable course to reach a legitimate end. It is quite another thing to ignore overwhelming evidence that the challenged law has no legitimate public purpose and in fact serves plainly illegitimate purposes. "[R]ational basis scrutiny is not tantamount to an abdication of the judiciary's responsibility 'to say what the law is.'" *United States v. Robinson*, 119 F.3d 1205, 1210 (5th Cir. 1997) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

The State's failure to even acknowledge Plaintiff's evidence, much less rebut it, pervades every argument it makes and is fatal to all of them. "When a plaintiff provides a court with undisputed context that betrays the otherwise rational basis the state has offered, the state can no longer expect the court's deference." *Lucid Group USA, Inc.*, 2023 WL 5688153, at *3 (citing *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 323 (5th Cir. 1999)).

II. **GOVERNMENT PAYMENT DOES NOT REMOVE THE REQUIREMENT OF RATIONALITY.**

Throughout its response, the State asserts that this case is somehow different from every other rational-basis challenge because the government is a "major payor" of home health services. *See e.g.* State's Resp. at 20. To begin with, the *federal* government often pays for home health

3

services through Medicare, but the State of Mississippi rarely does, since it is difficult for Medicaid patients to qualify for those services. Lampton Depo. (Doc. 88-2) at 51:19–52:19. Even if that were not the case, the fact that a law involves government funding does not exempt it from the basic requirement of rationality. *See e.g. U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (rejecting rationality of preventing fraud in food stamp program by requiring all members of recipient households to be related). The State does not even attempt to refute the overwhelming evidence that CON laws are *not* lowering the costs of home health services, and in fact, are likely raising them. Pl's. MSJ (Doc. 89) at 22–23. The mere fact that the State may occasionally pay for a service does not allow it to pursue irrational methods of containing the cost of that service.

Moreover, the State incorrectly asserts that its status as a payor of home health services allows it to maintain the moratorium solely for its own administrative ease, regardless of whether doing so benefits consumers in any way. *See e.g.* State's Resp. at 24; *contra Newell-Davis v. Phillips*, 2023 WL 1880000 at *4 (5th Cir. 2023). To support this assertion, the State claims that *Newell-Davis* is distinguishable because it dealt with respite care providers, which it says are not "government payor services[.]" State's Resp. at 24. But that is wrong. The State of Mississippi *does* pay for respite care through the Medicaid Home and Community-Based Services (HCBS) waiver program.[2] And even if it did not, that would not mean the State could enact a total prohibition on new home health agencies for the sole purpose of reducing applications or inspections. *See e.g. Vlandis v. Kline*, 412 U.S. at 451 (1973) (the state's interest in "administrative ease" does not satisfy due process); *Plyler v. Doe*, 457 U.S. 202, 227 (1982) ("preservation of resources standing alone can hardly justify" the denial of equal protection).

---

[2] *See* Mississippi Division of Medicaid, "HCBS Waiver Providers," available at: https://medicaid.ms.gov/hcbs-waiver-providers/ (last visited March 22, 2024).

### III.     PLAINTIFF DOES NOT HAVE TO PROVE THE EXISTENCE OF AN UNMET "NEED."

Without a hint of irony, the State blames *Mr. Slaughter* for the fact that it has arbitrarily prohibited him from pursuing his dream, saying he "has never even tried" to convince the Board of Health that there is a "need" for his services. State's Resp. at 33-34. To begin with, the suggestion that an entrepreneur should divine that his recourse lies with a board that is appointed, virtually invisible, and powerless to repeal the moratorium is nonsensical. It also ignores that the liberty to enter trade is not reserved for supplicants of government officials but is a constitutional right subject only to reasonable regulation.

Not content with merely shifting blame, the State goes further, claiming that "Plaintiff's failure to establish 'need' is fatal to his claims." State's Resp. at 34. That is wrong. As for his challenge to the CON law, whether Plaintiff's services are "needed" is completely irrelevant. The entire point of his challenge is that requiring home health agencies to prove their services are "needed" is irrational and he should *not* be required to do so.

As for Plaintiff's challenge to the moratorium, a lack of "need" would *only* be relevant if the State were arguing that his claim is *moot* because he would not qualify for a CON even if the moratorium were struck down. If the State could make that argument, it surely would. It cannot because it doesn't even collect the data its "need" methodology relies on. *See* Pl's. MSJ (Doc. 89) at 18. And the State's *ipse dixit* assertion that "[t]here continues to be 'no need'" is not enough to moot Plaintiff's claim. State's Resp. at 21. "[A] case is not necessarily moot because it's uncertain whether the court's relief will have any practical impact on the plaintiff. 'Courts often adjudicate disputes where the practical impact of any decision is not assured.'" *Dierlam v. Trump*, 977 F.3d 471, 477 (5th Cir. 2020) (quoting *Chafin v. Chafin*, 568 U.S. 165 (2013).

That is particularly true here, where the State has all but abandoned any pretense that it knows whether Plaintiff's home health agency is "needed." *Compare* State's Motion for Judgement on the Pleadings (Doc. 19) at 23 ("MSDH and the Board of Health *consistently find* that there is not a need for additional HHAs.") (emphasis supplied) *with* State's Motion for Summary Judgment (Doc. 85) at 10 ("To date, there has *never been a 'need' shown* for additional HHA providers") citing Lampton Depo. (Doc. 85-7) at 190:17-18 ("I've never *heard anyone say* we need more home health agencies.") (emphasis supplied). If government defendants could moot constitutional challenges based solely on what they claim *not* to have heard through the grapevine, no plaintiff would ever succeed. Fortunately, that is not the law. *See e.g. Dierlam*, 977 F.3d at 477.

Further, all of this ignores that the State's "need" methodology – which calculates future "need" based solely on how many patients were served in the past, regardless of whether sufficient services were available to begin with – is irrational. The only actual evidence about the real-world need for home health services in the Jackson-Metro area comes from Plaintiff's testimony and indicates there *is* such a need. Slaughter Depo. (Doc. 89-3) at 121:21–122:1 (Q: "[Y]ou are personally aware of patients who need that treatment in home health and were not receiving it; is that right? A: I am definitely personally aware of that.").

**IV.    THE INQUIRY IS WHETHER THE LAWS ARE RATIONAL TODAY, NOT WHEN ENACTED.**

The State claims that "in recent years" courts have been hesitant to apply the changed-circumstances doctrine, citing decisions from other circuits in the 1980s and 90s. State's Resp. at 10-11. To begin with, the context of the legislative moratorium's adoption illustrates that it was *never* constitutional and was instead designed solely to protect existing agencies from competition with hospitals. *See* Pl's. MSJ (Doc. 89) at 4–8. Setting that aside, the State's suggestion that the changed-circumstances doctrine is itself a victim of changed circumstances is misplaced. As

recently as 2014, the Supreme Court refused to evaluate the rationality of aggregate limits on campaign contributions based on the outdated facts present in 1976 and instead evaluated those limits in light of modern experience. *McCutcheon v. FCC*, 134 S. Ct. 1434, 1456 (2014). In 2013, the Court struck down parts of the Voting Rights Act of 1965 because those measures were predicated on "decades-old data and eradicated practices." *Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2617 (2013). And in 2005, the Court struck down laws prohibiting the direct shipment of wine by out-of-state wineries that had been made obsolete by advances in technology allowing regulators to easily monitor the wineries. *Granholm v. Heald*, 544 U.S. 460, 492 (2005).

The Fifth Circuit has long recognized the doctrine of changed circumstances. *Seaboard Air Line R.R. Co. v. City of West Palm Beach*, 373 F.2d 328, 329 n.3 (5th Cir. 1967) ("the slightest reflection would disclose the fallacy of a rule which would require a determination of the reasonableness of a long-standing ordinance in the light of circumstances and conditions that may have existed at the time of its adoption"). And the only federal district court opinion cited by the State from the Fifth Circuit, *Santos v. City of Houston*, recently invoked the doctrine to overturn a law. 852 F. Supp. 601, 608-09 (S.D. Tex. 1994) (striking down a law passed in 1924 to protect a city's streetcar industry that had ceased to exist 70 years later.). Other courts of appeals have also recently applied the doctrine. *See, e.g., Dias v. City and Cnty. of Denver,* 567 F.3d 1169, 1183 (10th Cir. 2009) (reversing a dismissal of a challenge to a pit-bull ban because "although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science in 2009 is such that the bans are no longer rational").

The Supreme Court has recognized since the inception of the modern rational-basis test that a law that may have once been rational can be rendered irrational due to changed factual circumstances of the world. *Carolene Prods.,* 304 U.S. at 153 (1938) ("[T]he constitutionality of

7

a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."). Indeed, the filled-milk statute upheld in *Carolene Products* was invalidated a little over thirty years later when fundamental changes in the filled-milk industry rendered its continued application irrational. *Milnot Co. v. Richardson,* 350 F. Supp. 221, 224 (N.D. Ill. 1972). This makes sense. If an irrational law is enforced against someone today, it is no comfort that the law may have been rational in the abstract at the moment of its passage half a century ago. That State's suggestion otherwise is a fundamental misreading of the law that would render courts powerless to prevent enforcement of utterly irrational laws based on nothing more than the happenstance of the time they were enacted.

## V.   COVID-19 INCREASED THE DEMAND FOR AND IMPORTANCE OF HOME HEALTH CARE.

The State argues that home health services actually "*decreased* across the State" during the COVID-19 pandemic. State's Resp. at 13, n. 2 (emphasis original). For support, the State relies on the report of its retained expert, which states that the unduplicated[3] count of patients in Mississippi declined between 2015 and 2020. *See* Sullivan Rep. (Doc. 84-4) at 6. Like other arguments advanced by the State, however, this claim was flatly refuted by the Health Department's primary representative. And he should know: *the Department supplied the erroneous figures the State's expert relied on*. *See* Lampton Depo. (Doc. 89-2) at 148:15–19 ("Q: [The] report by Mr. Sullivan … lists the unduplicated count of patients for 2010, 2015, and 2020? … A: The non-duplicate numbers are wrong. But they were wrong in [the Health Department report cited by Sullivan].").

When the *correct* figures are consulted, they reveal that "there was an *increase* in utilization from 2015 to 2020." *Id.* at 150: 18–19 (emphasis supplied). In fact, another prominent

---

[3] The Department's "non-duplicated" count of patients is derived by "only counting one person one time" regardless of any subsequent readmission. Lampton Depo. (Doc. 89-2) at 126:1–19. This "non-duplicated" count is the number the Department uses to record the utilization of home health services by Mississippi patients in the State Health Plan. *See id.* at 151:12-16.

8

source cited by the State's own expert, the Medicare Payment Advisory Commission (MPAC), similarly confirms this. *See* MPAC, DataBook, July 2023 at 110.[4] According to the Commission, "the share of [hospital] discharges that received home health care services increased relative to the pre-pandemic period and relative to the share that received [nursing home] care. The shift to home health care reflected the pandemic-related effects experienced by nursing homes and the reluctance of beneficiaries to use them." *Id.* And, if the actual numbers are not enough to convince the State, the direct experience of its own key witness should remove any doubt. *See* Lampton Depo. (Doc. 89-2) at 104:6–21 (there was an "increased need for home health" during COVID-19 since Mississippi physicians "utilized home health more frequently.").

Moreover, the State's attempt to cast doubt on the increased *use* of home health services is a red herring. Plaintiff's entire point is that there was an increase in *demand*. That much is clear. *See e.g.* Slaughter Depo. (Doc. 89-3) at 111:2–112:2 ("Q: Have you had any other phone calls from patients who were interested in home health services from you? A: Right. Especially during the COVID time, that seemed to be more people wanting you to come to their home."). Whether existing providers in an artificially limited market during a dangerous pandemic were able or willing to *meet* that increased demand is an entirely separate question. *See e.g.* Mid-Delta Letter Requesting Emergency Waiver (Doc. 89-28) at MSDH 000470 (reporting that home health agencies did not want to accept patients discharged from hospitals during COVID.)

In the end, the State cannot avoid the real issue by resorting to erroneous figures. There is *zero* genuine dispute that home health services played a vitally important role during the pandemic. *See e.g.* Knight Depo. (Doc. 89-8) at 54:6–9 ("Q: Did MAHC believe that the importance of home healthcare was increased in any way by the COVID-19 pandemic? A: I would say yes."). There is

---

[4] Available at https://www.medpac.gov/wp-content/uploads/2023/07/July2023_MedPAC_DataBook_SEC.pdf (last visited March 22, 2024).

likewise no dispute that this spurred Plaintiff to dedicate his considerable skill and expertise to the cause, but the challenged laws prevented him from doing so. The retention of those laws throughout the pandemic – and even afterwards – betrays their supposed rationality.

### VI. COURTS HAVE STRUCK DOWN CON LAWS AND ROUTINELY OVERTURN TOTAL BANS.

The State claims that "Plaintiff can point to no case law supporting overturning CON [laws] as unconstitutional." State's Resp. at 35. The State appears to overlook *New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) (striking down need review for ice manufacturers). *New State Ice Co.* came after the Supreme Court adopted "the presumption of constitutionality" for economic legislation. *O'Gorman & Young, Inc. v. Hartford Fire Ins. Co.*, 282 U.S. 251, 257 (1931). It has never been overruled, and its basic principle – that states may not arbitrarily restrict entry into a trade simply to protect established firms against competition – remains valid. This was demonstrated recently in another case striking down a CON law, *Bruner v. Zawacki*, 997 F. Supp. 2d 691, 699 (E.D. Ky. 2014) (overturning need review for moving companies).

Moreover, the moratorium is not simply a CON law – it is a complete prohibition on new home health agencies. On that score, it is the State that has little authority to support its position. Indeed, federal authorities are arrayed against total prohibitions of economic activities. *See e.g. St. Joseph Abbey v. Castille,* 712 F.3d 215 (5th Cir. 2013) (striking down banning direct casket sales); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) (same); *Santos v. City of Houston,* 852 F. Supp. 601 (S.D. Tex. 1994) (overturning ban on jitneys); *Brown v. Barry,* 710 F. Supp. 352 (D.D.C. 1989) (striking down ban on street-corner shoeshine stands). The State never grapples with the fact that, despite the deference it is afforded under rational basis review, it's defense of the moratorium swims against a strong current of jurisprudence holding complete prohibitions of economic activities unconstitutional.

## CONCLUSION

The Plaintiff respectfully requests the Court to grant summary judgment in his favor.

RESPECTFULLY SUBMITTED, this the 22nd day of March, 2024.

| | |
|---|---|
| /s/ *Aaron R. Rice* | A. Seth Robbins |
| Aaron R. Rice | MS Bar No. 103096 |
| MS Bar No. 103892 | WATSON JONES PLLC |
| MISSISSIPPI JUSTICE INSTITUTE | 2829 Lakeland Drive, |
| 520 George St. | Suite 1502 |
| Jackson, MS 39202 | Flowood, Mississippi 39232 |
| Tel: (601) 969-1300 | Tel: 601.939.8900 |
| aaron.rice@msjustice.org | srobbins@wjpllc.com     *Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

I, Aaron R. Rice, counsel for Plaintiff, hereby certify that the foregoing document has been filed using the Court's ECF filing system and thereby served on all counsel of record who have entered their appearance in this action to date.

This the 22nd day of March, 2024.

    /s/ *Aaron R. Rice*
    Aaron R. Rice

11