

_____

No. 3:20-CV-789-CWR-ASH

DR. CHARLES SLAUGHTER,

*Plaintiff,*

*v.*

DR. DANIEL P. EDNEY,
IN HIS OFFICIAL CAPACITY AS
THE MISSISSIPPI STATE HEALTH OFFICER,

*Defendant.*

_____

ORDER

_____

Before CARLTON W. REEVES, *District Judge.*

Plaintiff Charles Slaughter is a licensed physical therapist and entrepreneur. He sought to expand his practice by providing home health services but was unable to pursue this endeavor under Mississippi law. In Mississippi, a certificate of need ("Certificate") is required to establish a home health agency, and a statutory moratorium has banned all issuances of Certificates since 1983. Therefore, no new Certificates have been

issued, and no Certificate applications have been reviewed, for over forty years. Dr. Slaughter filed the current action before this Court, challenging the constitutionality of both the Mississippi Health Care Certificate of Need Law, *see* Miss. Code Ann. §§ 41-7-171 *et seq.* (the "Certificate Law"), and the related moratorium on issuing new Certificates, *see* Miss. Code Ann. § 41-7-191(9) and 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2 (the "Moratorium"). Specifically, Dr. Slaughter claims that both laws violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the Due process and Equal protection provisions of the Mississippi Constitution. He cannot offer home health services without a Certificate, and he cannot receive a Certificate because of the four-decade-long Moratorium.

There are two other parties to this suit: Defendant Dr. Daniel P. Edney,[1] in his official capacity as the State Health Officer of the Mississippi State Department of Health (the "MSDH"), and Intervenor-Defendant Mississippi Association for Home Care ("MAHC"; collectively "Defendants"), a non-profit whose membership consists of Certificate-holding home health agencies. Both Defendants, as well as Dr. Slaughter, have respectively filed a motion for summary judgment. While Dr. Slaughter claims that the challenged laws are facially unconstitutional, the Defendants' motions attempt to find rational bases to support them.

These three competing motions for summary judgment are now before the Court. Docket Nos. 82, 84, and 88. Each party's

---

[1] Dr. Edney was substituted as Defendant for his predecessor at the MSDH, Dr. Thomas Dobbs. Text-Only Order dated February 2, 2023.

motion is granted in part and denied in part. The Certificate Law survives review, but the Moratorium on issuing Certificates must be lifted on Due Process grounds.

## I.

## Background and Factual History

### A. Certificates of Need

Certificates are not uncommon in the health care industry. Certificates of need are state regulatory mechanisms for approving major capital expenditures and projects for certain health care facilities, including home health agencies. *See Certificate of Need State Laws*, National Conference of State Legislatures (Apr. 29, 2025), https://www.ncsl.org/health/certificate-of-need-state-laws. Essentially, these Certificates are authorizations that must be procured by health care organizations before making changes to any new or existing medical facility. Maggy Bobek, *Why Do Some States Still Require Healthcare Certificates of Need?*, Definitive Healthcare (Aug. 2, 2023), https://www.definitivehc.com/blog/why-do-some-states-still-require-certificates-of-need. The purpose of Certificates, as well as the laws regulating Certificate access, is to maintain health care costs by preventing duplicative or generally unnecessary services in a community. *Id*.

Certificate programs were introduced to the health care field in 1964 to review capital expenditures and regulate hospital service expansion. *See New York*, Inst. For Just., https://ij.org/report/conning-the-competition/state-profile/new-york/ (last visited January 8, 2026); *see also* Bobek, *Why Certificates?*. This innovation spread throughout the country after Congress

passed the National Health Planning Resources and Development Act in 1974, which threatened to withhold federal funds from states without Certificate programs. *Id.* The subsequent expansion was so drastic that, by 1982, Louisiana was the only state without an established Certificate program. NCSL, *Certificate of Need State Laws*.

But this boom was short lived. The federal government began favoring market incentives rather than policy regulations to address health care costs and, thereafter, Congress repealed the National Health Planning Resources and Development Act in 1986. Johanna Butler et al., *Should We Re-Invent State Health Planning and Certificate-of-Need Programs ?*, National Academy for State Health Policy, (June 29, 2020) https://nashp.org/should-we-re-invent-state-health-planning-and-certificate-of-need-programs/. This, of course, gave states authority to choose whether to continue their established Certificate programs. The Mississippi Legislature chose to do so.

### B. Mississippi's Certificate Law and Moratorium

The Mississippi Legislature adopted the Certificate Law in 1979. *See* Miss. Code Ann. §§ 41-7-171 *et seq*. This statute established Mississippi's Certificate program and provides administrative authority to the MSDH. *Id*. In sum, the Certificate Law requires issuance of a Certificate before any changes are made to a health care facility, as well as before certain health service actions are taken. *Id*. at § 41-7-191.

The Mississippi Health Care Commission ("HCC") was established to implement the Certificate Law. The HCC began meeting in June 1980, with an initial goal of creating standards

for determining the need for home health agencies.[2] Excerpts of 1980 HCC Meeting Minutes, Docket No. 84-5 at 3-4. A home health agency (hereinafter, also referred to as an "HHA") is a medical provider that offers personalized health care services to patients in the convenience and privacy of their homes.

In September 1980, the HCC first discussed procedures that could be used to assess the need for home health care services. *Id.* at 9. In November 1980, it began developing licensing laws for home health agencies. *Id.* at 14. HCC staff prepared the initial licensing standards for home health agencies seeking a Certificate and pre-filed their proposal with the State Legislature. *Id.* at 17. The licensure law passed during the 1981 Legislative Session.

With a new licensure law preparing to take effect, the HCC voted to implement a six-month administrative moratorium on issuing Certificates to home health agencies to allow time to compile additional information. *Id.* at 42. Thus, the initial "administrative moratorium" was adopted in June 1981. This decision was based, in part, on the assurance that each county in the state was covered by at least two home health agencies. *Id.* at 38-39. Because of continued disagreement over the most effective way to assess need, the HCC voted to extend the

---

[2] This was not the sole purpose of the HCC, but standards for HHAs were needed at the time. In 1980, there were already predetermined standards and criteria to be used to determine need for other health care facilities. Excerpts of 1980 HCC Meeting Minutes, Docket No. 84-5 at 3.

administrative moratorium *at least* three times between 1981 and 1983.

In 1983, the Legislature passed H.B. 927, which included the Moratorium that remains in effect today.[3] *Id*.at 91. This Moratorium indefinitely prohibits the issuance of Certificates to expand or establish, not just home health agencies, but any health care facility. Miss. Code Ann. § 41-7-191(9). The Moratorium has remained codified for over forty years, and the only disturbance it has encountered was a legislative vote to remove its statutory repealer.[4]

The HCC initially took no stance on the need for a Legislative Moratorium. Excerpts of 1980 HCC Meeting Minutes, Docket No. 84-5 at 95. But in January 1984, the HCC voted to publicly state its opposition to continuing the Moratorium beyond July 1, 1985 or to adopting any additional administrative moratoria. Excerpts of 1984 HCC Meeting Minutes, Docket No. 88-20 at 11. The HCC's opposition fell on deaf ears. In 1987, the

---

[3] In the meeting following passage of the Moratorium, the HCC adopted a policy recognizing that statutory law superseded its rules. Excerpts of 1980 HCC Meeting Minutes, Docket No. 84-5 at 98. During that meeting, the HCC also planned to draft a policy delineating its authority to limit monopolistic activity in the home health care industry given the Legislative Moratorium. *Id.*

[4] Meanwhile, the Certificate Law has undergone several changes. Most recently, the Mississippi House Public Health and Human Services Committee approved language in a Certificate bill that would make it "easier for medical facilities to make capital improvements[.]" Gwen Dilworth, *House Committee Passes Certificate of Need Bill, Eyes Further Changes*, Mississippi Today (January 7, 2026), https://mississippitoday.org/2026/01/07/certificate-of-need-bill-changes/.

HCC was abolished and the MSDH became the "sole and of-
ficial agency in the State of Mississippi to administer and su-
pervise" the Certificate Law. Miss. Code Ann. § 41-7-175.
Much has changed in the State of Mississippi since then, but
the Moratorium has remained.

Today, the Moratorium reads:

> The Department of Health shall not grant approval for
> or issue a certificate of need to any person proposing
> the establishment of, or expansion of the currently ap-
> proved territory of, or the contracting to establish a
> home office, subunit or branch office within the space
> operated as a health care facility as defined in Section
> 41-7-173(h)(i) through (viii) by a health care facility as
> defined in subparagraph (ix) of Section 41-7-173(h).

Miss. Code Ann. § 41-7-191(9).[5] To be clear, the Moratorium
does not preclude an existing health care facility from trans-
ferring or assigning its Certificate so long as it receives ap-
proval from the MSDH. *See* Miss. Code Ann. § 41-7-195(1). It
only bars approving or issuing a Certificate to a new health
care facility.[6]

─────────────────────────

[5] The statutory definition of a "health care facility" includes home health
agencies. Miss. Code. Ann. §§ 41-7-173(h) and (h)(ix).

[6] Mississippi defines a home health agency as "a public or privately
owned agency or organization, or a subdivision of such an agency or or-
ganization, properly authorized to conduct business in Mississippi, which
is primarily engaged in providing to individuals at the written direction
of a licensed physician, in the individual's place of residence, skilled nurs-
ing services provided by or under the supervision of a registered nurse

### C.  Mississippi Health Care Under the Moratorium

Mississippi defines a Certificate of Need as "a written order of the State Department of Health setting forth the affirmative finding that a proposal in prescribed application form, sufficiently satisfies the plans, standards and criteria" outlined by the MSDH. Miss. Code Ann. § 41-7-173(b). It applies to constructing new facilities, relocating existing health care facilities, and the provision of various services including, as relevant here, home health services. Miss. Code Ann. § 41-7-191.

Mississippi has not approved a Certificate for a new home health agency in over forty years. In fact, the MSDH does not even review Certificate applications for home health agencies under the Moratorium. The only home health agencies that exist in Mississippi are those that either predate the Certificate Law or those that were approved in the short period before the initial moratorium, between 1979 and 1981.

When the Moratorium was enacted, there were at least 135 home health agencies operating in the state. *See* MSDH

---

licensed to practice in Mississippi, and one or more of the following additional services or items:

1. Physical, occupational, or speech therapy;
2. Medical social services;
3. Home health aide services;
4. Other services as approved by the licensing agency;
5. Medical supplies, other than drugs and biologicals, and the use of medical appliances; or
6. Medical services provided by a resident in training at a hospital under a teaching program of such hospital.

Miss. Code Ann. § 41-7-173(h)(ix).

Response in Opposition, Docket No. 92 at 15-16 (citing sworn testimony). Of those, over 80 were operated by the MSDH. *Id*. The remaining 55 were either privately owned, or operated by local government. *Id*. at 16. That number has since declined. At the time Plaintiff filed his Complaint, there were 46 operational private home health agencies and the last of the state-operated HHAs have been "shuttered[.]" *Id*.; *see also* 2020 MSDH Report on HHAs, Docket No. 88-5 at 6. The MSDH believes this post-Moratorium decline in home health agencies is insignificant and merely reflects current trends. Nevertheless, a 16% decrease in private home health agencies has occurred.

Both the MSDH and MAHC maintain that no potential provider seeking to establish a new home health agency has met the high bar of showing need warranting issuance of a Certificate and, thus, there is no need to lift the Moratorium. Defendants also allege that there is no need for new home health agencies altogether; therefore, they see no need to lift the Moratorium barring review of new Certificate applications. They believe Mississippians are being adequately served by the home health agencies currently in existence.

### D. Dr. Slaughter Faces the Moratorium

This is the landscape the plaintiff seeks to navigate. Dr. Slaughter is a licensed physical therapist and entrepreneur affected by the Certificate Law and the Moratorium. He hoped to expand his services to include in-home physical therapy during the COVID-19 pandemic. Yet, he could not provide these services without first obtaining a Certificate, and he could not obtain a Certificate because of the Moratorium.

These frustrating circumstances inspired Dr. Slaughter to file suit challenging the constitutionality of the Certificate Law and the Moratorium. MAHC was granted permission to intervene as a defendant. Docket No. 24. At the pleading stage, the Court found that Dr. Slaughter's allegations plausibly stated a claim against the MSDH. *See Slaughter v. Dobbs*, 579 F. Supp. 3d 842 (S.D. Miss. 2022); *see also* Docket No. 32. The Court now considers the parties' cross-motions for summary judgment, along with the memoranda[7] they have respectively filed in support thereof.

## II.

### Legal Standard

A party may move for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. Rule Civ. P. 56(c)). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations and quotation marks omitted).

---

[7] The Court also considers the arguments presented in the briefs filed in this action. Docket Nos. 83, 85, 89, 92-96, 100, and 102-04.

On cross-motions for summary judgment, the Court must "examine each party's motion independently and view the evidence and inferences in the light most favorable to the non-moving party." *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 806, 811 (5th Cir. 2019) (cleaned up). Each party's motion embraces the same issues in either support or against the challenged laws. The Court considers all issues raised, and casts them in the light most favorable to the non-movant.

### III.

### Discussion

Dr. Slaughter alleges violations of the Due Process and Equal Protection Clauses of the United States Constitution, as well as the Due Process and Equal Protection[8] provisions of the Mississippi Constitution. This Court has already determined that Dr. Slaughter's "federal due process and equal protection claims are subject to rational-basis scrutiny." *Slaughter*, 579 F. Supp. 3d at 846 (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)). Mississippi requires the same due process and equal protection guaranteed by the Federal Constitution. *See Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2017 WL 3175915, at *5 (S.D. Miss. July 25, 2017); *see also Stallworth*, 936 F.3d at 227 n.5. Thus, the Court analyzes Dr.

---

[8] While the Mississippi Constitution has no explicit equal protection clause, it is well-established that Mississippi law "finds an equal protection component in its Due Process Clause." *Stallworth v. Bryant*, 936 F.3d 224, 227 n.5 (5th Cir. 2019) (quoting Jeffrey Jackson et al.'s *Encyclopedia of Mississippi Law* and citing Mississippi Supreme Court precedent).

Slaughter's state and federal claims together under rational basis review.

Dr. Slaughter's state and federal Due Process arguments are assessed first, followed by his state and federal Equal Protection claims. The Court conducts one Due Process analysis for the Certificate Law, followed by another Due Process analysis for the Moratorium. Because the Moratorium fails Due Process, the Court subjects only the Certificate Law to Equal Protection analysis.

### A. Due Process

The Due Process Clause of the Fourteenth Amendment provides that a state may not deprive a citizen of life, liberty, or property without due process of law. U.S. Const. amend. XIV § 1. "Due process has two major meanings: first, substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action; second, procedural due process may require government to assure that individuals are afforded certain procedures before they are deprived of life, liberty, or property." *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1528 (5th Cir. 1993) (citations omitted).

Dr. Slaughter alleges that the challenged laws violate substantive due process. "Substantive due process analysis is appropriate only in cases in which government arbitrarily abuses its power to deprive individuals of constitutionally protected rights." *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000). Here, Dr. Slaughter sues to "protect his constitutional right to be free from protectionist laws" infringing on

his right to earn a living.[9] Plaintiff's Memorandum, Docket No. 89 at 2. Substantive due process claims remain governed by rational basis review. *Simi*, 236 F.3d at 249.

Under rational basis review, laws are afforded "a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). A legislature need not "actually articulate at any time the purpose or rationale supporting its classification" *Duarte v. City of Lewisville, Tex.*, 858 F.3d 348, 355 (5th Cir. 2017). Thus, a plaintiff challenging a law subject to rational basis review faces the high bar of "negat[ing] every conceivable basis which might support the legislation." *Wal-Mart Stores, Inc. v.*

---

[9] Dr. Slaughter alleges that the challenged laws violate his "fundamental right to earn a living." Plaintiff Response in Opposition, Docket No. 95 at 2-6. He attests that the right to earn a living should be deemed "fundamental" under *Dobbs v. Jackson Women's Health Organization* because it is "deeply rooted in this nation's history" and "essential to our Nation's scheme of ordered liberty." 597 U.S. 215, 238 (2022) (quoting *Timbs v. Indiana*, 586 U.S. 146, 154 (2019)). The constitutionally protected right to earn a living is observed by the Supreme Court in *Conn v. Gabbert*, where it "indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." 526 U.S. 289, 291-92 (1999) (citations omitted). The Fifth Circuit also acknowledges the right in *U.S. v. LULAC*, where it held that "an individual has a liberty right to engage in a chosen profession free from unreasonable government interference." 793 F.2d 636, 647 (5th Cir. 1986) (citations omitted). Dr. Slaughter argues that violations of this right must be considered fundamental under strict scrutiny; however, the Fifth Circuit has held that "[r]ational basis review applies" where claims arising from an affront to one's right to earn a living are invoked. *Golden Glow Tanning Salon, Inc. v. Columbus, Miss.*, 52 F.4th 974, 979 (5th Cir. 2022).

*Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 225 (5th Cir. 2019).

That is not to say that the government's rationale may be "toothless[.]" *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous., Tex.*, 660 F.3d 235, 239 (5th Cir. 2011) (citation omitted). While "[t]he Constitution does not prohibit legislatures from enacting stupid laws[,]" the proffered rationality "must find some footing in the realities of the subject addressed by the legislation." *N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring); *Heller*, 509 U.S. at 321. Therefore, "although rational basis review places no evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (citation omitted).

All parties cite various studies and testimony in support of their claims. In their articulation of data, the parties attempt to discredit sources cited by their opponent. The Fifth Circuit instructs that "there is 'never a role for evidentiary proceedings' under rational basis review." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 596 (5th Cir. 2014) (quoting *Nat'l Paint & Coatings Ass'n. v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995)). "[W]hen conceiving of hypothetical rationales for a law, the assumptions underlying those rationales may be erroneous so long as they are 'arguable.'" *Glass v. Paxton*, 900 F.3d 233, 246 (5th Cir. 2018) (quoting *Beach Commc'ns*, 508 U.S. at 320).

To the extent experts disagree, rational basis review does not grant the Court authority to determine the validity of research

presented in support of a challenged law. It does, however, require courts "to ensure that the ends-means connection is not 'fantasy.'" *Newell-Davis v. Phillips*, No. 22-30166, 2023 WL 1880000, at *4 (5th Cir. Feb. 10, 2023) (quoting *St. Joseph Abbey*, 712 F.3d at 223). The research presented by the MSDH will be accepted to the extent it suggests an arguable rationalization.

1.  Rational Basis for the Certificate Law

Dr. Slaughter alleges that the Certificate Law is not rationally related to any legitimate governmental interest. The Court will address his arguments within the Defendants' posited interests in the Certificate Law, including maintaining public health and safety, cost containment, improving accessibility of care, and improving quality of care. *See* MSDH Memorandum, Docket No. 85 at 16-26.

a.  Maintaining Public Health and Safety

The MSDH submits that Mississippi's Certificate program is a key planning mechanism and helps promote the health, safety, and welfare of the public. *Id.* at 17. Defendants essentially claim that the Certificate Law assists in administrative ease and oversight. "Maintenance of public health and safety is a basic function of government; it is obviously a substantial state interest." *Lamar Outdoor Advert., Inc. v. Miss. State Tax Comm'n*, 701 F.2d 314, 331 (5th Cir. 1983). What is less obvious is whether the Certificate Law, as a tool for administrative ease, is rationally related to promoting that substantial state interest.

The MSDH adds that Certificates help with administrative oversight by preventing an influx of new providers at any

15

given time. *Id.* at 17-18. Defendants note that a drastic increase in agencies could result in a regulatory burden for the MSDH. *See id.* at 18 ("Only a few dozen [clinical providers] from each discipline could swamp MSDH's resources."). Dr. Slaughter disagrees. He points to deposition testimony from Dr. Lucious Lampton, the MSDH's expert and Chair of the MSDH Board of Health, where Dr. Lampton opined that he does not anticipate an influx of providers in absence of a Certificate Law. Lampton Depo, Docket No. 88-2, 39:4-15 (Dr. Lampton did not think there "would be a proliferation of new home health agencies" if both the Moratorium and Certificate Law were lifted).

The United States Supreme Court has held that "administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised." *Vlandis v. Kline*, 412 U.S. 441, 451 (1973). Nevertheless, the government may limit the number of health care providers in a state to focus its resources on a manageable number of providers. *Newell-Davis*, 2023 WL 1880000, at *4 ("By limiting the number of providers in the respite care business, the State can focus its resources on a manageable number of providers."). This distinction is necessary because, in health care, ensuring administrative ease and certainty are rarely the sole purposes of regulation. Instead, a lower administrative burden may "aid[] the State in ensuring that consumers receive the best possible healthcare in their communities." *Id.*

That is the very rationale presented here by the Defendants. Whether there would or would not be an influx of providers is immaterial so long as the government has demonstrated that it is "arguable" that such an influx would burden their administrative resources. *Beach Commc'ns*, 508 U.S. at 320 (citation omitted). The MSDH currently provides oversight to around fifty home health agencies. If even a small portion of the roughly 2,000 licensed physical therapists in the state are permitted to freely establish HHAs, it could drastically alter the administrative resources the MSDH has available. The Certificate Law prevents this from happening; thus, it is rationally related to promoting the substantial state interest of maintaining public health and policy.

### b. Cost Containment

The economics of health care are unique. Unlike most markets, the costs of services are primarily paid by either private insurers or government programs, rather than by the consumer patients themselves. *Tiwari v. Friedlander*, 26 F.4th 355, 364 (6th Cir. 2022) ("Prices in [health care] often are determined by the government (Medicare and Medicaid) or private insurance companies, and patients usually pay a minor cost of the care."). In fact, "[m]any of the classic features of a free market are simply absent in the health care context, and that fact counsels caution when courts are urged to dismantle regulatory efforts to counter perceived gaps and inefficiencies in the healthcare market." *Colon Health Centers of America, LLC v. Hazel*, 813 F.3d 145, 158 (4th Cir. 2016) (concluding it was not irrational for a legislature to believe a Certificate program reduced capital costs and the costs to consumers of medical services). These niche circumstances epitomize the

Defendants' rationale for the Certificate Law's effect on cost containment.

Defendants suggest that the Certificate Law advances "the State's interests to provide *some* cost containment by restricting (and closely monitoring) the holders and licensees that can seek payment/reimbursement directly from the States via Medicaid." MSDH Memorandum, Docket No. 85 at 19 (emphasis in original). The MSDH posits this has been the State's goal since, at least, 1986. *Id.* Therefore, their primary argument, as it relates to cost containment, is that the Certificate Law provides a method for containing the costs the State of Mississippi must allocate to fund health care.

A secondary defense raised is that the Certificate Law also maintains health care costs for the public. Dr. Slaughter argues that this belief is irrational because health care is not a capital driven field and research suggest that Certificates have not been an effective measure of decreasing the cost of home health. Plaintiff's Response in Opposition, Docket No. 95 at 21-22. All parties cite various literature and authorities supporting their position.[10] Because there is reasonable disagreement on this point, the government's rationale must be upheld so long as its "ends-means connection is not fantasy." *Newell-Davis*, 2023 WL 1880000, at *4 (internal quotations omitted).

---

[10] MSDH stipulates that the results of studies determining whether Certificate programs effectively control health care costs are mixed. MSDH Memorandum, Docket No. 85 at 20.

Dr. Slaughter suggests that the Fourth Circuit offers a dispositive opinion in *Medigen of Kentucky, Inc. v. Pub. Serv. Comm'n of W. Virginia*, 985 F.2d 164 (4th Cir. 1993). There, the court held that "restricting market entry does nothing to [ensure] that services are provided at reasonable prices. Without rate regulation, higher rather than lower prices will more likely result from limiting competition. [The State's] goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose." *Id*. at 167. Although this quotation is dramatic, and seems to directly embrace this issue, there are important distinctions between *Medigen* and this present case.

In *Medigen*, prospective transporters of infectious medical waste could not be granted a certificate of convenience unless it was predetermined that the services offered by current transporters were inadequate. *Id*. at 166. The *Medigen* court was affronted by a need-based restriction of interstate commerce in the transportation industry. *Id*. at 167 ("Restricting market entry . . . does not produce the benefits that the Commission urges justify the burden placed on interstate commerce."). The violation was not the regulation of medical providers themselves, who undoubtedly exist in a unique industry with distinct tasks. *Medigen* is fundamentally distinct from the matter at hand. The *Medigen* transporters' surface-level proximity to the medical field is not enough to justify its application to the Certificate Law

The Fourth Circuit also made this distinction in *Colon Health Centers of America, LLC v. Hazel*, twenty years after its *Medigen* decision. 733 F.3d 535 (4th Cir. 2013). The *Hazel* court assessed a due process challenge to Virginia's Certificate law, where

19

out-of-state medical providers sought to "avoid the purport-edly onerous burdens imposed by the certificate application process." *Id*. at 541. There, the court found a "legitimate pur-pos[e]" in the state's asserted rationale that the Certificate program "ensur[es] geographically convenient access to healthcare for Virginia residents at a reasonable cost." *Id*. at 548. Thus, viewed together, it may be inferred that the Fourth Circuit does find a legitimate purpose in a state's rationale to contain medical costs by restricting market entry for service providers, invalidating any claim that *Medigen* suggests oth-erwise.

The "ends-means" connection between the Certificate Law and cost containment is clearly not "fantasy." *Newell-Davis*, 2023 WL 1880000, at \*4. It is surely a rational argument that government costs would be contained by preventing the du-plication of services. It is also, at least, debatable that this will offer *some* cost containment to consumers. As such, Defend-ants have successfully demonstrated that the Certificate Law has a rational relationship with cost containment.

At this point, it is apparent that Dr. Slaughter has failed to "negate every conceivable basis which might support" the Certificate Law. *Wal-Mart Stores*, 945 F.3d at 225. Still, for the sake of completeness, the Court will address the Defendants' bases of access and quality together.

### c. Improving Access to Quality Health Care

Defendants assert that the Certificate Law prevents the dupli-cation of services, which would diminish the volume of pa-tients at any given home health agency. Other courts have

routinely found that a rational relationship exists between health care market restrictions and improving consumer access to quality health care.

"The State could plausibly think that a higher patient volume for all certified providers in the market will lead to higher quality service[s]" because medical providers' financial capabilities are dependent on having a sufficient base of patients in need of care. *Tiwari*, 26 F.4th at 364. Essentially, a high patient volume offers medical providers liquidity to invest in their facilities. Moreover, as it relates to accessibility, "by tailoring services to need in a given market, current providers could use the larger market share and increased patient volume that come with the entry restriction to operate more efficiently and to ensure a wide range of services in areas with smaller populations." *Id*. The Eighth Circuit has also noted that "insulating existing entities from new competition in order to promote quality services and protect infrastructure investment can survive rational basis review." *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020) (citation omitted).

Dr. Slaughter provides research to rebut the Defendants' assertion, but his efforts do not convince the Court that their assertion is implausible. Nor is the Court convinced that the Defendants' justifications for the Certificate Law are implausible. Because Dr. Slaughter has not negated "every conceivable basis which might support" the Certificate Law, his claims against it do not satisfy rational basis review. *Wal-Mart Stores*, 945 F.3d at 225.

2. <u>Rational Basis for Moratorium</u>

Turning to the Moratorium, Defendants raise three primary arguments to support their motions for summary judgment: that Dr. Slaughter's claims regarding the "Administrative Moratorium" are moot, the Moratorium is valid and constitutional because there is no need for additional home health agencies, and that the Moratorium advances the interests of the Certificate Law.

a. The "Administrative Moratorium**"**

Dr. Slaughter's Complaint seeks relief against the enforcement of both the "statutory moratorium" under Miss. Code Ann. § 41-7-191(9), as well as the "administrative moratorium" under 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2. Complaint, Docket No. 1 at 5-6. The MSDH asserts that Dr. Slaughter's claims under the "administrative moratorium" are moot because the term is associated with the temporary moratorium that was terminated in April 1983. *See* MSDH Memorandum, Docket No. 85 at 27-29.

Although Dr. Slaughter referenced an "administrative moratorium," the statement directly cites the Moratorium codified under 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2. *See* Docket No. 1 at 5-6. This statute enforces the Moratorium by prohibiting the MSDH "from granting approval for or issuing a [Certificate] to any person proposing the establishment or expansion of [a home health agency.]" 15 Miss. Admin. Code Pt. 9, Subpt. 91, R. 2.2.

The basis of Defendants' argument relies on an overly formalistic consideration for naming conventions, despite Plaintiff's

22

direct citation to the challenged statute. Dr. Slaughter is an entrepreneur, seeking redress by this Court to allow him to establish a home health agency. Therefore, Dr. Slaughter's controversy under the Moratorium remains live. As such, this argument of mootness is denied.

b.  "Need" for Additional HHA Providers

Defendants claim the Moratorium is constitutional because the "MSDH and the Board of Health consistently find that there is no need for additional HHA providers." MSDH Memorandum, Docket No. 85 at 29. Therefore, Defendants argue that the decision made in 1983 should remain binding today because "[t]he Legislature could rationally believe that the State's interests would be better served by prohibiting the issuance of new [Certificates] until a *comprehensive recommendation of HHA need* is made by MSDH, as opposed to forcing MSDH to review [Certificate] applications on a case-by case basis." *Id.* at 31 (emphasis in original).

The State Board of Health is authorized to review Mississippi statutes affecting public health and issue legislative recommendations and/or reports to the state government. Miss. Code Ann. §§ 41-3-6 and 19. In theory, this would include a comprehensive recommendation of HHA need, but the MSDH has not actually assessed need since, at least, 2018. Dr. Slaughter notes, in fact, that the Mississippi Health Plan "has not included an assessment of the 'need' in each of Mississippi's counties since 1992." Plaintiff Response in Opposition, Docket No. 95 at 13; *see also* Plaintiff Memorandum, Docket No. 89 at 17-18 (citing sworn testimony). Said plainly, the

MSDH claims no need exists without evidence of detailed, annual need assessment.

Defendants do not dispute that the MSDH is not currently assessing need as it relates to home health agencies. Dr. Lampton even acknowledges that the MSDH should reconsider the way it assesses need for home health agencies. Lampton Depo, Docket No. 88-2 at 14, 46:1-23. Still, Defendants maintain that the current need assessment is irrelevant because the Court should only consider what a legislator would have believed when the Moratorium was enacted in 1983. The Court disagrees.

In Mississippi, a moratorium statute may be assessed by the current facts and not those circumstances that existed when it was first implemented or continued. *See Jefferson Standard Life Ins. Co. v. Noble*, 185 Miss. 360 (1939) (deeming the Moratorium Law of 1938 unconstitutional, void, and unenforceable because the state of emergency that existed when it was implemented no longer remained). Contemporary facts may even allow the Court to end a moratorium that legislators have voted to continue.[11] *Id.* "A law depending upon the existence of an emergency or other certain state of facts to

---

11 The State also asserts that "[t]he fact that the Moratorium on HHA remains codified, despite numerous occasions to amend, must mean that the majority of the Legislature has not been convinced of the need to amend/repeal." MSDH Reply, Docket No. 100 at 7. In *Ecogen, LCC v. Town of Italy*, a moratorium was held unconstitutional despite a municipal Board's decision to renew it throughout multiple legislative sessions. 438 F. Supp. 2d 149, 153 (W.D.N.Y. 2006). The affirmative act to renew the regulation in *Ecogen* is far more assertive than the Mississippi legislature's acts of amending, or choosing not to amend, the Moratorium.

24

uphold it may cease to operate if the emergency ceases *or the facts change* even though valid when passed." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547-48 (1924) (emphasis added).

Even under the lens of rational basis review, courts may consider "the history of a challenged rule or the context of its adoption[.]" *St. Joseph Abbey*, 712 F.3d at 226; *see also Hines v. Quillivan*, 982 F.3d 266, 273-74 (5th Cir. 2020) (courts can compare "the state's offered rationale to the setting and history of the challenged rule."). Thus, the Court considers the full historic context of the Moratorium. While the legislature's decision to implement the Moratorium in 1983 may have been rational, the question before the Court in 2026 is whether it remains rational to continue the Moratorium more than four decades later.

The parties agree that the number of home health agencies in Mississippi has decreased under the Moratorium, while state records indicate that a lack of home health agencies has detrimentally impacted certain Mississippians. In the year 2020 alone, the MSDH reported that thousands of potential patients were denied referral to a home health agency either because they resided outside the licensed service area or because the requested service was unavailable.[12] 2020 MSDH Report on HHAs, Docket No. 88-5 at 11. While there may not have been a need for additional home health agencies when

---

[12] MAHC notes that this datum reflects how many referrals Mississippi home health agencies denied in total but does not distinguish the number of such patients who were directed to another home health agency. MAHC Rebuttal, Docket No. 102 at 10. Nevertheless, this information remains applicable in the Court's determination that a mass number of denials occur.

the Moratorium was implemented, recent facts demonstrate that a population lacking access exists in Mississippi.

This Court, among others, has noted the "outlier" nature of the 45-year Moratorium at issue. *See Slaughter*, 579 F. Supp. at 849; *see also Tiwari*, 26 F.4th at 369. To best address these niche circumstances, the Court must look to what others have done in the past. The United States Supreme Court requires that "any moratorium that lasts for more than one year should be viewed with skepticism." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 341 (2002). In *Tahoe*, this skepticism was placed toward a 32-month moratorium on development that was limited to a region in the Lake Tahoe Basin. *See id*. Here, this Court must be skeptical of a 45-year, state-wide Moratorium. Ultimately, the moratorium in *Tahoe* was held constitutional largely because its purpose was to provide an agency with time to develop a reasonable plan. *Id.* at 341-42.

Similarly, lower federal courts have often upheld moratoria that are implemented to provide regulators time to remedy a temporarily dire situation. *See e.g. Annapolis Rd., Ltd. v. Hagner*, 966 F.2d 1441, 1992 WL 120209, at *5 (4th Cir. June 2, 1992) (affirming district court's decision upholding a four-month moratorium because of its limited duration and its "specific purpose of promulgating more specific guidelines for the issuance and review of Class Y licenses"); *Bronco's Ent., Ltd. v. Charter Twp. of Van Buren*, 421 F.3d 440, 453 (6th Cir. 2005) (affirming in part district court's decision upholding a 182-day moratorium, instituted to allow a township time to revise zoning regulations); *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n*, 400 F. Supp. 1369, 1385 (D. Md. 1975)

(finding no Due Process violation because "the various sewer moratoria orders have been accompanied by extensive and detailed plans of the steps"); *Ecogen*, 438 F. Supp. 2d at 163-64 (upholding a two-year moratorium against windmill construction, but requiring the municipality to either enact a comprehensive plan within 90-days or review plaintiff's application).

The purpose of the initial moratorium, implemented in 1981, was "to allow time for [the] development, adoption, and implementation of licensure regulations and standards and for the development and adoption of well-conceived criteria by which certificate-of-need applications for home health services shall be reviewed." 1981 Moratorium Resolution, Docket No. 88-11. This rationale aligns with what has been deemed constitutional in other courts. Whereas the MSDH claims that the "foremost rationale" for the current Moratorium's perpetual existence is that the "MSDH and the Board of Health consistently find that there is not a need for additional HHA providers." MSDH Memorandum, Docket No. 85 at 29. Therefore, the Moratorium remains not to develop a plan, as seen in other constitutional moratoria, but merely to prohibit entry due to a purported lack of need. Over forty-years have passed, and the only plan developed is to completely ban new entrants, either in perpetuity or until the MSDH determines that a need for them exists. This is irrational.

Meanwhile, the Certificate application itself requires satisfaction of various criteria to demonstrate need. It must be noted that the Fifth Circuit does not observe a "least restrictive means component" in rational basis review. *Abbott*, 748 F.3d

27

at 594. But, here, the Court is confronted with seemingly duplicative means taken by the MSDH. Other courts have found that, "[e]ven if not dispositive, the existence of other applicable consumer-protection and public safety laws can undermine the asserted relationship between these legislative goals and the law at issue." *Lucid Grp. USA, Inc. v. Johnston*, No. 1:22-CV-1116-RP, 2023 WL 5688153, at \*5 (W.D. Tex. June 21, 2023) (citing *St. Joseph Abbey*, 712 F.3d at 226); *see also Q.C. Const. Co. v. Gallo*, 649 F. Supp. 1331, 1338 (D.R.I. 1986), *aff'd,* 836 F.2d 1340 (1st Cir. 1987) (ending a moratorium on the issuance of building permits in an area with substantial sewer line issues because there were more effective, and less drastic, regulatory measures available to protect the welfare of town residents). Once again, the U.S. Supreme Court's decision in *Vlandis* is instructional. There, it held that "ease and certainty" alone cannot satisfy Due Process "where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised." 412 U.S. at 451.

The Mississippi Health Plan describes that all Certificate applicants must establish "that a possible need for home health services exists in each county proposed to be served . . . state the boundaries of the proposed home health service area . . . document that each county proposed to be served has an unmet need . . . [and] that the home office of a new home health agency shall be located in a county included in the approved service area of the new agency." 2022 MS State Health Plan, Docket No. 88-4 at 5-6. Additionally, the potential provider must provide:

> a. "Letters of intent from physicians who will utilize the proposed services.
>
> b.  Information indicating the types of cases physicians would refer to the proposed agency and the projected number of cases by category expected to be served each month for the initial year of operation.
>
> c. Information from physicians who will utilize the proposed services indicating the number and type of referrals to existing agencies over the previous twelve (12) months.
>
> d. Evidence that patients or providers in the area proposed to be served have attempted to find services and have not been able to secure such services.
>
> e. Projected operating statements for the first three years, including:
>
>    i. Total cost per licensed unit;
>    ii. Average cost per visit by category of visit; and
>    iii. Average cost per patient based on the average number of visits per patient."

*Id.* at 6. Finally, the proposed provider must include information showing "whether proposed agencies would provide services different from those available from existing agencies."[13] *Id.* The MSDH confirms that the Certificate Law

---

[13] Once a Certificate application is complete, MSDH must notify affected persons who may request a public hearing to oppose the application. 15 MISS. ADMIN. CODE PT. 9, SUBPT. 91, R. 3.12. These "affected persons" are often pre-existing HHAs, who received a Certificate prior to the 1983

requires applicants to show "that there is a need for more providers in a particular area and that a new provider will not adversely affect the viability of existing providers." MSDH Memorandum, Docket No. 85 at 23.

The Certificate criteria clearly offer a thorough, yet reasonable, methodology for applicants to demonstrate need. If any criterion is not satisfied, then there is no need to establish the proposed agency. Thus, "need" would remain a consequential restriction without the Moratorium.[14]

To survive rational basis review, the MSDH's rationale must not be "plainly refuted" by Dr. Slaughter or "betrayed by the undisputed facts." *St. Joseph Abbey*, 712 F.3d at 223. Nor may it "obscure the actual structure of the challenged law." *Id.* (cleaned up). The MSDH's justification for the Moratorium is that there is no need for additional HHAs, even though it does not assess need and without regard for the thousands of Mississippians whose HHA needs remain unmet due to lack of services or access. It also ignores the less drastic need considerations that are maintained by the Certificate application. Nevertheless, it has been this way since 1981. These undisputed facts betray and plainly refute Defendants' assertion.

---

Moratorium. Ultimately, however, the decision to approve or deny an application resides with MSDH.

[14] A greater understanding of counties' need for home health services would exist without the Moratorium, considering the high threshold of information potential providers must supply in their Certificate application. This would allow the MSDH to assess need based on Certificate applicants' demonstrations.

Therefore, the Court also rejects this argument in Defendants' motions.

### c.  Advancing the Interests of the Certificate Law

The final argument offered is that the Moratorium is rationally related to interests the Certificate Law is meant to advance. These include cost containment and supply restrictions that purportedly improve quality and access statewide. The MSDH also asserts that the Moratorium was "intended to relieve the MSDH from having to consider HHA [Certificate] applications and, thus relieve the planning staff of the burden of processing applications *for which there is no need*." MSDH Memorandum, Docket No. 85 at 30 (emphasis in original) (citation omitted).

### i.  Administrative Ease

As previously observed, Dr. Slaughter has demonstrated that a need, or rather a demand spurred from lack of access to HHAs, exists in various parts of Mississippi. Therefore, the question now is whether the MSDH's rationale, that assessing Certificate applications would impose an unnecessary administrative burden on the MSDH, is legitimate. The Court has previously noted that administrative ease may not be the sole rationale offered. *Vlandis*, 412 U.S. at 451. But here, as it was with the Certificate Law, the purported administrative ease is associated with a broader claim. The MSDH suggests that the Fifth Circuit's opinion in *Newell-Davis* is dispositive.

The plaintiff in *Newell-Davis* challenged a Louisiana law that "forbids individuals from offering respite care services without first obtaining a license from the Louisiana Department of

Health[.]"2023 WL 1880000, at *1. There, the Fifth Circuit recognized that, "where a government wishes to create consumer benefits by limiting new entrants to the already highly-regulated market for healthcare services, it may use any rational tool to implement that limit—so long as there is a 'real' link between the tool and the benefits." *Id.* at *4. The MSDH claims that recognition supports its "prerogative to focus MSDH's limited resources on areas and facilities where there is an established need for additional providers." MSDH Memorandum, Docket No. 85 at 31 (citation omitted).

*Newell-Davis* guides the Court toward two inquiries: whether the Moratorium is a rational tool and whether there is an actual link between the Moratorium and the MSDH's administrative ease. Discarding all Certificate applications must decrease the Department's workload. So, there is a clear link between the tool and the benefit. What is less clear is whether the Moratorium, as a tool for that administrative ease, is rational. For this determination, the Court, again, looks to *Newell-Davis*.

While *Newell-Davis* is immediately applicable to the Certificate Law, there are issues with its applicability to the overarching Moratorium. First, in *Newell-Davis*, Louisiana contended that, "without its ability to exercise its discretion, it [would] not be able to ensure the health, safety, and welfare of respite-care recipients *at all*." 2023 WL 1880000, at *4 (emphasis in original). Whereas, in deposition, the MSDH's designees confirmed that, while removing the Moratorium would increase workload, the MSDH would still be able to provide effective oversight without it. *See* Wood Depo., Docket No. 88-10 at 17, 61:18-24.

32

Moreover, the Louisiana law at issue in *Newell-Davis* restricted respite care providers only to the extent that they first obtain a license from the Louisiana Department of Health. 2023 WL 1880000, at *1. Prospective home health providers have no ability to obtain licensure under the Moratorium, while the would-be providers in *Newell-Davis* still possessed a means for offering their services. This distinction is pivotal because *Newell-Davis* allows states to "limit" new entrants, but the Moratorium bars new entry altogether with no repealer or sunset provisions. *Id.* at *4. The licensure law at issue in *Newell-Davis* is a far less intrusive regulation than the Moratorium. Therefore, these *tools* are too dissimilar for parity.

When the Moratorium was first implemented, HHAs were reimbursed by Medicare on a cost-basis. This created a lucrative incentive for providers to establish home health practices, which resulted in a mass influx of Certificate applicants. The Moratorium was enacted, in part, to develop licensure regulations to ensure need and quality were maintained among these ambitious newcomers. *See* Lampton Depo., Docket No. 88-2 at 12, 41:15-25. Today, a different process exists, where Medicare reimburses HHAs through a flat-fee prospective payment system that is far less lucrative than the previous cost-reimbursement scheme. Thus, there no longer remains cause for fear of an overwhelming surge of eager applicants. And the MSDH has had over forty years to prepare for receiving and reviewing Certificate applications.

The Certificate Law purportedly offers the MSDH administrative ease in its oversight which, in turn, promotes the maintenance of welfare. The unending Moratorium renders the Certificate Law irrelevant by prohibiting altogether the

review of Certificate applications. This is irrational—particularly considering that the circumstances that inspired the mass influx of Certificate applicants no longer remain. Should an influx of applicants occur, the Certificate Law stands to ensure the maintenance of public health and safety. Considering these current facts, the Moratorium is not a rational tool to prevent the potential administrative burden of reviewing Certificate applications.[15]

### ii. Improving Access

The Court cannot escape the absurdity in maintaining an outright Moratorium for over forty years. Several courts have considered duration when reviewing the rationality of moratoria, but none have been presented with such an egregiously long restriction. *See e.g. Bronco's Ent.*, 421 F.3d at 453 (finding a 182-day moratorium on acceptance of new site plans to be a "reasonably short duration"); *Smoke Rise*, 400 F. Supp. at 1386 ("it is clear that the reasonableness of the duration of the moratorium must be measured by the scope of the problem which is being addressed."); *id.* at 1383 ("this Court notes that the moratorium . . . is temporary, not a permanent restriction."); *D'Ambra v. Providence*, 21 F. Supp. 2d 106, 113 (D.R.I. 1998) ("If the moratorium is merely temporary . . . plaintiff could apply again after it expires . . . [t]emporary implies a brief, circumscribed time period. This has lasted 18 months, and the record

---

[15] The MSDH claims that "a complete prohibition on the issuance of new [Certificates] would *also contain costs*." MSDH Memorandum, Docket No. 85 at 30 (emphasis in original). While it is obvious that there would be less costs associated with a total ban on Certificate application review, the Court finds the Moratorium to be an irrational way to pursue these means for the same reasons stated in its administrative ease analysis.

gives no hint when it will end."); *ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1109 (W.D. Wash. 2005) (finding moratorium "unconstitutional because it fails to provide adequate procedural safeguards by failing to specify a reasonable time frame for issuing a licensing decision and by enacting a 17-year moratorium on issuing new adult entertainment licenses."); *Ecogen*, 438 F. Supp. 2d at 161 ("to pass constitutional muster, a moratorium must be of reasonable duration"). In this context, the Court cannot view a forty-year prohibition as a reasonable duration nor a mere temporary restriction.

It would be hard to convince any court that a moratorium imposed since the early 1980s is reasonable. This Court too remains unconvinced. Like the Louisiana statute in *Newell-Davis*, the Certificate Law limits new entrants to ensure the state population maintains accessible and high-quality health care. The Moratorium, by contrast, prevents access by prohibiting new entrants altogether.[16] It is irrational to propose that this four-decade-long prohibition on market entry somehow increases access. Dr. Slaughter illustrates exactly that by offering exhibits demonstrating the painstaking circumstances experienced by Mid-Delta Home Health Inc. ("Mid-Delta") during the Covid-19 pandemic. *See* Mid-Delta Waiver Request, Docket No. 88-28; *see also* Mid-Delta Follow-Up Request,

---

[16] The MSDH claims that "the planning functions of the [Certificate Law] are how MSDH assures access to all." MSDH Reply, Docket No. 100 at 6. Because the Certificate Law already assures access, the assurances guaranteed by the Moratorium are duplicative.

Docket No. 88-29; *see also* Mid-Delta Request Denial, Docket No. 88-30.

There, the Court reviewed Mid-Delta's attempt to seek an "Emergency Waiver of the state Certificate of Need regulations" to serve home health patients outside its prescribed Certificate geographic area. Mid-Delta Waiver Request, Docket No. 88-28 at 1. The request was only issued because numerous health care providers contacted Mid-Delta, explaining that additional home health services were needed to make room at their respective facilities.[17] *Id.* Ultimately, the Mid-Delta request was denied, despite a formal state of emergency declared in Mississippi, and those patients needing home health care were left underserved.[18] *See* Mid-Delta Request Denial, Docket No. 88-30. The fact that Mid-Delta was compelled to seek a geographic waiver indicates the circumstances facilitated by a four-decade prohibition on market

---

[17] In an email to MSDH, Mid-Delta expressed frustration with their limitations under the Certificate regime, stating "[w]e don't really stand to profit from this – just trying to do our part to help where we are needed . . . [w]e run our business from the heart and not from a profit and loss analysis." Mid-Delta Follow-Up Request, Docket No. 88-29 at 1.

[18] The State of Emergency "proclamation declared that the provisions of state statutes, rules, and regulations or orders may be temporarily suspended or modified if compliance with such provisions would prevent, hinder or delay action necessary to cope with the outbreak." Mid-Delta Request Denial, Docket No. 88-30 (emphasis omitted). Mid-Delta's waiver was denied because the State Health Officer determined "that expansion of [their] home health territory [would] not prevent, hinder or delay action necessary to cope with the COVID-19 pandemic." *Id.*

entry. There were not enough service providers in a time of crisis; thus, there was insufficient access.

### iii. Improving Quality of Care

It is also uncertain how the Moratorium ensures quality of care when quality is already protected by the Certificate Law. While there are, naturally, objective standards to measure quality of health care, there is a more subjective observation that lays solely within patients' preferences. The Moratorium restricts patients' ability to *choose* a home health provider. It leaves them with no option but to determine which pre-existing provider can best meet their needs. While inapplicable to the greater due process theme articulated herein, *Caracci v. Commissioner* offers insight into the environment home health patients must navigate under the Moratorium. 118 T.C. 379 (2002), *rev'd*, 456 F.3d 444 (5th Cir. 2006).[19]

*Caracci* is a tax case, where taxpayer HHAs brought action against the IRS to challenge deficiency notices. *Id.* There, the Tax Court explains how Certificate-holding HHAs "lobby the Mississippi legislature in the interests of keeping the Moratorium in place, thus preserving the monopoly of others who received Certificates before the Moratorium." *Id.* at 410 (cleaned up). By disallowing new participants, the Moratorium has allowed pre-existing agencies to expand their services into conglomerate enterprises. *See* Lampton Depo,

---

19 *Caracci* was reversed by the Fifth Circuit because of the Tax Court's methodology used in its valuation of the taxpayer HHA's assets. *See Caracci*, 456 F.3d 444, 462. The fact-finding performed by the Tax Court remains relevant for purposes stated herein.

Docket No. 88-2 at 13, 43:10-44:01 ("the smaller home health agencies . . . sell out after a little while to a bigger one."). These large agencies may not be the preference sought by all patients. Moreover, because competition is so drastically restricted, there is little incentive for these agencies to ensure that patients' needs are met.

This justification for the Moratorium too fails rational basis review. As all arguments advanced by Defendants' motions in support of the Moratorium are rejected, the Defendants' motions for summary judgement, Docket Nos. 82 and 84, are denied with respect to the Moratorium. Dr. Slaughter has successfully negated every conceivable basis for the Moratorium. Thus, his motion for summary judgment, Docket No. 88, is hereby granted in parts relating to his Due Process challenge of the Moratorium.

### B. Equal Protection

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish an Equal Protection claim, Dr. Slaughter must show that "two or more classifications of similarly situated persons were treated differently." *Duarte*, 858 F.3d at 353 (citation omitted). "Once that threshold element is established, the court then determines the appropriate level of scrutiny to apply." *Id.* "If neither a suspect class nor a fundamental right is implicated, the classification need only bear a rational relation to a legitimate governmental purpose." *Id.* at 354 (citation omitted); *see also Beach Commc'ns*, 508 U.S. at 313 (citations omitted) ("In areas of social and economic policy, a

statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Once again, the Court must consider these circumstances under rational basis review.

Dr. Slaughter argues that the Certificate Law has inexplicable exceptions; in that physicians' private practice offices, personal care residential-living and assisted living facilities, abortion facilities, veterans' homes, and health care facilities owned and/or operated by the State of Mississippi or its agencies are exempt from Certificate regulation. *See* Miss. Code Ann. § 41-7-173(h). While these entities are clearly "treated differently" it cannot be said that they are similarly situated.

The MSDH duly notes that assisted-living facilities and residential-living facilities are incomparable to home health agencies "because they primarily offer nonmedical services" to the residents within those facilities. MSDH Memorandum, Docket No. 85 at 33. Mississippi statute denotes these living facilities as "personal care" facilities that offer "assistance rendered by personnel of the licensed facility to residents in performing one or more of the activities of daily living, including but not limited to bathing, walking, excretory functions, feeding, personal grooming, and dressing." 15 Miss. Admin. Code Pt. 16, Subpt. 1, R. 47.2.12. By contrast, home health agencies are "primarily engaged in providing to individuals at the written direction of a licensed physician, in the individual's place of residence, skilled nursing services[.]" Miss. Code. Ann. § 41-7-173(h)(ix). The statutory definition confirms that

personal care facilities offer a fundamentally different service than home health agencies.

The Sixth Circuit's opinion in *Tiwari* is directly on point in this dispute. In *Tiwari*, plaintiffs challenged a Kentucky law, claiming that excluding "continuing care retirement communities" from Certificate regulation violated the Equal Protection Clause. 26 F.4th`at 370. The Sixth Circuit found that, while continuing care retirement communities "sometimes provide services to their residents comparable to the services home healthcare companies provide . . . these facilities serve only the residents that already live there, and they provide a vast array of services, both medical and nonmedical, that home healthcare companies do not." *Id.* As in *Tiwari*, so too here do these "distinctions suffice to uphold the classifications." *Id.* (cleaned up).

Veterans' homes are also distinct from private home health agencies because they are owned and operated by the State of Mississippi. MSDH Memorandum, Docket No. 85 at 35. The MSDH clearly legitimizes its classification by confirming that "State-owned facilities lack a profit motive and are incentivized to avoid duplication of services based on the fact that the state must pay for a significant portion of the services they provide." *Id.*

Dr. Slaughter argues that physicians' offices and home health agencies are similarly situated because they require similar capital investments. Deposition testimony revealed that a part of physicians' exclusion from Certificate regulation was due to lobbying efforts on behalf of physicians to the Mississippi legislature. An expert from the MSDH, Dr. Sullivan,

40

acquiesced that "political consideration[s]" were "certainly" part of their exclusion. Sullivan Depo., Docket No. 88-22 at 53, 202:24-203:7. Nevertheless, he distinguished that medical doctors "operate in a different sphere than other types of providers." *Id.*

Once again, the *Tiwari* court offers guidance. There, the Sixth Circuit determined that "[a]mple rational bases exist for treating doctors' offices and home healthcare companies differently." *Tiwari*, 26 F.4th at 370. Here, the MSDH cites the same justifications for differential treatment: a "modest supply of physicians in parts of [the state,]" a "more urgent need for physicians than home healthcare agencies throughout the state," and a "more heavily regulated nature of the requirements for becoming a physician."[20] *Id.* Additionally, under Mississippi statute, home health agencies may only perform services "at the written direction of a licensed physician[.]" Miss. Code. Ann. § 41-7-173(h)(ix). HHAs' dependence on physicians also alludes to their separate nature.

Finally, Dr. Slaughter's Equal Protection claims relating to the different treatment of abortion facilities is moot because abortion facilities are now prohibited in the State of Mississippi. *See* Miss. Code. Ann. § 41-41-45; *see also Dobbs*, 597 U.S. at 302.

Given the differences in treatments provided through home health agencies and other medical facilities, the Court is not convinced that they are similarly situated for the purposes of this analysis. Even to the extent these other facilities were

---

[20] Although, physical therapists are also regulated by a rigorous licensure process.

similarly situated, Defendants have offered a rational basis for each classification. Dr. Slaughter has not negated every conceivable basis for classification underlying the Certificate Law. Therefore, his Equal Protection claims cannot advance.

## IV.

### Conclusion

Rational basis review of legislative decisions evinces the belief that laws, even those that are unwise, will eventually be remedied by the democratic process. Nevertheless, there are moments when courts must intervene to preserve justice by striking laws that lack a constitutional basis. Mississippi's four-decade Moratorium is one of those laws.

It is undeniable that state laws enjoy a presumption of rationality. That presumption is seldom disturbed unless it is found that no rational bases for such laws exist. The Court's decision today, as it relates to the Moratorium, echoes ages of precedent instructing that a law simply cannot be upheld upon irrational bases.

Although this cause was initiated by Dr. Slaughter's desire to operate a home health agency, the Moratorium encompasses all health care facilities defined under statute. This vast prohibition has undoubtedly burdened the liberties of others, who also sought to benefit Mississippi communities with the establishment of health care facilities. They may now do so within the prescribed standards of the Certificate Law. While states may require moratoria from time to time under rational bases, the forty-year application of this Moratorium is

irrational and, thus, unconstitutional. The Certificate Law, on the other hand, has satisfied rational basis review.

Therefore, because Dr. Slaughter has failed to negate every conceivable rational basis for the Certificate Law, his challenge to it fails and his motion is partially denied. Because Dr. Slaughter has successfully negated every conceivable rational basis for the Moratorium, his challenge to it succeeds and his motion is partially granted.

Accordingly, the Court orders as follows:

a) Both Defendants' motions are granted in part, as they relate to the Certificate Law.
b) Dr. Slaughter's motion is denied in part, as it relates to the Certificate Law.
c) Both Defendants' motions are denied in part, as they relate to the Moratorium.
d) Dr. Slaughter's motion is granted in part, as it relates to the Moratorium.
e) The legislative Moratorium on issuing certificates of need to health care facilities, codified under Section 41-7-191(9) of the Mississippi Code and Part 9, Subpart 91, Rule 2.2 of the Mississippi Administrative Code, is unconstitutional under the Due Process Clause of the Fourteenth Amendment.
f) Because each Motion for Summary Judgment is granted in part and denied in part, no attorneys' fees, costs, or expenses shall be awarded to any party.

**SO ORDERED**, this the 28th day of January, 2026.

s/ CARLTON W. REEVES
*United States District Judge*

43